1
2
3
4
5
6
7

William D. Hyslop
United States Attorney
Eastern District of Washington
Thomas J. Hanlon
Assistant United States Attorney
Richard Burson
Assistant United States Attorney
402 E. Yakima Avenue, Suite 210
Yakima, Washington 98901
(509) 454-4425

8

9
10

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

11
12
13
14
15
16
17

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          vs.<br><br>DONOVAN CLOUD,<br><br>                    Defendant. | 1:19-CR-02032-SMJ-2<br><br>United States Response to Defendant's Motion to Suppress Identification |

18
19
20
21
22
23
24
25

        Plaintiff, United States of America, by and through William D. Hyslop, United

States Attorney for the Eastern District of Washington, Thomas J. Hanlon, Assistant

United States Attorney for the Eastern District of Washington, and Richard Burson,

Assistant United States Attorney for the Eastern District of Washington, hereby

submits its response to the Defendant's Motion to Suppress the positive identification

of the Defendant by one of the Defendant's victims (ECF 194).

26
27
28

Response to Motion to Suppress
Identification                                    1

# I.    Introduction

Our legal system is built on the premise that it is the province of the jury to weigh the credibility of witnesses. *Kansas v. Ventris*, 556 U.S. 586, 594 (2009). That province of the jury includes weighing the reliability of eyewitness identification against any admissible mitigating evidence the Defendant produces at trial, and against the backdrop of the other trial safeguards afforded the Defendant (e.g. jury instructions and the right to cross examine). The Defendant is asking this Court to take the extraordinary step of stripping the jury of that function. However, before even engaging in pretrial review of the reliability of eyewitness identification, the Court must determine whether the Defendant has met his burden under *Perry* to show that police engaged in misconduct that was both unnecessary and unduly suggestive. Only then does the Court engage in pretrial reliability analysis.

The Defendant has not cleared the first bar. There was no misconduct, and certainly no action on the part of law enforcement that was both unnecessary and suggestive. Agent Ribail conducted initial photo line-ups in accordance with FBI guidance issued on the very same day he conducted the line-ups. And the Defendant has not alleged any actions by Agent Ribail that were suggestive in any way.

Here, in an attempt to show improper conduct and/or unduly suggestive circumstances, the Defendant devotes substantial weight to his unsubstantiated theory

Response to Motion to Suppress
Identification                                    2

of the victim "engaging in his own independent investigation," "doing his own investigation," and that the victim "launched his own investigation."   As discussed below, this "independent investigation" consisted of the victim looking at a Facebook post <u>after</u> he already positively identified the Defendant as the man who held a pistol to his son's head.

Even if there had been misconduct, the question of whether J.V.'s identification of the Defendant would still be one for the jury to weigh. Under *Manson* and its predecessor cases, the Court must determine whether the totality of the circumstances indicate a "very substantial likelihood of irreparable misidentification." Here, J.V. reviewed the Defendant's photograph and was visibly shaken.  J.V. identified the person depicted in the photograph as the person who held a gun to his son's head.

 The Defendant has the right to cross examine J.V. The Defendant has the right to seek to call expert witnesses to rebut J.V.'s identification. The Defendant has the right to advocate for jury instructions governing eyewitness identification. The Defendant does not have the right to conceal his victim's identification of the Defendant from the jury when police engaged in no misconduct and circumstances do not indicate a likelihood of irreparable misidentification.

## II.    Background

### A.    Victims Escape From Medicine Valley Road

On June 8, 2019, just after 4:00 p.m., a female called 911 and reported that she was in a truck headed west on Evans Road in White Swan. She told dispatch she was fleeing from her friend's house, where unknown assailants had opened fire on the vehicle she and her friends were in. Her friend, L.L., was driving the truck from the passenger side of the vehicle, because her other friend, Dennis Overacker, was dead in the driver's seat, having been shot in the head. The female and L.L. had both been shot.

The female directed law enforcement to the residence in White Swan where she and her friends had been shot – 5151 Medicine Valley Road, the home of John Cagle, a man affectionately known as "Dobbie Jack."  Law enforcement subsequently traveled to 5151 Medicine Valley Road and discovered four deceased individuals.

### B.    Report of Carjacking

At approximately 4:45 p.m., N.V. called 911 and reported that two men had walked into her yard on Evans Road approximately seven miles from the Medicine Valley murder scene, put a gun to her young son's head, and stole her husband's truck. Responding officers spoke with N.V., her husband, J.V. and their two children, S.V. and M.V. The family relayed the following: S.V. was walking in the backyard when a "native male" walked up to him, grabbed him by his shirt and put a gun next

Response to Motion to Suppress
Identification                                                4

to his head. The assailant walked S.V. to the house and told a second "native male" to "get the keys, Vance." N.V., seeing her son being held with a gun to his head, frantically ran to J.V., who was inside the house, and told J.V. that there were two men in the yard, one of whom had a gun to S.V.'s head. J.V. went to the garage area and saw one "native" man with a shotgun. Just outside of the garage, he saw a second native man holding a pistol to S.V.'s head. Both men yelled at S.V. to give them the keys to the vehicles that were parked there. J.V. quickly went to the house's mudroom and retrieved the first set of keys he saw – the keys to his wife's van. The man with the pistol wanted the keys to the truck instead. J.V. attempted to comply while the man holding the pistol at S.V.'s head yelled at J.V., accusing him of stalling. J.V. went into the house to retrieve the keys for J.V.'s truck. The man with the shotgun followed, and kept apologizing for what the two men were doing, while continuing to point the shotgun at J.V. J.V. retrieved and handed over the truck keys. The man with the pistol ordered S.V. to get in the truck. J.V. pleaded with the two men not to take his son. The men refused. J.V. asked the men to let S.V. ride in the back of the truck. The assailants acquiesced to that request, and S.V. got into the bed of the truck. As the two armed men sped away in the truck, J.V. yelled for S.V. to jump. S.V. jumped out of the bed of the truck as the vehicle kept going, escaping the two kidnappers. The family ran into the house and called 911.

As police were talking to J.V., another responding officer saw two people in the field directly behind J.V.'s house. Two officers went to the field and apprehended the two people: M.S. and N.J. Both were taken into custody. A short time later, after being provided *Miranda* rights, M.J. told officers the following about Medicine Valley: He and N.J. had been with Donovan and James Cloud at Cagle's. The Clouds were in Cagle's residence while M.J. and N.J. waited in the truck they had arrived in with the Clouds. That's when M.J. heard gunshots. M.J. explained that the four of them then fled Cagles's in a truck after ransacking Cagle's residence. The truck they fled in (later determined to be Eneas') broke down (and was later found) near J.V.'s house. M.J. and N.J. separated from the Clouds at that point and ran off through the field where they were apprehended. They did not know where the Clouds went.

J.V. was asked to provide a written statement as to what had happened. J.V. provided his statement to law enforcement.

Detectives began combing the area and questioning residents as to the whereabouts of the Clouds. As night fell and the next day dawned, the suspected perpetrators of five murders, two attempted murders, one carjacking and one kidnapping were still at large amongst the community and believed to be armed and dangerous.

Response to Motion to Suppress
Identification                                    6

### C. Donovan Cloud Arrested

Donovan Cloud was apprehended on June 9, 2019 at approximately 2:00 p.m. in Oregon, the day after the murders. When he was arrested, he was accompanied by two women. One of those women had an outstanding warrant out of Washington unrelated to the Medicine Valley investigation. She was arrested on the outstanding warrant. News of the arrest was communicated through various agencies.

### D. The FBI conducts a photo line-up; J.V. identifies the Defendant.

The Federal Bureau of Investigation began assisting in the investigation the same day of the murders, kidnapping and carjacking. Special Agent Ronald T. Ribail ("Agent Ribail") took the lead. Agent Ribail is a 17 year veteran of the FBI. He has received FBI training on conducting photo lineups, personally conducted approximately 20 lineups in the course of his career, observed an additional 20, and has trained new agents on how to conduct line-ups. As such, while state resources processed the crime scene, Agent Ribail dispatched with Yakima County Sherriff's Office ("YCSO") Detective Cypher to interview J.V. and his family and conduct a photo lineup.

Agent Ribail and Detective Cypher went to the YSCO substation in Zillah to compile a photo line-up for each of the four suspects in the murders and the related carjacking and kidnappings. At the substation, Agent Ribail and Detective Cypher used a Spillman Technologies software program to generate the lineups. Generation of

the lineups took approximately two hours. Separate line-ups were prepared for each suspect. The photograph of each suspect was the most recent state law enforcement photo on hand.  None of the photos had been previously shown to any of the witnesses. None of the photos contained indications of criminal misconduct.  As relevant here, lineup 5032 consisted of six photographs.  The Defendant photograph was number 6 of 6.   The photograph depicted the Defendant's face.  In regards to clothing, the photograph depicted an orange collar on the Defendant's shirt.

As relevant here, Agent Ribail and Detective Cypher traveled to J.V.'s residence. Agent Ribail administered the photo line-up to J.V.[1]  The line-up was conducted in the drive way of the residence.  Agent Ribail started the lineup session by reading the line-up instructions to J.V. and allowed him (J.V.) to read the instructions. Exhibit A (Instructions signed by J.V.). There was no information in the surrounding area that could have influenced the identification. Agent Ribail used the photos attached as Exhibit B for the line-up that included Donovan Cloud.  The photos were shown to J.V. one at a time. Agent Ribail conducted the line-up by placing the six photographs face down in a stack on the hood of a truck. Agent Ribail used a "blinded" administration technique: he flipped the photographs over one at a time and handed it to J.V., careful not to look at the photo himself.

---

[1] All of the family members were interviewed and line-ups were shown separately.  The instant motion focuses on J.V. as this is the identification challenged by the Defendant.

When Agent Ribail conducted the line-up viewing with J.V. When J.V. got to photograph #6 (photograph depicting Donovan Cloud), Agent Ribail observed that J.V. "was visibly shaken and his eyes teared up." J.V. advised that the person depicted in photograph #6 "looks like the man that held the pistol to his son's head." According to Agent Ribail's report, J.V. stated the facial hair, height, and hair style were similar." Agent Ribail asked J.V. about his reaction. J.V. explained that "he had became overwhelmed with emotions when he saw the photograph." J.V. identified the photo of Donovan Cloud as the individual who had held a pistol to his son's head. J.V. signed the bottom of the photograph.

Agent Ribail and Detective Cypher later returned to J.V.'s residence to look in the field for evidence in furtherance of their investigation. After they had concluded their search of the area, they were leaving the residence when J.V. flagged them down. J.V. informed Agent Ribail that he had seen online photos of each of the men who had kidnapped his son. J.V. stated that one of the photos showed the same person that he had previously identified as the person (Donovan Cloud) who had held a gun to his son's head. The other picture was a photo of the man who had held the shotgun. J.V. stated that he was "100 percent sure" that those were the two guys. J.V. asked Agent Ribail why Agent Ribail had not used the Facebook pictures in his line-up, because

the Facebook photos were better representations.[2] Agent Ribail later asked J.V. to send him the photos that he had seen on Facebook that he recognized to be those of the kidnappers. In response, J.V. texted Agent Ribail a photo of Donovan Cloud, and a link to the Yakama Nation public safety warning of James Cloud. Exhibit D (J.V. text message).

**Analysis**

In order to successfully move this Court to conduct a review of the reliability of an eyewitness identification before allowing a jury to decide reliability for themselves, the Defendant must first show the existence of police misconduct that was (1) unnecessary and (2) unduly suggestive. Without that showing, the inquiry ends before any trial court review of reliability, and the jury is allowed to hear both the eyewitness identification and any admissible evidence Defendant wishes to present to attack reliability.

Here, the Defendant falls short. The Defendant alleged that Agent Ribail did not follow proper FBI procedure. In fact, Agent Ribail followed FBI guidance governing the assembly and administration of photo line-ups issued on the very same day he

---

[2] It was clear to Agent Ribail that J.V. had viewed the Facebook photos after viewing the photo line-ups. This was bolstered by the fact that J.V. questioned Agent Ribail as to why he didn't use the Facebook pictures as they were better representations. Nonetheless, Agent Ribail conducted an interview with J.V. See Exhibit C. At that time, J.V. confirmed that he viewed the Facebook photos **after** he viewed the line-up. The Defendant's repeated suggestions that J.V. viewed the Facebook photographs prior to viewing the line-up is without merit. See ECF No. 194, Pg. 10, Lines 2-3.

conducted the line-ups in this case. Any immaterial documentation errors of the line-ups did not create suggestive circumstances, and Defendant has failed to articulate how immaterial documentation errors would have had any influence on the eyewitness' identification of the Defendant.

Even if the Defendant had successfully shown police misconduct that was both unnecessary and suggestive, J.V.'s identification is submitted to the jury, not barred outright, because a totality of the circumstances, analyzed under *Biggers*, does not indicate a "very substantial likelihood of irreparable misidentification" that cannot be mitigated by the Defendant's right to cross examine J.V., call rebuttal witnesses and advocate for appropriate jury instructions.

A. <u>The *Manson* test does not apply because there was no police misconduct that created unnecessarily suggestive circumstances.</u>

Because there is no evidence that any law enforcement official acted improperly, J.V.'s identification cannot be hidden from the jury, and whether or not his identification is reliable is a solely question for them to decide.

The Constitution protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence is unreliable *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). Potential unreliability of evidence does not render its introduction at trial fundamentally unfair. *See Ventris*,

556 U.S. 586 at 594 (rejecting a broad exclusionary test for uncorroborated jailhouse snitch statements). Even assuming that eyewitness testimony is fallible, fallibility does not, without the taint of police misconduct, justify a trial court screening the evidence for reliability before allowing a jury to make that determination. *Perry*, 565 U.S. at 245. Before J.V.'s identification of the Defendant can be concealed from the jury, the Defendant must show that police acted improperly in obtaining the identification by creating circumstances that were both unnecessary and suggestive. *Id.* at 228 (citing *Manson v. Brathwaite*, 432 U.S. 98, (1977)).

This prerequisite – an affirmative showing of police misconduct – makes sense, and protects a cornerstone of our judicial system: the fundamental role of the jury to weigh evidence. Without this prerequisite, the door would open to judicial review of every eyewitness identification prior to its introduction to the jury. *Perry,* 565 U.S. at 243. That type of review would impermissibly trespass on the province of the jury to weigh the reliability of evidence. It would also render null the protections already afforded defendants in cautioning juries against placing undue weight on eyewitness testimony the defendant believes unreliable. These protections include the Sixth Amendment right to confront the eyewitness, *see Maryland v. Craig*, 497 U.S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant."); the right to an attorney who can expertly test the eyewitness' testimony through cross examination, and argue

unreliability to the jury, *Perry*, 565 U.S. at 246; and the protections already built into the courts' instructions to the jury to consider whether the identification was the product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness. MODEL CRIM. JURY INSTR. 9th Cir. 4.11 (2020). A critical aim of the prerequisite of police misconduct is not to rob the jury of their right to weigh evidence, but instead to deter law enforcement from using improper line-ups, show-ups and photo arrays. *Perry*, 565 U.S. at 241 (citing *Manson*). Because here, no police conduct has been shown by the Defendant, the Court's inquiry is complete under *Manson* and *Perry*.

> a. Agent Ribail followed FBI procedure when he administered the June 9, 2019 line-up.

On June 9, 2019, the same day Agent Ribail administered the photo line-up to J.V., the FBI promulgated their Procedures for Eyewitness Identification of Suspects Policy Guide. Exhibit E (FBI Policy). That document and the policies therein incorporate and rely upon the Department of Justice Memorandum, EYEWITNESS IDENTIFICATION: PROCEDURES FOR CONDUCTING PHOTO ARRAYS (Jan. 6, 2017). *Id*. at 19.

In incorporating the guidance of then Attorney General Sally Yates, and updating their own internal policies consistent with the memorandum, the FBI promulgated eight rules for agents to follow when assembling photo line-ups:

1. Prepare a separate photographic lineup for each suspect.

2. Select a photograph of the suspect that resembles the witness's description of the perpetrator or the perpetrator's appearance at the time of the incident.

3. Avoid using photographs that are outdated or are substantially dissimilar from the witness's description of the perpetrator.

4. Include at least five filler photographs that generally fit the witness's description of the perpetrator.

5. Consider creating a consistent appearance between the suspect and fillers by artificially adding or concealing any unique or unusual features (e.g., scars or tattoos).

6. Select photographs that are of similar size, background, format, and color.

7. Not reuse photographs previously shown to the same witness.

8. Attempt to use photographs that do not indicate criminal misconduct (e.g., booking photographs). If a booking photo is the only available photograph of the suspect, the number board or other indicia of prior arrest should be covered or masked and similar masking must be used for all filler photographs.

Exhibit E at 14.

Agent Ribail did not violate any of the guidelines when he assembled the photo line-ups in this case.

The FBI also promulgated 16 rules for administering sequential photo line-ups:

1. Conduct the procedure separately for each witness.

2. Provide instructions to the witness as described in subsection 4.7.2., "Instructing the Witness."

3. Conduct the photographic lineup in a location that does not expose the witness to information or evidence that could influence the witness's identification.

4. Ensure that neither the suspect nor any photographs of the suspect are visible where the witness will be present.

Response to Motion to Suppress Identification                    14

5. Consider using "blind" or "blinded" administration techniques. In a blind administration technique, the administrator is not involved in the investigation and does not know what the suspect looks like. In a blinded administration technique, the photographs are shielded from the administrator's view so he or she cannot see the placement of the suspect's photograph, even if he or she knows what the suspect looks like. The use of blind or blinded administration of photo arrays is strongly encouraged whenever practicable.

6. Not allow the witness to observe or overhear other witnesses during the procedure.

7. Allow the witness as much time as needed to view the photographs.

8. Avoid providing the witness any feedback regarding an identification.

9. Ask the witness how confident he or she is regarding any identification made.

10. Consider the value of audio or video recording the procedure. (*See* DIOG subsection 18.5.6.4.17.2, "Recorded Noncustodial Interviews," for approval and documentation requirements for recordings containing audio content.)

11. Have the witness initial and date the chosen photograph, if the witness makes an identification.

12. Request that the witness not discuss the identification procedure or its results with other witnesses involved in the case or have contact with the media.

13. Not advise the witness how many photographs he or she will be asked to view.

14. Present each photo to the witness separately, and remove each from view before presenting the next photograph.

15. Show all photographs at the same pace, even if the witness identifies a photograph.

16. Allow the witness to view any of the photographs again upon request.

Exhibit E at 15.

Response to Motion to Suppress
Identification                                    15

Agent Ribail followed each of the above rules regarding the administration of photo line-ups. But because the Defendant has inferred otherwise, a few of them are worth discussing here.

### i.  FBI policy and Contact with the Media.

The main argument presented by the Defendant is that Agent Ribail engaged in improper misconduct in that he (1) failed to advise J.V. to avoid media accounts and (2) failed to advise J.V. not to launch his own investigation. ECF No. 194, Pgs 10-11.

First, the FBI policy requires that Agents "request that the witness not discuss the identification procedure or its results with other witnesses involved in the case or have contact with the media." See Exhibit E at 16.  A footnote to this FBI policy provision further clarifies, "**unless directed by the court**, a witness must never be ordered not to talk to potential witnesses, the media, or any other persons."  Exhibit E at 16, FN 6 (emphasis added).

The FBI policy does not request that Agents ask witnesses ignore or block out public safety messages from law enforcement or their government. Here, J.V. did not contact the media. For that matter, the record contains no evidence that he viewed or had contact with any media output. J.V. viewed a Yakama Nation Facebook page and a public safety announcement issued by the Yakama Nation, warning their community that an armed and dangerous suspect in a quintuple homicide was loose in their community.

Response to Motion to Suppress Identification

Here, the Defendant argues that Agent Ribail's failure to caution J.V. to avoid media accounts is "improper police conduct." However, the FBI policy clearly states the exact opposite. Exhibit D at 16, FN 6. Therefore, the Defendant's argument is without merit.

Second, the Defendant devotes a great deal of weight to his unsubstantiated theory that J.V. "launched his own investigation" or was "engaging in his own independent investigation." Here, the evidence before the court is that J.V. viewed a Yakama Nation Facebook page <u>after</u> he and his family were attacked, and <u>after</u> he viewed a photo line-up.[3] The act of viewing a public Facebook page does not seem similar to the launching of an investigation. The Defendant cites no authority that a FBI agent can lawfully compel a citizen not to view the media.

Finally, even if FBI policy did require that Agent Ribail warn J.V. to avoid public safety warnings, J.V.'s viewing of the public safety warning here would still not result in the showing of police misconduct required under *Perry. See Schroeder v. Premo*, 714 F. App'x 666, 669 (9th Cir. 2017) (finding no police misconduct, and thus allowing in-court identification *without* judicial reliability assessment, where the eyewitness had read a newspaper article that included a photograph of the suspect and

---

[3] Agent Ribail interviewed J.V. regarding the Facebook photos. At that time, J.V. confirmed that he viewed the Facebook photographs <u>after</u> he viewed the photo line-up. Again, J.V. identified the Defendant as the man who held a pistol to his son's head during the line-up. Agent Ribail's report is attached and marked as Exhibit C.

saw a brief news clip about the suspect's case prior to identifying him in the photo

lineup.).

> ii.  Agent Ribail generally followed FBI policy regarding the
> documentation of line-ups, and documentation deficiencies
> do not create unnecessarily suggestive circumstances.

In addition to guidance regarding the creation and administration of photo line-

ups, the FBI publishes to its Agent guidance regarding the documentation of line-ups.

Exhibit E at 17.  Here, Agent Ribail complied with almost every aspect of the FBI

guidance.  The Defendant focuses on the few areas where Agent Ribail presumably

fell short.  However, none of these alleged errors created suggestive circumstances.

First, the Defendant highlights that Agent Ribail failed to document the time of

the administration of the photo array.  The policy reads that the agent should

document "the approximate date, time, and location of the photographic lineup."

Here, Agent Ribail documented the date and location.  The time was not documented.

Second, the Defendant highlights that Agent Ribail did not document whether any

photograph was showed to the witness more than once.  This was not documented.

Third, the Defendant highlights that Agent Ribail did not document the approximate

amount of time J.V. required to make his identification.  Here, this alleged error is

debatable.  Agent Ribail did not document the seconds/minutes required before J.V.

made his identification.  Rather, Agent Ribail documented that J.V. "was visibly

shaken and his eyes teared up when he reviewed #6."  This would appear to

document that J.V. had an immediate reaction to viewing the Defendant's photograph. Fourth, the Defendant highlights that Agent Ribail did not ask J.V. to clarify or expand on an ambivalent identification and did not obtain the witness stated degree of confidence. Against, this is debatable. The policy guidance does not include that the agent should equate the confidence level to a number or some other metric equivalent. Here, Agent Ribail documented that J.V. viewed photograph #6, was visible shaken and his eyes teared up, made a statement and concluded with "J.V. identified photograph #6 as the individual that held a gun to his son's head and signed the bottom of the paragraph." Lastly, the Defendant highlights that Agent Ribail did not document whether the photo array was administered sequentially or simultaneously. This was not documented but the array was administered sequentially.

Even if all of the alleged errors were founded, the Defendant does not show how such created an unnecessarily suggestive circumstance.

Despite dealing with an extremely hectic situation, Agent Ribail followed FBI protocol when he administered the line-ups on June 9, 2019. There was no misconduct on his part. Defendant has not pointed to any action on the part of Agent Ribail or any other law enforcement official that created unnecessarily suggestive circumstances.

 "A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances is to deter *law enforcement* use of *improper procedures* in the first place." *Perry* 565 U.S. 228 at 241 (emphasis added). The

Response to Motion to Suppress Identification                    19

rational for the *Manson* test is clear: we want to deter law enforcement from engaging in conduct that creates unnecessarily suggestive circumstances influencing an eyewitness. *Id*.

### B. Even if the *Manson* test did apply, the identification procedure was not unnecessarily suggestive.

Even if there had been misconduct, the Defendant must next show that the act of misconduct was both unnecessary and suggestive. "[D]ue process concerns arise only when law enforcement officers use[d] an identification procedure that is *both* suggestive *and* unnecessary." *Id.* at 238–239. A rule requiring automatic exclusion upon a showing of misconduct would "g[o] too far," for it would "kee[p] evidence from the jury that is reliable and relevant," and "may result, on occasion, in the guilty going free." *Manson*, 432 U.S. at 112. Only those acts of misconduct that create circumstances that are both unnecessary and suggestive satisfy the "police misconduct" element of *Perry* and *Manson*.

Whether an action was "unnecessary" and "suggestive" are separate inquiries. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds* by *United States v. Johnson*, 457 U.S. 537 (1982). In *Stovall* (a case upon which *Manson* is built), police had conducted a show-up by bringing the suspect handcuffed into the victim's hospital room and asking if he "was the man." The victim later made an in court identification. The Supreme Court recognized that the show up was of the type

Response to Motion to Suppress
Identification                                    20

1    that had been widely condemned, but upheld the conviction nonetheless because the

2    show up was necessary (it was thought the victim might die).

3    C.    J.V.'s identification of the Defendant is reliable viewed in the totality of the

4         circumstances.

5         Finally, even if the Defendant could successfully show that there was some sort

6    of police misconduct that was both unnecessary and unduly suggestive, this Court

7

8    should still not take the extraordinary step of concealing J.V.'s identification of the

9    Defendant from the jury, because the circumstances do not indicate a "very substantial

10   likelihood of irreparable misidentification," and thus the identification evidence

11

12   should be admitted at trial and the reliability of the identification is "for the jury to

13   weigh." *Manson*, 432 U.S. at 114, 116. A "suggestive and unnecessary identification

14   procedure does not violate due process so long as the identification possesses

15

16   sufficient aspects of reliability," for reliability is the "linchpin in determining the

17   admissibility of identification testimony." *Id.* at 106. The factors to be considered in

18

19   evaluating the likelihood of misidentification are: (i) the opportunity of the witness to

20   view the criminal at the time of the crime; (ii) the witness' degree of attention; (iii) the

21

22   accuracy of the witness' prior description of the criminal; (iv) the level of certainty

23   demonstrated by the witness at the confrontation and (v) the length of time between

24   the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). The

25

26

27

28   Response to Motion to Suppress
     Identification                          21

1

2

*Biggers* factors, applied to J.V.'s identification of the Defendant, weigh heavily in favor of allowing the jury to consider J.V.'s testimony for themselves.

3

4

> a. J.V. had ample opportunity to view the Defendant at the time of the crime.

5

6

7

8

9

10

11

J.V. had ample opportunity to view the Defendant.  The crime occurred during a bright and sunny day.  The Defendant was not wearing a mask.   The Defendant did not attempt to conceal his identify.  The confrontation lasted for several minutes. J.V. had more than enough opportunity to view the Defendant's face to allow him to make a reliable identification.

12

13

> b. J.V.'s degree of attention was high during his interaction with the Defendant.

14

15

16

17

18

J.V. was no mere bystander. He observed the Defendant holding a gun to his son's head.  J.V. attempted to negotiate with the Defendants. He pleaded with them. There is no doubt that J.V. was paying attention to what the Defendant and his brother were doing.

19

20

> c. J.V.'s prior description of the Defendant was not inaccurate.

21

22

The Defendant's does not point to any specific description provided by J.V. that was later deemed to be inaccurate.

23

24

> d. J.V.'s identification of the Defendant occurred within 24 hours after the Defendant carjacked him and tried to abduct his son.

25

26

27

28

Response to Motion to Suppress Identification

22

The kidnapping and carjacking took place on June 8, 2019 between 4:00 and 5:00 p.m.  J.V. positively identified the Defendant the following day.  Each of the *Biggers* factors weighs in favor of admissibility.

Here, after a review of the *Biggers* factors, the Court cannot come to the conclusion that circumstances indicate a "very substantial likelihood of irreparable misidentification," *Manson*, 432 U.S. at 116. Thus the identification evidence should be admitted at trial and the reliability of the identification is "for the jury to weigh." *Id*.

D.    Courts applying the *Manson / Perry* test permit eyewitness testimony under these circumstances.

In *Perry,* the Supreme Court held that a defendant must show improper police conduct. *Perry*, 565 U.S. at 241. Even before *Perry*, the court had linked the due process check of exclusion "not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." *Id*. at 242 (citing *Coleman v. Alabama*, 399 U.S. 1 (1970). *See also Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (Where the "crucial element of police overreaching" is missing, the admissibility of an allegedly unreliable confession is "a matter to be governed by the evidentiary laws of the forum . . . and not by the Due Process Clause."); *Schroeder v. Premo*, 714 F. App'x 666, 669 (9th Cir. 2017) ("Under *Perry*, however, only police-created impermissibly suggestive circumstances

implicate due process concerns and thus require a reliability assessment by the trial court.").

In *Schroeder*, cited above, the Ninth Circuit found <u>no police misconduct</u> where the eyewitness had read a newspaper article that included a photograph of the suspect and saw a brief news clip about the suspect's case prior to identifying him in a photo lineup. 714 F. App'x at 669. Thus, the Ninth Circuit held that the trial court did not err by admitting the identification without judicial review of reliability.

In *Boyer v. Chappell*, the Ninth Circuit found that, because there was <u>no police misconduct</u>, a trial court did not err by admitting in-court identification, despite the witness having mis-identified the defendant in two live line-ups and one photo line-up. 793 F.3d 1092, 1100 (9th Cir. 2015). There, in two prior live line-ups, the witness picked out men other than the defendant. In a subsequent photo line-up, she also picked out someone different than the defendant. Although there were obvious deficiencies, the Ninth Circuit held that because the unreliability did not stem from "unnecessarily suggestive circumstances arranged by law enforcement . . . the state court did not unreasonably apply clearly established Supreme Court precedent [*Perry*] when it determined that federal law did not require a live evidentiary hearing to assess the reliability of [witness'] testimony." *Id*.

In *Benjamin v. Gibson*, an 11 year old girl failed to identify the defendant as the perpetrator and instead picked out another man in a photo line-up. She reiterated that

Response to Motion to Suppress
Identification                    24

mis-identification at a preliminary hearing (at which the defendant was presumably present), again failing to identify the defendant. Then, after a lunch break, she took the stand, recanted her testimony, and identified the defendant. She was allowed to identify the defendant at a later trial. Despite the obvious reliability issues, the Ninth Circuit held that counsel was not ineffective by not moving to suppress her testimony, because the motion would have likely been unsuccessful since there was <u>no police misconduct</u>. 640 F. App'x 656, 658 (9th Cir. 2016) (unpublished).

It's clear from the above line of cases, in order for this Court to even consider concealing J.V.'s identification of the Defendant from the jury by engaging in a review of his reliability, it must first identify circumstances that were:

1. Caused by police misconduct;

2. Unnecessary; and

3. Unduly suggestive.

The Defendant has not identified any such circumstances. Therefore, the Court's inquiry ends here and the question of reliability is one for the jury.

E.    <u>This Court should not take the extraordinary step of casting aside *Manson* and *Perry* and exclude the evidence under Rule 403.</u>

*Perry* is clear: without police misconduct creating unnecessary and suggestive circumstances, eyewitness identification of a defendant cannot be excluded. To exclude an eyewitness identification without a showing of police misconduct is to

ignore the Supreme Court's holding in *Perry*. This Court cannot simply toss aside on-point Supreme Court precedent governing the admissibility of evidence simply on the basis that Rule 403 is also applicable. Rule 403 is always applicable. But where the Supreme Court has established a detailed test for the admissibility of evidence, as it has with eyewitness identifications like the one here, Supreme Court precedent controls. Otherwise, every Supreme Court ruling governing the admissibility of evidence would be swallowed by Rule 403.

There is nothing to differentiate J.V.s identification of the Defendant from the eyewitness identification at issue in *Perry* or in the numerous Ninth Circuit decisions cited above. In each case, the testimony is or will be that the Defendant was the person who committed the crime. J.V.'s identification cannot be treated differently than the witness in *Perry*. In both, there was no police misconduct. Just as the Supreme Court held that the inquiry in *Perry* could go no further, so must this Court.

## III.    Conclusion

The Defendant is asking this Court to take the extraordinary step of stripping the jury of their primary function: the weighing of evidence. The law is clear that the Court can do so only after identifying police misconduct that is both unnecessary and unduly suggestive. The Defendant has proffered no such actions on the part of law enforcement. Furthermore, the totality of the circumstance surrounding J.V.'s

identification of the Defendant indicate that the identification was reliable, and certainly not do not indicate a risk of irreparable misidentification.

For those reasons, the Defendant's motion should be denied, and the jury allowed to fulfill its proper role.

DATED: September 21, 2020        William D. Hyslop
                                 United States Attorney

                                 *s/ Thomas J. Hanlon*____
                                 Thomas J. Hanlon
                                 Assistant United States Attorney

                                 *s/ Richard Burson*____
                                 Richard Burson
                                 Assistant United States Attorney

Response to Motion to Suppress
Identification                        27

I hereby certify that on September 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:   Richard A. Smith and Mark A. Larranaga.

*s/ Thomas J. Hanlon*_____
Thomas J. Hanlon
Assistant United States Attorney