1

1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,          ) Case No.
3                                  ) 1:19-cr-2032-SMJ-1, 2
                      Plaintiff,   )
4                                  ) September 29, 2020
v.                                 )
5                                  ) Yakima, Washington
JAMES DEAN CLOUD (01); and         )
6  DONOVAN QUINN CARTER CLOUD       ) Evidentiary Motion Hearing
   (02),                           ) Day 1, Volume I
7                                  ) Pages 1 to 244
   _____Defendants.  )
8

9

                 BEFORE THE HONORABLE SALVADOR MENDOZA, JR.
10                    UNITED STATES DISTRICT COURT JUDGE

11

                             APPEARANCES:
12

   For the Plaintiff:          Richard Cassidy Burson
13                             Richard.c.burson@usdoj.gov
                               Thomas Hanlon
14                             Thomas.j.hanlon@usdoj.gov
                               United States Attorney's Office
15                             402 East Yakima Avenue
                               Suite 210
16                             Yakima, WA 98901
                               509-454-4425
17

18  For the Defendant James    John B. McEntire, III
    Cloud (01):                Jay_McEntire@fd.org
19                             Lorinda Youngcourt
                               Lorinda_Youngcourt@fd.org
20                             Jeremy Sporn
                               Jeremy_Sporn@fd.org
21                             Federal Defenders
                               Eastern Washington
22                             10 N. Post Street
                               Spokane, WA 99201
23                             509-624-7606

24

25

2

| | |
|---|---|
| For Defendant Donovan Cloud (02): | Richard A. Smith<br>Rasmith@house314.com<br>Smith Law Firm<br>314 North Second Street<br>Yakima, WA  98901<br>509-457-5108 |
| | Mark A. Larranaga<br>Mark@jamlegal.com<br>Walsh and Larranaga<br>705 2nd Avenue<br>Suite 501<br>Seattle, WA  98104<br>206-972-0151 |
| Official Court Reporter: | Kimberly J. Allen, CCR #2758<br>United States District Courthouse<br>P.O. Box 685<br>Richland, Washington 99352<br>(509) 943-8175 |

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

3

1                                **INDEX**

2

3                            **WITNESS INDEX**

4  **Plaintiff Witness:**                                    **Page**

5

6  **RONALD TROY RIBAIL**
           Direct Examination By Mr. Burson              18
7          Cross-Examination By Mr. McEntire             83
           Cross-Examination By Mr. Smith                176
8          Redirect Examination By Mr. Burson            189
           Recross-Examination By Mr. McEntire           202
9
   **MICHAEL EDWARD WILLIAMS**
10         Direct Examination By Mr. Burson              208
           Cross-Examination By Mr. McEntire             235
11
                            *****
12
   **Defense Witnesses:**                                   **Page**
13

14
      None
15

16

17                        **EXHIBITS ADMITTED**

18 **Plaintiff**
      **Number**         **Description**                     **Page**
19
         1        FBI Procedures for Eyewitness          27
20                Identification of Suspects Policy
                  Guide - Nov. 26, 2013
21       2        FBI Procedures for Eyewitness          27
                  Identification of Suspects Policy
22                Guide - June 9, 2019
         4        Photographic Lineup 5032, June 9,      30
23                2019

24

25

4

| | | |
|---|---|---|
| 5 | Photographic Lineup 5033, June 9, 2019 | 30 |
| 3 | Yakima County Sheriff's Office Photographic Lineup Instructions and Results Sheet | 37 |
| 8 | Screenshot of SA Ribail Conversation with JV | 51 |
| 7 | Yakama Nation Facebook Post, June 9, 2019, 5:12 p.m.) | 54 |
| 6 | Yakama Nation Facebook Post, June 9, 2019, 3:19 p.m. | 57 |
| 10 | Video recording of EZ interview (physical exhibit previously submitted) | 216 |
| 9 | Photographic Lineup 5038, June 10, 2019 | 221 |

| Defense Number | Description | Page |
|---|---|---|
| 1009 | January 6, 2017 Memo from Deputy Attorney General Sally Yates to All Law Enforcement Heads | 106 |
| 1023 | FBI Lineup policy manual with a review date of 11/26/2016 | 125 |
| 1012 | FBI Eyewitness ID Policy Implementation Guide, 06.09.2019 | 132 |
| 1010 | Conditionally Admitted - October 1999, Department of Justice, Eyewitness Evidence, a Guide for Law Enforcement | 147 |
| 1006 | James Cloud Wanted Poster | 162 |
| 1014 | Lineup 5034 (Morris Jackson) | 169 |
| 1017 | YCSO Lineup Instructions for LL | 172 |
| 1002 | YCSO - Eyewitness ID Policy | 236 |

## GENERAL INDEX

| | Page |
|---|---|
| Reporter's Certificate | 244 |

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER

1    (September 29, 2020; 9:01 a.m.)

2         THE COURTROOM DEPUTY:  All rise.

3       (Call to Order of the Court.)

4         THE COURT:  Please be seated.

09:01:32    5         THE COURTROOM DEPUTY:  Matter before the Court is *United*

6    *States of America v. James Dean Cloud and Donovan Quinn Carter*

7    *Cloud*, Cause No. 1:19-cr-2032-SMJ, Defendant 1 and Defendant 2.

8         Counsel, each time you address the Court, please state

9    your name for the court reporter to make an accurate record.

09:01:57    10    Please -- oh.

11         Counsel, please state your presence for the record,

12    beginning with plaintiff's counsel.

13         MR. BURSON:  Government's counsel?

14         THE COURT:  Government's.

09:02:08    15         MR. BURSON:  Good morning, Your Honor.  Richard Burson

16    and Tom Hanlon for the United States, joined today by Agent Troy

17    Ribail with the FBI.

18         THE COURT:  Good morning to all three of you.

19         MR. McENTIRE:  Good morning, Your Honor.  Jay McEntire,

09:02:19    20    as well as Lorinda Youngcourt, as well as Jeremy Sporn on behalf

21    of James Cloud.

22         THE COURT:  Good morning.

23         Good morning, Mr. Cloud -- James Cloud.  Good morning,

24    sir.

09:02:29    25         DEFENDANT JAMES CLOUD:  Good morning.

1        MR. SMITH:  Your Honor, Rick Smith and Mark Larranaga on

2    behalf of Mr. Donovan Cloud.

3        THE COURT:  Good morning to you two.

4        Good morning, Mr. Cloud.

09:02:42  5        Counsel, I wanted to go over a few things today; more

6    than anything, just process.  Let me just get this computer set

7    up here.

8        All right.  So as I understand, there are -- there are

9    three motions before the Court, and I want to go over again what

09:03:28  10   the Court anticipates, and I want to hear discussion from you

11   all if that's the plan, if that's what you all agree to.

12       As a preliminary matter, the courthouse has been closed

13   to the public.  However, the public line is open, so they -- the

14   public can have access to this hearing.

09:03:55  15       The parties are free to remove your masks when you are

16   asking questions, and you can ask those questions from your

17   seated position.  You do not have to approach the podium.  If

18   there is a problem, we will clarify, with any issues of not

19   being able to understand you.  You can keep your mask if you

09:04:25  20   wish to keep it on while you're asking the questions as well.

21   And the same will be true for the witnesses; they can remove

22   their masks while they're testifying or they can keep their

23   masks, as they feel comfortable.  It will be -- it will be up to

24   that individual witness.

09:04:43  25       Any questions about that process?

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                 7
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*

1          MR. McENTIRE:  No, Your Honor.

2          MR. BURSON:  No, Your Honor.

3          THE COURT:  As I indicated, there are three motions.

4     The Court will begin first with the motion to suppress JV's

09:05:07  5     tainted identification, as it's titled.  The second motion is a

6     motion in limine regarding Mr. ███████ false memory.  And

7     the third is a motion to exclude EZ's unreliable ID.

8          A question for the parties, and we want the record to be

9     consistent:  The parties have used initials for two individuals

09:05:34  10    yet not for the third.  I think, for consistency sake, we should

11    either do all initials and refer to the parties by that so that

12    the court record is clear and, again, there's no ambiguity.

13         Is there a reason why we have chosen to use the full

14    name of the second individual?

09:05:57  15         MR. McENTIRE:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MR. McENTIRE:  The reason was -- is LL had voluntarily

18    met with the *Yakima Herald Republic* reporter, and that resulted

19    in an article published online, so his name was freely available

09:06:21  20    as witness slash victim.  Based on that, I felt comfortable

21    using LL's name, since he had essentially made his own decision

22    to make his name publicly available to the universe.  And so

23    that's why I had elected in that motion to refer to him by his

24    full name, as ████████████, as opposed to the other two

09:06:44  25    individuals, EZ as well as JV.

1          And so that was one of the questions preliminarily that

2     we had for the Court, is what the Court would prefer to do with

3     that.

4          In that vein, Your Honor, throughout the motions, I

09:07:00  5     believe all three motions, I consistently referred to both James

6     Cloud and Donovan Cloud always by their first names to provide

7     clarity.

8          THE COURT:  Right.

9          MR. McENTIRE:  And just to let the Court know, for

09:07:13  10     purposes of the hearing today, I intend to do the same thing so

11     there's a clear record that whenever we're referring to James

12     Cloud, it's clear, and whenever we're referring to Donovan

13     Cloud, it's also clear.

14          THE COURT:  Thank you.

09:07:25  15          Anyone else from the defense like to speak to that

16     point?

17          Okay.  What's the Government's position?

18          MR. BURSON:  During the course of this hearing, Your

19     Honor, the Government's position is we should use initials for

09:07:37  20     LL as well, first of all, for consistency, as the Court pointed

21     out; but because the other two witnesses at issue here, they did

22     not go to the media, their identities haven't been revealed.

23     And second of all, the Government has an obligation, and,

24     respectfully, I think this Court does, too, to protect the

09:07:54  25     identity of witnesses.  Whether or not those witnesses have

1    taken action that sacrifices their own protection, I don't think

2    the Government or this Court should then go the extra step and

3    just go ahead and make the -- make their name a matter of public

4    record.

09:08:07   5    THE COURT:  Okay.  You know, I agree.  I think it's -- I

6    think it's a good practice to refer to these individuals by

7    their initials.  It will be consistent throughout.  So why don't

8    we do that, Counsel.  That will -- again, it will -- one, it's

9    establishing the record as to the reasoning, but I think it

09:08:29   10   makes sense to do that, just to be consistent.

11   Also, and you all know this, you all have appeared in

12   front of me on various motions, but you know there's no

13   tag-teaming.  One attorney is going to speak on any motion or

14   any witness.  You can confer, obviously, with co-counsel, but

09:08:57   15   one attorney at a time.  It gets a little confusing, and the

16   record becomes unclear, when that doesn't happen.

17   So -- and just for the Court's understanding, who is

18   going to be handling -- from the -- from the defense, and who is

19   going to be handling Mr. -- or Agent -- is it Ribail?

09:09:25   20   MR. BURSON:  I will, Your Honor.

21   THE COURT:  Okay.

22   MR. BURSON:  For the record, Richard Burson.

23   THE COURT:  Thank you, Mr. Burson.

24   And from the defense?

09:09:35   25   MR. McENTIRE:  For James Cloud, Jay McEntire will be

1    handling all of the motions and all of the witnesses.

2         THE COURT:  Okay.

3         MR. SMITH:  Your Honor, I will be handling on behalf of

4    Donovan Cloud.

09:09:58    5         THE COURT:  Okay.  Got it.

6         Let's see.  Okay.  Any other preliminary issue that we

7    need to address at this time?

8         MR. McENTIRE:  I do have one, Your Honor.  I did have an

9    open question as to who, in fact, is calling in on the Court's

09:10:15    10   public line.

11        THE COURT:  Who is calling in?

12        MR. McENTIRE:  Correct, Your Honor.  And the reason I

13   had a question is I wanted to check and see if there were any

14   other specifically listed victims that may be calling in on the

09:10:31    15   Court's public line and listening to this hearing.

16        THE COURT:  I don't know if there's a way for us to --

17   to know that.  Maybe there is.

18        MR. HANLON:  Your Honor, if I could speak with

19   Mr. McEntire for just a moment?

09:10:43    20        THE COURT:  Sure.

21        (Counsel conferring.)

22        THE COURT:  I'm sorry, Counsel?

23        MR. McENTIRE:  Your Honor, I just had an opportunity to

24   confer with Mr. Hanlon -- and would the Court prefer me to be

09:11:23    25   standing or seated when I address the Court?

1     THE COURT:  Seated, I think, is easier for you.  So why

2  don't we do that.

3     MR. McENTIRE:  Thank you, Your Honor.

4     I just had an opportunity to confer --

09:11:30   5     THE COURT:  And your mic is on, correct?

6     MR. McENTIRE:  It is, Your Honor.

7     THE COURT:  Okay.  Thank you.

8     MR. McENTIRE:  I just had an opportunity to confer with

9  Mr. Hanlon, and the individuals that would be listening in on

09:11:42  10  this hearing are essentially family members or related to the

11  deceased rather than the actual -- the individuals that I was

12  concerned about, Your Honor, would either be if JV was listening

13  in on this hearing --

14     THE COURT:  Oh, witnesses you mean, or potential

09:12:00  15  witnesses.

16     MR. McENTIRE:  Not necessarily potential witnesses.  My

17  concern, Your Honor, is under 18 U.S.C. 3771, which is the Crime

18  Victim Rights Act --

19     THE COURT:  Right.

09:12:11  20     MR. McENTIRE:  -- it gives victims certainly a right to

21  be present and notified and participate in these court hearings.

22     THE COURT:  Right.

23     MR. McENTIRE:  However, there's an exception to it, and

24  specifically the exception under (a)(3), which is unless the

09:12:23  25  Court finds, after receiving clear and convincing evidence, it

1    determines that the testimony by the victim would be materially

2    altered if the victim heard other testimony at that proceeding.

3           So my concern, Your Honor, was that especially with

4    respect to ▆▆▆ -- JV, especially with respect to LL, and

09:12:40  5    especially with respect to EZ, that if they were participating

6    in this hearing or listening to this hearing, they would be

7    hearing substantive testimony throughout the course of today, as

8    well as tomorrow, involving the science behind eyewitness

9    identification, what happened with respect to their particular

09:12:57  10    identifications.  And my concern is, speaking straight to the

11    heart of that exception under 3771, is that their testimony

12    could be materially altered by listening to essentially a

13    play-by-play of, from defenses' perspective, what went wrong

14    with those lineups.

09:13:13  15           THE COURT:  Thank you.  But it's my understanding that

16    they are not.

17           Is that -- is that the Government's understanding as

18    well?

19           MR. HANLON:  That is our understanding, Your Honor.  I

09:13:21  20    provided the names to Mr. McEntire of the people who reported

21    they will be listening today, so we don't have an issue.  I

22    can't guarantee for certainty they're not listening today, but

23    the ones that reported to us, "Hey, we're listening," none of

24    the folks that he's worried about have said they're going to be

09:13:35  25    listening today.  Specifically, JV stated he will not be

 1   listening today.

 2         THE COURT:  Okay.  Okay.  Any -- anything else on that?

 3         MR. McENTIRE:  No, Your Honor.  I just wanted to

 4   essentially lay out the record that that was one of the

 5   concerns, if those were any one of the individuals that would be

 6   calling in.

 7         THE COURT:  The information that the Court has is that

 8   there may be seven individuals that are -- that are on the

 9   phone, so that's the information that we have.

10         Okay.  Again, any preliminary matters that anyone wants

11   to address at this point?  Anything else?

12         MR. McENTIRE:  Not from James Cloud's perspective, Your

13   Honor.

14         THE COURT:  Mr. Smith?

15         MR. SMITH:  No, Your Honor.  Thank you.

16         MR. BURSON:  Nothing from the Government, Your Honor.

17         THE COURT:  Very well.

18         We're going to start, then, with the defense motion with

19   regards to JV's alleged tainted identification.

20         And one of the things that I -- as I mentioned -- again,

21   you all have practiced before me, so you know I don't hide the

22   ball.  And so here's -- here's a question, and really a question

23   for the defense, and maybe this will be elicited from the

24   testimony that will come out.  I'm not asking for argument, but

25   I want to tell you sort of where my brain is on this issue, and

1    what my concerns are, and what I'm trying to find out; if --

2    what the testimony supports or doesn't support.

3           When I look at *Perry*, that was, again, decided just a

4    few years ago, what the Court seems to be concerned about is

09:15:28    5    that coordination between -- in order to establish sort of the

6    police misconduct, the Court seems to be concerned with that

7    coordination between government agencies, police departments,

8    in -- in establishing this particular factor.  And so I'm going

9    to want to know what, if any, of that type of coordination did,

09:15:58   10    in fact, occur.  And I presume that that will be elicited from

11    the -- from the testimony, whether it was arranged, rigged,

12    organized -- again, that's the language that the Supreme Court

13    uses.

14           Now, Sotomayor, in dissent, is, you know -- I would

09:16:22   15    argue is frustrated by what the majority have done, but she, of

16    course, is in the minority.  And so that's the case of the law.

17    So I'm going to want to hear testimony on that point one way or

18    another so that the Court is clear on -- on that -- on that

19    point.

09:16:41   20           Also, the other factor discussed in *Perry* is the -- is

21    the -- whether it was unnecessarily suggested influence.  The

22    question is whether or not it's unnecessarily suggested.  The

23    "unnecessary" part of that -- that point is going to be clear.

24    So I'm going to want to hear testimony on that or -- and

09:17:08   25    obviously argument on that particular point.  So make sure you

1    focus on that.

2         And from the -- and with regards to the third point, I'm

3    interested to hear the Government's position in terms of the

4    testimony that comes out with regards to the reliability, given

09:17:41  5    the totality of the circumstances.  So I'm interested to hear

6    the Government's position there.

7         And I was a little puzzled by the Government's argument

8    that -- that JV, having significant opportunity, favors a later

9    positive identification, in terms of its reliability.  So I'm

09:18:15  10   going to want to hear how the testimony establishes that and

11   what the argument is towards that, just so I'm clear in my head

12   how you all -- how you all are seeing this.

13        So, again, I just -- ultimately, there's a 403 argument

14   as well.  So I want to see how, in spite of all of that, how

09:18:34  15   really -- although it's prejudicial, what -- you know, many

16   things are prejudicial, from the defenses' perspective, I'm

17   sure, but how is that outweighed by its incredibly probative

18   value.  So that's another point that I want to make sure that

19   that is clear in your presentations today and tomorrow.

09:19:00  20        So, again, that's how -- those are the questions that I

21   have in my mind, and I'm interested to see what the testimony

22   shows.

23        So, with that in mind, I think we're ready for our first

24   witness, and that would be Agent -- is it "Ri-bell"?  How is

09:19:17  25   that pronounced?

1        MR. BURSON:  "Ree-bail," Your Honor.

2        THE COURT:  I'm sorry?

3        MR. BURSON:  Agent Ribail.

4        THE COURT:  Ribail.  Mr. Ribail I recognize; he's

5   testified before.  But I apologize for mispronouncing your name.

6   All right.

7        MR. BURSON:  Before we begin, Your Honor, could the

8   Court repeat what it said it was concerned with regarding JV's,

9   I believe, significant opportunity to view?  Was that what the

10  Court was wondering about?

11       THE COURT:  Yeah.  The Government must show the

12  reliability, given the totality of the circumstances.  And so

13  one of the questions I have is understanding the Government's

14  argument as to that point, frankly.  That's really it.  So I

15  want to make sure I understand how you're making the point that

16  under the totality of the circumstances that that is, in fact,

17  reliable.

18       MR. BURSON:  Understood.

19       THE COURT:  Okay.

20       MR. BURSON:  And I know we have the three pending

21  motions, Your Honor, but Agent Ribail's testimony is going to

22  cover two of those motions --

23       THE COURT:  Okay.

24       MR. BURSON:  -- or be relevant to two of those motions.

25  The Government's subsequent witnesses will cover the third

1    pending motion.  And I just want to make sure everyone is on the

2    same page --

3            THE COURT:  Is your mic on, Counsel?

4            MR. BURSON:  It is, Your Honor.

09:20:36   5            THE COURT:  Okay.  And why don't you have a seat,

6    because, again, the public is listening in, and I want to make

7    sure that we're capturing that on the microphones, so -- and I

8    know you're doing it out of habit and out of practice and out of

9    deference, and I appreciate that.  Thank you.  But I want to

09:20:52  10   make sure everyone is capturing what you're saying and that the

11   record is clear and that the public is able to hear.

12           So, go ahead.

13           MR. BURSON:  I will remain seated, Your Honor.

14           So just wanted to make sure everyone is on the same

09:21:03  15   page.  We're taking testimony relevant to all the motions today,

16   and then argument will be after the conclusion of testimony in

17   all three motions.

18           THE COURT:  Very well.  That makes sense.  All right.

19           Is that the defenses' understanding?

09:21:15  20           MR. McENTIRE:  It is, Your Honor.

21           THE COURT:  Okay.  That makes sense.  All right.  So

22   let's go forward with our first witness.

23           MR. BURSON:  The Government will then call Special Agent

24   Troy Ribail with the Federal Bureau of Investigation.

09:21:31  25           THE COURT:  All right.  Come on up.

1    THE COURTROOM DEPUTY:  Will you please raise your right

2    hand.

3

4                          RONALD TROY RIBAIL,

09:21:42  5    called as a witness on behalf of the Plaintiff, having first

6          sworn or affirmed, testified under oath as follows:

7          THE WITNESS:  I do.

8          THE COURTROOM DEPUTY:  Thank you.

9          When you are testifying, you're welcome to take off your

09:21:57  10   mask, if you wish.  There's a bottle of water there.  Please

11   take it with you when you step down.

12         If you could please state your first and last name for

13   the record, and spelling them both for the record.

14         THE WITNESS:  Okay.  Troy Ribail; T-R-O-Y, R-I-B-A-I-L.

09:22:16  15         THE COURT:  Go ahead, Counsel.

16

17                          DIRECT EXAMINATION

18   BY MR. BURSON:

19   Q    Good morning, Agent Ribail.

09:22:19  20   A    Good morning.

21   Q    Just for the record, is that your full legal name?

22   A    It is not.

23   Q    Could you please give us that for the record, and spell

24   that as well.

09:22:25  25   A    It is Ronald Troy Ribail.

1  Q     How long have you been with the Federal Bureau of

2  Investigation?

3  A     Seventeen years.

4  Q     Okay.  And over the course of those 17 years, how many of

09:22:39  5  them were here in the Yakima resident office?

6  A     I've almost been here five years now, I think.

7  Q     And where were you before that?

8  A     I was in Virginia, prior -- prior to here.

9  Q     Okay.  During the time that you've been here with the

09:22:55  10  Yakima resident office, primarily what types of crimes have you

11  spent your time investigating?

12  A     Mainly I would say drugs, gangs, violent crime, including

13  the Yakama Indian Reservation.

14  Q     Have you received training from the FBI on the interviewing

09:23:16  15  of victims and witnesses and victim witnesses?

16  A     Yes.

17  Q     Okay.  Have you received ongoing training during your

18  career with the FBI, both on the job and -- and formal or

19  informal?

09:23:29  20  A     Yes.

21  Q     What about lineup procedures?  Have you received training

22  on lineup procedures?

23  A     Yes.

24  Q     Okay.  How many lineups would you say you've conducted?

09:23:39  25  Let's -- and let's -- let's answer that question for now only

1   with respect to photographic lineups.

2   A    I would say approximately 20.

3   Q    Okay.  How many lineups have you maybe not conducted

4   yourself but observed or assisted with?

09:23:56  5   A    Probably another ten, maybe 20.

6   Q    Okay.  Now, if we expanded that to other types of

7   lineups -- in-person lineups, photo book lineups containing

8   larger compilations -- how many lineups do you think that you've

9   either participated in or -- or conducted yourself?

09:24:13  10   A    Fifty to 100, probably.

11   Q    Okay.  Are you familiar with a document or publication,

12   internal publication entitled "Procedures For Eyewitness

13   Identification of Suspects, Policy Implementation Guide,"

14   published November 26th of 2013 by the FBI?

09:24:32  15   A    Yes.

16   Q    Okay.  And you've -- you were familiar with that document?

17   A    Yes.

18   Q    Okay.  Were you familiar with that document prior to June

19   of 2019?

09:24:43  20   A    Generally, yes.

21   Q    Okay.  "Generally" meaning you had read it and reviewed it

22   at some point in time?

23   A    I think I was -- maybe phrase it a different way --

24   probably provided some sort of training and/or have seen it, but

09:24:58  25   I don't know that I've -- had read the whole thing front to

1    back, necessarily.

2    Q    Okay.  All right.  And what about another publication

3    entitled "Procedures For Eyewitness Identification of Suspect

4    Policy Guide," titled June -- sorry, published June 9th of 2019?

09:25:18    5    As we sit here today, are you familiar with that document?

6    A    I am.

7    Q    Now, that document was published June 9th of 2019; is that

8    right?

9    A    Yes.

09:25:27    10    Q    And so --

11            THE COURT:  And, Counsel, just for the Court's

12    clarification, can you clarify who produces this document, what

13    the document is, just so that I'm -- the record is clear.

14            MR. BURSON:  I can, Your Honor.  And you're referring

09:25:39    15    only to the second document?

16            THE COURT:  Yes.

17            MR. BURSON:  Okay.

18    BY MR. BURSON:    (Continuing)

19    Q    So the document I was just referring to published June 9th,

09:25:46    20    2019, that was an FBI-published document, Agent Ribail?

21    A    Yes.

22    Q    Okay.  And did you review it on June 2019 [sic], the day

23    that it was published?

24    A    No.

09:25:59    25    Q    Okay.  Was that -- it was a Sunday, I believe.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    22
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/D/Burson*

1   A    Correct.

2   Q    Okay.  Were you engaged in an investigation during that

3   time?

4   A    Yes.

09:26:06   5   Q    Okay.  Did you administer a lineup on that day?

6   A    Yes.

7   Q    And did that involve an individual going by the initials of

8   JV?

9   A    Yes.

09:26:16  10   Q    Okay.  Did you administer a lineup on that day to an

11   individual going by LL?

12   A    Yes.

13   Q    Okay.  Had you had a chance to review that publication,

14   being published that same day, prior to administering those

09:26:29  15   lineups?

16   A    No.

17   Q    So I just mentioned some dates.  I'd like to talk a little

18   bit more about those dates.  I'd like to take you back to

19   June 8th of 2019.  That was a Saturday.

09:26:46  20        What were you involved in that day?

21   A    On that day I was -- I was the duty agent, or on-call

22   agent, and I received a call from Yakama Nation Tribal Police

23   Department that there were -- there was a -- I think the initial

24   call was maybe a double homicide or triple homicide, out in

09:27:05  25   White Swan.

1    Q    What did you do after you received that call from Yakama

2    Nation?

3    A    I drove out to the physical location.

4    Q    Okay.  And, roughly, could you just tell us where that

09:27:19  5    physical location was.

6    A    It was on --

7    Q    You can refer to the residence, if you know the residence.

8    A    It was, uh -- it's on Medicine Valley Road in White Swan.

9    Q    Okay.  Whose residence was that?

09:27:30  10    A    Uh, John Cagle.

11    Q    Okay.  And when you arrived to that residence, could you

12    briefly describe what that crime scene appeared to involve, in

13    terms of illegal conduct?

14    A    When I arrived, there was one individual kind of outside

09:27:46  15    the driveway still alive.  They were trying to Medevac him out

16    of the area.  And then there were four other -- or three other

17    bodies on the property.

18    Q    What time did you arrive, roughly, on that Saturday

19    June 8th, 2019?

09:28:01  20    A    It was midafternoon.  I would say maybe 3:00.

21    Q    Okay.  How long do you think you spent at the crime scene

22    that day?

23    A    I was there until after midnight.

24    Q    Okay.  Were there any other agencies on scene with you?

09:28:16  25    A    Yes.  The Yakima Sheriff's Office, uh, Tribal Police.  Uh,

1    there could have been a few others at that time.  And then

2    later, Washington State Patrol.

3    Q    Okay.  You left around midnight.

4         When did you next return to that residence?

09:28:31  5    A    About 9:00 a.m. the next morning.

6    Q    Okay.  What were you engaged in in the morning when you got

7    there on June 9th, 2019?

8    A    We executed a federal search warrant on the property.

9    Q    Okay.  Had that search warrant been obtained overnight or

09:28:47  10   earlier that morning?

11   A    Early that morning, yes.

12   Q    All right.  And so the execution of the search warrant, how

13   many agencies were involved in the execution of that search

14   warrant?

09:28:56  15   A    Uh, pretty much all the ones I mentioned.  But Washington

16   State Patrol was the main entity conducting the search for us.

17   Q    How many agents and officers, roughly, would you say, if

18   you had to estimate, based on your observations, were there at

19   the crime scene involved in the investigation on June 9th, 2019?

09:29:22  20   A    The entire case, like people out in the field doing

21   different things as well?  Probably 50.

22   Q    Okay.  And from the FBI, were you the only agent at the

23   scene?

24   A    On Saturday, yes.  But on Sunday there was another agent

09:29:40  25   out there.

1   Q   Okay.  And what office was that agent from?

2   A   Uh, he works in the Tri-Cities FBI office.

3   Q   All right.  So in White Swan on that particular day, you

4   were the only agent from the Yakima resident office on scene?

09:29:59  5   A   That's correct.

6   Q   Okay.  Approximately how much time did you spend that

7   morning at the Cagle residence?

8   A   In the morning, maybe two or three hours; and then later in

9   the evening, another couple hours.

09:30:11  10   Q   All right.  So in the morning, two or three hours, so you

11   left sometime around 11:00 or noon?

12   A   Yes.

13   Q   Okay.  Did the other 50-or-so agents and officers, did

14   they, for the most part, remain at the crime scene?

09:30:26  15   A   Yes.

16   Q   Okay.  And when you left about two or three hours after

17   arriving, where did you go?

18   A   Uh, I think initially I went with Detective Cypher to their

19   Zillah substation.

09:30:44  20   Q   Okay.  And what was the purpose of going to that

21   substation?

22   A   We started making photographic lineups.

23   Q   Okay.  By that point in time, had you identified some

24   potential witnesses that you wanted to interview and/or

09:30:59  25   administer lineups to?

          1   A    Yes.

          2   Q    Okay.  At the substation, how long did it take to compile

          3   the lineups?

          4   A    At least an hour.  It felt like maybe even up to two hours.

09:31:14  5   Q    Okay.  And how many lineups in total were compiled?

          6   A    Four.

          7   Q    And each lineup, did it contain a different -- well, let's

          8   back up.

          9        Were the lineups generating [sic] using the identities of

09:31:29 10   possible suspects?

         11   A    Yes.

         12   Q    Okay.  And how many -- you said four.

         13        Did each lineup contain one such suspect?

         14   A    Yes.

09:31:39 15   Q    Okay.  So the Spillman system is what you used to conduct

         16   the -- or what was used to compile the lineup?

         17   A    It was Spillman, yes.

         18   Q    Okay.  Can you give us a brief description -- brief -- of

         19   how it is that Spillman generates a lineup when a known

09:32:03 20   individual, a suspect is -- is used as sort of the base

         21   photograph?

         22   A    Yes.  I am not a Spillman operator, but from being around

         23   other people when they do it, my understanding, and from

         24   observing them do it, is you enter either the subject's name or

09:32:21 25   their name number, and from there it generates -- it pulls

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                    27
Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020
Ribail/D/Burson

1  information about that person -- their height, weight, even

2  race, sex -- and from there it generates a photo lineup for you,

3  um, of five other pictures, including the subject.  And then on

4  the side, it -- it shows other individuals that might be -- that

09:32:49  5  are similar.  It gives you a choice, I guess, of other people to

6  add and subtract from the lineup.

7        MR. BURSON:  Before I move on, Your Honor, the agent

8  spoke briefly about two policy guides that were published by the

9  FBI in 2013 and 2019, respectfully.  Those are marked as

09:33:19  10  Government's Exhibits 1 and 2.  I'd like to move to just go

11  ahead and admit those now.

12        THE COURT:  Any objection?

13        MR. McENTIRE:  No, Your Honor.

14        THE COURT:  They'll be admitted.

09:33:27  15    (Government Exhibit No. 1 admitted into evidence.)

16    (Government Exhibit No. 2 admitted into evidence.)

17        MR. BURSON:  May I approach the podium for --

18        THE COURT:  You can.

19  BY MR. BURSON:  (Continuing)

09:34:18  20  Q    Agent Ribail, I'm showing you the cover page of what is

21  marked as Government's Exhibit 4.

22        THE COURT:  I'm sorry.  I didn't catch it.  Government

23  exhibit ...?

24        MR. BURSON:  4, Your Honor.

09:34:29  25        THE COURT:  4.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                        28
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/D/Burson*

1    BY MR. BURSON:   (Continuing)

2    Q    Have you seen that document before?

3    A    Yes.

4    Q    And you can see it on your monitor right now, right?

09:34:37  5    A    I can.

6    Q    What is this document?

7    A    Uh, this is one of the lineups that we made that day.

8    Q    Okay.  And by "that day," you're referring to June 9th,

9    2019?

09:34:48  10    A    Correct.

11    Q    At the substation?

12    A    Yes.

13    Q    Okay.  I'm going to briefly flip through.

14         As you recall, is this the complete lineup that was

09:35:03  15    generated that day?

16    A    Yes.

17    Q    All right.  And which -- which suspect was this lineup

18    generated from?

19    A    Donovan Cloud.

09:35:19  20    Q    And so is this the picture that was used to generate the

21    remainder of the lineup (indicating)?

22    A    Yes.

23    Q    Can you see that on your screen Agent Ribail?

24    A    Yes.

09:35:48  25    Q    Do you recognize this document?

1    A    I do.

2    Q    What document is this?

3    A    It's a -- it's another photo lineup, but this one contains

4    James Cloud.

09:35:57  5    Q    Okay.  And this was also generated June 9th, 2019?

6    A    Yes.

7    Q    I'm going to flip through --

8        THE COURT:  Counsel, what exhibit number is this?

9        MR. BURSON:  This is marked as Exhibit 5, Your Honor.

09:36:09  10       THE COURT:  Okay.

11   BY MR. BURSON:  (Continuing)

12   Q    I believe you testified that this was generated using a

13   photo of James Cloud, correct?

14   A    Yes.

09:36:29  15   Q    Is this the photo of James Cloud --

16   A    Yes.

17   Q    -- that was used to generate the lineup?

18   A    Yes.

19   Q    Okay.  And both of these exhibits that we just reviewed,

09:36:39  20   Exhibits 4 and 5, they're in the same condition they were

21   following their generation that day?

22   A    Yes.

23   Q    Okay.

24       MR. BURSON:  Your Honor, Government moves to admit

09:36:48  25   Exhibits 4 and 5.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/D/Burson*

30

1          MR. McENTIRE:  No objection from James Cloud.

2          MR. SMITH:  No objection, Your Honor.

3          THE COURT:  They'll be admitted.

4      (Government Exhibit No. 4 admitted into evidence.)

09:37:00  5      (Government Exhibit No. 5 admitted into evidence.)

6  BY MR. BURSON:  (Continuing)

7  Q     So after you produced these lineups, Agent Ribail, where

8  did you go?

9  A     We went to JV's residence.

09:37:17 10  Q     Okay.  So we've been talking about another crime scene --

11  right? -- at, I believe you referred to it as Cagle residence at

12  one point, Medicine Valley another time.

13      What was the -- what was your reason for going to JV's

14  residence?

09:37:34 15  A     Uh, JV and his family, uh, on Saturday, a couple of people

16  had arrived at their residence and basically carjacked, you

17  know, their car at gunpoint.

18  Q     Okay.  When you went to the residence, were you able to

19  make contact with JV and his family?

09:37:54 20  A     Yes.

21  Q     Okay.  I want to focus primarily on JV.

22      What was your understanding of the incident, as described

23  by him?

24  A     Just generally starting at the beginning?

09:38:14 25  Q     Yes.

1    A    I believe his wife and a kid were outside working on flower

2    beds, something like that, when a couple people approached the

3    house and demanded a car, I think, in simple terms.

4    Q    Okay.  Are you aware of any more detail that he had

09:38:32  5    provided before you arrived at the residence or in subsequent

6    interviews?

7    A    Yes.

8    Q    Could you enlightened us, please.

9    A    Well, yes.  So he was interviewed that day by, I believe,

09:38:43  10    the sheriff's office, but he described both individuals, uh,

11    like height, you know, size, I think a little bit of clothing,

12    and that they were both armed.

13    Q    Okay.  And as far as what happened when those individuals

14    arrived, what he witnessed, could you tell us what he described

09:39:00  15    regarding that?

16    A    So one of them, I think, had a pistol pointed at his son's

17    head.  Uh, the other individual stayed with JV.  JV eventually

18    got keys to the vehicle, and then that's the vehicle they used

19    to flee, but they actually brought the son with them, until the

09:39:18  20    son jumped out.

21    Q    Okay.  And why did JV go get the keys?

22    A    Uh, they were in the garage, I believe.  They were inside

23    the house.  He had to go inside the house to get the keys.

24    Q    Okay.  You said "they" went inside the house.

09:39:33  25    Other than JV, who went inside of the house?

1   A    One of the suspects.

2   Q    Okay.  Accompanied him into the house?

3   A    Yes.

4   Q    Okay.  And JV, as you understand it, retrieved the keys for

09:39:44  5   what vehicle?

6   A    I think initially it was a van.

7   Q    Okay.

8   A    And then they didn't like -- didn't want the van, so then

9   he gave them the keys to his truck.

09:39:53  10   Q    Okay.  When you say "they," you're referring to?

11   A    The suspects.

12   Q    Okay.  And so did he have to go back into the house to

13   retrieve an additional set of keys?

14   A    I don't know.  I -- I mean, generally, yes, but I -- my

09:40:10  15   impression was it wasn't like a long way into the house.  It was

16   kind of like reaching into the -- maybe into the garage.  So it

17   was slightly in, bringing the van keys, and they didn't want the

18   van so slightly in, switching to the truck --

19   Q    Okay.

09:40:24  20   A    -- is my impression.

21   Q    So there were two retrievals of keys.

22   A    Yes.

23   Q    Okay.  During this time, you said one suspect had a gun to

24   his son's head, I believe, correct?

09:40:35  25   A    Yes.

1    Q    What was the other suspect doing, as reported by JV?

2    A    He also had a gun, um, described as a shotgun.

3    Q    Okay.  And what was he doing with that shotgun?  Did JV

4    say?

09:40:44    5    A    I would say JV felt threatened by the shotgun, yes.

6    Q    Okay.  And do you recall how -- how far away JV said he --

7    he was?

8    A    I don't know that there was a specific number, but -- to

9    the person with the shotgun very close, but from him to his son

09:41:08    10    and the other suspect, I would say within 20 feet, 10 -- 10,

11    20 feet.

12    Q    Okay.  And as reported by JV, what happened after he

13    retrieved the set of truck keys, after returning the van keys?

14    A    Uh, the suspects got in it, they -- they made his son get

09:41:26    15    in the back of the truck, and then when they left, the son

16    jumped out of the truck.

17    Q    Okay.  So the -- the son got into the back of the truck?

18    A    Yes.

19    Q    Okay.  Why did the son get into the back of the truck?

09:41:39    20    A    Initially, they were trying to get the son in the front,

21    and I think the family pled with them to let him -- to allow him

22    to ride in the back of the truck.

23    Q    Okay.  Again, just for clarity sake, when you say "they,"

24    you're referring to?

09:41:53    25    A    JV and his family.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    Q    Okay.  And when you say "they" wanted to get the son into

2    the front of the truck, you're referring to?

3    A    The suspects.

4    Q    Okay.  And so if I'm understanding your testimony right,

09:42:06    5    there was an attempt to -- I don't want to misclarify here, but

6    "they," referring to the suspects, wanted the son in the cab of

7    the truck.

8    A    Correct.

9    Q    Okay.  And when -- and when they made that known, what

09:42:23   10    happened?

11    A    JV and his family pled with them to allow him to -- to ride

12    in the bed of the truck.

13    Q    Okay.  And so during this time, it sounds like JV and his

14    family were speaking with the suspects.

09:42:34   15    A    Yes.

16    Q    Okay.  And then -- and so did they convince the suspects

17    to -- to allow the son to ride in the back of the truck?

18    A    They did.

19    Q    Okay.  Once the son is in the back of the truck, what

09:42:49   20    happened?

21    A    Uh, the truck starts to pull out.  I think it had to back

22    up, stop for a second, then go forward.  And as that was

23    happening, JV and/or his wife were screaming, you know, "Get out

24    of truck" or "jump" or something, and the son did.  And then the

09:43:05   25    truck left their residence.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    35
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/D/Burson*

1    Q    Okay.  And so it was after -- it would have been the day

2    after this incident that you went to JV's residence, correct?

3    A    Yes.

4    Q    Okay.  And you spoke with JV?

09:43:22   5    A    Yes.

6    Q    What was the -- the primary reason for going to JV's

7    residence?

8    A    To show him the photo lineups.

9    Q    And you recall Exhibits 4 and 5 that we just went through,

09:43:39   10   correct?

11   A    Yes.

12   Q    And you -- did you show JV all four lineups that were

13   generated?

14   A    Yes.

09:43:45   15   Q    Okay.  And Exhibits 4 and 5, those were amongst those four

16   lineups?

17   A    Yes.

18   Q    Okay.  I'm showing you what's marked as Government

19   Exhibit 3.

09:44:07   20        Do you recognize that document?

21   A    I do.

22   Q    Okay.  Could you briefly describe for us what that document

23   is.

24   A    So it's a Yakima County Sheriff's Department photographic

09:44:20   25   lineup, it's basically instructions that they use to -- before

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    they show a photo lineup to a witness.

2    Q    Okay.  And you had gotten this document from where?  It's

3    not an FBI document, correct?

4    A    That's correct.

09:44:30    5    Q    Okay.  It's a Yakima County document.

6         And you retrieved it from?

7    A    Uh, Detective Cypher had it.

8    Q    Okay.  So the document was from Detective Cypher.

9         Who actually administered the lineup?

09:44:45    10    A    I did.

11    Q    Okay.  There's a signature line here.  It says, "Officer

12    Showing the Lineup."

13         Whose signature is that?

14    A    Mine.

09:44:55    15    Q    Okay.  And right here, where it says, "Person Viewing the

16    Photo Lineup," whose signature is that?

17    A    JV.

18    Q    Okay.  And I believe this indicates June 9th, 2019, is the

19    day the lineup was administered.

09:45:11    20    A    That's correct.

21    Q    Now, you've reviewed this document before, it sounds like.

22    A    Yes.

23    Q    Is it in the same condition as it was on June 9th, 2019,

24    following the execution and completion of the other notes on

09:45:20    25    here?

1    A    Yes.

2         MR. BURSON:  Okay.  Your Honor, the Government moves to

3    admit Government's Exhibit 3.

4         MR. McENTIRE:  No objection from James Cloud.

09:45:32  5         MR. SMITH:  No objection, Your Honor.

6         THE COURT:  It will be admitted.

7         (Government Exhibit No. 3 admitted into evidence.)

8    BY MR. BURSON:   (Continuing)

9    Q    So I'd like to talk about the procedure that you went

09:45:48  10   through with JV.

11        Before you started administering the lineups, did you tell

12   him anything about the lineups that you were getting ready to

13   administer or the pictures that he was getting ready to review?

14   A    So we read the -- that form verbatim, um, and then I

09:46:12  15   believe there was a short discussion afterwards of -- you know,

16   in my memory, one thing for sure we told him was, you know,

17   don't tell your family whether you picked anyone or not.  Don't

18   discuss what you did or didn't do when we showed you the lineup,

19   with your family.

09:46:28  20   Q    Okay.  And you gave JV that instruction prior to beginning

21   the lineup?

22   A    Yes.  We gave that to all of his -- all of JV's family.

23   Q    Okay.  And so when you talk about Exhibit 3 --

24        MR. BURSON:  Could we pop that up?  Thank you.

25

1    BY MR. BURSON:   (Continuing)

2    Q    When you talk about Exhibit 3, you said you read these

3    instructions verbatim.

4         Are you referring to the instructions here, where I'm

09:46:57    5    indicating, marked as 1 through 6?

6    A    Yes.

7    Q    Okay.  And then I assume this introductory line here

8    (indicating).

9    A    Yes.

09:47:06    10    Q    Okay.  As best as you recall, did JV have any questions

11    about those instructions?

12    A    No.

13    Q    And did he review the document before he signed it where

14    you indicated he did earlier?

09:47:19    15    A    Yes.

16    Q    Okay.  And just for clarity purposes, Agent Ribail, the

17    lineups that you generated, as we saw earlier, and, again, those

18    are Exhibits 4 and 5 that we're going to be talking about, the

19    first page of those is a cover sheet with some identifying

09:47:56    20    information about the individuals pictured.

21         Was that included with the photos while you conducted the

22    lineup with JV?

23    A    No.

24    Q    So that was removed beforehand?

09:48:08    25    A    Yes.

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                    39
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/D/Burson*

1    Q    Okay.  So now let's talk about the actual administrative --

2    the actual administration of the lineup following the execution

3    of that cover sheet marked as Exhibit 3 or admitted as

4    Exhibit 3.

09:48:23    5        Did you use the same procedure for each of these -- well,

6    for all of the lineups that you administered with them?

7    A    Yes.

8    Q    Okay.  Can you walk us through -- first of all, where did

9    this lineup take place?

09:48:39    10   A    It was in JV's driveway at his residence.

11   Q    Okay.  So the two of you were standing in the driveway?

12   A    Yes, with -- with Detective Cypher.

13   Q    Okay.  And as you were administering this lineup with JV,

14   where was rest of his family?

09:48:56    15   A    Inside the residence, I believe, but not -- not around us

16   or, you know, within -- I couldn't see them, so ...

17   Q    Okay.  Other than you, Detective Cypher, and JV, was anyone

18   else in the driveway?

19   A    No.

09:49:12    20   Q    Okay.  And now can you walk us through how you actually

21   administered this lineup?

22   A    So I -- I would take a packet, and then based on my notes,

23   I believe we started with, you know, No. 5035.  I would make

24   sure that the name list was gone, so either put it in my folder

09:49:34    25   or put it under the other remaining lineups.  And then I would

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    hand them to him, and we're actually on the hood of a car.  So

2    hand him -- they're upside down.  You know, I would hand him the

3    first photo, he would review it, and then hand it back, and we

4    would repeat.  And I'm handing them in such a way -- they're

09:49:54  5    upside down -- so that I'm not really -- I can't see them, you

6    know, either, as I'm handing them.

7    Q    Okay.  So the stack of photos would be on the hood of the

8    truck?

9    A    Car, yes.

09:50:04  10    Q    Hood of the car.

11        Did you hand him the photos one by one?

12    A    Yes.

13    Q    Okay.  So you would hand him one photo.

14        Would you hand him another photo while he's still looking

09:50:16  15    at that, or would you wait until he gave the photo back to you

16    before handing him another photo?

17    A    Would wait for him to, yes, hand it back after -- most

18    people say "no" or something like that.  So he would say "no,"

19    and then he -- I would take it back and then hand him the next

09:50:32  20    one, and then after he had enough time to review it, I would

21    take it back and then hand him another one.

22    Q    Okay.  And, now, I know the photos were upside down on the

23    hood of the car, and you just testified that you made an effort

24    not to see which photo it was as you handed it to him.

09:50:54  25        What about when he handed it back to you?  Would you make

1    the same effort to not view the photo he had just handed back?

2    A    I think generally.  I think it's harder when somebody is in

3    control, so I probably did see them.  But, yes, I did my best to

4    not be involved in knowing what he was looking at.

09:51:12  5    Q    Okay.  And as you recall, by the time you took the photo

6    back in each instance, he had already indicated a "yes" or a

7    "no," as far as identification goes?

8    A    Yes.

9    Q    Okay.  What about the order in which the photos were laying

09:51:30  10   facedown on the vehicle?  Did you know what order they were in?

11   A    It's a tough question.  I think the answer is "yes" and

12   "no."  Um, I would say yes, I knew -- I know what order they

13   were in, because we kept them in the same order as they are in

14   the lineup, as they were generated, the list.  Um, but because

09:51:53  15   there were so many lineups, I couldn't memorize which lineup was

16   which.  So, you know, in this case we started with 5035.  Um, I

17   had -- I did not memorize all four lineups where suspects, what

18   number they were in each, I guess, if that makes sense.

19   Q    So as you were handing photos to JV, and you weren't able

09:52:22  20   to see the photo, did you know which photo it was as you handed

21   it to him?

22   A    I guess generally I'd know this is the first photo, the

23   second photo, and so on, yes.

24   Q    But did you know whether it was a filler photo or a suspect

09:52:36  25   photo?

1    A    No.

2    Q    So looking back at Exhibit 3, there are some markings down

3    here, and we'll start with the four-digit numbers; each of them

4    begins with a 5.

09:53:02    5        What are those numbers referring to?

6    A    That's the unique number that Spillman gives the photo

7    lineup when you're done and save it.

8    Q    Okay.  And -- and who was it that was making these notes

9    here?

09:53:14    10    A    Myself.

11    Q    All right.  And so judging by the fact that there's --

12    there are four lineups administered, there's four unique

13    identifying numbers on here -- 5032, 5033, 5034, 5035 -- this

14    cover sheet was used to record, by you, the results of the

09:53:38    15    lineups for all of the lineups consolidated, right?

16    A    Correct.

17    Q    Okay.  I'd like to show you again Exhibit No. 5.

18        We've been talking about unique identifying number.  This

19    5033 on the cover sheet of the lineup, and also in the upper

09:54:13    20    left-hand corner of the -- each individual picture, is that the

21    unique identifier, same unique identifier that is indicated as

22    5033 on Government Exhibit 3?

23    A    Yes.

24    Q    And going back to Exhibit 4, this unique identifier, 5032,

09:54:50    25    is that the same 5032 that's on the cover sheet?

1    A    Yes.

2    Q    Okay.  So let's talk about Exhibit 4.

3         You testified earlier that this was a lineup including a

4    photo of Donovan Cloud, correct?

09:55:05    5    A    Yes.

6    Q    All right.  And was this -- and, again, you testified this

7    is one of the lineups that you showed to JV on that day.

8    A    Yes.

9    Q    All right.  And when you administered this lineup to him,

09:55:21    10   did you use the same single-blinded procedure you described

11   earlier?

12   A    Yes.

13   Q    Do you recall if, when you handed him any pictures in this

14   lineup one at a time, whether he indicated that he recognized

09:55:38    15   any of these individuals in this lineup as the individuals who

16   had visited his house that day, you know, held his son at

17   gunpoint, et cetera?

18   A    Yes, he did.

19   Q    Okay.  Do you recall -- well, let's just look at the notes

09:55:54    20   you made, shall we?

21        Showing again Government Exhibit 3.  There's a "5032" here.

22        Is that referring -- again, referring to the "5032" on

23   Exhibit 4?

24   A    Yes.

09:56:10    25   Q    Can you read the note next to "5032"?

1    A    Yes.  It says (reading):  Looks like guy had pistol to

2    son's head, facial hair, height, hair, teared up almost instant.

3    Q    Okay.  And as you recall it, that description, that looks

4    like the guy that had gun to son's head and -- is that an

09:56:44    5    accurate statement of what he said about this particular

6    individual?

7    A    Yes.  That's me taking notes as he's describing why he

8    believes that is one of the -- that that's the person with the

9    pistol at his son's head.

09:57:00    10    Q    Okay.  Do you recall, when you handed him that picture, any

11    time delay between him looking at the picture and him making

12    that comment?

13    A    No.  He teared up -- that's why I noted it that way -- up

14    almost instantly.  I mean, he took the picture, and you could

09:57:19    15    just see his face change.

16    Q    Okay.  So that comment there, teared up instantly, does

17    that accurately reflect what you observed happened when he

18    viewed the picture that you had handed him?

19    A    Yes.

09:57:39    20    Q    Okay.  And "5032" with a "6" next to it, what does that

21    note indicate?

22    A    That's me noting which picture he identified.

23    Q    And by "5032-6," showing Government Exhibit 4, last page --

24    Page 6 is labeled 7, is this the photo that you're referring to

09:58:13    25    when you made that note --

1    A    Yes.

2    Q    -- that he instantly teared up upon seeing --

3    A    Yes.

4         MR. SMITH:  Your Honor, I'm going to object.  The

09:58:22    5    attorney is misstating what the officer's notes reflect.  He

6    keeps -- he keeps referring to it as "teared up instantly," when

7    the officer's notes reflect that -- there's another word there,

8    and I don't want to -- to make a record that's incorrect.

9         MR. BURSON:  I'll rephrase, Your Honor.

09:58:39    10         THE COURT:  Go ahead.

11    BY MR. BURSON:  (Continuing)

12    Q    Is this the picture that JV, as you recall and made a note,

13    quote, according to your note, "teared up almost instantly"?

14    A    Yes.

09:58:54    15    Q    Okay.  Going back to Exhibit 5, lineup 5033, as indicated

16    on each page on the upper left-hand corner, you testified

17    earlier this is a lineup that included James Dean Cloud,

18    correct?

19    A    Correct.

09:59:25    20    Q    Okay.  And this lineup, did you use the same single-blinded

21    administration technique that you described for us earlier?

22    A    Yes.

23    Q    Okay.  And as you handed these photos to JV, did he pause

24    at any of them to indicate that he recognized any individuals?

09:59:47    25    A    No.

1    Q    Okay.  So he made no identification for this?

2    A    Correct.

3    Q    And, indeed, Government Exhibit 3, next to "5033" indicates

4    none.

10:00:06    5         Is that right?

6    A    No identification, correct.

7    Q    Okay.  Now, you administered lineups to his wife and his

8    son that day as well, correct?

9    A    I -- yes.

10:00:26    10    Q    They made no identification?

11    A    Correct.

12    Q    After you administered the lineups that day at JV's

13    residence with JV and his family, did you depart the residence?

14    A    Yes.

10:00:45    15    Q    Where did you go?

16    A    I don't remember exactly where we went next, but later -- I

17    know later in that day we, um, administered a lineup with LL,

18    and we also ended up back on JV's property later that day as

19    well.

10:01:02    20    Q    Okay.  So I want to focus on the ending up back at JV's

21    property.

22         How did you end up -- I should say, why did you end up back

23    on JV's property?

24    A    Based on the investigation at that point, we believed that

10:01:17    25    there might be some other evidence out in one of their fields,

1    so we wanted to go take a look.

2    Q    Okay.  And so you were -- you actually were on JV's

3    property?

4    A    Yes.

10:01:28    5    Q    And do you remember approximate time of day?

6    A    I would guess 6:00 or 7:00 at night.

7    Q    When you were on JV's property, did you make contact with

8    JV?

9    A    We did.

10:01:46   10    Q    Okay.  How did that come about?

11    A    We were -- I think we were driving through -- to get on his

12    property, which is kind of a farm, we had to drive through part

13    of the driveway.  And as we were driving through the driveway, I

14    think on the way in -- could have been on the way out, but I

10:02:04   15    think on the way in, he -- I picture him kind of like running,

16    kind of shaking his hands, so we stopped to see what he wanted.

17    Q    Okay.  And what -- and what did he want?

18    A    Uh, he wanted to talk to us because he had seen pictures on

19    the Internet of who he thought were the suspects.

10:02:23   20    Q    Okay.  And did he make any statements about those photos

21    that he'd seen on the Internet?

22    A    He did.  He said that, uh, the photos that he saw on the

23    Internet he was 100 percent sure were the two individuals that

24    carjacked him and his family the previous day.

10:02:42   25    Q    Okay.  And you just used the phrase "100 percent sure."

1       Are those his words or yours?

2    A    His words.

3    Q    Verbatim?

4    A    Yes.  I didn't even ask.  He said, "100 percent."  And he

10:02:55  5  was kind of mad.

6    Q    Okay.  And you said you didn't ask.  You didn't ask for a

7    degree of certainty.  He volunteered 100 percent?

8    A    Correct.

9    Q    Okay.  So you said he was kind of mad.

10:03:05  10      Why would he be -- did he indicate why he was mad?

11   A    He did.  He said, "Why couldn't you use those photos?"  And

12   I hadn't seen the photos that he had seen at that point, but,

13   um, he was sort of describing that, you know, one of them was

14   like a Facebook picture, I think he said like a guy, you know,

10:03:23  15  flexing his muscles in front of a waterfall or --

16       MR. SMITH:  Your Honor, I'm sorry, I can't hear the

17   witness' testimony.

18       THE COURT:  Okay.

19       MR. SMITH:  If you could bring it a little closer and

10:03:32  20  speak up.

21       THE COURT:  Sure.

22       Could you repeat your last answer.

23       MR. SMITH:  Please.

24       THE WITNESS:  I don't remember where I was at.  Um --

25

1    BY MR. BURSON:    (Continuing)

2    Q    You were just saying that he indicated that at least one of

3    them was a Facebook photo.

4    A    Yes.  He kind of described the photos; that one he

5    described, in my memory, as being kind of like a Facebook photo,

6    um, of a guy like posing in front of a waterfall.  His point was

7    that these were new, fresh, you know, pictures.  It looked like

8    the two people that were there.

9    Q    Okay.  Now, he didn't show you the pictures that day, I

10    believe you just indicated.

11    A    No.

12    Q    All right.  At some point thereafter were you able to see

13    what pictures he was referring to that he had -- he had seen and

14    was, quote, 100 percent certain that those -- those were the

15    suspects?

16    A    Yes.  He provided them to us at a later date.

17    Q    Okay.  How did he provide them to you?

18    A    Uh, he sent them in a text message.

19    Q    All right.  Showing you what has been marked as Government

20    Exhibit 8, albeit very small at the bottom.

21        Do you recognize this photo?

22    A    Yes, that's -- that's what he provided to me.

23    Q    Okay.  When you say -- this appears to be like a text

24    message string.

25        Is that right?

1    A    Correct.

2    Q    Okay.  So when you say he provided it to you, you mean he

3    sent you a text?

4    A    Yes.

10:05:17    5    Q    Okay.  And so this is an exchange between you and JV; is

6    that right?

7    A    That's correct.

8    Q    Okay.  And is this like a screen-shot of your phone?

9    A    Yes.

10:05:29    10    Q    Okay.  And -- and so this would be you asking for a web

11    page link?

12    A    Yes.

13    Q    Okay.  And is this the -- did he indicate that this is the

14    photo that he had seen online?

10:05:43    15    A    Yes.

16    Q    All right.  He didn't provide a name, correct?

17    A    This is all he provided, yes.  Correct.

18    Q    Okay.  And what I mean is he didn't provide a name of "This

19    person named X, this is his picture"?

10:05:57    20    A    Not -- not that I recall, no.

21    Q    Okay.  Do you know now who this -- who the individual

22    pictured in this photo is?

23    A    Yes.

24    Q    Could you tell us?

10:06:06    25    A    It's Donovan Cloud.

1  Q    Okay.  And JV had already indicated that a photo of Donovan

2  Cloud in the lineup was the person who held a gun to his son's

3  head, correct?

4  A    Yes.

10:06:23  5  Q    Okay.  Now, he also sent you this link here.

6      Do you recall what that link is to, as best as you recall?

7  A    Yes.  It's I think it's called Yakima Scan.  I can't

8  remember if it's attached -- I mean, it's attached to Facebook,

9  but it's a local place where people -- you can get on there and,

10:06:48  10  you know, say, "My neighbor's house is on fire" or "the police

11  are at this address."  It's just a way to report crime and --

12  and fires and other dangerous situations, I guess.

13      MR. BURSON:  Okay.  Your Honor, Government moves to

14  admit Exhibit 8.

10:07:03  15      MR. SMITH:  No objection, Your Honor.

16      MR. McENTIRE:  And no objection from James Cloud.

17      THE COURT:  It will be admitted.

18      (Government Exhibit No. 8 admitted into evidence.)

19  BY MR. BURSON:  (Continuing)

10:07:35  20  Q    Showing you what's marked as Government Exhibit 7.

21      Is this -- is this the photo that JV had sent you a link

22  to?

23  A    No.

24  Q    So --

10:07:51  25  A    That's not the link.  That's --

1    Q    Sorry.  Okay.  Is this a reproduction of the photo that JV

2    had sent you a link to?

3    A    Yes.

4    Q    Okay.  But it was on something called Yakima Scan, I

10:08:05  5    believe you testified to.

6    A    Scan and/or the Yakama Nation website.

7    Q    Okay.  Are you familiar with this image here?

8    A    Yes.

9    Q    Including, you know, the -- the information up top, the

10:08:18  10    imagery?

11    A    Yes.

12    Q    Okay.  And so where does this come from?

13    A    Uh, the Yakama Nation Tribal Police put this bulletin out.

14    Q    Okay.  Now, this is a photo of James Cloud, correct?

10:08:35  15    A    Correct.

16    Q    Your understanding is this is the photo that JV saw

17    sometime prior to him coming out and flagging you down?

18    A    Yes.

19    Q    This was the photo that he was referring to, it's your

10:08:45  20    understanding, when he said, "Why didn't you guys use these

21    photos"?

22    A    Yes.

23    Q    This is one of them.

24    A    That's correct.

10:08:51  25    Q    Okay.  And when he said he was 100 percent certain that

1    these were the guys, your understanding is these were one of the

2    guys that he was referring to?

3    A    Yes.

4    Q    Okay.  So have you become familiar with the origins of

10:09:06    5    this -- well, first, you've viewed this, right, online?

6    A    Yes.

7    Q    Okay.  In and around the time that JV provided you the

8    information?

9    A    Yes.

10:09:16    10    Q    And it's substantially in the same form as it was when you

11    viewed it?

12    A    Yes.

13    Q    Okay.  And, again, you viewed this on the Yakama Nation's

14    Facebook page?

10:09:26    15    A    Yes.

16        MR. BURSON:  Okay.  Your Honor, move to admit Government

17    Exhibit 7.

18        THE COURT:  Any objection?

19        MR. McENTIRE:  The question was whether or not he viewed

10:09:36    20    it under the Yakama Nation's Facebook page, and I think it was

21    viewed on the Yakama Tribal Police.  I just want to clarify

22    that.

23    BY MR. BURSON:   (Continuing)

24    Q    Where did you originally view this?

10:09:48    25    A    I saw it in multiple places, so I don't know which place I

1    saw it initially.

2    Q    Okay.

3    A    I think this reproduction we actually got from either

4    Tribal directly or from their website.

10:10:00   5    Q    Okay.  But you obtained this from one of those sources?

6    A    Yes.

7    Q    Okay.  Is it in substantially the same form as it was when

8    you obtained it --

9    A    Yes.

10:10:07  10    Q    -- from one of those sources?

11    A    Yes.

12         MR. McENTIRE:  No objection from James Cloud.

13         MR. SMITH:  No objection, Your Honor.

14         THE COURT:  It will be admitted.

10:10:13  15    (Government Exhibit No. 7 admitted into evidence.)

16    BY MR. BURSON:  (Continuing)

17    Q    So I want to talk about this Facebook posting for a bit.

18         You know, it says (reading):  One suspect remains at large

19    in reservation murders.

10:10:28  20         Your understanding is that's referring to the murders that

21    we've been discussing, correct?

22    A    Correct.

23    Q    All right.  And I just want to clarify one point:  At this

24    point in time, did the investigation indicated [sic] that the

10:10:39  25    same people who were suspected of these reservation murders that

1    had occurred the day before this was posted, were they the same

2    suspects in the events at JV's residence that we've been talking

3    about?

4    A    At this point that's what we believed, yes.

10:10:57  5    Q    Okay.  Still believe that?

6    A    Yes.

7    Q    So -- and what was that based on?

8    A    I think generally it was based on a vehicle was taken from

9    where -- from John Cagle's residence, and that vehicle was near

10:11:17  10    this -- near JV's residence.  And, you know, there were four

11    occupants at one point, and then two got picked up and the other

12    two didn't, so kind of narrowed down which two likely ended up

13    at JV's residence.

14    Q    Okay.  And is there other -- as we stand here today, is

10:11:35  15    there other evidence to corroborate that the same individuals

16    were involved in both incidents that you haven't detailed today

17    and --

18    A    Yes.

19    Q    -- are the subject of another hearing?

10:11:44  20    A    Yes.

21    Q    Okay.  So this post, that appears it was posted June 9th at

22    5:12 p.m., indicates that one suspect remains at large in the

23    reservation murders.

24        Was that your understanding as well, that there was one

10:12:04  25    subject at large?

1    A    Yes.

2    Q    Okay.  And based on your investigation up to that point,

3    one of those suspects was James Cloud, the individual pictured

4    here --

10:12:13    5    A    Yes.

6    Q    -- correct?

7         Okay.  And so that's an accurate statement:  June 9th,

8    2019, 5:12 p.m., one suspect remained at large, and it was the

9    individual pictured here.

10:12:23    10         Correct?

11    A    Yes.

12    Q    And actually named in the -- in the post.

13    A    Yes.

14    Q    Okay.  I'd like to show you another posting with the header

10:12:47    15    "Yakama Nation Info."

16         Are you familiar with this image here?

17    A    Yes.

18    Q    Did you obtain this image as well?

19    A    The FBI did, yes.

10:12:55    20    Q    Okay.  And where was it obtained from?

21         THE COURT:  What exhibit number, Counsel?

22         MR. BURSON:  This is marked as Government Exhibit No. 6,

23    Your Honor.

24         THE COURT:  Thank you.

25

1    BY MR. BURSON:  (Continuing)

2    Q    Are you familiar with this image?

3    A    Yes.

4    Q    Okay.  Do you know where it came from?

10:13:08  5    A    The Yakama -- Yakama Tribal Police.

6    Q    Okay.  And so was this -- and in substantially the same

7    form as it was when you originally viewed it after it was

8    obtained by another agent?

9    A    Yes.

10:13:24  10    Q    And your understanding is it's also a Facebook post?

11    A    Yes.

12        MR. BURSON:  Okay.  Move to admit Government Exhibit 6.

13        THE COURT:  Any objection?

14        MR. McENTIRE:  No objection from James Cloud.

10:13:36  15        MR. SMITH:  No objection, Your Honor.

16        THE COURT:  It will be admitted.

17        (Government Exhibit No. 6 admitted into evidence.)

18    BY MR. BURSON:  (Continuing)

19    Q    So this post indicates that it was put up on the Facebook

10:13:43  20    account on June 9th, 2019, at 3:19 p.m.

21        You'd agree with that, right?

22    A    Yes.

23    Q    That's two hours prior to this post in Exhibit 7 saying

24    that one suspect is at large.

10:14:02  25    A    Yes.

1   Q    And even though it's two hours prior, this one says all

2   suspects connected to five murders have been apprehended.

3   A    That's correct.

4   Q    Okay.  So you would agree the later post, in Exhibit 7,

10:14:17   5   indicating one suspect, James Cloud, pictured here is at large,

6   is a correction of this earlier post saying that all suspects

7   are -- have been captured.

8   A    Yes.

9   Q    Okay.  Did you do any investigation or did a co-agent do

10:14:37   10   any investigation, that you've spoken with on this matter, do

11   any looking into exactly how that happens, that the Yakama

12   Nation posted all suspects in custody at 3:00 p.m. and then two

13   hours later another post saying, actually, that's not the case;

14   there's one suspect at large?

10:15:00   15   A    Yes.

16   Q    Could you briefly describe how it is that that happened.

17   A    Yes.  Generally, Oregon State Police arrested Donovan Cloud

18   and there were a couple other people in the car or in the area,

19   and I think when that information was relayed to law enforcement

10:15:18   20   up here, you know, through Tribal, through Sheriff's Office,

21   through us, somehow it got twisted that there were two people in

22   custody.  And I think, uh, somebody told Tribal, or they made

23   the leap themselves, that because two people -- two people,

24   including Donovan Cloud, were in custody, that they both were in

10:15:38   25   custody.

1    Q    Okay.

2    A    And then they released this memo.

3    Q    So Oregon State Police had apprehended Donovan Cloud --

4         THE COURT:  Counsel, let me stop you here.

10:15:50  5         This is normally the time when we take our morning

6    recess when we're in trial, so we're going to follow a normal

7    trial schedule.  We'll take a 15-minute recess at this time,

8    give the witness and everyone an opportunity to take a little

9    break.

10:16:12  10         One thing I failed to mention, and I want to make sure

11   that the record is, in fact, also clear on this:  Mr. -- Messrs.

12   Cloud, your attorneys are seated in a socially distant way,

13   approximately at least 6 feet from you.  However, if you need to

14   communicate with them at any point, you can do so at any point.

10:16:36  15   If there's something that is -- you cannot hear, it is mumbled

16   because of a person wearing facemasks or whatever, let me know,

17   and I will make sure that whatever is not understood by you is

18   repeated.

19         Is that clear?  First with Mr. James Cloud?

10:16:56  20   DEFENDANT JAMES CLOUD:  Yes.  Yes.

21   THE COURT:  Mr. Donovan Cloud?

22   DEFENDANT DONOVAN CLOUD:  Yes.

23   THE COURT:  And, also, have you had an opportunity to

24   communicate with your lawyers, if you wished to do so, during

10:17:07  25   the hearing this morning?  If you wished to do so, did you have

1    an opportunity to communicate with them during this hearing?

2              DEFENDANT DONOVAN CLOUD:  No.  Yeah.  No.

3              THE COURT:  Okay.  Well, it's not a trick question.

4    Okay?  Let me start with Mr. James Cloud.

10:17:27    5        During this hearing, did you have an opportunity to, if you

6    wanted to, not to say that you were compelled to, but if you

7    wanted to talk to your attorney, did you have an opportunity to

8    do so if you wanted to?

9              DEFENDANT JAMES CLOUD:  Yeah, briefly.  But, um --

10:17:43   10              THE COURT:  I can't hear you.

11              DEFENDANT JAMES CLOUD:  I said yeah, briefly, when I

12    first got here.  But like I just got a big stack of papers to

13    review yesterday, and we don't actually got --

14              THE COURT:  Okay.

10:17:59   15              THE REPORTER:  I'm sorry?

16              DEFENDANT JAMES CLOUD:  I got a bunch of copies of

17    motions --

18              THE COURT:  Sure.

19              DEFENDANT JAMES CLOUD:  -- well over 100 pages.

10:18:04   20              THE COURT:  Sure.

21              DEFENDANT JAMES CLOUD:  We can't -- we want to take part

22    in our own defense.  We don't get actually all of that here.

23              THE COURT:  Okay.  And that is the subject of probably

24    another motion that is going to come to me, but I appreciate you

10:18:19   25    telling me that.  But just with regards to this hearing, have

1    you had an opportunity to talk to your attorney during the

2    course of this hearing, if you wanted to?

3            DEFENDANT JAMES CLOUD:  Um, well, yeah, right here in

4    the courtroom.

10:18:32   5            THE COURT:  Okay.  That's all I'm asking.  Thank you,

6    sir.

7            Sir, with regards to you?

8            DEFENDANT DONOVAN CLOUD:  Yeah.

9            THE COURT:  You have?

10:18:40   10            DEFENDANT DONOVAN CLOUD:  Yes.

11            THE COURT:  All right.  Okay.  And, again, feel free

12    that you are able to talk to your attorneys.  If we need to stop

13    this proceeding in order for you to do that, know that you can.

14            Is that clear to you?  Sir, first to you, Mr. James

10:18:54   15    Cloud.

16            THE DEFENDANT JAMES CLOUD:  Yes.  Thank you.

17            THE COURT:  Mr. Donovan Cloud?

18            DEFENDANT DONOVAN CLOUD:  Yes.

19            THE COURT:  All right.  We'll take a short recess at

10:19:00   20    this time.  Thank you.

21            THE COURTROOM DEPUTY:  All rise.  Court is in recess.

22            (Recess taken: 10:19 a.m. to 10:34 a.m.)

23            THE COURTROOM DEPUTY:  All rise.

24            (Call to Order of the Court.)

10:35:11   25            THE COURT:  Please be seated.

1          Mr. Burson, you can continue.

2          MR. BURSON:  Thank you, Your Honor.

3     BY MR. BURSON:  (Continuing)

4     Q     So, Agent Ribail, just to get us back on track here, we

10:35:47   5     were talking about these two Facebook posts by Yakama Nation,

6     right?

7     A     Yes.

8     Q     And we were discussing the fact that two hours before they

9     posted -- posted a picture of James Cloud saying one suspect at

10:36:10  10     large still, they had posted a posting saying that all suspects

11     were in custody.

12     A     Yes.

13     Q     And I believe you testified that that was basically the

14     result of some miscommunication between Oregon State Police

10:36:24  15     and -- what was the other -- what's the entity that posts -- is

16     responsible for this posting, as you know?

17     A     Yakama Nation.

18     Q     Okay.  Yakama Tribal Police or Yakama Nation?

19     A     They're one in the same, but I think Yakama Nation Tribal

10:36:43  20     Police ultimately were the ones that either asked to have this

21     posted or posted it directly.

22     Q     Okay.  And that was because they had heard from Oregon

23     State Police that two people were in custody, correct?

24     A     Yes, but -- there could have been a middle agency in

10:36:58  25     between, but, generally yes.

1    Q    Okay.

2    A    Yes.

3    Q    Are you familiar with the phrase "game of telephone"?

4    A    Yes.

10:37:03    5    Q    Okay.  Is it your understanding that is what occurred here?

6    There was a game of telephone, and two suspects in custody

7    became these two suspects in custody?

8    A    Correct.

9    Q    Okay.  And is it your understanding that at some point in

10:37:18    10    time, within two hours, I suppose, the Yakama Nation became

11    aware that their earlier posting was incorrect?

12    A    Yes.

13    Q    And this subsequent posting, indicating that James Cloud

14    was still at large, was that issued to correct the prior

10:37:38    15    posting?

16    A    Yes.

17    Q    Okay.  And you -- you -- who is the other agent working

18    with you closely on this?

19    A    Uh, Special Agent Jennifer Terami.

10:37:48    20    Q    Okay.  And one or both of you has had conversations with

21    Yakama Nation about this Facebook posting?

22    A    Yes.

23    Q    Okay.  And you've discussed it amongst each other.

24    A    Yes.

10:37:56    25    Q    Okay.  And so is it your understanding -- well, let me ask

1    you, where this post says "due to misidentification," what is

2    your understanding of what is being referred to?

3    A    The fact that they believed they were both in custody, and

4    then they later learned that only one was.

10:38:13  5    Q    Okay.  So we touched briefly earlier on FBI policy at the

6    beginning of your testimony.

7         And, again, at the time that you were conducting the

8    lineups that we've been discussing, you were operating under FBI

9    policy guidance issued in November of 2013 --

10:38:54  10   A    Correct.

11   Q    -- is that right?

12        And you testified you're familiar with that policy.

13   A    Yes.

14   Q    Okay.  And we also talked earlier about the procedure that

10:39:03  15   you went through with JV's lineup, as well as other lineups, and

16   another lineup that we haven't talked about yet.

17        Is it your understanding that those lineups were conducted

18   in compliance with the FBI November 2013 policy guidance?

19   A    Yes.

10:39:25  20   Q    Okay.  And so based on the policy guidance, you would

21   agree -- right? -- the policy guidance requires you to include

22   only one suspect per photo lineup?

23   A    Yes.

24   Q    Did you do that?

10:39:44  25   A    Yes.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    Q    It requires you to use a minimum of five filler

2    photographs.

3         Did you do that?

4    A    Yes.

10:39:49  5    Q    It requires you to use fillers that are similar in

6    appearance to not only themselves but to the suspect that's

7    included.

8    A    Yes.

9    Q    Did you do that?

10:40:01  10   A    Yes.

11   Q    Okay.  Now, you're aware that it says that you should

12   request the witness not to have any contacts with the media,

13   correct?

14   A    Yes.

10:40:13  15   Q    Okay.  So focusing on -- on the lineup administered to JV

16   and the instructions you gave him before and after the lineup,

17   if any, you testified earlier that you told him not to discuss

18   it with his family, correct, the lineup?

19   A    Correct.

10:40:31  20   Q    Okay.  Did you tell him not to contact any media?

21   A    No.

22   Q    And why not?

23   A    I think generally I sort of forgot.  I also felt like he

24   was not the type of person that was going to go do interviews

10:40:48  25   with the media.

 1    Q    Okay.  And is that your understanding of what the policy

 2    means when it says "contact the media," actually go do

 3    interviews and -- and things of that nature?

 4    A    Absolutely.

10:40:59  5    Q    Okay.  And this policy, as written by the FBI, this is to

 6    provide guidance to agents, correct?

 7    A    Yes.

 8    Q    Not lawyers?

 9    A    Correct.

10:41:14  10    Q    And so I want to kind of get your understanding, as an FBI

11    agent governed by this policy, what that means, "contact the

12    media."

13         Do you have a smartphone?

14    A    Yes.

10:41:28  15    Q    You're an FBI agent.  I assume you're probably not very

16    active on social media.

17    A    I am not.

18    Q    Okay.  But do you look at the news?

19    A    Every day, yes.

10:41:37  20    Q    Okay.  Through a web browser on your smartphone?

21    A    Yes.

22    Q    Did you do it this morning?

23    A    Yes.

24    Q    Did you have any contact with media in the last 24 hours?

10:41:47  25    A    No.

1   Q    Okay.  And because, as you understand it, "contact" means

2   engage with, speak to; things of that --

3   A    Yes.

4   Q    -- nature?  Okay.

10:41:58   5       So you didn't tell JV to not -- to -- you didn't request

6   that he not contact media.

7       First of all, is it your understanding from the policy that

8   you can only request?

9   A    Yes.

10:42:11   10   Q    You can't, like, tell them not to, correct --

11   A    That's correct.

12   Q    -- the same way you can tell them, "Don't speak to other

13   witnesses"?

14   A    Yes.

10:42:19   15   Q    Okay.  You're aware that JV saw these Facebook posts that

16   we've been talking about.

17   A    Yes.

18   Q    Okay.  Given that, are you aware of JV having contact with

19   media, as you understand it?

10:42:40   20   A    No.

21   Q    Okay.  Moving on to some other guidance that's included in

22   the FBI policy regarding instructing the witness, other than the

23   contacting the media thing, it says, you know, you're supposed

24   to inform them that they're going to be asked to view a series

10:42:59   25   of photographs.

1    Did you tell JV that?

2  A    Yes.

3  Q    It also requires or advises that you should inform them

4  that it's just as important to clear innocent people from

5  suspicion as it is to identify guilty people.

6    Did you inform JV of that?

7  A    Yes.  And, I'm sorry, I'm trying to remember the -- you

8  know, we read the sheriff's form, so it's a little different

9  than our policy, but yes.

10  Q    Okay.  So when you say that you read the sheriff's form,

11  your referring to Government Exhibit 3?

12  A    Correct.

13  Q    Okay.  So you read this verbatim, 1 through 5.

14  A    Yes.

15  Q    Okay.  And I believe one of those advisals is it's just as

16  important to eliminate innocent persons as it is to identify

17  those persons responsible.

18  A    Yes.

19  Q    The policy also advises that you should tell the individual

20  that the person who committed the crime may or may not be in the

21  lineup.

22    Did you inform JV of that, either through a written

23  document or verbatim?

24  A    Yes.

25  Q    Okay.  Now, it also requires you to ask how certain an

1    identification is, correct?

2    A    Correct.

3    Q    Now, with the lineup of Donovan Cloud, he made an

4    identification, as you recall; is that right?

10:44:19    5    A    Yes.

6    Q    And we've seen the indications on Government Exhibit 3.

7         Did you indicate, when you took your notes on Government

8    Exhibit 3 -- and I'll put them back up here so you can see

9    them -- did you indicate on there, when he identified someone in

10:44:40    10    lineup 5032, which we've already discussed, which is the one

11    that included defendant Donovan Cloud, did you indicate what his

12    level of certainty was with respect to that identification?

13    A    In my opinion, yes.

14    Q    Okay.  In your -- and how did you make that indication?

10:45:03    15    A    The -- him tearing up almost instantly, and just talking to

16    him afterwards, I didn't -- I had no doubt that he was certain

17    that that was, uh, Donovan Cloud.

18    Q    Okay.  And so why make that indication, that he teared up

19    almost immediately?  Why -- why include that note there?  Why

10:45:30    20    not just say, "Yes.  Guy who held a gun to my son's head"?

21    A    Well, it was very notable.  I mean, when we do interviews,

22    people have different reactions, and it was a very unique

23    reaction.

24    Q    How many -- how many victim witness interviews do you think

10:45:48    25    you've conducted over the past 17 years?

1    A    At least 100, probably.

2    Q    Okay.  In your opinion, when a witness sees something in a

3    lineup, sees an individual in a lineup and you've observed them

4    tearing up almost instantly, as you put it, is that an

5    indication of certainty, in your mind?

6              MR. SMITH:  Objection, Your Honor; lack of foundation.

7    He hasn't been qualified as an expert on emotional responses or

8    what it means.

9              THE COURT:  Sustained.

10             MR. BURSON:  Could I be heard on that, Your Honor?

11             THE COURT:  Have I heard of what?

12             MR. BURSON:  Can I be heard on that?

13             THE COURT:  You can, yes.

14             MR. BURSON:  I understand that.  I'm asking --

15             THE COURT:  Counsel, I know what you're asking.  If you

16   could ask it a different way, you might be able to get the

17   answer that I think you're trying to get.  So go ahead.  But you

18   can be --

19   BY MR. BURSON:  (Continuing)

20   Q    Agent Ribail --

21             THE COURT:  -- heard on that.

22             MR. BURSON:  Sorry, Your Honor, I didn't mean to

23   interrupt.

24             THE COURT:  No, that's okay.

25

1    BY MR. BURSON:   (Continuing)

2    Q    Agent Ribail, when you indicated on there that the witness

3    had teared up almost instantly, were you doing -- was your

4    intent to record a level of certainty?

10:46:56    5    A    Yes.

6    Q    Thank you.

7         Now, since -- since the lineup was administered, and we

8    spoke earlier about the FBI policy that was published or --

9    published on June 9th, 2019, the same day the lineup was

10:47:30    10    administered with JV, have you become familiar with that policy?

11    A    Yes.

12    Q    But it was sometime subsequent to the administration of the

13    lineup?

14    A    Yes.

10:47:41    15    Q    Okay.  Now, does that policy suggest that you, when

16    practicable, audio and video record lineups?

17    A    Yes, it does.

18    Q    Okay.  The policy that you were operating under, as you

19    testified, does that one require audio and video recording?

10:48:03    20    A    No.  And the new one does not require it.

21    Q    Okay.  It doesn't require it.

22         What does it -- what does it say about it?

23    A    It says it should be considered.

24    Q    Okay.  All right.  Did you consider using audio or video

10:48:15    25    equipment?

1    A    I would say "no."

2    Q    Okay.  Other than the fact that that policy that you were

3    operating under didn't require you to consider or suggest that

4    you consider audio and video recording, is there any reason that

10:48:32  5  you would have considered it?

6    A    I'm sorry.  I don't -- I don't think I understand the

7    question.

8    Q    Let me ask it this way:  Setting the policies aside, other

9    than recording what happened, based on your experience with

10:48:56  10  lineups, do you think it adds value to the lineup?

11   A    Audio or video recording it?

12   Q    Yes.

13   A    I don't think it would have in this instance, no.

14   Q    Okay.  Do you think that it would have increased or

10:49:13  15  decreased the chance that JV would have made either an

16   identification, in one instance, or a non-identification in the

17   other instance?

18   A    No.

19   Q    Okay.  Other than JV's family, did you conduct any more

10:49:37  20  lineups that day?

21   A    Yes.

22   Q    Okay.  And who was that lineup administered with?

23   A    LL, initials.

24   Q    Okay.  Now, the lineups that you showed LL, were they the

10:49:51  25  same lineups that you showed to JV?

1    A    Yes.

2    Q    Okay.  So the lineups including Donovan Cloud and the

3    lineup including -- sorry -- singular lineup including Donovan

4    Cloud and the lineup including James Cloud, those two lineups

10:50:08  5    were also shown to LL --

6    A    Yes.

7    Q    -- later that day?

8         Sometime that day, right?

9    A    Yes.

10:50:21  10    Q    Now, sticking to -- let's talk about the lineup you

11    administered on LL with Donovan Cloud.

12         Did he pick anybody out of that lineup as someone who

13    had -- he had witnessed committing a crime that day?

14    A    No.

10:50:36  15    Q    Okay.  And I think, for clarity purposes, we should talk

16    about LL.

17         As you understand it, what was LL a witness to in Medicine

18    Valley?

19    A    He showed up in a truck with some other individuals at John

10:50:56  20    Cagle's property, um, and eventually the driver and one of the

21    passengers were shot and killed, and then LL and another

22    passenger were also injured by a shotgun.

23    Q    Okay.  And how many times did he arrive at Cagle's

24    residence that day on separate occasions, if any?

10:51:17  25    A    Two times.

1   Q    Okay.  Regarding the first visit, did he describe any --

2   any crime occurring that you're aware of?

3   A    No.

4   Q    Okay.  What did he describe?

10:51:28   5   A    He said when they arrived, um, an individual had told them

6   that Dobie wasn't having guests or, you know, not -- wasn't

7   coming out to talk to anybody, generally.

8   Q    Okay.

9   A    And to go away, sort of.

10:51:42   10   Q    And so that individual wasn't Cagle.

11   A    Correct.

12   Q    Or Dobie Jacks, as he's sometimes referred to.

13        And then what did they do after that individual told them

14   that?

10:51:55   15   A    Um, so they left.  Um, they picked up another person that

16   they thought would help them, I guess, talk or see John Cagle,

17   and then they returned.

18   Q    Okay.  And then what happened when they returned, briefly?

19   A    That person went, I guess, onto the property, um,

10:52:16   20   eventually came back out, and that's when they shot everybody.

21   Q    Okay.  So let's talk about the lineups then.  Let's go back

22   to that.

23        So June 9th, 2019, the day after he was at Medicine Valley,

24   you -- you administered a lineup including Donovan Cloud.  He

10:52:36   25   made no identification, correct?

1    A    Correct.

2    Q    Okay.  What about the lineup including James Cloud; any

3    identification of anyone in that lineup?

4    A    No.

10:52:43  5    Q    And you showed him two other lineups that day, correct?

6    A    Yes.

7    Q    Four in total, just like -- just like JV and his family,

8    right?

9    A    Yes.

10:52:50  10    Q    Now, he did make an identification on one of those,

11    correct?

12    A    Yes.

13    Q    Okay.  Of an individual not here today, right?

14    A    Correct.

10:52:58  15    Q    Okay.  Do you recall what he said about that individual

16    that he had identified?

17    A    Generally, he described clothing and, uh, the weapon that

18    person had.

19    Q    Okay.  Do you recall the clothing?

10:53:19  20    A    A blue shirt.

21    Q    Did you have an opportunity to interview LL after that

22    initial lineup and interview?

23    A    Yes.

24        MR. McENTIRE:  I'm actually going to object on that,

10:53:36  25    based on it doesn't match with what the lineup instructions say.

1    It's mischaracterizing the evidence.

2            THE COURT:  One second.

3            MR. BURSON:  Referring to the lineup --

4            THE COURT:  Referring to what?  I'm not sure --

10:53:57    5            MR. McENTIRE:  It's --

6            THE COURT:  What mischaracterizes the evidence?

7            MR. McENTIRE:  It's a reference to blue shorts, not a

8    blue shirt --

9            THE COURT:  Oh, I see.

10:54:05    10            MR. McENTIRE:  -- according to the written lineup

11    instructions.

12            THE COURT:  Well, that's certainly an error that the

13    witness might be making, and I'm glad you're pointing it out,

14    but you can ask that on cross, Counsel.

10:54:16    15            Go ahead.

16    BY MR. BURSON:  (Continuing)

17    Q    So, Agent Ribail, did you have an opportunity to interview

18    LL after this initial lineup and interview?

19    A    Yes.

10:54:27    20    Q    And what was -- when -- when did that interview occur?

21    A    That was January, I think, 27th of this year.

22    Q    Okay.  And so that's about six months after the lineup,

23    right?

24    A    Yes.

10:54:42    25    Q    And what was the -- what was the purpose of that interview?

1    A    We wanted to clarify a couple things.

2    Q    Okay.  A couple --

3    A    Ask -- ask follow-up questions.

4    Q    Okay.  About Medicine Valley?

10:54:57    5    A    Correct.

6    Q    Okay.  Did you do a second lineup during that time?

7    A    No.

8    Q    Okay.  Did you ask him any questions to try and elicit

9    identification of any particular individuals during that

10:55:11    10    interview?

11    A    No.

12    Q    Okay.  So fair to say you were just asking for more details

13    or to go over details about the incidents at Medicine Valley

14    that we've been talking about?

10:55:23    15    A    Yes.

16    Q    Regarding the individuals that were present at Medicine

17    Valley other than his group, was he describing the clothing worn

18    by any individuals during this January 2020 interview?

19    A    Yes.

10:55:42    20    Q    Okay.  Can you tell us how he was referring to individuals,

21    referring to their clothing?

22    A    He referred to a male that had a blue shirt and a male that

23    had a red shirt.

24    Q    Okay.  So amongst other people; is that right?

10:55:58    25    A    Yes.

1    Q    Okay.  But he just -- he said one male, red shirt; one

2    male, blue shirt?

3    A    Yes.

4    Q    Okay.  At any point in time did he refer to either of those

5    individuals by anything other than guy in blue shirt, guy in red

6    shirt?

7    A    Yes.

8    Q    How did he refer to them, and which person was he referring

9    to?

10   A    So it caught our attention that on multiple times he

11   referred to one of them as James Cloud.  So we clarified that he

12   was talking about the person in the red shirt.  And then we

13   asked, "Why are you calling him James Cloud" --

14   Q    Hold on.

15        So before we get to that, at some point during the

16   interview he started referring to the man in the red shirt as

17   James Cloud?

18   A    Correct.

19   Q    Okay.  Did you ask him why he started referring to the man

20   in the red shirt as James Cloud during the interview?

21   A    Yes.

22   Q    Okay.  What was his answer?  Well, first, do you remember

23   his verbatim answer?

24   A    No.

25   Q    Okay.  What was his answer?

1    A    In the easiest sense, he said he saw James Cloud and the

2    name on the news.

3    Q    Okay.  And what was your understanding of what that meant?

4    A    What that meant to me was he saw a photo or a video or

10:57:23   5    whatever on the news --

6         MR. McENTIRE:  Objection.  It calls for speculation, not

7    what the witness actually said.

8         THE COURT:  Sustained.

9         MR. BURSON:  One second, Your Honor.

10:57:40   10        THE COURT:  Sure.

11        (Pause in proceedings.)

12        MR. BURSON:  Apologies, Your Honor.  I start out

13    organized but ...

14        THE COURT:  We all have our own systems, Counsel.

10:58:23   15        (Pause in proceedings.)

16    BY MR. BURSON:   (Continuing)

17    Q    Following this January 2020 interview with LL, did you

18    draft a report on a FD-302 form?

19    A    Yes.

10:59:08   20    Q    Do you recall what you wrote on the FD-302 form regarding

21    what LL had told you about why he was referring to the man in

22    the red shirt as James Cloud?

23    A    Generally, I do.  But not verbatim, no.

24    Q    You don't remember exactly what you wrote?

10:59:33   25    A    No.

1    Q    But you did do the 302?

2    A    Correct.

3    Q    If you reviewed that 302, would that refresh your

4    recollection about what you wrote?

10:59:42   5    A    Yes.

6         MR. BURSON:  May I approach, Your Honor?

7         THE COURT:  Go ahead.

8         MR. BURSON:  For the record, defense has a copy of this

9    document they've marked 1018, defense exhibit.

10:59:50   10        THE COURT:  Any objection?

11        MR. McENTIRE:  None, Your Honor.

12        THE COURT:  Okay.

13        MR. BURSON:  I'm not sure who to get closest to.

14    BY MR. BURSON:  (Continuing)

11:00:03   15   Q    Agent, take a minute to review it if you need to.

16    A    I'm good.

17    Q    Are you done?

18    A    Yes.

19        THE COURT:  Hold on, Counsel.  Before you approach the

11:00:10   20   witness, would you please wear a mask.

21        MR. BURSON:  Yes.

22        Thank you, Your Honor.

23        THE COURT:  We're all trying to deal with this new

24    process.  Go ahead.

25

1   BY MR. BURSON:   (Continuing)

2   Q    Now that you've reviewed the report, do you recall what you

3   wrote on your 302?

4   A    Yes.

11:00:39   5   Q    Okay.  And can you tell us now what you wrote on the 302?

6   A    That he was -- he -- LL told us that he was referring to

7   the man in red as James Cloud because he saw him in the news.

8   He saw James Cloud in the news.

9   Q    Okay.

11:01:01   10   A    And the way I wrote it, it may not be clear to everyone,

11   but the reason I wrote that was his answer is telling us that he

12   saw James Cloud on the news, and that's the same person that he

13   saw in the red shirt.  That's why he's calling him James Cloud.

14   Q    Okay.

11:01:21   15        MR. McENTIRE:  And objection; calls for speculation on

16   what the witness actually said.

17        THE COURT:  Sustained.

18   BY MR. BURSON:   (Continuing)

19   Q    Fair to say that on the 302, Agent Ribail, you reported

11:01:41   20   "after seeing Cloud and hearing the name on the news"?

21   A    Correct.

22   Q    That's what you wrote, right?

23   A    Correct.

24   Q    To your knowledge, at the time of this interview -- or did

11:02:21   25   you become aware during your investigation whether there was any

1    prior relationship between LL and James Cloud?

2    A    I was not aware of any relationship, no.

3    Q    Okay.  Do you know if LL was ever asked during the

4    investigation if -- by law enforcement if he had any prior

11:02:39   5    relationship with James Cloud?

6    A    Not specifically, no.

7    Q    Okay.  Last question about your conversation with LL:  Was

8    there any indication -- let's back up.

9        You testified earlier you've conducted hundreds of

11:03:03   10    interviews.

11    A    Yes.

12    Q    Okay.  During these interviews, based on your interactions

13    with folks during the interviews, are there -- are there certain

14    times when someone is exhibiting signs of being on a controlled

11:03:18   15    substance?

16    A    Yes.

17    Q    Okay.  So what are -- give me some examples, maybe, of some

18    signs that someone might be on a controlled substance when

19    you're interviewing them.

11:03:29   20    A    They can be jittery, they could be tired, they could slur,

21    um, off-balance.

22    Q    Okay.  During your interview with LL, was he exhibiting any

23    signs that he was on a controlled substance?

24        THE COURT:  Counsel, could you clarify what interview

11:03:42   25    you're talking about, the date or the time frame, so that I know

1    which interview we're talking about?

2          MR. BURSON:  Yes, Your Honor.

3          THE COURT:  Thank you.

4    BY MR. BURSON:  (Continuing)

11:03:50  5    Q    During your interview with LL in January of 2020, was he

6    exhibiting any signs that he was on a controlled substance?

7    A    No.

8    Q    Okay.  During the investigation, though, have you become

9    aware of information, whether from other witnesses or elsewhere,

11:04:07  10    indicating that he may have been on a controlled substance

11    sometime around the incident on June 8th, 2019?

12    A    Possibly, yes.

13    Q    Okay.

14          MR. BURSON:  Your Honor, the Government has no further

11:04:22  15    questions for this witness at this time.

16          THE COURT:  Very well.  Thank you.

17          Go ahead, Mr. McEntire.

18          MR. McENTIRE:  May I please have the technology

19    activated to the computer station, please?

11:04:43  20          May I proceed, Your Honor?

21          THE COURT:  You may.  Go ahead.

22

23                          CROSS-EXAMINATION

24    BY MR. McENTIRE:

11:05:24  25    Q    Good morning, Agent Ribail.

1    A    Good morning.

2    Q    I just want to make sure that I'm not missing information.

3    We'll start first with some questions about JV's lineup, and

4    then we'll proceed over to LL's lineup, just to keep things

11:05:40    5    organized and in the same sequence.

6        Okay?

7    A    Okay.

8    Q    So I want to start out by just making sure that I'm not

9    missing any information about JV's lineup or the other lineup of

11:05:52    10    JV's family.

11        The reports that you prepare are called 302s.

12    A    Yes.

13    Q    And you've prepared many 302s in this case.

14    A    Yes.

11:06:04    15    Q    And let's just focus on the ones dealing with JV and his

16    family.

17        You prepared a 302 for a lineup that you did with SV.

18    A    Yes.

19    Q    One of the sons.

11:06:20    20        And that was a 302 documenting a lineup that you did.

21    A    I'm sorry.  I couldn't hear.

22    Q    That was a 302 documenting a lineup that you administered.

23    A    Yes.

24    Q    That lineup occurred on June 9th.

11:06:35    25    A    Yes.

1    Q    Sunday.

2    A    Yes.

3    Q    And you drafted the report on June 19th.

4    A    I'd have to see the report.

11:07:02    5         THE COURT:  Counsel, could you identify the document

6    that you're showing?

7         MR. McENTIRE:  I can, Your Honor.  I am -- and this is

8    not to be admitted.  This is just for refreshing recollection.

9    BY MR. McENTIRE:  (Continuing)

11:07:12    10    Q    Agent Ribail, do you recognize this document?

11    A    Yes, I do.

12    Q    And this is a 302 that you prepared?

13    A    Yes.

14    Q    Involving the lineup that you administered on SV.

11:07:22    15    A    On what?

16    Q    On SV.

17    A    There's no name, so I'd have to take your word for it.

18    Q    The names are redacted, and fair to say that that's how the

19    discovery was provided from the United States to Mr. Cloud?

11:07:40    20    A    I'll have to take your word for that on -- too.  I don't --

21    I don't --

22    Q    Fair enough.

23    A    -- turn over discovery to you.

24    Q    Turning to the bottom of this particular report, there's a

11:07:54    25    few different date locations.  Fair?

1    A    Yes.

2    Q    One is when the investigation occurred on.

3    A    Yes.

4    Q    And you documented June 9th.

11:08:03    5    A    Yes.

6    Q    And then there's a separate date for when you actually

7    entered the notes themselves into a report.

8    A    Yes.

9    Q    And that reflects June 19th.

11:08:12    10    A    Yes.

11    Q    So with respect to the report administered on -- or drafted

12    on SV's lineup, there was a ten-day delay between when the

13    lineup occurred and when you wrote the report.

14    A    Yes.

11:08:32    15    Q    You also prepared a 302 for a lineup that you administered

16    on MV.

17    A    Yes.

18    Q    And that lineup was also administered on June 9th.

19    A    Yes.

11:08:42    20    Q    And you also prepared that report, again, ten days later,

21    on June 19th?

22    A    I'd have to see the report to -- to know.

23         MR. McENTIRE:  Your Honor, again, I'm pulling up not for

24    admissibility but just for identification purposes to refresh

11:09:01    25    recollection another 302.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    87
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1    BY MR. McENTIRE:   (Continuing)

2    Q    Agent Ribail, do you recognize this 302?

3    A    Yes.

4    Q    And this, again, reflects the lineup that you administered

5    on one of the other children of JV.

6    A    I'll have to take your word for it.  Yes.

7    Q    And, again, this one also was redacted, making it difficult

8    to find out who administered the lineup and to whom it was

9    administered on.  Fair?

10   A    It's clear who administered it.  My name is on it.

11   Q    Who you administered the lineup --

12   A    Okay.

13   Q    -- to is difficult to tell from this report.

14   A    Yes.

15   Q    Down at the bottom there's also the series of dates that

16   document when the investigation happened, as well as the date

17   that you wrote this report, correct?

18   A    Yes.

19   Q    And then, again, it reflects a ten-day delay from June 9th

20   until June 19th when you actually wrote up this report.

21   A    Yes.

22   Q    You also prepared a report for the lineup that you did with

23   NV, the wife of JV.

24   A    Yes.

25   Q    And, again, that lineup occurred on June 9th.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                88
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1   A    Yes.

2   Q    Since I'm going to anticipate probably your next answer, do

3   you remember that there was a ten-day delay between that report

4   and when you -- when the lineup occurred and when you documented

11:10:34   5   it?

6   A    Yes, I see that.

7   Q    A ten-day delay as well.

8   A    Correct.

9   Q    And you also prepared a 302 for JV's lineup as well.

11:10:49   10   A    Yes.

11   Q    And, again, that lineup occurred on June 9th.

12   A    Yes.

13   Q    And I'm showing you what's been marked as Defense

14   Exhibit 1004.

11:11:11   15       Agent Ribail, do you recognize this?

16   A    Yes.

17   Q    This is the 302 that you prepared to document your lineup

18   administration on JV.

19   A    That's correct.

11:11:25   20   Q    I'm going to draw your attention to this exhibit, on 1004,

21   at the bottom.  Again, the date that the lineup occurred, which

22   was June 9th.

23   A    Correct.

24   Q    And then the date that you entered the report, which was

11:11:38   25   June 13th.

1    A    Yes.

2    Q    So there was a four-day delay on -- from when the lineup

3    occurred to when you actually wrote down or typed up this

4    report.

11:11:48    5    A    That's correct.

6    Q    Now, there was one additional report that you prepared with

7    respect to your contact with JV --

8    A    Yes.

9    Q    -- correct?

11:12:09   10    A    Yes.

11    Q    And that was an encounter that you had with him the

12    following month, in July, regarding the subject of the Facebook

13    postings.

14    A    Yes.

11:12:22   15    Q    And, Agent Ribail, I am pulling up what has been marked as

16    Defense Exhibit 1005.

17         Do you recognize that report?

18    A    I do.

19    Q    And that's the report that you prepared regarding the

11:12:34   20    subsequent contact that you had with JV.

21    A    Yes.

22    Q    And that contact reflects, again, at the bottom on the

23    dates, that you contacted or spoke with JV on July 12th.

24    A    Yes.

11:12:54   25    Q    Roughly a month later.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                    90
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1    A     Yes.

2    Q     So if I understand it correctly in terms of the reports

3    that you prepared, Agent Ribail, there were two total reports

4    with respect to JV; one that occurred that you typed up on June

11:13:15   5    13th documenting the lineup, correct?

6    A     Yes.

7    Q     And a second that was prepared in July regarding contact on

8    the Facebook posts.

9    A     Correct.

11:13:29   10   Q     There's no other reports that you can recall preparing

11   involving your contact with JV?

12   A     Not that I recall.

13   Q     I want to focus on the delay between the June 9th lineup

14   and the June 13th in terms of when you documented when -- what

11:13:57   15   happened during that lineup.

16         Fair to say between June 9th and June 13th, during that

17   four-day window, you were pretty busy involved with this case?

18   A     Yes.

19   Q     Interviewing witnesses?

11:14:12   20   A     Yes.

21   Q     Writing up search warrants?

22   A     Yes.

23   Q     Executing search warrants?

24   A     Yes.

11:14:17   25   Q     Searching for evidence?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    A    Yes.

2    Q    You indicated that even on the first day, that you were at

3    one of the scenes until midnight.

4    A    Yes.

11:14:25    5    Q    So during that four-day time period, a lot was going on.

6    A    Absolutely.

7    Q    You're coordinating with different law enforcement agencies

8    during that time as well.

9    A    Yes.

11:14:35    10    Q    Oregon State Police?

11    A    Yes.

12    Q    Yakama Nation Tribal Police?

13    A    Yes.

14    Q    Washington State Patrol?

11:14:42    15    A    Yes.

16    Q    Yakima County Sheriff's Office?

17    A    Yes.

18    Q    Fair to call this a multiagency investigation?

19    A    Yes.

11:14:55    20    Q    During the time, that four-day window -- or during the time

21    of the lineup, I should say, lineups on June 9th, in addition to

22    the handwritten notes that you wrote on the lineup instructions,

23    did you have other notes, handwritten notes that you were taking

24    to track what was happening?

11:15:16    25    A    With the -- regarding the person that I'm interviewing?

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                              92
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1    Q    Correct.  Regarding JV specifically.

2    A    I don't believe so.

3    Q    So there were no handwritten notes.  So your only

4    handwritten notes were the ones written on the lineup

11:15:33   5    instructions.

6    A    Yes, my notes are written on the instruction sheet.  Yes.

7    Q    No other handwritten notes.

8    A    Not that I -- not that I'm aware of.

9    Q    So when you typed up your report on June 13th documenting

11:15:51  10    the lineup from June 9th, the only handwritten notes that you

11    had available to you were the notes written just on the Yakima

12    County Sheriff's Office lineup instruction form.

13    A    Yes.

14    Q    There were no other notes documenting the information or

11:16:17  15    what you discussed with JV?

16    A    Not that I'm aware of.

17    Q    Agent Ribail, let's talk about your role in this case.

18         My understanding from at least reading the United States'

19    briefing is that, quote, you took lead in this case.

11:16:50  20    A    Was there a question?  Sorry.

21    Q    Were you the lead investigator in this case?

22    A    I am, yes.

23    Q    Okay.  And so there were multiple agencies that you were

24    coordinating with a response.

11:17:02  25    A    Yes.

1  Q    And you were in charge -- the FBI principally was in

2  charge.

3  A    At some point.  Initially, there was -- we weren't sure who

4  was going to be the lead agency.

11:17:17  5  Q    Once you got the call, you had mentioned that you were on

6  duty?

7  A    Correct.

8  Q    And that you had showed up to the scene.

9  A    Correct.

11:17:25  10  Q    Shortly after that, the FBI took lead in investigating this

11  case.

12  A    No.  It was not until, I would say, 10:00, 11 o'clock at

13  night that that final decision was made.

14  Q    Ah.  That day, on June 9th, a decision was made to have the

11:17:44  15  FBI be the lead agency on this case.

16  A    On June 8th at about --

17  Q    June 8th, same day.

18  A    -- 10:00 p.m.

19  Q    Understood.

11:17:53  20  A    On that case.  But the carjacking, I think, was still in

21  debate somewhat, who may take that.

22  Q    And ultimately there was a decision made to have the FBI

23  take lead on that case as well.

24  A    That's correct.

11:18:06  25  Q    So between both the incident at Medicine Valley as well as

1    the incident at JV's house, the FBI ultimately became the lead

2    investigative agency.

3    A    Yes.

4    Q    And you became the lead agent over that investigation.

11:18:17   5    A    Yes.

6    Q    So fair to say, from an investigative standpoint, you were

7    in charge?

8    A    Yes.

9    Q    And you mention that there was another FBI agent, Special

11:18:30   10    Agent Jennifer Terami.

11    A    Yes.

12    Q    And she was assisting.

13    A    Yes.

14    Q    But, again, that you were taking charge.

11:18:35   15    A    Yes.

16    Q    So you were taking the lead in, again, coordinating with

17    all of these agencies that we've talked about.

18    A    Yes.

19    Q    You were taking the lead in making decisions on who to

11:18:48   20    interview.

21    A    Some of the time, yes.  Sometimes interviews just happen,

22    so it -- you'd have to be more specific on what -- what decision

23    I made or didn't make.

24    Q    After the FBI was designated or officially asserted itself

11:19:07   25    as the lead investigative agency, you took the lead in

1    coordinating where to search.

2    A    Generally, yes.

3    Q    You took the lead in filling out search warrant affidavits.

4    A    I wrote some, yes.

11:19:29    5    Q    And you indicated that with respect to JV, you were the one

6    that was responsible for preparing the four Spillman lineups

7    that were used not only for JV but also for LL.

8    A    I was involved in the preparation.

9    Q    And -- fair point.

11:19:48    10    So, to clarify, you indicated that there's a technology

11    that assembles the lineups called Spillman.

12    A    That's true.

13    Q    That there was, presumably, someone with Yakima County

14    Sheriff's Office that was using the software.

11:20:04    15    A    Yes.

16    Q    And you were standing there facilitating in the ultimate

17    selection of those lineups.

18    A    Yes.

19    Q    You indicated you enter an individual's name and it spits

11:20:14    20    out options.

21    A    That's my understanding, yes.

22    Q    And you can see even other options, and as you testified

23    earlier, you can sort of select or add or replace as you see

24    fit.

11:20:25    25    A    Yes.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*    96
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1  Q    And you weren't sure how long that process took; somewhere

2  roughly between one to two hours.

3  A    Yes.

4  Q    Done at the Yakima station -- substation in Zillah.

11:20:39  5  A    Yes.

6  Q    For the Yakima County Sheriff's Office.

7  A    Yes.

8  Q    As the lead investigator, Special Agent Ribail, I mean,

9  it's your responsibility to make sure that evidence is selected

11:20:52  10  correctly.

11  A    Yes.

12  Q    Witnesses are interviewed properly.

13  A    Yes.

14  Q    And lineups are administered correctly.

11:20:58  15  A    Yes.

16  Q    And, importantly, that policies are adhered to.

17  A    Yes.

18  Q    You touched previously upon your experience regarding

19  eyewitness identifications, but I'd like to develop that a

11:21:15  20  little bit further.

21      You indicated that you have a 17-year history with the FBI.

22  A    Yes.

23  Q    I don't believe I caught how long you've been in Yakima.

24  A    Uh, I would say four-and-a-half-ish years.

11:21:30  25  Q    Before Yakima, the four-and-a-half-year stint that you've

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                    97
Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020
Ribail/X/McEntire

1    had here, where were you?

2    A    I was in Newport News, Virginia.

3    Q    And before that?

4    A    El Centro, California.

11:21:47  5    Q    And anywhere else before that?

6    A    I was in Modesto, California.

7    Q    And before that?

8    A    With the FBI?  Nowhere.  Well, Quantico.

9    Q    So during your 17-year tenure with the FBI, you've moved to

11:22:06  10   four different locations.

11   A    Yes.

12   Q    After graduating from Quantico.

13   A    Yes.

14   Q    And you indicated that you've personally conducted

11:22:16  15   approximately 20 lineups?  Photographic lineups.

16   A    Yes.  Yes.

17   Q    And that you've observed another ten.

18   A    Yes.

19        MR. BURSON:  Actually, I'm going to object.  That

11:22:27  20   misstates prior testimony.

21        THE COURT:  It's 10 to 20, but sustained.

22        Go ahead.

23   BY MR. McENTIRE:  (Continuing)

24   Q    My understanding:  As part of your training, you've

11:22:45  25   received training on how to conduct and administer lineups.

1   A   I -- I believe at Quantico we did, yes.

2   Q   Have you received ongoing training since your time at

3   Quantico on how to properly administer lineups?

4   A   I don't honestly know that I have or haven't received any

11:23:04  5   since.  We receive training all the time, but I don't know that

6   I've received any specific only to like that policy manual, for

7   example.

8   Q   So you've received ongoing training from the FBI since you

9   graduated from Quantico.

11:23:23  10   A   Yes.

11   Q   But you don't recall whether or not you've received any

12   specific trainings on lineup administration.

13   A   Yes.  That would be -- dependent on -- I don't remember any

14   formal training, but probably with my training agent, um,

11:23:40  15   on-the-job training.  But I can't specifically say that I've had

16   photo lineup training since the academy.

17   Q   Fair to say you didn't attend a class that was a refresher

18   course on how to attend a lineup or how to administer a lineup?

19   A   I can't say for sure one way or another.

11:23:58  20   Q   No specific trainings dedicated exclusively to dealing with

21   the proper administration of a lineup.

22   A   I can't say one way or the other.

23   Q   In reviewing the United States' briefing, my understanding

24   is that you actually teach other agents how to administer

11:24:19  25   lineups.

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                    99
Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020
Ribail/X/McEntire

1    A    Yes, I've taught new agents and demonstrated how I

2    administer lineups.  Yes.

3    Q    Does it take any particular qualifications or certification

4    in order to become an instructor with the FBI on how to teach

11:24:33  5    new agents how to administer a lineup?

6    A    No.

7    Q    So there's no certification of advanced training that you

8    received.

9    A    No.

11:24:44  10    Q    Simply on-the-job training.

11    A    Yes.

12    Q    So based on the in-person lineups that you've done, it's

13    your experience from that that was the basis for providing

14    instruction to other agents.

11:25:00  15    A    Well, when I say that, usually I've had a new agent

16    assigned to work with me, so my job is to train them in whatever

17    we do as a whole.  So it's not specifically training them for

18    photo lineups.  It's day-in and day-out work.  You're a training

19    agent.

11:25:23  20    Q    So when you are training new agents, it's just on how to do

21    the job, not necessarily you've been training them how to

22    specifically do a lineup?

23    A    Correct.  You teach them -- yes.

24    Q    And taking you back to your training at Quantico, did they

11:25:43  25    teach you how to construct a photo montage?

1    A    Generally, yes.

2    Q    Did they instruct you how to instruct a witness before a

3    lineup?

4    A    Yes.

11:26:02  5    Q    Did they instruct you on how to provide instructions to a

6    witness during the lineup itself?

7    A    Yes.

8    Q    And did it provide instruction on how to instruct a witness

9    after a lineup?

11:26:18  10    A    I don't recall.

11    Q    Agent Ribail, fair to say, so your training at Quantico

12    taught you how to do a lineup?

13    A    Yes.

14    Q    Did they talk about the why?

11:26:44  15    A    I believe so.

16    Q    Why it's important to follow certain procedures.

17    A    Yes.

18    Q    Why it's important to follow certain instructions.

19    A    Yes.

11:26:56  20    Q    So during your training, they talked to you about why it's

21    important to create a photo montage in a particular way.

22    A    Yes.

23    Q    They talked to you about why it's important to instruct a

24    witness in a particular way before the lineup begins.

11:27:11  25    A    Yes.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                101
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1   Q    Talked to you about why it's important to instruct a

2   witness in a particular way during the lineup.

3   A    I'm sorry.  Can you repeat that?

4   Q    During your training, you received instruction or guidance

11:27:27   5   or information on why it's important to provide witnesses with

6   instructions during the lineup.

7   A    Yes.  Well, we're -- I don't know what you mean by

8   "during."  I'm sorry.  We read them instructions, and then we

9   perform the lineup, generally.  I don't know what you mean

11:27:45   10   "during."

11   Q    Did you receive instructions on if a witness is making

12   comments, for example, how you should react?

13   A    Yes.

14   Q    So that's the how.  Did --

11:27:55   15   A    They should not react.

16   Q    -- you receive the why that's important?

17   A    Yes.

18   Q    Why it's important to provide an answer in a specific way.

19   A    I don't understand that question.

11:28:17   20   Q    Agent Ribail -- Ribail, excuse me, in the training that

21   you've received, you'd agree it would be inappropriate to ask a

22   witness during a lineup, "What about this witness?  What about

23   this suspect right here?"  That would be inappropriate.

24   A    Correct.

11:28:34   25   Q    Did they talk to you about why?

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                    102
Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020
Ribail/X/McEntire

1    A    Yes.

2    Q    Okay.  So during the lineup, you received instruction on

3    why it's important in the feedback that you provide to an

4    eyewitness.

11:28:47    5    A    No, we don't provide feedback.

6    Q    You received instruction why it's important not to do that.

7    A    Yes.

8    Q    Okay.  Did your trainings cover the science behind lineup

9    administration during this "why" component?

11:29:11    10    A    I don't believe so.

11    Q    So during your training on how to administer lineups and

12    why you should administer lineups in a certain way, you received

13    no training on the science behind human memory.

14    A    Well, it's a tough question to answer, because we did

11:29:28    15    receive training on, uh, the human brain, people how -- their

16    memory, at different blocks of instruction.  So, yeah, I think

17    overall we -- I would say I have received some training overall,

18    but not specifically pointed at a photo lineup necessarily.

19    Q    So you've received instruction overall on how memories are

11:29:51    20    made.

21    A    A little bit.

22    Q    How memories are stored?

23    A    Sure.

24    Q    How memories are retrieved?

11:30:01    25    A    Sure.

1    Q    Did you receive instruction on the science behind how

2    memory does not work like a Polaroid picture?

3    A    I don't know.

4    Q    Did you cover, during your lineup training, how memory can

11:30:25  5    be impacted or affected by what a lineup administrator says?

6    A    Not specifically, no.

7    Q    Did you receive any training on how memory could be

8    impacted based upon what a lineup administrator does in terms of

9    behaviors?

11:30:45  10    A    No.

11    Q    Sounds?

12    A    I don't know what you mean by "sounds."

13    Q    Did you receive any training on -- on why it's problematic,

14    for example, if a lineup administrator makes sounds or speaks up

11:31:02  15    during the lineup process?

16    A    We were trained to not be -- yes, not affect the process;

17    don't make a sound, don't make a gesture, don't do anything that

18    would lead somebody one way or another.

19    Q    And did you receive training on why that's important?

11:31:19  20    A    Because we don't want a false identification.

21    Q    And did you cover the science behind why that can happen if

22    you speak up or make gestures or communicate to the witness

23    during the process?

24    A    Not that I recall.

11:31:43  25    Q    Special Agent Ribail, you mentioned during your direct

1    testimony that you are familiar with the November FBI lineup

2    policy from 2013.

3    A    Yes.

4    Q    You also reflected that you are familiar with -- well, on

11:32:38   5    that, you mentioned that you're familiar with that 2013 policy,

6    correct?

7    A    Yes.

8    Q    But you didn't review it cover to cover.

9    A    No, not that I can recall.

11:32:56   10   Q    Special Agent Ribail, I want to draw your attention to

11   what's been marked for identification purposes as Defense

12   Exhibit 1009, which is appearing on your monitor.

13         Are you familiar with this memorandum that was sent out to

14   all law enforcement agencies from the deputy attorney general,

11:33:17   15   on eyewitness identifications?

16   A    I am.

17   Q    You are familiar with it.

18   A    I am.

19   Q    Do you recall when you first reviewed this or saw this

11:33:29   20   memo?

21   A    Probably shortly after you filed your motion.

22   Q    So shortly after filing the motion, you had an opportunity

23   to review this update from the deputy attorney general on lineup

24   policies?

11:34:03   25   A    That's correct.

1         MR. BURSON:  Objection.  Counsel just referred to it as

2    an update.  I'm not sure it's an update to anything.

3         THE COURT:  Sustained.

4         THE WITNESS:  And let me clarify.  I can't say that I've

11:34:14  5    never seen this before, but my -- my -- my familiarization with

6    it currently is reviewing it after you submitted your motion.

7    BY MR. McENTIRE:  (Continuing)

8    Q    Did you have an opportunity to review the document?

9    A    Yes.

11:34:48  10   Q    Special Agent Ribail, referring to first page of this

11   memorandum, it discusses (reading):  The Department of Justice

12   last addressed procedures for photo arrays in its 1999

13   publication, Eyewitness Evidence, a Guide For Law Enforcement --

14        THE COURT:  Counsel, we're reading off of a document

11:35:11  15   that has not been admitted.

16        Do you wish to either lay the foundation, or if you feel

17   it sufficient, then move to admit.

18        MR. McENTIRE:  Certainly, Your Honor.

19   BY MR. McENTIRE:  (Continuing)

11:35:21  20   Q    Special Agent Ribail, this document, you indicated that you

21   have recently reviewed it.

22   A    Yes.

23   Q    Is what you're seeing on the screen a fair and accurate

24   representation of the January 6th, 2017, memorandum sent out by

11:35:35  25   the deputy attorney general?

1    A    Yes.

2         MR. McENTIRE:  I'd move to admit it.

3         MR. BURSON:  No objection.

4         THE COURT:  It will be admitted.

11:35:43  5    (Defense Exhibit No. 1009 admitted into evidence.)

6         THE COURT:  Go ahead.  Sorry to have interrupted.

7         MR. McENTIRE:  Thank you, Your Honor.

8    BY MR. McENTIRE:  (Continuing)

9    Q    Drawing your attention to the third paragraph, Special

11:35:52  10   Agent Ribail, second sentence, it indicates that (reading):

11   Research and practice have both evolved significantly since

12   then, referring back to 1999.  Fair?

13   A    Are you asking me what it says?  I'm sorry.

14   Q    Correct.  Did I accurately read that?

11:36:09  15   A    Yes.

16   Q    So it's been awhile since main Justice had sent out a

17   directive or an update, if you will, on guidance, shall we say,

18   on eyewitness identification.  Since 1999.

19        MR. BURSON:  Objection; calls for speculation.  Agent

11:36:29  20   Ribail can't be familiar with every document that the Department

21   of Justice has issued.

22        THE COURT:  Sustained.

23   BY MR. McENTIRE:  (Continuing)

24   Q    Special Agent Ribail, the first sentence in that paragraph

11:36:38  25   says, (reading):  The Department of Justice last addressed

1    procedures for photo arrays in its 1999 publication.

2         Did I read that correctly?

3    A    You read that correctly, yes.

4    Q    So based on the deputy attorney general's memorandum, the

11:36:51   5    Department of Justice believes the last time it issued guidance

6    on this topic was in 1999.

7    A    Sure.

8    Q    Turning your attention, Special Agent Ribail, to 1009-2,

9    the second page of this memorandum, it talks about -- first of

11:37:30   10    all, there's -- there's some policies that are attached to this

11    memorandum, correct?

12    A    I don't know.

13    Q    Turning to Page -- turning your attention, excuse me, to

14    1009-3, attached to this memorandum is a document that reads:

11:37:55   15    "U.S. Department of Justice Eyewitness Identification Procedures

16    For Conducting Photo Arrays."

17         Did I read that correctly?

18    A    Yes.

19    Q    And this is attached to that memorandum.

11:38:07   20    A    Yes.

21    Q    So there are procedures attached to this memorandum

22    addressing eyewitness identification.

23    A    Yes.

24    Q    Turning your attention back to the previous page, 1009-2,

11:38:26   25    the deputy attorney general is discussing the work that went

1    into updating these policies and procedures, reading, quote:

2    Over the past year, a team of department experts, including

3    prosecutors, law enforcement personnel, and social scientists,

4    have worked together to study the research and identify best

11:38:47    5    practices.  Their work culminated in the attached document,

6    which outlines procedures for the administration of photo

7    arrays.

8         Did I read that correctly?

9    A    Yes.

11:38:58    10    Q    So this is a document prepared by the Department of

11    Justice.

12    A    Yes.

13    Q    In conjunction with researchers.

14    A    Sure.

11:39:09    15    Q    In updating the procedures for photo identification or

16    lineup policies.

17    A    Sure.

18    Q    What I'd like to do, Special Agent Ribail, is draw your

19    attention to a few different sections of this particular

11:39:33    20    policy -- policies, plural.

21         Turn your attention to 1009-3.  First section is discussing

22    location of the photo array.  Fair?

23    A    Yes.

24    Q    Quote:  Unless impracticable, the witness should view the

11:39:59    25    photo array out of earshot and view of others and in a location

1   that avoids exposing the witness to information or evidence that

2   could influence the witness' identification, including

3   information about the case, the progress of the investigation,

4   or the suspect.

11:40:13   5        Correct?

6   A    Yes.

7   Q    And you would agree, based on what you testified earlier,

8   that keeping witnesses away from other witnesses from a lineup

9   is important.

11:40:27   10   A    Yes.

11   Q    In fact, you indicated that during the administration of

12   JV's lineup, that you segregated, if you will, the rest of the

13   family while you were administering the lineup on JV.

14   A    Yes.

11:40:39   15   Q    And you did the same for each individual from JV's family.

16   A    Yes.

17   Q    And you would agree that this is a best practice or

18   something that should be followed when administering a lineup.

19   A    Yes.

11:40:56   20   Q    And so what this policy memorializes, if you will, is the

21   recognition that outside information can influence an

22   eyewitness's identification.

23        MR. BURSON:  Objection, Your Honor.  Agent Ribail has

24   received some training from the FBI on lineup procedures, as

11:41:15   25   he's indicated.  He is not an expert on the science behind it,

1    nor the reasons for it.

2         THE COURT:  Sustained.

3    BY MR. McENTIRE:   (Continuing)

4    Q    Agent Ribail, during your training, you've testified that

11:41:33  5    you received training not only in how to administer a lineup --

6    fair?

7    A    Yes.

8    Q    And one of those trainings that you received was involving

9    keeping witnesses separate from each other.

11:41:48 10    A    Yes.

11    Q    You also testified that you received not only instruction

12    on the how but the why that's important.

13    A    Some, yes.

14    Q    And you would agree, based upon your 17-year experience

11:41:59 15    with the FBI, having conducted many lineups, that keeping

16    witnesses separate or segregated during a lineup is something

17    that is important.

18    A    Yes.

19    Q    And you've even agreed -- testified that it is, in fact, a

11:42:14 20    best practice.

21    A    Yes.

22    Q    So you are familiar with lineup best practices.

23    A    Yes.

24    Q    Including this one.

11:42:20 25    A    Yes.

1    Q    And you would agree, Special Agent Ribail, that from your

2    training and experience in 17 years with the FBI, having

3    administered many lineups, receiving training on many lineups,

4    and teaching others on how to do lineups, that outside

11:42:41  5    information that a witness may hear could impact the integrity

6    of that lineup.

7    A    While I'm administering them, yes.

8    Q    Special Agent Ribail, drawing your attention to

9    Paragraph 1.2 of that same section under 1009-3, quote:  Neither

11:43:13  10    the suspect nor any photographs of the suspect, including wanted

11    posters, should be visible in any area where the witness will be

12    present.

13         Did I read that correctly?

14    A    Yes.

11:43:24  15    Q    And based upon your 17-year history with the FBI and your

16    training, that's an important guideline to follow.

17         You'd agree?

18    A    Yes.  But this is not the FBI's policy.

19    Q    Hmm.

11:43:47  20    A    I'm not disagreeing with 1.2, but this is --

21    Q    I'm sorry.  I couldn't hear that.

22    A    I said I still agree with 1.2, but this is not the FBI's

23    policy.

24    Q    Hmm.  Fair.

11:43:57  25         So you agree with what 1.2 articulates regarding this

1  procedure.

2  A    Yes.

3  Q    You'd agree that that would be a best practice.

4  A    Yes.

11:44:05  5  Q    And something that should be implemented with all lineups.

6  A    I think it's a best practice, yes.

7  Q    And, again, there's a recognition, for example, that a

8  wanted poster would be outside information that could influence

9  or corrupt the lineup's integrity.

11:44:22  10  A    Are you talking while administering a photo lineup or

11  anytime ever?

12  Q    While administering the photo lineup.

13  A    Yes.

14  Q    Now, you mention, turning to 1009-2, that the attached

11:44:41  15  document is, as you indicated, not a, quote, FBI policy,

16  correct?

17  A    Correct.

18  Q    I'm drawing your attention to the second paragraph of

19  1009-2 which states (reading):  The heads of the department's

11:44:56  20  law enforcement components should review these procedures and,

21  to the extent necessary, update their own internal policies to

22  ensure they are consistent with the procedures described in this

23  document.

24       Did I read that correctly?

11:45:07  25  A    Yes.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*    113
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1  Q    Now, talking about agency structure, the FBI is part of the

2  Department of Justice.

3  A    We are a component, yes.

4  Q    As is the Bureau of Prisons, correct?

11:45:23  5  A    Yes.

6  Q    As is the U.S. Marshal Service?

7  A    Yes.

8  Q    As is the ATF.

9  A    Yes.

11:45:29  10  Q    They are all agencies underneath the umbrella of the

11  Department of Justice.

12  A    Yes.

13  Q    So this is a directive coming from the Department of

14  Justice.

11:45:40  15       MR. BURSON:  Objection to the characterization as a

16  "directive."

17       THE COURT:  Sustained.

18  BY MR. McENTIRE:  (Continuing)

19  Q    This is a memorandum issued by the deputy attorney general

11:45:48  20  to all law enforcement heads.

21  A    I didn't see who it was sent to, but I'll take your word

22  for it.

23  Q    Turning back to the first page, the title of this

24  memorandum is "Memorandum For Heads of Department Law

11:46:06  25  Enforcement Components, All Department Prosecutors."

1    Did I read that correctly?

2    A    Sure.

3    Q    Issued from Sally Yates, the deputy attorney general.

4    A    Yes.

11:46:18  5    Q    And so this was sent out to heads of department law

6    enforcement, correct?

7    A    It is, but I don't know what that means.  Anyway ...

8    Q    Returning to this point, though, the FBI is an agency

9    within the overall branch of the Department of Justice.

11:46:48  10    A    Yes.

11    Q    So the head law enforcement, if you will, would be the

12    attorney general.

13    A    The head what?

14    Q    The head of the Department of Justice is the attorney

11:47:01  15    general.

16    A    Yes.

17    Q    And the Department of Justice oversees many law enforcement

18    components, including the FBI.

19    A    I'm not -- I'm not an expert in what the relationship

11:47:21  20    between DOJ and FBI is, but we do have our own director, so I

21    don't know that one is above the other, but ... go -- go ahead.

22    Q    So, to clarify, I'm sorry, are you -- are you unclear as to

23    whether or not the Department of Justice is over the FBI with

24    respect to administrative agencies?

11:47:41  25    A    They are an overarching -- yes, DOJ as a whole is over the

1    FBI, but I don't know that the director -- or that the AG can

2    tell the director of the FBI how to administer policies, I

3    guess.

4         But, anyway, I would -- so I would agree that this was sent

11:47:57  5    to the FBI, yes.  That's what you're really getting at.

6    Q    And turning back to 1009-2 in this first paragraph, you

7    would agree that in that first sentence it's reflecting that the

8    heads of department law enforcement components should review

9    these procedures and, if necessary, update them to be

11:48:19  10    consistent.

11    A    Yes.

12    Q    So it sounds like, based on your reading of this, this was

13    a directive to bring all of the agencies underneath the

14    Department of Justice in line with this memorandum.

11:48:35  15         MR. BURSON:  Objection to the characterization as

16    "directive" once again.

17         THE COURT:  Sustained.

18    BY MR. McENTIRE:  (Continuing)

19    Q    Agent Ribail, I would like to direct your attention to

11:49:26  20    1009-6 further down in this policy.

21         One of the instructions from this procedure is under 6.3.7,

22    (reading):  Please do not discuss the procedure or any

23    photograph that you may pick with any other witness in this

24    case.

11:49:53  25         Did I read that correctly?

1    A    Yes.

2    Q    And these are instructions that should be provided to a

3    witness during a lineup.

4    A    Yes.

11:50:03    5    Q    And this is, as you testified, consistent with one of the

6    instructions that you provided to JV.

7    A    Yes.

8    Q    And, again, this is a recognition, your recognition, that

9    if JV spoke with the other witnesses, it could impact the

11:50:21    10    integrity of his identification or vice versa.

11        MR. BURSON:  Objection.  I don't believe the witness

12    testified to that earlier.  And I frankly don't see how it's

13    possible that speaking to a witness after the lineup has been

14    administered would impact the lineup that already occurred.  So

11:50:38    15    I think it's an incorrect statement as well.

16        THE COURT:  Overruled.  He may answer if he knows.

17    A    I'm sorry.  Could you repeat.

18    BY MR. McENTIRE:  (Continuing)

19    Q    Sure.

11:50:48    20        Special Agent Ribail, based on your 17-year experience with

21    the FBI, you would agree that it is important for one witness

22    not to discuss the procedure or any photograph that you may pick

23    with any other witness in the case.

24    A    Yes.

11:51:24    25    Q    And that's based on the recognition that if, for example,

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                    117
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1    SV was the first person to engage in the lineup and immediately

2    walked back and spoke with JV, who is next to participate in the

3    lineup, that communication could impact the integrity of JV's

4    subsequent participation in the lineup.

11:51:49   5    A    Yes.

6    Q    Again, this is a recognition that outside information could

7    influence what a witness selects or who a witness selects.

8    A    Yes.

9    Q    I'm turning your attention to 1009-7.  Under a section

11:52:23   10   entitled "Administrator Feedback," (reading):  The administrator

11   must avoid any words, sounds, expressions, actions or behaviors

12   that suggest who the suspect is.

13        Did I read that correctly?

14   A    Yes.

11:52:37   15   Q    Would you agree, Special Agent Ribail, based upon your

16   experience and training on lineup administration, it is

17   important for a lineup administrator to do just that?

18   A    Yes.

19   Q    And that's based on the recognition that words that a

11:52:57   20   lineup administrator could say could impact what an

21   eyewitness -- who an eyewitness picks.

22   A    Yes.

23   Q    It's a recognition that sounds that a lineup administrator

24   brings up could impact who an eyewitness selects.

11:53:16   25   A    Hypothetically, yes.

1   Q    Expressions could impact who an eyewitness selects.

2   A    Yes.

3   Q    The same with actions.

4   A    Yes.

11:53:29   5   Q    The same with behaviors.

6   A    Yes.

7   Q    So there's a recognition by the Department of Justice that

8   even nonverbal behaviors could impact the integrity of a lineup

9   administration.

11:53:46   10   A    That's what they say, yes.

11   Q    Do you agree, Special Agent Ribail, with what is said here,

12   that it's important and those things could impact the integrity

13   of a lineup?

14   A    Yes.

11:53:59   15   Q    So you would agree with this statement.

16   A    Yes.

17   Q    Special Agent Ribail, I would like to direct your attention

18   to Defense Exhibit 1011, which is appearing up on your monitor.

19   A    Yes.

11:54:36   20   Q    This is the FBI's 2013 policy.

21   A    Yes.

22   Q    And this is the one that you testified earlier that you had

23   received -- you were familiar with.

24   A    Yes.

11:54:48   25   Q    But you had not reviewed cover to cover.

1    A    I don't believe so.  And the one we -- if my memory serves

2    me correctly, the one we had been using and referring to is

3    actually this but with an updated or reviewed -- revised 2016

4    version, I think.  I think.

11:55:12    5         MR. BURSON:  Could you repeat that one more time, Agent

6    Ribail?

7              THE WITNESS:  I feel like on the cover, I could be

8    wrong, but ours is November 26, 2013, but reviewed, revised,

9    something, at a later date.  2016 revisions?  No?

11:55:32   10    BY MR. McENTIRE:  (Continuing)

11    Q    Special Agent Ribail, is it your testimony that this 2013

12    policy has been updated or amended since this time?

13    A    Since 2013?

14    Q    Besides the update on June 9th, 2019.

11:55:46   15    A    That's why I'm cautiously saying I could be mixing which

16    one I'm thinking of.  A policy that I reviewed in the last few

17    months had a revision, and I thought it was possibly this one.

18    I could be incorrect.

19              THE COURT:  Counsel, it is noon, and so it might be a

11:56:08   20    good opportunity that we take a recess at this time, and people

21    can confer about what things exist and don't exist.  Why don't

22    we take our recess.  We'll come back at 1:30, and continue the

23    testimony at that time.

24              Any -- before we do that, anything we need to address?

11:56:30   25              MR. BURSON:  Typically, the Government wouldn't have

1    ongoing conversation with a witness who is in the middle of

2    cross-examination.  Probably best practice.  But I think the

3    Court wanted the Government to clarify that issue or --

4         THE COURT:  Why don't you all confer, and then -- and

11:56:49  5    then if there's a disagreement, then no.  If there is an

6    agreement, then yes.  And we'll go from there.  All right.

7         THE COURTROOM DEPUTY:  All rise.

8         THE COURT:  We'll be in recess.  Thank you.

9         (Recess taken: 11:57 a.m. to 1:31 p.m.)

11:57:03  10         THE COURTROOM DEPUTY:  All rise.

11    (Call to Order of the Court.)

12         THE COURT:  Please be seated.

13         Mr. McEntire, are you ready to proceed?

14         MR. McENTIRE:  I am, Your Honor.

01:32:06  15         THE COURT:  Very well.  Go ahead.

16         MR. McENTIRE:  And, Your Honor, I will need to approach

17    the Elmo, if that's okay with the Court.

18         THE COURT:  Yes.

19

01:32:22  20                    CONTINUED CROSS-EXAMINATION

21    BY MR. McENTIRE:

22    Q    Good afternoon, Special Agent Ribail.

23    A    Good afternoon.

24    Q    Shortly before we broke for lunch there was a discussion on

01:32:41  25    policy dates.

1    A    Correct.

2    Q    And your memory was -- is that there was an update beyond,

3    or I should say, in between the FBI's November 2013 policy and

4    the FBI's June 2019 policy, correct?

01:33:01    5    A    Possibly, yes.

6        MR. BURSON:  Objection.  I actually believe that

7    question misstates the testimony.  The testimony was that Agent

8    Ribail remembers reviewing a document that had a different date

9    after the November 2013 date.  I don't believe he characterized

01:33:15    10    it as an update to the policies.

11        THE COURT:  I understand your point.  Overruled.

12    BY MR. McENTIRE:  (Continuing)

13    Q    Special Agent Ribail, I'm showing you what's been marked

14    newly as Defense Exhibit 1023.

01:33:36    15        Do you recognize this document?

16    A    Yes.

17    Q    And this, in fact, is the FBI policy that was first

18    published on November 26th, 2013, according to the title page.

19    A    Yes.

01:33:45    20    Q    And updated November 26th, 2016.

21        MR. BURSON:  Objection.  It doesn't say "updated" on

22    that cover, Your Honor.

23        THE COURT:  Sustained.

24    BY MR. McENTIRE:  (Continuing)

01:33:54    25    Q    It has a review date of November 26, 2016.

1    A    That's correct.

2    Q    And this was what you were recalling before we broke for

3    lunch.

4    A    I believe so, yes.

01:34:06  5    Q    That there was a policy that had that new date from 2016.

6    A    Yes.

7    Q    And to your knowledge, was that a document that was

8    previously provided to defense counsel?

9    A    I don't know what was provided to defense counsel.

01:34:23  10    Q    Based on discussions over the lunch hour, are you aware

11    that this document was e-mailed to defense counsel over the

12    lunch hour?

13    A    I had no discussions with anybody during lunch.

14    Q    Fair enough.

01:34:36  15        What I'd like to do, Special Agent Ribail, is draw your

16    attention to a particular page --

17        THE COURT:  Counsel, I'm going to stop the testimony.

18    I'm confused by your question, and I need clarification from the

19    parties.

01:34:49  20        Are you indicating that you have -- that the defense has

21    never received this document before?

22        MR. McENTIRE:  True.

23        THE COURT:  Okay.  All right.  I guess then I have a

24    question for the Government.

01:35:00  25        Why is that the case?

1       MR. BURSON:  Well, Your Honor, I think it's important to

2  look at the document in question.  The only difference is that

3  there is a new cover sheet with some administrative materials,

4  two entire pages, in between it and the start of the cover

01:35:15    5  sheet, which was provided to the defense and is entered as an

6  exhibit.  So that's the only difference.

7       THE COURT:  Okay.

8       MR. BURSON:  And then the Government, at least the U.S.

9  Attorney's Office was not aware of the presence that -- of this

01:35:26   10  particular cover sheet and two administrative pages.

11       THE COURT:  Okay.  And I'll hear more about this.  I

12  just wanted to make sure that it wasn't anything more -- if

13  there are nominal changes, we'll get into that at some point

14  later, but let's hear testimony on this at this point.

01:35:45   15       Thank you.

16       MR. BURSON:  The other clarification I do want to make,

17  in case it does comes up, is that it appears as though earlier

18  in discovery we released, at the request of the defense,

19  policies governing eyewitness procedures and photo lineups.  In

01:35:58   20  the interest of time, and to get it to defense, we didn't narrow

21  the scope for this disclosure, and so it's a little more broad

22  and covers things not at issue here, such as mugshot lineups,

23  live lineups, things of that nature, that aren't really at issue

24  in this case.

01:36:15   25       THE COURT:  All right.  Well, we'll get to that when we

1    get to that.

2         Thank you.

3    BY MR. McENTIRE:   (Continuing)

4    Q    Special Agent Ribail, in the morning you had indicated that

01:36:22  5    it was your understanding that the lineup that you had

6    administered to JV was conducted in compliance with the

7    November 2013 policy.

8    A    Generally, yes.  I'm not going to say it was perfect, but

9    yes.

01:36:54  10   Q    So, Special Agent Ribail, I'm directing your attention to

11   defense exhibit marked for identification purposes as 1023.

12        And in this vein, you recognize this document?

13   A    Yes.

14   Q    This is a 21-page document that has this title page again

01:37:26  15   with the publish date of November 26th.

16        MS. YOUNGCOURT:  Your Honor, this monitor is not on for

17   them to see.

18        Thank you.

19        THE COURT:  Oh, apologies.

01:37:37  20        Is that working now?

21        Thank you.  Thank you for letting us know.

22        Go ahead.

23        MR. McENTIRE:  Thank you, Your Honor.

24   BY MR. McENTIRE:   (Continuing)

01:37:47  25   Q    And, again, the review date of November 26th, 2016.

1    A    Yes.

2    Q    Does this document, 21-page document fairly and accurately

3    represent the FBI's lineup policy as reviewed on November 26,

4    2016?

01:38:02    5    A    Yes.

6         MR. McENTIRE:  And I'd move to admit this exhibit, Your

7    Honor?

8         THE COURT:  Any objection?

9         MR. BURSON:  No objection.

01:38:06    10        THE COURT:  It will be admitted.

11        (Defense Exhibit No. 1023 admitted into evidence.)

12   BY MR. McENTIRE:   (Continuing)

13   Q    Turning, Special Agent Ribail, to Page 13 of Exhibit 1023,

14   under Section 3.6.4, that title is "Sequential Live Lineup

01:38:30    15   Identification Procedures."

16        Did I read that correctly?

17   A    Yes.

18   Q    And this is a series of instructions or guidance for

19   special agents administering lineups in the -- in the field or

01:38:44    20   wherever you happen to be administering a lineup.

21   A    Yes.

22   Q    And it's -- indicates that "investigators are responsible

23   that the lineup should do," and, again, a series of bullet point

24   instructions.

01:38:59    25   A    Yes.

1  Q    Near the bottom, third from bottom (reading):  Request the

2  witness not to discuss the identification procedure or its

3  results with other witnesses involved in the case.

4          MR. BURSON:  Your Honor, I'm going to make an objection

01:39:12  5  to relevance.  This case doesn't deal with live lineups.  This

6  was a photo lineup.

7          THE COURT:  Overruled.  Go ahead.

8  BY MR. McENTIRE:   (Continuing)

9  Q    And this is an instruction that you provided to JV.

01:39:25  10  A    Can you repeat?  I couldn't hear part of --

11  Q    Certainly.

12          Essentially the "do not contact" -- or "do not discuss your

13  lineup with other witnesses," this is an instruction that you

14  mentioned earlier this morning that you had provided to JV.

01:39:38  15  A    Yes.

16  Q    The second part of this is that "and request that the

17  witness not have contact with the media."

18  A    What was the question, that that's in the policy?

19  Q    Correct.

01:39:52  20  A    Yes.  Yes.

21  Q    And you had indicated this morning, when asked about that

22  second part of the policy, that, quote, generally you sort of

23  forgot, unquote, as to giving that last part of the instruction.

24  A    That's correct.

01:40:08  25  Q    And, quote, felt like this wasn't the type of guy that

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                    127
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1    would go and contact the media, unquote.

2    A    Yes, due -- if I can elaborate, I can't quote, but he made

3    a statement like, you know, "I don't want to talk to anybody

4    about this," or something that -- yeah.  So, yes, between me not

01:40:26  5    having, obviously, this policy with me, using the sheriff's

6    policy, which does not contain this language, and I -- generally

7    not feeling it necessary, we did not tell him to contact the

8    media.

9    Q    So this is a procedure that is set forth in the FBI's

01:40:43  10   policy manual, correct?

11   A    Yes.

12   Q    That you agree you did not follow.

13   A    Correct.

14   Q    I'd like to turn your attention to a different section from

01:40:59  15   this lineup -- or from this policy manual, excuse me.

16         MR. McENTIRE:  Again, Your Honor, this is Defense

17   Exhibit 1023, Page 10.

18   BY MR. McENTIRE:   (Continuing)

19   Q    I'm under Section 3.5.6, "Recording Showup Results."

01:41:26  20         Do you recognize this section of the lineup procedure?

21   A    I do.  I'd like to point out that this is not the lineup

22   section; neither was the previous.

23   Q    Under the second section here (reading):  For each witness,

24   document a statement regarding the degree of certainty for both

01:41:47  25   identification and nonidentification results.

1          MR. BURSON:  Objection; relevance, Your Honor.  There

2   was no show-up here.  That's not what any testimony has been

3   about.

4          THE COURT:  Overruled.  Go ahead.

01:41:58   5   BY MR. McENTIRE:  (Continuing)

6   Q    You indicated, with respect to lineup 5032, the one for

7   Donovan Cloud, that -- and I'm paraphrasing your testimony from

8   this morning -- that you felt JV's response was -- in terms of

9   tearing up was your interpretation of his level of certainty.

01:42:23  10   A    That and other factors, yes.

11   Q    And you had documented that in your 302 regarding that

12   lineup.

13   A    Documented what?

14   Q    His response, his reaction.

01:42:36  15   A    Yes.

16   Q    And you had written that down again on the YCO lineup

17   instructions.

18   A    Yes.

19   Q    You indicated that that morning -- or afternoon, excuse me,

01:42:49  20   you had administered three other lineups besides the one to JV.

21   To MV, correct?

22   A    Yes.

23   Q    As well as SV?

24   A    Yes.

01:43:05  25   Q    As well as NV.

1    A    Yes.

2    Q    And in each of those other lineups besides JV, no one

3    selected either James Cloud or Donovan Cloud from those lineups.

4    A    That is correct.

01:43:27    5    Q    And in your 302, you did not document the level of

6    certainty of the nonidentification presented by NV.

7    A    I'm not aware how you document a nonidentification.  I

8    wrote NV, or whoever we're discussing, did not identify anybody.

9    So there's a level of certainty when they say, "I can't identify

01:43:54    10    anybody" or "I don't recognize anybody."

11        But I did, uh -- I don't want to go too far, unless you

12    want to show me some of the other reports, but I did note things

13    they observed and other statements they made.  But they did not

14    identify anybody.

01:44:12    15    Q    When you administered the lineup to JV, he did not identify

16    James Cloud.

17    A    Correct.

18    Q    And in your 302 documenting that, you did not record the

19    level of certainty of that nonidentification.

01:44:35    20    A    I feel like I already answered that.  No, I didn't.  I

21    don't know how you document my level of certainty that "I don't

22    recognize anybody."

23    Q    So, for example, "definitely not No. 2," that would be a

24    level of certainty indicated by an eyewitness.

01:44:55    25        Agreed?

1   A    Yes.

2   Q    And that is information relevant to writing down or

3   recording as part of your documentation of a lineup.

4   A    It could be.

01:45:09   5   Q    But you did not document the level of certainty regarding

6   JV for the nonidentifications.

7   A    I wouldn't say that's true, no.  I documented statements

8   that the witness said.  In general, if I hand somebody a photo,

9   and they just hand it back, I hand them another one until we're

01:45:34  10   done.  And then when we're done, "Do you recognize anybody?"

11        "No."

12        So I -- I -- I write my report, and I say, "Witness did not

13   identify anybody."

14        If I hand it, and they say, "No, no, no, no, no, no," I

01:45:46  15   would still -- I would still write, "The witness did not

16   identify anybody."

17        If I hand it to them and they say, "He looks similar to,"

18   then I document that.  And that's how my reports are written.

19   Q    Okay.  Special Agent Ribail, going back to the instruction

01:46:35  20   from the FBI's policy that -- asking witnesses, not directing

21   but asking witnesses not to speak with other individuals --

22        MR. McENTIRE:  And may I have the technology, actually,

23   switched over to the table, please.

24   BY MR. McENTIRE:  (Continuing)

01:47:33  25   Q    I want to actually just pivot for a moment to, you had

1    mentioned there is also an FBI 2019 policy.

2    A    Yes.

3    Q    And that came into effect on June 9th, 2019.

4    A    That is the date of the policy.  I don't know when it was

01:47:52    5    published or put into effect, but that is the date of the

6    policy, yes.

7    Q    So I am drawing your attention, Special Agent Ribail, to

8    Defense Exhibit 1012, which is the policy that we were just

9    discussing, this June 2019 policy.

01:48:24    10    A    Yes.

11    Q    So is it your testimony that the date June 9th, 2019, is

12    not the date that that policy went into effect?

13    A    It may be, but the FBI may have put it -- for like my -- I

14    may not have had the ability to view this policy until Monday,

01:48:44    15    Tuesday, Wednesday, who knows?  Because this was a Sunday, and

16    most government employees don't work on Sundays.  So who knows

17    when it was actually made available to review.

18    Q    Fair.

19        So you're drawing a distinction between maybe when the

01:48:58    20    policy, the date it went into effect versus when you were

21    actually able to view it.

22    A    Correct.

23    Q    So you have no disagreement with the idea that this policy

24    went into effect on June 9th, 2019, but you may have reviewed it

01:49:12    25    later.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                          132
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1    A    It's possible, yes.

2    Q    And you've reviewed this policy.

3    A    Yes.

4    Q    I want to draw your attention to 1012-6 --

01:49:33    5         THE COURT:  Counsel, has this document been identified

6    and admitted?

7         MR. McENTIRE:  Good point, Your Honor.

8    BY MR. McENTIRE:  (Continuing)

9    Q    With respect to 1012, Special Agent Ribail, do you

01:49:43    10   recognize this document?

11   A    Yes.

12   Q    Is it a fair and accurate representation of the FBI's

13   June 2019 policy?

14   A    Yes.

01:49:51    15        MR. McENTIRE:  I'd move to admit it.

16        MR. BURSON:  No objection.

17        THE COURT:  It will be admitted.

18        (Defense Exhibit No. 1012 admitted into evidence.)

19   BY MR. McENTIRE:  (Continuing)

01:50:00    20   Q    I'm going to draw your attention to 1012-6, which is the

21   sixth page of this policy manual.  This is the Authorities

22   section.

23        Agreed?

24   A    Yes.

01:50:13    25   Q    This is the justification, or authority, if you will, for

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    133
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/McEntire*

1    where these policies are coming from.

2    A    Yes.

3    Q    It lists three things.  The first is the Constitution of

4    the United States.

01:50:27    5    A    Is that a question?

6    Q    Agreed?

7    A    Yes.

8    Q    The second is the Attorney General's Guidelines For

9    Domestic FBI Operations, As Amended?

01:50:35    10    A    Yes.

11    Q    And the third is the Department of Justice Memorandum,

12    Eyewitness Identification Procedures For Conducting Photo

13    Arrays, January 6th, 2017.

14    A    Yes.

01:50:46    15    Q    So the authority for the amendments to the FBI policy come

16    from the January 6th, 2017, memo from the deputy attorney

17    general.

18    A    Yes.

19    Q    So this was essentially the FBI revising their policies and

01:51:05    20    using as authority for those amendments what was contained in

21    that memorandum.

22    A    Yes.

23    Q    I want to direct your attention back to -- back to Defense

24    Exhibit 1009, which is that policy that we -- excuse me, that

01:51:40    25    memorandum that we had just discussed.

1      I've got it up on your monitor right now.  And I'd like to

2  draw your attention specifically to 1009-7.  There's a section

3  from this memorandum specifically title "Documentation."

4      Fair?  Correct?

01:52:09  5  A    I'm sorry.  I'm reading.

6      What was your question?

7  Q    There's a section here that is contained in this policy

8  called "Documentation"?

9  A    Yes.

01:52:20 10  Q    And under 9.1, it specifically states that (reading):  The

11  witness' identification of a photo, if any, and the

12  corresponding statement of confidence should be clearly

13  documented by video or audio recording the photo array.

14      Did I read that correctly?

01:52:38 15  A    Yes.

16  Q    And so this is the policy section attached to the memo sent

17  out in January of 2017.

18  A    Yes, from the DOJ policy.  Yes.

19  Q    Recording is not something that's referenced back from the

01:53:03 20  2013 FBI policy.

21  A    Correct.

22  Q    So this is something that's new.

23  A    For the FBI in the 2019 policy, yes.

24  Q    I'd like to draw your attention to a footnote specifically

01:53:39 25  from that section entitled "Documentation."

1          (Reading): Electronic recording serves several important

2     purposes.  It preserves the identification process for later

3     review in court.

4          Is that something that you would agree with?

01:53:54  5     A     Sure.

6     Q     (Reading):  It protects officers from unfounded claims of

7     misconduct.

8     A     True.

9     Q     (Reading):  And it allows fact finders to directly evaluate

01:54:04  10    the witness' verbal and nonverbal reactions and any aspects of

11    the array procedure that would help contextualize or explain the

12    witness' selection.

13    A     Sure.  I do apologize, but sometimes I feel like you're

14    making a statement versus asking me a question.  So ...

01:54:24  15    Q     Based on your experience and training, Special Agent

16    Ribail, what this footnote says makes sense.  Fair?

17    A     I think it makes sense, yeah.  I don't know that it makes

18    sense in every instance, but I have no problem with, uh, this

19    policy generally.

01:54:42  20    Q     Would you agree that a video recording of a lineup would

21    allow a fact finder to hear everything that was said during a

22    lineup?

23    A     Yeah, it would.

24    Q     All the words exchanged?

01:54:53  25    A     Yes.

1    Q    All the sounds made?

2    A    Yes.

3    Q    All the behaviors and gesticulations that the lineup

4    administrator made?

01:55:02   5    A    Yes.

6    Q    And all the behaviors and gesticulations that the

7    eyewitness made?

8    A    Yes.

9    Q    So a video recording would allow a judge to see the

01:55:11   10   witness' expressions, which may be important.

11   A    Possibly.

12   Q    A video recording would allow the judge to see your

13   expressions as the lineup administrator, which may be important.

14   A    Yes.

01:55:25   15   Q    Effectively, a recording gives the fact finder greater

16   context to assess what happened.

17   A    Yes.

18   Q    And greater context, Special Agent Ribail, you'd agree,

19   means that the fact finder is more fully informed.

01:55:46   20   A    I'm sorry.  I couldn't hear the last part.

21   Q    It means the fact finder would be more fully informed

22   regarding what happened that day.

23   A    Yes.

24   Q    I want to direct your attention, Special Agent Ribail, to

01:56:09   25   Defense Exhibit 1009, Page 12.

1    There's a section from this memorandum specifically titled

2  "Recording the Photo Array."

3  A    I'm sorry.  Can I interrupt?  I thought you said Page 12.

4  I'm on Page 10.

01:56:41  5  Q    Fair.  The defense exhibit marking is 1009-12.

6  A    Okay.  I'm sorry.

7  Q    And there's a section here entitled "Recording the Photo

8  Array."

9  A    Yes.

01:56:55  10  Q    And down there at the bottom, last sentence, it reads

11  (reading):  If video is impracticable, however, an audiotape may

12  be useful, because it allows judges and jurors to hear exactly

13  what was said by both the administrator and the witness rather

14  than relying exclusively on an oral or written report about the

01:57:14  15  procedure.

16    Correct?

17  A    That's what it says, yes.

18  Q    And you'd agree, Special Agent Ribail, that an audio

19  recording would allow a fact finder to hear everything that

01:57:28  20  occurred during that lineup.

21    MR. BURSON:  Objection; calls for speculation about the

22  quality of the audio recording at issue.

23    THE COURT:  Overruled.

24  A    Yes.  I mean, assuming, yeah, it works.  Sometimes you do

01:57:43  25  interviews outside in the wind and other things make it so you

1    cannot hear everything, but yes.

2    BY MR. McENTIRE:   (Continuing)

3    Q    Put differently, an audio recording, when coupled with your

4    notes or report, would give the fact finder greater context on

01:57:59  5    what happened during that lineup.

6         MR. BURSON:  Objection, Your Honor.  This applies to a

7    lot of the questions so far, but we're getting into

8    argumentative territory at this point.  Counsel is essentially

9    testifying here.

01:58:09  10         THE COURT:  Overruled.  He can answer.

11    A    I'd like to define who a "fact finder" is.  Am I a fact

12    finder?  Who are you referring to?

13         MR. SMITH:  Would you please pull the microphone a

14    little closer to you?

01:58:22  15         THE WITNESS:  For me?

16         MR. SMITH:  Yes.

17         THE WITNESS:  Sorry.

18         MR. SMITH:  Thank you.

19    BY MR. McENTIRE:   (Continuing)

01:58:37  20    Q    Turning back to 1009-7 under the section titled

21    "Documentation," Footnote 3 (reading):  It preserves the

22    identification process for later review in court, it protects

23    officers against unfounded claims of misconduct, and it allows

24    fact finders to directly evaluate a witness' verbal and

01:58:57  25    nonverbal reactions.

1      Special Agent Ribail, is it fair to say that when this

2    memorandum is referring to a "fact finder," it would be

3    referring to either the Court or a jury?

4    A    I don't know what the definition of a "fact finder" is in

01:59:12    5    this context.  It's not a term we use in -- like in the FBI

6    policy, I don't think you'd see that term, so I'm unsure what

7    that means.  But, yeah, I think it would make -- the recording

8    would serve myself, the Court, uh, a jury, defense attorneys;

9    everybody, I guess, if that's what it means.

01:59:31    10    Q    So in that respect, an audio recording would help provide

11    additional context to that fact finder, let's say a judge.

12    A    Possibly.

13    Q    You had mentioned earlier this morning that you were at the

14    Zillah substation preparing the lineup for one, maybe up to two

01:59:52    15    hours.

16    A    Yes.

17    Q    When you left that morning -- or when you headed out to

18    JV's residence, it wasn't just you.

19    A    Correct.

02:00:03    20    Q    There was another detective that was with you.

21    A    Yes.

22    Q    Dan Cypher from the Yakima County Sheriff's Office.

23    A    Yes.

24    Q    When you went out there, Special Agent Ribail, did you have

02:00:14    25    your phone with you?

1    A    Yes.

2    Q    Does your phone have the capability of video recording?

3    A    Generally, yes.

4    Q    Does it have the capability of audio recording?

02:00:30    5    A    I don't know.  That's a good question.  I used to have it

6    turned off.  But I would assume we can make a video with audio,

7    that maybe the audio mic works.  I don't know.  It's a good

8    question.

9    Q    Do you know whether or not Detective Dan Cypher had a phone

02:00:45    10    with him that day?

11    A    I'm sure he did.

12    Q    Do you know whether or not his phone was capable of video

13    or audio recording?

14    A    That I don't know.

02:00:57    15    Q    So you had a phone with you capable of doing some form of

16    recording.

17    A    Yes.  But I don't believe, if I can clarify, that me

18    recording an interview with my phone would be within FBI policy.

19    Nowhere is it required to record the lineups at that point,

02:01:23    20    period.

21    Q    Special Agent Ribail, do you remember going to the Benton

22    County Jail to collect DNA from James Cloud?

23    A    To collect DNA?

24    Q    (Nodded.)

02:01:59    25    A    Was it DNA or fingerprints?  I think --

1    Q    Do you remember going to the Benton County Jail?

2    A    I've been there a lot.  Sorry.

3    Q    Do you remember going to the Benton County Jail in this

4    case and present were not only James Cloud but also one of his

02:02:16    5    attorneys, Lorinda Youngcourt?

6    A    Yes.  We did fingerprints and -- and DNA, yes.

7    Q    Do you remember using your phone to take photographs of

8    James Cloud that day?

9    A    Yes.  If I can clarify, I am allowed to take a photograph

02:02:34    10    with my phone.  I am not authorized, in general, to record an

11    interview with my phone.  I would need permission, various

12    permissions.  And I'm not even sure I could -- would be allowed

13    to use my phone, but to do a recorded interview I need

14    permission in advance.

02:02:56    15    Q    And that's permission that you did not seek to obtain

16    before heading out to administer either the lineup with JV or

17    his family or LL.

18    A    No, I did not.

19    Q    And nor did you bring any type of recording equipment with

02:03:14    20    you.

21    A    I don't believe I had any, because I believe I was riding

22    with Dan Cypher, and any recording device I would have would

23    have been in my -- my vehicle.

24    Q    Special Agent Ribail, you had mentioned the amount of time

02:03:42    25    that you had spent at the Zillah substation.

1    Was that information that you had reflected in your 302?

2  A    Which information?

3  Q    That you had spent one to two hours compiling a -- a lineup

4  there.

02:03:54  5  A    No.

6  Q    You had mentioned that you had used the Spillman technology

7  to help assemble the lineup, correct?

8  A    Yes.

9  Q    Was that information that you had included in your 302?

02:04:04  10  A    Indirectly, yes, by attaching the, in my opinion, by

11  attaching the lineups with the numbers and all of that.  To me,

12  that is -- that makes it, I guess, reproducible or, for me,

13  obvious what -- how we made them, and they're -- had the ability

14  to retrieve them again.  That's why we kept the numbers and

02:04:27  15  stuff like that of the photo lineups.

16  Q    You had mentioned and testified earlier today that the

17  lineups were conducted in the driveway of ██████ -- JV's

18  residence.

19  A    Yes.

02:04:45  20  Q    Was that information that was reflected in your 302?

21  A    No.

22  Q    You had mentioned that the family members were interviewed

23  and shown lineups separately and one at a time.

24  A    I'm sorry?

02:04:56  25  Q    You had testified earlier today that the family members

1    were interviewed and showed lineups separately and one at a

2    time.

3    A    Yes.

4    Q    Was that information that was reflected in your 302?

02:05:06    5    A    Yes.

6    Q    It was.

7        I'm pulling up Defense Exhibit 1004, which is your 302

8    documenting the lineup with JV that day.

9        Can you point to me where that's reflected in your 302.

02:05:31    10    A    It's -- I -- you want me to point?  I'm sorry.  What do you

11    mean, "point"?

12    Q    Where is that information reflected in your report?

13    A    So if there were more than one person present, their name

14    would be listed as being present during the interview, and they

02:05:45    15    are not.

16    Q    So it doesn't state that.

17    A    To me, it does.  As the author of this report, if there

18    were more people there, I would put that there were more people

19    there.  I don't -- I don't write a report, if I go to somebody's

02:06:02    20    house, and they're by themselves, I don't write "no one else is

21    present."  I just write who is there and who is a party to the

22    interview.

23    Q    You testified earlier today that while one member was being

24    interviewed, the others were sequestered and out of earshot.

02:06:20    25        Was that reflected in your 302?

1    A    No.

2    Q    You testified earlier today that the photos were shown to

3    JV one at a time.

4    A    Yes.

02:06:34    5    Q    And that's referred to as a sequential technique?

6    A    Yes.

7    Q    Was that reflected in your 302?

8    A    It's reflected in my report, my overall report, which is,

9    to me, the 302 and the corresponding documents that are attached

02:06:55    10    to or made part of the file with the interview report.

11    Q    Special Agent Ribail, I want to draw your attention back to

12    the FBI's 2019 policy.  This is Exhibit 1012-4.

13        Section 4.7.4, under the section "Documenting the Use of a

14    Photographic Lineup," under the third bullet point one of the

02:07:34    15    things the documentation should include are, quote, the

16    procedures used in the photographic lineup, i.e. sequential or

17    simultaneous.

18        So going back to my question:  Is whether or not this is

19    was a sequential or simultaneous lineup reflected anywhere in

02:07:52    20    your report?

21    A    My opinion stands, is, yes, it's -- it is documented.  And

22    this is not the policy that I was operating under when these

23    took place.  This is the policy that came out on Sunday.  It's

24    dated Sunday.

02:08:11    25    Q    So this policy that came out on June 9th, 2019, it's your

1    testimony that you do not believe that that policy controls.

2    A    I don't think it controlled my actions during that day

3    because I was unaware of the policy on June 9th.  That policy

4    could have come out at 11:00 p.m. on June 9th or, like I said,

02:08:34  5    it could have been published for my access on June 10th.  I

6    don't know.  I just know that I was in White Swan with no

7    access -- even if I had even thought to review if there had been

8    a policy change, I wasn't in the office to do so, period, nor

9    was I notified by e-mail, or any other means, that there was a

02:08:52  10   new policy to be reviewed on that day.

11   Q    Your testimony this morning is that you conducted each

12   lineup by placing the photographs down on -- in a stack on the

13   hood of a truck.

14   A    Car.

02:09:05  15   Q    Car.

16   A    Yes.

17   Q    Is that information that was reflected in your report?

18   A    No.

19   Q    And, Special Agent Ribail, you mention that you've been

02:09:41  20   with the FBI for 17 years.

21   A    Yes.

22   Q    And so you started with the agency, the Bureau sometime

23   around 2003?

24   A    Yes.

02:09:55  25   Q    So directing your attention back to Defense Exhibit 1009,

1    turning to that third paragraph, first sentence, that (reading):

2    The Department of Justice last addressed procedures for photo

3    arrays in its 1999 publication Eyewitness Evidence, a Guide For

4    Law Enforcement.

02:10:20    5        So that was the last DOJ guidance before this 2017

6    memorandum.

7        Is that something that you had received training on at the

8    academy?

9    A    The 1999?

02:10:34    10    Q    Correct.

11    A    I don't know.  I know we received training.  I don't know

12    where it came from.

13    Q    I'm pulling up what's been marked Defense Exhibit 1010,

14    which is the Eyewitness Evidence, a Guide For Law Enforcement

02:10:59    15    from 1999.

16        Special Agent Ribail, do you recognize this document?

17    A    I can't say that I do.

18    Q    So during your experience or training, this is not a

19    document -- this -- procedures outlined in this document is not

02:11:14    20    something that you are familiar with or can recall having

21    reviewed?

22    A    No.

23        MR. McENTIRE:  Your Honor, what I'd like to do is offer

24    this under -- again, Defense Exhibit 1010 for purposes of asking

02:11:31    25    a few questions.

1          THE COURT:  Counsel?

2          MR. BURSON:  Sorry.  Is it being admitted into evidence

3     or is it --

4          MR. McENTIRE:  Yeah, right now just as a basis to ask a

02:11:42   5     few questions.

6          MR. BURSON:  No objection.

7          THE COURT:  Okay.

8          (Defense Exhibit No. 1010 admitted conditionally into

9     evidence.)

02:12:00  10  BY MR. McENTIRE:  (Continuing)

11  Q    Special Agent Ribail, I'm directing your attention to

12     Defense Exhibit 1010-26, which has a section titled "Obtaining

13     Information From the Witnesses."

14          And on the very next page, on a continuation, there's two

02:12:22  15     instructions there, or guidelines, No. 8 being -- excuse me,

16     No. 7 being (reading):  Encourage the witness to avoid contact

17     with the media or exposure to media accounts concerning the

18     incident.

19          Is that something that you're familiar with?

02:12:41  20  A    I am not familiar with this manual, so no.

21  Q    During your training with the FBI, as we've talked about

22     from this morning --

23  A    Correct.

24  Q    -- we talked about various forms of outside influence and

02:12:56  25     how they could impact an eyewitness.

1    A    We did.

2    Q    And we talked about how it's important to minimize outside

3    influence as much as possible, as an agent conducting a lineup.

4    A    Was that a question?

02:13:10    5    Q    Yes.

6    A    I didn't -- I'm sorry.  Can you rephrase it then?  I heard

7    a statement.

8    Q    Sure.

9         We talked about minimizing, the importance of minimizing

02:13:20    10    outside influence as a lineup administrator, correct?

11    A    Yes.

12    Q    And you would agree that that's something that is, a lineup

13    administrator should endeavor to do.

14    A    I couldn't hear the last part.

02:13:36    15    Q    That a lineup administrator should endeavor to do.

16    A    Yes.

17    Q    So, Special Agent Ribail, when you were going through

18    Quantico, you had indicated that you had received generalized

19    training on lineup administrations.

02:14:03    20    A    Yes.

21    Q    And how to conduct them.

22    A    Yes.

23    Q    And why the procedures of administering a lineup are

24    particularly important.

02:14:13    25    A    Yes.

1    Q    To follow them.

2    A    Yes.

3    Q    And one of the things, again, that is always a goal is to

4    minimize outside influence.

02:14:21  5    A    Yes.

6    Q    And this is a guide from the Department of Justice on

7    encouraging a witness to avoid contact with media or exposure to

8    media accounts concerning the incident.

9        THE COURT:  Well, Counsel, this document has not been

02:14:35  10    identified, so I -- that's an improper question.  If you could

11    rephrase that.

12        (Counsel conferring.)

13        THE COURT:  And the reason I interrupted is because

14    you're referring to this document, and the Government hasn't

02:14:58  15    objected, which is fine, but this document has not been

16    admitted, so referring to it anything other than a document that

17    this witness is reviewing would be improper.

18        MR. McENTIRE:  And, Your Honor, what I would ask for is

19    conditional admissibility on the grounds that our expert witness

02:15:11  20    will be laying foundation for this document and admitting it

21    through her.

22        THE COURT:  Any objection to that?

23        MR. BURSON:  No, Your Honor.

24        THE COURT:  Okay.  It will be admitted for that purpose

02:15:20  25    with that caveat.

1          Go ahead.

2    BY MR. McENTIRE:   (Continuing)

3    Q    So, Special Agent Ribail, in your investigation and

4    training as an agent, it's your testimony that this is not an

02:15:32  5    instruction or guidance that you ever received.

6    A    That I don't know.  We -- I'm sure when I got into the FBI

7    in 2003 there was a policy, an FBI policy, and then at some

8    point it changed, and maybe even changed again, until we had

9    the -- the 2013 policy that we've been reviewing, and that's

02:15:52  10   what I was operating under up until learning that there was a

11   new policy that came out in 2019.

12        But as far as DOJ policies and memos, they don't -- I'm not

13   saying they shouldn't affect me, but they don't.  I'm not -- DOJ

14   does not e-mail us their ideas of policies.  They go to FBI

02:16:15  15   management, and FBI management makes a decision whether to enact

16   some of those policies or ideas or not, and then they push them

17   down to us.

18        So anything other than FBI policy I can't -- I can't say --

19   I don't have to follow, um, or -- and I may not even be aware

02:16:31  20   that it exists.  So this -- I don't know whether this existed or

21   not.  This could have been something they used at the academy.

22   I don't know.

23   Q    You would agree that exposure to media counts as a form of

24   outside information.  Watching the news, for example.

02:16:48  25        MR. BURSON:  Objection.  We keep talking about exposure

1    to outside information.  Without some sort of time limitation

2    here, it's a vague question.  There's outside information that

3    comes in during the lineup, and there's outside information

4    after the lineup.

02:17:01  5          THE COURT:  Sustained.

6    BY MR. McENTIRE:  (Continuing)

7    Q    Special Agent Ribail, one of the policies that you're

8    supposed to do or follow is to instruct witnesses not to

9    communicate with other witnesses.  We've talked about this.

02:17:23  10   A    In this context, I take that as, yes, if I show you

11   something, and then I'm going to show somebody else something

12   immediately, that you two should not speak in between, yes.

13   Q    Perfect.

14         So building on that, so there's a recognition there that

02:17:43  15   instructing, for example, JV not to immediately leave the lineup

16   and go and talk to his wife, NV, would be a policy worth

17   following.

18   A    Yes.

19   Q    And that is an influence that could happen on NV that

02:18:01  20   occurs after the lineup is done.

21   A    I'm sorry.  If JV told NV something after JV reviewed it

22   but before NV reviewed it?

23   Q    Correct.

24   A    Yes.  Absolutely.

02:18:16  25   Q    So in that case, there is a policy that helps control

1    outside information that occurs after that individual's lineup.

2         MR. BURSON:  Objection.  The question is vague without

3    referencing the direction of the information.  Is it coming from

4    the person who just took the lineup, going to the person who

02:18:33  5    hasn't taken the lineup ...

6         THE COURT:  If you'd clarify the question.

7         MR. McENTIRE:  Certainly.

8    BY MR. McENTIRE:  (Continuing)

9    Q    If you are conducting a lineup on JV -- okay? -- and that's

02:18:46  10    the first lineup that you've administered, you would agree one

11    of the instructions you should provide JV is to not speak with

12    other witnesses.

13    A    Yes, about what they did.  Yes.

14    Q    And the reason that you would provide that instruction is

02:19:05  15    the concern that JV could then leave that lineup, walk over to

16    his wife, NV, and provide information on what occurred.

17    A    Yes.

18    Q    Before she comes and does the lineup.

19    A    Yes.

02:19:18  20    Q    So the FBI policy of not speaking to other witnesses is

21    meant to protect against a taint that occurs after that

22    witness', JV's, lineup.

23    A    Yes.

24         MR. BURSON:  Objection; vague.  Taint of which lineup,

02:19:39  25    Your Honor?

1         THE COURT:  Overruled.

2         MR. McENTIRE:  I apologize.

3    BY MR. McENTIRE:   (Continuing)

4    Q    Protects future witnesses' lineups.

02:19:47    5    A    Yes.

6    Q    You would agree that social media is -- let me rephrase

7    that.

8         Special Agent Ribail, I'm pulling back up, this is Defense

9    Exhibit 1011 dash -- 1011, which has been previously admitted.

02:20:41    10   This is the 2013 FBI policy.

11   A    Okay.

12   Q    I'm referring you to Section 3.8 dealing with photographic

13   lineups, and I'm reading the highlighted section.

14        (Reading):  The primary objective of these procedures are

02:21:08    15   to minimize suggestiveness by ensuring nothing is said or done

16   by the FBI to distinguish the suspect's photograph from other

17   photographs?

18        Correct?

19   A    That you read that correctly?  Yes.

02:21:20    20   Q    And immediately before that (reading):  The investigator --

21   I'll highlight this for ease.  (Reading):  The investigator or

22   administering agent, if not the lead investigator, must conduct

23   the photographic lineup in a nonsuggestive manner conducive to

24   obtaining accurate identification or nonidentification results

02:21:49    25   based on the witness' memory, while minimizing the effect of

1    outside influences.

2    A    Yes.

3    Q    That's from the policy.

4    A    Yes.

02:21:58    5    Q    So the goal, again, as an agent administering lineups, you

6    are trying to minimize outside influences.

7    A    Yes.

8    Q    And you would agree, as we've discussed before, that the

9    environment could be an outside influence.

02:22:13    10    A    Can you define "environment"?

11    Q    For example, a wanted poster on a wall.

12    A    Yeah.

13    Q    Which is why you were making sure that there was nothing in

14    or around where you were conducting the lineup on JV.

02:22:27    15    A    Yes.

16    Q    Other witnesses could be, again, this outside influences.

17    A    Yes.

18    Q    What you say and do as a lineup administrator could be

19    outside influences.

02:22:39    20    A    Yes.

21    Q    And so there -- these are all categories of outside

22    influences that you, as an agent, are trying to minimize.

23    A    Yes.

24    Q    Special Agent Ribail, would you agree that news is a form

02:22:56    25    of outside influence?

1    A    No.

2    Q    You don't believe news is a form of outside influence.

3    A    Not after the lineup is already administered, no.  They've

4    already -- they've already answered the question, they've

02:23:09   5    already reviewed the photos, and -- and picked one or not picked

6    one.  And I'm ...

7    Q    I want to pivot and bring up lineup 5033, which is the

8    lineup you administered that day to JV, among the other

9    witnesses.  This is Defense Exhibit 1000.

02:23:45   10        Do you recognize this, Special Agent Ribail?

11    A    Yes.

12    Q    And directing your attention to 1000-3, this is the

13    photograph that you included of James Cloud.

14    A    Yes.

02:24:04   15    Q    And this is what Spillman produced.

16    A    That's my understanding, yes.

17    Q    And he has short hair in this photograph.  Based upon you

18    looking at the photograph, would you agree he has short hair?

19    A    Sure.  I'd call it medium, but ...

02:24:26   20    Q    And it creates, I guess, what I would describe as sort of

21    a -- kind of a bump, rounded bump in his hair at the top.

22    A    Yes.

23    Q    This photograph does not depict James Cloud in any form of

24    visible jail uniform.

02:24:47   25    A    No.

1    Q    There's no height markings behind him.

2    A    No.

3    Q    There's nothing that suggests that this was actually, in

4    fact, a booking photo.

02:24:56  5    A    Correct.

6    Q    The photographs that you were showing, Special Agent

7    Ribail, these were full-size, 8 1/2 x 11 photographs?

8    A    It's -- the paper is 8 1/2 x 11.

9    Q    Sure.

02:25:21  10        So the photograph is, as depicted here, slightly smaller

11    than an 8 1/2 x 11-sized photograph.

12    A    Yes.

13    Q    Color?

14    A    Yes.

02:25:37  15    Q    And you indicated there are numbers in this lineup down at

16    the bottom.  This one indicating, under 1000-3, there's a "2"

17    underneath James Cloud's photograph.

18    A    Yes.

19    Q    And if I go back one, to 1000-2, there's a "1" there.

02:25:56  20    A    Yes.

21    Q    And you indicated, testifying earlier today, that these

22    numbers were essentially the printed order of the lineup.

23    A    Yes.

24    Q    It was also the order in which you provided the lineup to

02:26:10  25    each of the individual witnesses.

           1    A    Yes.

           2    Q    Special Agent Ribail, as the lead investigator in this

           3    case, you had an opportunity to review other police reports

           4    involving other agencies that were doing investigation as well.

02:27:02   5    A    Yes.

           6    Q    There are quite a few police reports.

           7    A    I'm sorry?

           8    Q    There are quite a few police reports.

           9    A    Yes.

02:27:14  10    Q    You had an opportunity -- you yourself did not interview JV

          11    besides this lineup.

          12    A    Correct.

          13    Q    There was a different law enforcement officer that did

          14    that.

02:27:29  15    A    Yes.

          16    Q    A Deputy Jay Heinz?  Does that ring a bell?

          17    A    I don't recall.

          18    Q    From your review of the reports, Special Agent Ribail, you

          19    would agree that what the reports reflect from JV, as well as

02:27:47  20    your discussions with JV, is that this incident that happened at

          21    JV's home elapsed over several minutes.

          22    A    It what over seven minutes?

          23    Q    It elapsed over several -- over several minutes.

          24    A    Yes.

02:28:05  25    Q    From reviewing, again, police reports and speaking with JV,

1    JV indicated that he interacted with the individuals, spoke with

2    them.

3    A    The two people that carjacked the car?

4    Q    Correct.

02:28:29    5    A    Yes.

6    Q    Spoke with not only the individual with the pistol that was

7    holding it to his son's head.

8    A    Yes.

9    Q    He also interacted with the other individual with a

02:28:39    10    shotgun.

11    A    Yes.

12    Q    In fact, the individual with the shotgun followed him into

13    the house while he was exchanging keys.

14    A    Yes.

02:28:48    15    Q    The keys from -- initially he pulled the keys from a van?

16    A    Yes.

17    Q    But the individuals wanted a truck instead.

18    A    Yes.

19    Q    And so over this several-minute interaction, he's in close

02:29:02    20    proximity to the individual with the shotgun who's following

21    him.

22    A    Yes.

23    Q    And he was actually talking to him, the individual with the

24    shotgun.

02:29:15    25    A    I -- my -- based on reading the reports, yes, I know some

1    discussion.  Yes.

2    Q    According to JV, that the man with the shotgun was

3    apologetic and continually told him he was very sorry for what

4    he was doing.

02:29:32    5    A    Yes.

6    Q    Do you recall that from the reports?

7    A    I recall that from the reports, yes.

8    Q    JV also ended up negotiating with them essentially about

9    where his son would sit in the truck.

02:29:41   10    A    Yes.

11    Q    Initially they wanted him inside the cab.

12    A    Yes.

13    Q    Later they agreed that the son could be in the bed of the

14    truck.

02:29:51   15    A    Yes.

16    Q    So this was more than a fleeting encounter, if you will.

17    We're not talking seconds.  We're talking minutes.

18    A    Yes.

19    Q    And you'd agree that JV had a good opportunity to view both

02:30:11   20    suspects that day.

21    A    I -- personally I don't know, because I am not JV, but my

22    opinion is actually, no, I don't agree with that.  If somebody

23    is following you, you can't see them.  And number two, if

24    somebody -- my opinion, based on my training and experience,

02:30:32   25    that if somebody has a gun to my son's head, I'm going to be

1    focused on them more than somebody that's on my side or behind

2    me.  So I -- my opinion, which is only worth my opinion, is that

3    JV more likely got a better look at the man holding the pistol

4    to his son's head, my opinion.

02:30:55    5    Q    You'd agree with the -- that the second individual followed

6    JV inside the home, as we talked about.

7    A    That's what the report says.

8    Q    And the other individual didn't follow him inside with his

9    son.

02:31:07    10   A    That's correct.  But you can't see somebody when they're

11   behind you.

12   Q    Is it your testimony that JV specifically told you exactly

13   where the second individual was positioned during this

14   interaction?

02:31:23    15   A    No.  I told you that's my opinion from reading the reports.

16   Q    So this is not something that JV said.  This is your

17   opinion based on your review of the reports.

18   A    It was -- it's my opinion based on you just saying that --

19   it sounded like you were reading a report that said that the man

02:31:39    20   with the shotgun followed him into the house.

21   Q    Ah.

22   A    Your words.

23   Q    So this is not something based upon your discussions or a

24   conversation with JV himself.

02:31:50    25   A    That's correct.

1    Q    Draw your attention to Defense Exhibit 1006.

2         There was some testimony about this earlier today.  And

3    this is something that you testified to that the Yakama Nation,

4    be it the police department, I think, or the Tribal Police is

02:32:30  5    what you were guesstimating had issued.

6    A    Yes.

7    Q    And based on the testimony, there was first a statement

8    saying that everyone was arrested, and that was published

9    sometime around 2 o'clock.

02:32:42  10    A    Yes.

11    Q    And then there was a clarification saying that, in fact,

12    that was not true, and that came out shortly after 5 o'clock.

13    A    Yes.

14    Q    And that subsequent statement, that's where this bulletin,

02:32:55  15    if you will, Defense Exhibit 1006, came from.

16    A    Yes.

17         MR. McENTIRE:  I don't believe, Your Honor, that this

18    has been admitted.

19    BY MR. McENTIRE:  (Continuing)

02:33:05  20    Q    But just in case it hasn't, Special Agent Ribail, do you

21    recognize this document?

22    A    Yes.

23    Q    Does it fairly and accurately represent the bulletin that

24    was issued?

02:33:15  25    A    Yes.

1      MR. McENTIRE:  I'd move to admit this.

2      MR. BURSON:  No objection.

3      THE COURT:  It will be admitted.  Counsel, I just want

4 to be clear.  The Government has its own exhibit of the same

02:33:25  5 document.

6      MR. BURSON:  That's correct, Your Honor.  There's

7 actually multiple overlapping exhibits.

8      THE COURT:  Okay.  If you all want to have multiple

9 exhibits, that's fine.

02:33:35  10      (Defense Exhibit No. 1006 admitted into evidence.)

11 BY MR. McENTIRE:   (Continuing)

12 Q    On timing, Special Agent Ribail, you had indicated that

13 this document, Defense Exhibit 1006, was something that JV had

14 seen that day on June 9th.

02:34:15  15 A    Yes.

16 Q    In the afternoon.

17 A    Yes.

18 Q    And JV had actually contacted you as you were driving into

19 his property or around his property to let you know about this

02:34:28  20 identification.

21 A    Yes.

22 Q    This document that JV described seeing, he encountered it

23 on the Yakama Nation's Facebook page?

24 A    That's my understanding, yes.

02:34:57  25 Q    And this appears to be on the Yakama Nation's letterhead.

            1    A    Yes.

            2    Q    And it contains two photos.

            3    A    Yes.

            4    Q    Tile photos, if you will.

02:35:05    5    A    Sure.

            6    Q    A picture of James Cloud's front.

            7    A    Yes.

            8    Q    And side.

            9    A    Yes.

02:35:12   10    Q    So these aren't the same size photos that JV had looked at

           11    with respect to the lineup.

           12    A    Correct.

           13    Q    These are smaller.

           14    A    Yes.

02:35:19   15    Q    Quite a bit.

           16    A    Yes.

           17    Q    This photo does not contain a neutral background.  You'd

           18    agree?

           19    A    I agree.

02:35:41   20    Q    It contains a height marking, indicative of a booking

           21    photo.

           22    A    Is that a question?

           23    Q    It is.

           24    A    It does.

02:35:51   25    Q    It also contains what appears to be -- James Cloud is

1    wearing jail garb.

2    A    Yes.

3    Q    And it contains a paragraph at the top.  Starting out with

4    (reading):  Toppenish, Washington.  Due to misidentification.

02:36:08    5    A    Yes.

6    Q    And there was some testimony about that earlier on the

7    reason why the "due to misidentification" was inserted in there.

8    A    You mean why this bulletin was put out in -- yes.

9    Q    Correct.

02:36:30    10    And your testimony from earlier today is that was an error

11    communicated somewhere along the way as information made it from

12    the Oregon State Patrol or state police to various law

13    enforcement agencies to the Yakama Nation that ultimately

14    resulted in an incorrect bulletin being issued.

02:36:49    15    A    Yes.

16    Q    In this paragraph, "due to misidentification," it does not

17    say "due to misidentification as a result of law enforcement

18    error," correct?

19    A    Correct.

02:37:04    20    Q    So there's no clarification on who made the mistake.  It

21    just states "due to misidentification."

22    A    You are correct.  The first three words are "due to

23    misidentification," yes.  I'm not sure I understood the

24    question.

02:37:25    25    Q    And, again, it goes on to state, identifying James Cloud as

1    wanted for the reservation murders.

2    A    Correct.

3    Q    This information regarding the miscommunication along the

4    way by law enforcement, that's not information that was public

02:37:50    5    knowledge.

6    A    No.

7    Q    So it was not communicated to JV.

8    A    Which part, that -- that they were in custody and they

9    weren't?  Or I don't know what --

02:38:03    10    Q    Who made -- who made the mistake.

11    A    Who made the mistake?

12    Q    Correct.

13        MR. BURSON:  Objection; calls for speculation.

14        THE COURT:  I'm going to sustain it.  If you could

02:38:14    15    rephrase it to clarify the question.

16    BY MR. McENTIRE:    (Continuing)

17    Q    Special Agent Ribail, to your knowledge, JV was not aware

18    of the miscommunication that had happened between the Oregon

19    State Patrol and the Yakama Nation police.  That's something

02:38:36    20    that was within law enforcement.

21        MR. BURSON:  Objection.  I believe the final link in the

22    chain indicated on the letterhead was the Confederated Tribes

23    and Bands of the Yakama Nation, which is not the Yakama Tribal

24    Police.

02:38:54    25        THE COURT:  Overruled.

 1    A    Can you repeat?

 2    BY MR. McENTIRE:   (Continuing)

 3    Q    JV was not aware of the miscommunication that occurred

 4    between the various law enforcement agencies.

02:39:09  5    A    I don't know what he knows and doesn't know.

 6    Q    Was that information that was made publicly available as to

 7    the internal error, to your knowledge as the lead investigator?

 8    A    I actually think it's painfully obvious that, yes, there

 9    was internal error, because there was a memo that went out that

02:39:26 10    said that they're both in custody, and then it had to be fixed

11    to notify the public that they weren't both in custody.  So to

12    me, that's very obvious, if I'm a member of the public, that an

13    error was made.  So I would say yes, he is aware.

14    Q    Special Agent Ribail, were you present at the July 18th,

02:40:00 15    2019, arraignment in this case?

16    A    I believe so, but I -- I don't remember.

17    Q    Do you remember a court hearing occurring over in Richland?

18    A    I don't remember.  I don't know if I attended or not.

19    Q    Special Agent --

02:40:30 20    A    Which -- it would have been --

21    Q    -- Ribail, is it your practice, as the lead agent on -- in

22    a case like this, to attend court hearings?

23    A    Generally, but if I'm busy, which I would have been in that

24    time frame, I wouldn't attend something that I didn't have a

02:40:51 25    purpose, necessarily.

1  Q    Do you remember a two-part hearing, one where the Clouds

2  were arraigned on the superseding indictment, and then there was

3  actually a substantive hearing before the Court immediately

4  afterwards?

02:41:11  5  A    I don't remember.

6  Q    I'm going to pivot, Special Agent Ribail, to there was two

7  identifications that you -- excuse me.

8       You did a second lineup procedure on a different individual

9  by the name of LL that day, on June 9th.

02:42:04  10  A    Yes.

11  Q    And you -- where did that lineup occur?

12  A    At his residence.

13  Q    Did you employ the same techniques that you did at -- with

14  the various individuals at JV's residence as you did with LL?

02:42:27  15  A    Yes.

16  Q    Including a sequential lineup procedure.

17  A    Yes.

18  Q    Did you use the same lineup photos?

19  A    Yes.

02:42:47  20  Q    Did you use the same blinded procedure that you described

21  in terms of taking a stack and putting them facedown?

22  A    Yes.

23  Q    Did you use the same numerical 1 through 6 order that you

24  described from before?

02:43:03  25  A    Yes.

1    Q    I'm going to draw your attention to Defense Exhibit 1013.

2         Do you recognize -- and I'm going to scan through it so you

3    can see it in total -- this lineup?

4    A    Yes.

02:43:40   5    Q    And this is lineup 5032.

6    A    Yes.

7    Q    And you administered this lineup on LL.

8    A    Yes.

9    Q    And he reviewed all of the photos.

02:43:51   10    A    Yes.

11    Q    And he did not identify anyone.

12    A    Correct.

13    Q    And this was the lineup containing Donovan Cloud.

14    A    Correct.

02:44:03   15    Q    I'm going to turn your attention to exhibit -- Defense

16    Exhibit 1000.  This is lineup 5033.  Again, scanning through it.

17         Do you recognize this lineup?

18    A    Yes.

19    Q    And you showed this lineup to LL?

02:44:21   20    A    Yes.

21    Q    And this is the lineup containing James Cloud.

22    A    Yes.

23    Q    And he did not identify James Cloud.

24    A    Correct.

02:44:36   25    Q    Here's a different lineup.  This is lineup 5034.  This is

1    one we haven't reviewed yet today.  I'm going to scan through

2    it.  This is Defense Exhibit 1014.

3         Do you recognize this lineup?

4    A    Yes.

02:44:54   5    Q    And this is the lineup that you prepared, under 5034,

6    containing Morris Jackson?

7    A    Yes.

8         MR. McENTIRE:  Your Honor, I'd move to admit Defense

9    Exhibit 1014.

02:45:10   10        MR. BURSON:  No objection.

11        THE COURT:  It will be admitted.

12        (Defense Exhibit No. 1014 admitted into evidence.)

13   BY MR. McENTIRE:  (Continuing)

14   Q    Now, there was an identification on this lineup.

02:45:18   15   A    Yes.

16   Q    Specifically Photo No. 4, right here?

17   A    Yes.

18   Q    LL identified this individual as the blue-shirted male that

19   shot him.

02:45:32   20   A    To the best of my knowledge, that's my recollection, but if

21   you would -- if I could review my 302, I could answer it better.

22   Q    I'm pulling up Exhibit 1016, which is your 302.  For lineup

23   5034, (reading):  LL stated that No. 4, Morris Jackson, possibly

24   looks like the guy --

02:46:05   25        THE COURT:  Counsel, this is an exhibit that you're

 1    asking him to review to refresh his recollection?

 2          MR. McENTIRE:  Recollection.

 3          THE COURT:  And so he can do that without you reading

 4    that into the record.

02:46:15  5    BY MR. McENTIRE:  (Continuing)

 6    Q    Special Agent Ribail, would you mind taking a look at this.

 7    A    Yes.  I read it.

 8    Q    Okay.  Is your recollection refreshed regarding this

 9    lineup?

02:46:26  10   A    Generally, yes.

 11   Q    Okay.  Based on what you recorded, did LL identify Morris

 12   Jackson as the person that shot him and had the shotgun?

 13   A    Yes.

 14   Q    Special Agent Ribail, as your -- lead investigator, you've

02:46:51  15   participated in several different interviews over the course of

 16   this investigation?

 17   A    Yes.

 18   Q    You've also reviewed reports from several different

 19   witnesses as well.

02:47:06  20   A    Yes.

 21   Q    Are there other witnesses that identified Morris Jackson as

 22   an individual with a shotgun that shot LL?

 23         MR. BURSON:  Objection; relevance.

 24         THE COURT:  Overruled.

02:47:27  25   A    The short answer is I believe so, yes.

         1    BY MR. McENTIRE:   (Continuing)

         2    Q    Do you recall ███████████████ saying that?

         3    A    I'd have to review my report.

         4    Q    I apologize.  Do you recall EZ saying that?

02:47:54  5    A    I'd have to review my report.

         6    Q    Do you recall Natasha Jackson saying that?

         7    A    Yes.

         8    Q    How long did you spend doing the lineups with LL?

         9    A    Maybe 20 minutes.

02:48:30 10    Q    You were -- used the same Yakima County Sheriff's Office

        11    procedure, lineup procedure with LL as well?

        12    A    Yes.

        13    Q    I'm pulling up Defense Exhibit 1017.

        14         Do you recognize this document?

02:48:46 15    A    Yes.

        16    Q    Is this the lineup instructions that were provided to LL?

        17    A    Yes.

        18    Q    Are -- are these your notes?

        19    A    Yes.

02:48:52 20    Q    Regarding his responses to the lineup.

        21    A    Yes.

        22    Q    Does this document fairly and accurately represent the

        23    original from that day?

        24    A    Yes.

02:49:03 25         MR. McENTIRE:  Your Honor, I'd move to admit Defense

1    Exhibit 1017.

2              MR. BURSON:  No objection.

3              THE COURT:  It will be admitted.

4         (Defense Exhibit No. 1017 admitted into evidence.)

02:49:11  5    BY MR. McENTIRE:   (Continuing)

6    Q    You indicated that you provided these procedures, these

7    same cautionary instructions to LL as well.  You read them to

8    him.

9    A    Yes.

02:49:32  10   Q    Did you provide an instruction to LL regarding contacting

11   the media?

12   A    I don't recall, but probably not.

13   Q    Are you aware that shortly after this interview, this

14   lineup procedure, that LL, in fact, did have contact with the

02:50:06  15   press?

16   A    Yes.

17   Q    With the *Yakima Herald Republic*.

18   A    Yes.

19   Q    And that brings us to the January 27th, 2020, interview

02:50:17  20   that you testified to briefly this morning.

21   A    That brings us to?

22   Q    To that interview.

23        You recall that interview.

24   A    Yes.

02:50:29  25   Q    And you had testified that you went out there to do some --

1    ask some follow-up questions.

2    A    Correct.

3    Q    And you were with Special Agent Jennifer Terami?

4    A    Correct.

02:50:45    5    Q    And Special Agent Terami did not prepare a report from that

6    follow-up.

7    A    She did.  We share a report.

8    Q    One report, two authors.

9    A    Correct.

02:51:04    10    Q    You mentioned earlier this morning that LL referred to the

11    red-shirted male as James Cloud, which caught you off guard.

12    A    Yes.

13    Q    And it caught you off guard because during the previous

14    lineup, he had not identified James Cloud.

02:51:24    15    A    Yes.

16    Q    And when you asked Special Agent -- or excuse me, when you

17    asked LL to explain, you had recorded in your report that LL

18    responded after seeing Cloud and hearing the name on the news.

19    A    Yes.

02:52:14    20    Q    Did you follow up with what news he was referring to?

21    A    No.

22    Q    Did you ask him whether or not it was on social media?

23    A    No.

24    Q    Did you ask him whether it was in the newspaper?

02:52:30    25    A    No.

1    Q    You moved on.

2    A    Yes.

3    Q    And you indicated that Special Agent Terami was also

4    present.

02:52:44  5    A    Yes.

6    Q    Did Special Agent Terami ask -- she didn't ask, excuse me,

7    whether or not LL saw this on the news or on the -- what news he

8    was referring to.

9    A    Not specifically.  My recollection is it was like watching

02:53:06  10    TV news.  That's -- that's how I recall the answer.

11    Q    But, again, she didn't ask specific follow-up questions

12    either.

13    A    She could have -- she could have.  She could have said,

14    "When you say the news, what do you mean?"

02:53:22  15        "Oh, on TV."

16        I don't know.  Something like that.  We were both

17    interviewing.  I don't know who asked what.

18    Q    But that's not -- those specific follow-ups aren't

19    documented in your 302.

02:53:33  20    A    No.  We didn't ask, like, what channel?  Was it a day ago,

21    a month ago, a year ago?  No, we didn't ask any of that.

22        MR. McENTIRE:  Your Honor, may I have just a moment?

23        THE COURT:  Sure.

24        (Counsel conferring.)

02:54:23  25        MR. McENTIRE:  No further questions, Your Honor.

1          THE COURT:  Mr. Smith?

2          MR. SMITH:  Pardon me, Your Honor?

3          THE COURT:  Any questions for this witness?

4          MR. SMITH:  Yes.  Sorry.  I was doing something else.

02:54:33  5   Your Honor, I do have some questions, but I want to clarify

6    something.

7          The -- we have -- we filed a motion to join the motion

8    to suppress the identification of LL.  And I think -- and that

9    is set for today.  We also have our own motion to suppress,

02:54:54 10   which is set for December 7th for a hearing on that, and it

11   would probably involve testimony from -- from this agent at that

12   time.

13          I was contacted by the U.S. Attorney, and I told him

14   that we would not -- we had set our motion to suppress the

02:55:15 15   identification for December 7th, our separate motion, and that I

16   wouldn't be pursuing it today because it was set for another

17   day.  So I -- I don't want to -- I don't want to ask questions

18   of this witness and then be prohibited from having -- having --

19          THE COURT:  Two cracks at the apple, Mr. Smith?

02:55:37 20   MR. SMITH:  I'm not trying -- I'm not trying to do that.

21   In fact, I'm trying to avoid that, Your Honor.  I don't want --

22   I don't want the Court to -- to prohibit me from asking

23   questions.  I can -- I can -- I can save my questions for this

24   agent for that motion for that date, every one of them.

02:55:54 25          The Government did, in its inquiry to this witness, did

1    kind of open up an area of -- of questioning.  But then again, I

2    can -- I'm happy to refrain from asking him questions with

3    regard to our motion and ask him questions with regard to our

4    motion that is set for today, which is that motion to join and

02:56:15  5    would involve his interview of Mr. ████████, LL.

6              THE COURT:  Why don't you go ahead with your questions

7    with regard to LL.

8              MR. SMITH:  Thank you, Your Honor.

9              It's a -- it's a new world, Your Honor, when we can ask

02:56:25  10   questions sitting down.

11             THE COURT:  Yeah, I know.  I know.

12

13                            CROSS-EXAMINATION

14   BY MR. SMITH:

02:56:40  15   Q    The -- I'm going to try not to -- to repeat the questions

16   that have been asked by -- by co-defendant's counsel here, Agent

17   Ribail, but there may be a few questions that I ask you just

18   because I need to have a little lead-in for the questions that I

19   am asking you.

02:57:14  20        So, as I understand it, and what you reported, was that you

21   administered a photo array to LL on June 9th.

22        Correct?

23   A    Correct.

24   Q    And in that photo array there was a -- there was a photo

02:57:28  25   array that you identified as 5032, correct?  You don't

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                    177
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/X/Smith*

1    remember --

2    A    I don't have all of the numbers memorized.  I'm sorry.

3    Q    All right.  Well, let's --

4    A    I'm sure you guys prepare, and I'm sure you all memorize

5    them all now, but this was a year ago for me.

6              MR. SMITH:  Is --

7              THE COURT:  Yes.

8    BY MR. SMITH:   (Continuing)

9    Q    I'm going to use a document of co-defendant's counsel.

10             MR. SMITH:  I don't know how to turn it on, but if you

11   do -- okay.

12   BY MR. SMITH:   (Continuing)

13   Q    This is Defendant's Exhibit 1016.  I believe it has been

14   admitted.

15        Do you recognize that document?

16             THE COURT:  Hold on one second, Counsel.

17             MR. SMITH:  I'll take care of that if it hasn't, Your

18   Honor.

19             MR. McENTIRE:  And, Your Honor, this was just used for

20   refreshing recollection purposes.

21             THE COURT:  Right.

22             MR. McENTIRE:  This was not substantively admitted under

23   a defense exhibit.

24             THE COURT:  That's what I thought.

25             MR. SMITH:  Say what?

1          THE COURT:  It was not admitted, Counsel, but it was

2    used to refresh the witness' recollection.

3          MR. SMITH:  Then I'm going to ask him some questions

4    with regard to it.

02:58:53  5          THE COURT:  Sure.

6    BY MR. SMITH:  (Continuing)

7    Q    All right.  So do you see that up on the screen?  It's

8    Defendant's identification 1016.

9    A    Yes.

02:59:01 10    Q    And do you recognize that document?

11    A    Yes.

12    Q    And is that a document that you created?

13    A    Yes.

14    Q    And you created that at or near the time of the events

02:59:15 15    that -- that are reflected on it?

16    A    Yeah, I can't see the date that was written, but ...

17    Q    I'll show you.  June 19th.

18    A    Yes.  Ten days later.

19    Q    Now, did you -- I mean, you created that document on

02:59:32 20    June 19th, but it is a record of the events that occurred on

21    June 9th, correct?

22    A    Yes.

23          MR. SMITH:  All right.  I move for the admission of this

24    for the purposes of this hearing, Your Honor, 1016.

02:59:48 25          MR. BURSON:  Your Honor, actually, I'm going to object.

1    Obviously hearsay is admissible in a hearing such as this, but

2    where the witness is present and testifying, I don't know that

3    the admission of this exhibit adds anything, and therefore would

4    be irrelevant, unless -- I'll concede that if there is a prior

03:00:10   5    inconsistent statement, we might have a different admissibility

6    question, but --

7              THE COURT:  I'm going to sustain that objection.

8              Counsel, maybe you can ask the question, and if he

9    doesn't remember, then you can deal with the document.

03:00:20   10             MR. SMITH:  Very well.

11   BY MR. SMITH:   (Continuing)

12   Q    Agent Ribail, you indicated that you couldn't recall the

13   number of the photo array that included a photo of Donovan

14   Cloud.

03:00:32   15             Is that correct?

16   A    Of who?

17   Q    Of Donovan Cloud?

18   A    Correct.

19   Q    Okay.  And would you please review identification 1016, and

03:00:42   20   tell me whether that refreshes your recollection as to the photo

21   array, the number of the photo array.

22   A    It doesn't help me remember which one Donovan Cloud was

23   contained in.

24   Q    All right.

03:01:23   25             THE COURT:  Counsel, if you're looking for Exhibit 4 of

 1    the Government ...

 2             MR. SMITH:  Pardon me?

 3             THE COURT:  Are you looking Exhibit 4, the Government's

 4    Exhibit 4?

03:01:31  5        MR. SMITH:  I was -- actually, I was looking through

 6    the -- the defense exhibits, but it may be easier to use the

 7    Government's, Your Honor.  Thank you.

 8             THE COURT:  Is that the one you're looking for?

 9             MR. SMITH:  I'm pretty sure.

03:02:07  10       And then I believe that this has been ...

 11            THE COURTROOM DEPUTY:  Counsel, yes, it has been.

 12            MR. SMITH:  Pardon me?

 13            THE COURTROOM DEPUTY:  It has been.

 14            MR. SMITH:  It has been okay.  Thank you.

03:02:25  15  BY MR. SMITH:  (Continuing)

 16   Q    I'm showing you, Agent Ribail, Government's Exhibit 4,

 17   which has been admitted in evidence.

 18            And do you recognize that document?

 19   A    Yes.

03:02:34  20  Q    All right.  And does that refresh your recollection as to

 21   the lineup number that included a photograph of Donovan Cloud?

 22   A    Yes.  Thank you.

 23   Q    All right.  So -- and what number is that, please?

 24   A    5032.

03:02:50  25  Q    Okay.  Now, moving back to the -- your -- the report of

1    your administration of the photo lineup to LL, identification

2    1016, so -- now, understanding that No. 5032 includes the

3    photograph of Donovan Cloud, you indicated that he did not

4    identify anyone in that lineup, correct?

03:03:23    5    A    Correct.

6    Q    All right.  And that's your -- your recollection; is that

7    right?

8    A    Yes.

9    Q    Okay.  The -- now, you -- you were -- when you administered

03:04:22    10    the Lineup 5032, you were aware that LL had identified -- had

11    given some physical description of two individuals, correct?

12    A    Generally, no, because there were no reports written at

13    that point, um, for me to read, for example.  Um, there was

14    some -- I know I -- information was coming from a lot of

03:04:54    15    different places, from a lot of different agencies, interviewing

16    different people, you know, including LL and others.  So I don't

17    recall what I knew of his physical description at that point.

18    Q    Well, so are you saying that -- that when you -- when you

19    prepared -- you prepared this lineup, and this is the 5032

03:05:19    20    lineup, it was the same lineup, I think you testified earlier,

21    that you -- that you administered to JV, correct?

22    A    Correct.

23    Q    So is that also true for when you created the lineup, you

24    didn't -- you didn't have any physical descriptors of the

03:05:35    25    individuals that you placed in the lineup?

1    A    No.  What I'm saying is I heard physical descriptors from

2    different agencies doing different interviews.  Um, that's how

3    we made the lineups.  But I don't know that any of them came

4    specifically from LL, or maybe all of them came from LL.  I

03:05:52    5    don't recall where they all came from.

6    Q    Okay.  All right.  Well, okay.  Let me ask you this.

7    A    To say it a different way, we developed names of suspects

8    between Saturday and Sunday, and when we had the names, then we

9    could get physical descriptions from the suspects' files,

03:06:12    10    compared to what descriptions we had -- had received as well.

11    Q    All right.  So you're -- you're not -- you're saying that

12    you were given a name, and then you attempted to determine the

13    physical description of the people that you were given a name.

14    A    No.  I'm saying it came from both.

03:06:29    15    Q    Yeah.  Okay.

16        Well, what was the physical description -- descriptors that

17    you used, independent of that which you attached to the name of

18    the individual in the photo array?

19        MR. BURSON:  I'm going to object, Your Honor.  The

03:06:44    20    witness earlier testified that the photo array was generated

21    using the name of the suspect and then autopopulated from there

22    so --

23        MR. SMITH:  I agree.  He seemed to contradict that with

24    his testimony here.

03:06:57    25        THE COURT:  I'm going to sustain the objection.

1    MR. SMITH:  Sustain?

2    THE COURT:  Yes.

3    MR. SMITH:  Thank you, Your Honor.

4    BY MR. SMITH:  (Continuing)

03:07:04  5    Q    The -- when you -- after you had administered the photo

6    array to -- to LL on June 9th, did you have any contact with LL

7    between then and January 27th?

8    A    I think so, yes.

9    Q    Did you document your contact with LL in any report in that

03:07:35  10    interim period?

11    A    I don't believe so.

12    Q    Is it -- is it in some notes that you have, that you --

13    that you recorded your contact with LL?

14    A    No.

03:07:47  15    Q    So you're -- you're basing your testimony that you did have

16    contact with LL between the time that the photo array was

17    administered and the time that you interviewed him on

18    January 27th, 2020, based upon your recollection.

19    A    I think so.  It could have been after January 27th.  I know

03:08:06  20    one time I was in that area, and I just stopped by to see if he

21    was alive, how he was doing.

22    Q    Okay.

23    A    And probably to get a phone number to coordinate like

24    victim witness contact.

03:08:20  25    Q    Was anybody with you?

1    A    I don't remember.

2    Q    Um --

3    A    But I'm saying it was more administrative to get a number

4    so the victim witness specialist could reach him or something to

03:08:37  5    that effect.  It wasn't an interview.

6    Q    Well, is it your practice to -- to not record contact with

7    a critical witness in a homicide investigation?

8    A    No, it's not my practice.  My --

9    Q    Is there anywhere where we can determine, or any document

03:08:57  10   or memorandum that exists that we can determine, the date of

11   your contact with LL and the content of that -- that contact?

12   A    I doubt it.

13   Q    The -- and as you sit there today, you don't recall whether

14   that was prior to the January 27th interview or after, between

03:09:25  15   now and then?

16   A    I think it was before.

17   Q    All right.  When you and Agent Terami interviewed LL on

18   January 27th, you didn't show him any pictures.

19   A    No.

03:09:50  20   Q    You didn't -- you didn't ask him about any prior

21   identification that he had made.

22   A    No.

23   Q    The purpose of your contact with LL was what?

24   A    It was to clarify information, um, from his other

03:10:15  25   interviews.

1    Q    Well, what -- what exactly was it about the -- his -- his

2    identification or nonidentification on June 9th that you wanted

3    to clarify?

4         MR. BURSON:  Objection.  That's not what the witness

03:10:31  5    testified to.

6         THE COURT:  Overruled.

7         MR. SMITH:  I couldn't hear the objection, Your Honor.

8    If it's overruled, it's okay.

9         THE COURT:  Overruled.  Go ahead.

03:10:41  10        MR. SMITH:  All right.

11   A    That was not the purpose.

12   BY MR. SMITH:   (Continuing)

13   Q    So was it that you wanted to clarify his identification of

14   his identification?

03:10:59  15   A    No.

16   Q    I mean, you didn't need to clarify a nonidentification,

17   correct?

18   A    Correct, I think.

19   Q    Well --

03:11:12  20   A    It was a double negative.  I'm sorry.

21   Q    Well, you had testified earlier that if a person says --

22   says -- doesn't identify a person, that you take that as a

23   100 percent statement of certainty, non-ID; didn't identify

24   anybody.

03:11:27  25        Correct?

1   A    And, like I said, we were not there to clarify any

2   identification or nonidentification.  That's not why we went

3   there.

4   Q    Okay.  You went there to interview him for what?

03:11:38   5   A    About the events that happened on June 8th.

6   Q    Now, when you went there on January 27th, if you went there

7   to clarify his previous interviews, by other law enforcement?

8   A    Yes.

9   Q    So at that time you knew -- you did have his prior

03:12:05   10   identification of at least two individuals, correct?

11   A    We had reports at that point, yes.

12   Q    All right.  And did you -- did you --

13   A    I'm sorry.  I don't think I understood that last question.

14   Q    I'm sorry.  I can't hear you.

03:12:20   15   A    I don't think I understood your last question or heard it

16   correctly.  We went to clarify that he -- his previous two --

17   Q    I'll ask it again.

18       When you -- when you went to interview LL on January 27th,

19   you said that you went there to clarify the identification --

03:12:40   20   A    No, that's not what I said.

21   Q    No?

22   A    No.

23   Q    You just wanted to ask him about the events.

24   A    Yes.

03:12:47   25   Q    And those -- and your questions were related to -- well,

 1    let me ask you this:  I'll back up.

 2            THE COURT:  Actually, why don't we do this.  It's 3:15.

 3    This is when we typically take our afternoon break, and we'll do

 4    that again.  We'll be on break for 15 minutes, and we'll be back

03:13:09    5    at 3:30.  Thank you.

 6            THE COURTROOM DEPUTY:  All rise.

 7        (Recess taken: 3:13 p.m. to 3:30 p.m.)

 8            THE COURTROOM DEPUTY:  All rise.

 9        (Call to Order of the Court.)

03:30:26   10            THE COURT:  Please be seated.

11            Go ahead, Mr. Smith.

12            MR. SMITH:  Thank you, Your Honor.

13    BY MR. SMITH:  (Continuing)

14    Q    So, Agent Ribail, during the interview on January 27th,

03:30:44   15    2020, did you ever use the name Donovan Cloud?

16    A    I don't believe so.

17    Q    Well, do you know or do you not know?

18    A    I would say "no."

19    Q    Is there -- did you -- did you -- did -- did LL ever say

03:31:09   20    the name Donovan Cloud?

21    A    No, not that I recall.

22    Q    The -- after you concluded your interview of LL on

23    January 27th, have you -- have you interviewed him further?

24    A    I'm sorry.  I couldn't hear the end.

03:31:38   25    Q    After January 27th, 2020, have you -- let me ask you it in

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                    188
Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020
Ribail/X/Smith

1    a better way.

2          Have you had any further contact with LL?

3    A    I don't believe so.

4    Q    Is there some reason why you answer "I don't believe so"

03:31:51  5    versus "yes" or "no"?

6    A    Uh, because I've done a lot of work in this case, and I

7    can't remember every time I spoke to somebody, um, if -- for

8    instance, I could point out with him we have an obligation for,

9    uh, the victim witness people to reach out, so they want phone

03:32:07  10   numbers or addresses, and sometimes if they can't get ahold of

11   them, so they -- the victim witness could say, "Hey, Troy, would

12   you call LL, and tell him to get ahold of me, because he's not

13   answering my phone."  So it's possible I reach out, and he

14   happens to answer, and I say, "Call the victim witness person."

03:32:25  15        So it's -- I mean, there's possibilities that I could have

16   spoken to him afterwards that I don't recall.  But if I did,

17   there was nothing substantive or else I would have written a

18   report.

19   Q    So at least to your best recollection, you haven't had any

03:32:42  20   contact with him after the January 27th interview.

21   A    Not of any substance, no.

22        MR. SMITH:  I have no other questions.

23        THE COURT:  No other questions?

24        MR. SMITH:  No other.

03:32:53  25        THE COURT:  Okay.  Counsel?

1       MR. BURSON:  Thank you, Your Honor.

2

3                    REDIRECT EXAMINATION

4  BY MR. BURSON:

03:33:03  5  Q    Actually, I'll start seated.

6       Agent Ribail, you work for a component of the Department of

7  Justice, correct?

8  A    Correct.

9  Q    And that component is the FBI; is that right?

03:33:17  10  A    Yes.  Yes.

11  Q    And the FBI has a director; is that right?

12  A    Yes.

13  Q    Okay.  You've worked for the FBI for 17 years.

14  A    Yes.

03:33:30  15  Q    And the director of the FBI is appointed by the president,

16  right?

17  A    Yes.

18  Q    So not the attorney general.

19  A    Correct.

03:33:37  20  Q    And I assume not the deputy attorney general.

21  A    Correct.

22  Q    Do you know how long director of the FBI is appointed for?

23  A    Uh, I believe ten years.

24  Q    That's correct.

03:33:48  25       Do you know who can fire the director of the FBI?

1    A    The president.

2    Q    Okay.

3         MR. BURSON:  May I, Your Honor?

4         THE COURT:  Yes.

03:34:12   5    BY MR. BURSON:   (Continuing)

6    Q    So this is Exhibit -- Defense Exhibit 1009.  I assume

7    you've become acquainted with this previously and over the past

8    three hours.

9    A    Yes.

03:34:25   10   Q    Okay.  Could you read for me where it starts "Memorandum,"

11   the title of this?

12   A    Sorry.

13   Q    Go ahead.

14   A    "Memorandum for Heads of Department Law Enforcement

03:34:36   15   Components, All Department Prosecutors."

16   Q    Okay.  Okay.  So you previously testified that you're a

17   member of a law enforcement component.

18   A    (No audible answer.)

19   Q    Okay.  Are you --

03:34:57   20        THE REPORTER:  I didn't hear an answer.

21        THE WITNESS:  I already forgot the question.

22        MR. BURSON:  He's a member of the law enforcement --

23        THE WITNESS:  Yes.

24        MR. BURSON:  -- component.

03:35:00   25        THE WITNESS:  Yes.

1    BY MR. BURSON:  (Continuing)

2    Q    You are not the head of your law enforcement component, are

3    you?

4    A    No.

03:35:08    5    Q    Fair to say, not even close?

6    A    No, not -- no.

7    Q    And so was this memo addressed to you?

8    A    No.

9    Q    Okay.  Now, the date of this memo was 2017, correct?

03:35:22    10    A    Yes.

11    Q    Okay.  Can we agree it's impossible, then, that it was --

12    well, that it was an authority underlying the 2013 guidance,

13    considering it was issued after the time that the guidance

14    was -- after the date on the cover of that guidance and after

03:35:42    15    what is marked as the review date of that guidance which was

16    2016?

17    A    Yes.

18    Q    Okay.

19        MR. BURSON:  One moment, Your Honor.

03:36:10    20        THE COURT:  Sure.

21        (Counsel conferring.)

22    BY MR. BURSON:  (Continuing)

23    Q    I'm showing you the same exhibit, Agent Ribail.  And for

24    the record, this has been highlighted by myself.

03:36:34    25        Could you read Footnote 1, please.  Can you see it?

1    A    I can't see it.

2    Q    Oh.  There you are.

3    A    The entire or the highlighted?

4    Q    You know, why don't we just read the highlighted.

03:36:49  5    A    (Reading):  Nothing in these procedures implies that an

6    identification not done in accordance with them is unreliable or

7    inadmissible in court.

8    Q    So, Agent Ribail, I have a couple of clarifying questions

9    here.  I'm going to try and keep them in a sensible order, but

03:37:33  10    it is going to jump around quite a little bit.

11    A    Okay.

12    Q    We talked about your training earlier or, actually, we

13    talked about it and you talked about it with counsel for the

14    defendants as well.

03:37:45  15         I want to be clear:  You testified that you train new

16    agents, correct?

17    A    Yes.

18    Q    On -- on lineups that you have trained --

19    A    I've had new agents be part of lineups with me, yes.

03:37:57  20    Q    Okay.  And -- but that wasn't as an instructor per se.

21    A    Correct.

22    Q    Okay.  So you've had agents conduct --

23         THE COURT:  Counsel, do you have an exhibit that you're

24    going to use at the Elmo or are you going to have a seat?

03:38:09  25         MR. BURSON:  No, I can sit down.

1           THE COURT:  Okay.  Thank you.

2    BY MR. BURSON:   (Continuing)

3    Q    And so this was -- when you say "train new agents," you

4    mean sort of like the equivalent of a field training officer at

03:38:24  5    a local police department.

6           Is that right?

7    A    Yes, that's what we are.

8    Q    Okay.  And is that how you were trained in lineups, aside

9    from the formal training that you received from like the FBI

03:38:35 10    academy and any follow-on training?

11    A    Yes.  When I got in the field, I had a training agent, and

12    he taught me to do a lot of things, and I think one of those

13    things was showing lineups as well.

14    Q    Okay.  We talked a lot about outside influences, and -- and

03:38:57 15    how they can impact the lineup.

16           You testified you agree that outside influences can impact

17    the lineup.

18    A    Yes.

19    Q    Can an outside influence, based on your training and

03:39:14 20    experience, affect a lineup after the lineup has been

21    administered?

22    A    No.

23    Q    We've agreed it can affect it while the lineup is being

24    administered, correct?

03:39:27 25    A    Yes.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                    194
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Ribail/ReD/Burson*

1    Q    And so during your administration of the lineup with JV,

2    did you -- are you aware of anything in the surrounding area

3    that could have influenced that lineup?

4    A    No.

03:39:41    5    Q    Okay.  So there was no wanted poster hanging around,

6    correct?

7    A    Correct.

8        MR. BURSON:  Could I just have one second, Your Honor?

9        THE COURT:  Sure.

03:40:03    10    (Pause in proceedings.)

11    BY MR. BURSON:  (Continuing)

12    Q    You -- you testified earlier that you didn't record the

13    time you spent at the Yakima County Sheriff's Office compiling

14    the lineups, correct?

03:41:18    15    A    That's correct.

16    Q    And you testified it was one to two hours, right?

17    A    Yes.

18    Q    All right.  Now, were you the individual -- you were the

19    lead investigator.  You've testified to that.

03:41:29    20        But were you the individual who actually sat down with the

21    Spillman machine and created the lineups?

22    A    No.

23    Q    Okay.  Who was that?  That was Detective --

24    A    Detective Cypher.

03:41:42    25    Q    And your failure to record the amount of time that you

1    spent at the Yakima County Sheriff's Office, did that appear,

2    during your administration of the lineup of JV, to have any

3    impact on whether or not he identified anyone in any of the

4    lineups?

03:42:03  5    A    No.

6    Q    You testified that earlier that you showed the photos to JV

7    separately and one at a time, but you didn't record that

8    specific detail on your 302 from this lineup.

9         Is that right?

03:42:18  10   A    Correct.

11   Q    During your administration of the lineup with JV, did that

12   appear to impact whether or not he was able to identify anyone

13   or not identify anyone?

14   A    No.

03:42:31  15   Q    You testified that the other family members of JV were

16   sequestered and out of earshot, but you failed to document that

17   on the 302 -- by the way, that you drafted after the lineup,

18   correct?

19   A    I couldn't hear the last part.

03:42:46  20   Q    Sorry.   That was a compound question.

21        Just for clarity purposes, this 302 was drafted, I believe

22   it was six days after the lineup -- I'm sorry, four days after

23   the lineup.

24        Correct?

03:43:02  25   A    I don't remember.   Something like that, yes.

1    Q    Okay.  Several days after the lineup?

2    A    Several.  JV's.

3    Q    JV's, yes.

4    A    Yes.

03:43:11  5    Q    Okay.  Now, on that 302, you didn't document the fact that

6    the other family members were sequestered and out of earshot,

7    correct?

8    A    I'm sorry.  I argued earlier that I did.  I didn't note

9    that anyone else was there because there was no one to note.

03:43:27  10    I -- if there was a parrot there, I probably wouldn't write

11    there was a parrot.  But ...

12    Q    So is it your testimony, then, that their sequestration and

13    being out of earshot was on the 302 by implication?

14    A    Yes.

03:43:40  15    Q    The failure to explicitly include that on the 302, which

16    was drafted after JV's lineup, during your administration of the

17    lineup, did that seem to impact whether or not he could identify

18    or not identify anyone?

19    A    No.

03:43:55  20    Q    You testified that the photos were placed facedown on the

21    hood of the car during the blinded technique.  You failed to

22    document that detail in the 302.

23        Do you think that affected his ability to identify or not

24    identify anyone in the lineup?

03:44:12  25    A    No.

1    Q    Okay.  Do you think that any of those things, those details

2    that you either failed to document or failed to explicitly

3    document, do you think any of them suggested in any manner who

4    it was that JV should pick or not pick out of the lineup?

03:44:28    5    A    No.

6    Q    You decided to administer the lineup with JV on the same

7    day that you did administer the lineup, correct?  In other

8    words, you hadn't decided on June 8th, "Hey, tomorrow I'm going

9    to interview or I'm going to administer a lineup on JV," right?

03:45:01    10    A    Correct.

11    Q    Okay.  And so you began the morning of June 9th, 2019,

12    executing a search warrant.  You testified to that earlier.

13    A    Yes.

14    Q    And you were there for several hours, correct?

03:45:13    15    A    Yes.

16    Q    And was it towards the conclusion of those several hours

17    that you decided to go create a lineup and then administer it on

18    JV?

19    A    Yes.

03:45:26    20    Q    Okay.  And you went to the Yakima County Sheriff's Office

21    to do that, right?

22    A    Yes.

23    Q    How far away was that from Medicine Valley?

24    A    I'd say 30 minutes.

03:45:41    25    Q    Okay.  And that wasn't an FBI facility, correct?

1    A    Correct.

2    Q    Okay.  How -- how close by was the nearest FBI facility?

3    A    We're a little bit further.  But we don't have Spillman.

4    Q    Okay.  Now, when you went to JV's residence, you conducted

03:46:05  5    the lineup outside in the driveway, correct?

6    A    Yes.

7    Q    Outside.  Was it windy or anything like that, breezy?

8    A    I think it was a little bit on and off, because I remember

9    having to make sure papers weren't blowing off the hood of the

03:46:27  10    car.

11    Q    And this was June in the middle of Medicine Valley, right?

12    A    Yes.

13    Q    It's a particularly open, large area, a lot of pastures --

14    A    Yes.

03:46:36  15    Q    -- things like that?

16        And it's sort of right there in the -- in the valley,

17    correct?

18    A    Yes.

19    Q    Do you think using an audio recording device outside in the

03:46:49  20    conditions, as you recall them, would have made a recording that

21    was easy to hear later on?

22        MR. McENTIRE:  Objection; calls for speculation.

23        THE COURT:  Sustained.

24    BY MR. BURSON:  (Continuing)

03:47:06  25    Q    You testified earlier that other than your phone, you had

1    no video recording equipment, correct --

2    A    Correct.

3    Q    -- at JV's residence?

4         So, Agent Ribail, you testified with counsel for the

03:47:23   5    defense about the value of an audio and/or video recording, and

6    I believe you agreed with several statements regarding the value

7    that an audio or video recording could have for a reviewer or a

8    subsequent fact finder.

9    A    Possibly, yes.

03:47:51   10   Q    Do you think the presence of video recording equipment or

11   audio recording equipment, or both, would have an impact on the

12   lineup itself while you're administering the lineup?

13   A    It could.

14   Q    Okay.  Are you -- in what direction?

03:48:19   15   A    I guess, in my experience, some people, when they know that

16   they're being videotaped, they get nervous, for example.  So

17   that would be an effect on somebody.

18   Q    Okay.  So we mentioned briefly there was a four-day delay

19   between the drafting of the 302 documenting the lineup

03:48:52   20   administration with JV.

21        That four-day delay, is that typical or common with the

22   drafting of FBI 302s?

23   A    Four days, I would say, is very normal.

24   Q    Could you repeat that?

03:49:07   25   A    I say, four days is normal.

1   Q    Is normal --

2   A    Yes.

3   Q    -- is that what you said?  Okay.

4        Agent Ribail, I'm showing you Government Exhibit 6, just

03:50:19   5   briefly.

6   A    Yes.

7   Q    And Government Exhibit 7.

8   A    Yes.

9   Q    These were previously admitted.  Actually, I am going to

03:50:41   10   show you another exhibit.

11       Well, actually, those will have to do.

12       Those two Facebook posts, do you remember who it was that

13   had posted those?  In other words, what the letterhead was on

14   the top, what entity?

03:51:39   15   A    Yakama Nation.

16   Q    Okay.  The Confederated Tribes and Bands of the Yakama

17   Nation, as it's stated on there?

18   A    Yes.

19   Q    Okay.  Is that a separate entity than the Yakama Nation

03:51:50   20   Tribal Police?

21   A    Yes.

22   Q    Okay.  So does the chairman of the --

23       MR. McENTIRE:  I'm going to object for foundation on

24   understanding the nuance differences between the two.

03:52:06   25       THE COURT:  Actually, if you could clarify that

1    question.  Earlier testimony, it is the Court's recollection

2    that you indicated that the Yakama Nation and the police, gave

3    the impression, at least to me, that they were one in the same

4    in terms of producing that bulletin.  If that's not the case, I

03:52:28  5    need clarification on that.

6         THE WITNESS:  I don't recall exactly what I said, Your

7    Honor.

8         THE COURT:  Okay.

9         THE WITNESS:  But what my recollection of what I

03:52:38  10   intended to say was I think Yakama Nation Tribal Police were

11   responsible for at least generating or wanting to put out the

12   memo.  But who actually physically put it -- that's not a good

13   term, but put it on the Internet, onto Facebook, I don't know

14   who physically did it in the end.

03:52:59  15        MR. BURSON:  Okay.  All right.

16        THE COURT:  Go ahead.

17   BY MR. BURSON:  (Continuing)

18   Q    You also testified that with LL you may or may not have

19   contacted him outside of the initial lineup and the January 2020

03:53:17  20   interview.  It could have happened before that January 2020

21   interview; it could have happened after.

22   A    Correct.

23   Q    And that was for purposes of -- or it could have been for

24   purposes of coordinating or helping the FBI's victim witness

03:53:37  25   coordinator get in touch with LL.

1    A    Yes.

2    Q    Okay.  If LL had said anything relevant to witness

3    identification, would you have documented that in a 302,

4    typically?

03:53:53   5    A    Yes.  If he said anything relevant to anything, I would

6    have, yes.

7        MR. BURSON:  Your Honor, I have no further questions.

8        THE COURT:  Mr. McEntire?

9        MR. McENTIRE:  Thank you, Your Honor.

03:54:24   10

11                    RECROSS-EXAMINATION

12    BY MR. McENTIRE:

13    Q    Special Agent Ribail, you testified that later on in the

14    evening of June 9th, you and Detective Cypher were present at

03:54:52   15    JV's residence collecting evidence.  Later on that --

16    A    Attempting to.  Looking for, yes.

17    Q    Looking for evidence.

18    A    Yes.

19    Q    And that he had flagged you down.

03:55:04   20    A    Yes.

21    Q    And when he had flagged you down, he wanted to talk to you

22    about an update or some information that he wanted to provide to

23    you.

24    A    At that point I didn't know why he flagged us down.

03:55:22   25    Q    So you stopped to speak with him.

1   A    Yes.

2   Q    And he indicated that he had come across something on

3   Facebook, correct?

4   A    Yes.

03:55:40   5   Q    And it was --

6        MR. McENTIRE:  May I please have it switched over to the

7   port over here?

8   BY MR. McENTIRE:   (Continuing)

9   Q    And he advised you that he had come across this Defense

03:56:03   10  Exhibit 1006, and -- and seen this, and he wanted to update you

11  that this was, in his opinion, the individual that he had saw

12  the day before.

13  A    Yes.

14  Q    And that he was 100 percent certain, according to what you

03:56:17   15  had documented.

16  A    Yes.

17  Q    And did you interpret that as essentially a statement of

18  certainty?

19  A    My opinion, yes.  I am not -- I am not JV, but that's how I

03:56:34   20  took it.

21  Q    A certainty regarding information that had caused him to

22  reverse what he had told you earlier that day.

23  A    I don't --

24       MR. BURSON:  Objection, Your Honor.  He had told him

03:56:47   25  that day that he didn't identify anybody in the lineup.  That's

1    different than identifying a totally different picture.

2          THE COURT:  Counsel, we already -- we already went

3    through this.  Counsel didn't really go into this, so I don't

4    know why we're rehashing stuff that wasn't on --

03:57:01   5          MR. McENTIRE:  Certainly, Your Honor.  I'll keep my

6    questions focused on the questions of outside influence that

7    came up on redirect.

8          THE COURT:  Okay.  Thank you.

9    BY MR. McENTIRE:  (Continuing)

03:57:11  10   Q    You testified on redirect that the cautionary instructions

11   that you provide aren't designed to mitigate influence that

12   occurs after a lineup.

13   A    Yes --

14         MR. BURSON:  That's --

03:57:29  15   A    -- generally.

16         Let me clarify.  Yeah, I don't know that that's what I

17   testified to, but we did discuss that some things can't affect a

18   lineup once it's done.

19   BY MR. McENTIRE:  (Continuing)

03:57:41  20   Q    To narrow this down, do you agree that there's a difference

21   between influencing the lineup and influencing an

22   identification?

23   A    What's an identification?

24   Q    After someone reviews a wanted ad and changes their mind.

03:57:57  25   A    So -- okay.  So now you defined that, what -- can you

1    repeat the question?

2    Q    Sure.

3         Would you agree that there is a difference between

4    influencing a lineup and influencing an identification?

03:58:18    5    A    I honestly don't know how to answer that, because like if

6    you're referring specifically to this, I'm not involved, I'm not

7    there to influence.  So I'm not sure I understand the question

8    again.

9    Q    The cautionary instruction included in the FBI's policies

03:58:35    10    to caution someone against contacting the media has to do with

11    not influencing their identification.

12    A    I don't -- the -- that is not our policy.  When our policy

13    says don't contact the media, that's to go -- intended -- my --

14    my understanding from my training and experience, is that, uh,

03:58:57    15    any of these witnesses should not -- we're asking them not to go

16    contact the media, to go give a statement to the media, not that

17    they can't ever use their phone.  I mean, if I understand your

18    point of view, our policy would -- would say that JV should not

19    have looked at his phone for the last 15 months, or whatever

03:59:16    20    it's been now.  We're not asking people to do that.  They're not

21    jurors sitting in a trial.

22    Q    You would agree that after JV viewed this wanted poster

23    involving James Cloud, he wanted to tell you that he had -- he

24    changed what he told you earlier when he -- when the lineup was

03:59:52    25    administered.

1    A    He didn't change anything.

2         MR. BURSON:  I'm going to object, Your Honor.  He's not

3    changing -- JV is not changing what he told him.  It was a

4    lineup where he didn't make an identification, and then he

04:00:01    5    recognizes someone later on.  That's not reversing what was

6    said.

7         THE COURT:  Sustained.

8    BY MR. McENTIRE:    (Continuing)

9    Q    You testified earlier this morning that when JV had

04:00:16   10    contacted you, he had indicated he was frustrated that this

11    wanted poster was not shown to him because it was a better

12    representation of James Cloud.

13        MR. BURSON:  Objection; outside the scope of redirect.

14        THE COURT:  Sustained.

04:00:36   15        MR. McENTIRE:  No further questions, Your Honor.

16        THE COURT:  Mr. Smith?

17        MR. SMITH:  No, thank you.  No, Your Honor.  Thank you.

18    Nothing.

19        THE COURT:  Very well, sir.  Thank you for your

04:00:47   20    testimony.  At this point you're excused.

21        THE WITNESS:  Thank you.

22        THE COURT:  We have until 5:00.  Do we have another

23    witness?

24        MR. BURSON:  We do, Your Honor.  We could probably

04:00:58   25    complete direct in that amount of time.

1    THE COURT:  Okay.  Sounds good.  Let's get started.

2    (Witness approached.)

3    MR. BURSON:  Government calls Detective Michael Williams

4  with the Yakima County Sheriff's Department, Your Honor.

04:01:40  5    THE COURT:  Thank you.  And we're going through our new

6  procedure here, so bear with us a minute.

7    (Pause in proceedings.)

8    THE COURTROOM DEPUTY:  Raise your right hand, please.

9

04:02:12  10              MICHAEL EDWARD WILLIAMS,

11   called as a witness on behalf of the Plaintiff, having first

12      sworn or affirmed, testified under oath as follows:

13    THE WITNESS:  I do.

14    THE COURTROOM DEPUTY:  Okay.  You can remove your mask

04:02:27  15  while you're testifying.  There's a water there; make sure you

16  take it with you when you leave.

17      And if you will state your full name for the record, and

18  spelling your first and last name.

19    THE WITNESS:  Michael Williams.  I'm sorry.

04:02:39  20    THE COURT:  And you can remove your mask or you can keep

21  it on, whatever makes you most comfortable.  But go ahead.

22    THE WITNESS:  Michael Edward Williams; M-I-C-H-A-E-L.

23    THE COURT:  Go ahead, Counsel.

24    MR. BURSON:  Thank you.

04:02:52  25

                            DIRECT EXAMINATION

BY MR. BURSON:

Q    And it's Detective Williams, correct?

A    Yes.

Q    And who do you work for, Detective Williams?

A    Yakima County Sheriff's Office.

Q    How long have you worked for Yakima County Sheriff's
Office?

A    Um, this December will be six years.

Q    Okay.  And how long have you been a detective with Yakima
County Sheriff's Office?

A    Um, almost two years.

Q    Okay.  So relatively new to being a detective.

A    Yes.

Q    When you became a detective, did you receive any training
above and beyond what you had received as, I assume, a patrolman
before then?

A    I, uh, had some.  A homicide investigation class, uh, a
Reid investigation -- interview investi -- class.

Q    Okay.

A    I've taken the, um, child forensic interview class.
There's been a few others; I just really can't recall off the
top of my head right now.

Q    Okay.  And what about lineup training, either on the job,
by observing other people's or formal training?  Did you receive

1    formal lineup training?

2    A    No formal training.  From what I recall, this is, um,

3    something that was probably shown to me through my field

4    training officer, and that was it.

04:04:25    5    Q    Okay.  And how many lineups do you think you've conducted

6    during your time with Yakima County Sheriff's Office?

7    A    Maybe five to ten at the most.  Closer -- closer to five, I

8    would say.

9    Q    Okay.  All right.  So on June 8th of 2019, were you

04:04:51    10    involved in an investigation or assisting in an investigation

11    out of Medicine Valley in White Swan?

12    A    Yes.

13    Q    Okay.  In what capacity were you assisting with the

14    investigation?

04:05:04    15    A    Um, well, I was called on -- into service by my sergeant.

16    Um, he advised that he had, um, multiple victims out in that

17    area, and at least two crime scenes.  So I was instructed to,

18    um, go to the sheriff's office to central, um, in Yakima, and

19    get the crime scene van, um, which I then took out to the second

04:05:39    20    scene, which was the pickup truck, a black pickup truck, I

21    believe.

22    Q    Okay.  So where a black pickup truck was on the side of the

23    road?

24    A    Correct.  I don't remember the name of the road at this

04:05:52    25    time, but ...

1   Q    Okay.  And how long on June 8th were you out at White Swan

2   providing this assistance?

3   A    Um, that first -- that first day it was -- gosh, I don't

4   remember exactly.  It was all -- all evening I'm sure.

04:06:12   5   Q    Okay.  Were you working that Saturday or were you --

6   A    No.

7   Q    You were working.  Did you start the day working?

8   A    It was my day off, yeah.

9   Q    And you were called in even though it was your day off?

04:06:25   10   A    Correct.

11   Q    How many detectives at the time were working at the Yakima

12   County Sheriff's Office?

13   A    Um, that day or just as a whole?

14   Q    As a whole.

04:06:36   15   A    Um, we have six detectives; three in the upper valley,

16   three in the lower valley, and one detective sergeant.

17   Q    Okay.  Of those six detectives -- and we'll go ahead and

18   include the detective sergeant as well -- how many were called

19   out to Medicine Valley?

04:06:52   20   A    I believe it was three plus the -- plus the detective

21   sergeant.  There may have been four plus the sergeant, but I

22   think it was three.

23   Q    Okay.  And on June 9th the following day, did you return to

24   Medicine Valley to assist?

04:07:12   25   A    Yes.

1    Q    Okay.  Was it in a similar capacity as June 8th?

2    A    Similar, yes.

3    Q    Okay.  What was the last day that you -- let me rephrase

4    that.

04:07:27   5        After June 9th, 2019, did you continue to assist in the

6    investigation of the murders out at White Swan?

7    A    Um, and that was the --

8    Q    So it would have been -- June 9th, 2019, was a Sunday.

9    After that day, did that conclude your planned assistance in the

04:07:52  10   Medicine Valley murders?

11   A    Planned assistance.

12   Q    Yes.

13   A    Yes.

14   Q    So come Monday, come Monday morning when you came to work,

04:08:02  15   were you still working on the Medicine Valley murder case?

16   A    Um, I may have been finishing a report but other than that,

17   no.

18   Q    Okay.  Now at some point --

19        MR. BURSON:  And I'd like to sidestep here and make a

04:08:21  20   quick clarification, primarily for the benefit of the Court, but

21   also counsel for the defense.

22        In the Government's briefing, we indicated that a

23   certain witness in this case, EZ, arrived at Yakima County

24   Sheriff's Office at her own volition.  Following the

04:08:37  25   Government's briefing, and, in fact, quite recently, we became

1    aware that she was actually called in.  So there will be an

2    inconsistency in the testimony preceding this and the

3    Government's prior briefing regarding EZ.

4              THE COURT:  Go ahead.

5              MR. BURSON:  Thank you, Your Honor.

6    BY MR. BURSON:  (Continuing)

7    Q    So Monday, June 20th, 2019, were you working?

8    A    Yeah.

9    Q    Where did you report that day?

10   A    I just went to my own office desk.

11   Q    Okay.  At some point you interviewed someone with the

12   initials EZ; is that right?

13   A    Correct.

14   Q    How was it -- and that took place at the Yakima County

15   Sheriff's Office?

16   A    Yes.

17   Q    How was it that EZ came to arrive at the Yakima County

18   Sheriff's Office?

19   A    Um, at some point early in my shift, I was called by --

20   excuse me -- I was called by a CPS caseworker.  Um, she informed

21   me that, um, EZ was, um, the subject of one of her

22   investigations, and -- um, I don't know if you want me to go

23   into that --

24   Q    Okay.

25   A    -- that case.

1    Q    All right.

2    A    But I -- I came to have EZ as another case assigned to me

3    as a CPS follow-up.

4    Q    Okay.  So --

04:10:00  5    A    So --

6    Q    Just to clarify for the record, CPS stands for Child

7    Protective Services --

8    A    Correct.

9    Q    -- right?

04:10:07  10         And they called you and asked you to work this case

11    involving EZ?

12    A    They basically called me to, as is typical when I get a CPS

13    referral, um, whether it -- it could be all types of cases, but

14    in this case, I believe it was a child endangerment.  Um, so she

04:10:29  15    called me, um, you know, introduced herself, and said, "This is

16    a case I believe that was activated to you.  Um, I was wondering

17    if you could get into contact with EZ and interview her."

18         And I had just received this -- this case; it had just been

19    activated to me.  I don't even think I knew it was activated to

04:10:53  20    me yet.  And so I said sure.  Um, and that's how she came about

21    coming to our office, EZ.  I placed a call to her and asked her

22    to so that I could interview her reference to that case.

23    Q    Okay.  So the purpose of you calling her and then

24    interviewing her that day was this CPS referral.

04:11:12  25    A    To my memory, yes, that was the sole purpose.

1    Q    Okay.  So were you calling her in to interview her about

2    the Medicine Valley homicides two days prior?

3    A    At that point, no.  At that point it was for the CPS.

4    Q    Okay.  Now, at some point you did -- at some point you did

5    discuss the Medicine Valley murders with her, correct?

6    A    Yes.

7    Q    And the fact that she had been at the Cagle residence in

8    White Swan, correct?

9    A    What happened is once she arrived, um, I don't know exactly

10    who found out that -- one of the other detectives found out that

11    she was coming to our office, um, said, "Hey, we need to

12    interview her for this other incident in Medicine Valley."  So

13    that's how that came about.

14    Q    Okay.  Was the CPS referral related to the events --

15    A    Yes.

16    Q    -- at Medicine Valley two days prior?

17         In what way?

18    A    Um, EZ, when she arrived at the Medicine Valley location,

19    she was in the rear of a pickup truck, um, with her, I believe,

20    at the time six-month-old child.  Um, and the -- the reason for

21    the referral was, you know, to discuss this with her and to see,

22    you know, did she know that she was, uh, going to this residence

23    to do what?  What was she bringing this child to -- with her to

24    this residence for?  What was her reasoning to go there?

25    Q    Okay.  Now, you then conducted an interview with EZ,

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    215
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Williams/D/Burson*

1    correct?

2    A     I did.

3    Q     Okay.  And was anyone else in -- in the interview room?

4    A     Detective McIlrath.

04:13:16  5    Q     Okay.  Was the interview room equipped with audio and

6    visual equipment?

7    A     Yes.

8    Q     Okay.  Was that activated for the duration of this

9    interview?

04:13:27  10   A     Yes.

11   Q     Okay.  You were provided a copy by the U.S. Attorney's

12   Office of that video that they obtained from your office,

13   correct?

14   A     Yes.

04:13:38  15   Q     Have you reviewed that prior to this hearing?

16   A     Yes.

17   Q     Does it accurately depict the video?

18   A     Yes.

19   Q     Okay.

04:13:47  20         MR. BURSON:  Your Honor, I know I haven't gone through

21   all of the formalities typically associated with introducing a

22   video, but since it's been introduced by, I believe, both

23   parties at this point, I'm going to move to admit it.

24         THE COURT:  Is that Government's 10?

04:14:02  25         MR. BURSON:  It is, Your Honor, yes.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1          THE COURT:  Any objection?

2          MR. McENTIRE:  None from James Cloud.

3          THE COURT:  It will be admitted.

4          Oh, sorry.

04:14:13  5      MR. SMITH:  No, Your Honor.

6          THE COURT:  It will be admitted.  Sorry about that.

7          (Government Exhibit No. 10 admitted into evidence.)

8    BY MR. BURSON:   (Continuing)

9    Q    So the primary purpose of you interviewing EZ that day was

04:14:23  10   related to the CPS referral.

11   A    The primary purpose became the Medicine Valley incident at

12   that point.  Uh, when I spoke to her about the CPS referral, um,

13   that was -- that conversation was fairly brief.  Um, I -- I

14   think looking at it -- looking at the referral and speaking to

04:14:54  15   her for -- for a few moments, I realized that it was going to be

16   really difficult to show that she had that intent, uh, knowing

17   that these things might happen and so on, and that she -- enough

18   to prove that she put her child in danger recklessly or however,

19   you know, was going to be really hard to do, so that

04:15:18  20   conversation didn't last very long.

21   Q    Okay.  And so let's back up a little bit.

22        When the interview started, what was the discussion about?

23   A    The Medicine Valley incident.  From what I recall, that's

24   how -- that's where the conversation -- conversation started.

04:15:39  25   That was the topic --

 1   Q    Okay.

 2   A    -- from what I recall.  I don't remember mentioning

 3   anything about, you know, the child endangerment or anything

 4   like that in the beginning.

04:15:51  5   Q    Okay.  At some point -- at some point you decided to

 6   administer a lineup; is that right?

 7   A    Yes.

 8   Q    And why did you decide to administer a lineup?

 9   A    Um, another detective asked.  I believe it was Detective

04:16:17  10  Cypher, but I'm not positive about that.  I -- I believe

11   Detective McIlrath spoke with that person who was -- most likely

12   was Detective Cypher, and he asked that we do that.

13   Q    Okay.  And did you have a lineup compiled already then?

14   A    Not at that point, no.

04:16:39  15  Q    So between you and Detective McIlrath, I believe is --

16   A    McIlrath.

17   Q    -- which one of you compiled the lineup that would

18   eventually be administered to EZ?

19   A    Detective McIlrath did.

04:16:57  20  Q    And did he prepare the lineup in the interview room or did

21   he have to leave the interview room to do that?

22   A    He left the room, and, to my best recollection, that's when

23   I spoke with EZ about the CPS.

24   Q    Okay.  Do you recall how long Detective McIlrath was

04:17:16  25  outside the interview room?

1    A    I don't know exactly, but I would estimate ten minutes or

2    more.

3    Q    Okay.  And during this ten-minute-or-more period, what

4    did -- I know you just testified it had to do with the CPS

04:17:33  5    thing, but could you tell us generally the topics that were

6    discussed with EZ during this ten-or-more minute period while

7    Detective McIlrath was outside the room preparing the lineup?

8    A    The topics that were discussed?

9    Q    Yes.

04:17:47  10    A    Um, why she went to that address; um, drug use; did she

11    know that -- you know, is that the reason they went out there,

12    because that was kind of the assumption; um, just things along

13    those lines.

14    Q    What was her demeanor like during this ten-minute period or

04:18:15  15    so?

16    A    Um, she was upset, but she was fairly composed.  She was

17    crying off and on, but she was able to speak pretty well and

18    compose herself, but it was pretty obvious that she was upset.

19    And she -- she had a wound to her back, um, that looked like a

04:18:35  20    shotgun blast.  That's what was told to us, and ...

21    Q    And after ten-or-so minutes Detective McIlrath returned

22    with the lineup?

23    A    Yes.

24    Q    I'm showing you what is marked as Government Exhibit 9.

04:19:06  25    Do you recognize that cover --

1    A    Yes.

2    Q    -- cover sheet?

3    A    Yes.

4    Q    Can you see it?

04:19:17  5    A    Yes.

6    Q    Okay.  Could you briefly tell us what -- what this cover

7    sheet is?

8    A    Um, that is a -- well, as it says on the top, it's

9    instructions for a photographic lineup.  So anytime you present

04:19:30  10    a lineup, um, along with the photos, you're going to present

11    this to the, uh, person who is receiving the lineup, and you're

12    going to read that out loud to them and let them read it

13    themselves and make sure they understand.  And after they, um,

14    say that they understand it, you're going to, you know, present

04:19:52  15    the lineup to them.  They're going to eventually sign the

16    bottom.  If they've selected a photo, they would indicate that

17    in the bottom left corner.  If they have not, they will not.

18    Q    Okay.  Do you recognize that marking there that I just

19    circled (indicating)?

04:20:08  20    A    Yes, my.

21    Q    Okay.

22    A    My -- my signature.

23    Q    What is that?

24    A    My signature.

04:20:13  25    Q    Okay.  And it looks like there's a date next to it

1    indicating that it was executed on June 10th, 1999.

2        Is that correct?

3    A    I had messed up that "9".

4    Q    Okay.

04:20:29  5    A    That should be a "1", of course, but ...

6    Q    All right.  So June 10th, 2019, is what that should say?

7    A    Yes.

8    Q    Okay.  And do you remember which lineup or who -- who this

9    lineup was administered on?

04:20:46  10    A    Um, I believe it was, um, on James.

11    Q    No, but, I mean, who was the person that you were -- who --

12    who were you showing this lineup to?

13    A    Oh, EZ.

14    Q    Okay.  I'm going to flip through.

04:21:07  15        So you've seen all of the photos in this lineup before,

16    correct?

17    A    Yes.  It's been a little while, but yeah.

18    Q    Okay.  So now, this lineup, now that you've seen all of the

19    pictures, including all of the pictures that are included, this

04:21:25  20    is the lineup that you showed to EZ on June 9th, 2019.

21    A    I believe so, yes.

22    Q    And it's in substantially the same form as it was back

23    then.

24    A    It should be, yes.

04:21:36  25    Q    It should be or it is?

1    A    I believe it is, yes, sir.

2         MR. BURSON:  Your Honor, move to admit Government

3    Exhibit 9.

4         MR. McENTIRE:  No objection from James Cloud.

04:21:47   5         MR. SMITH:  No objection.

6         THE COURT:  It will be admitted.

7         (Government Exhibit No. 9 admitted into evidence.)

8    BY MR. BURSON:   (Continuing)

9    Q    So you testified you typically give the person

04:21:53  10   instructions.

11        Did you or Detective McIlrath give instructions to EZ?

12   A    I did.

13   Q    Okay.  Could you describe how you gave those instructions.

14   A    I read this -- this lineup, uh, instruction page to her,

04:22:06  15   and I explained to her that, um, you know, the important things

16   were the person may or may not be in the -- in the photos, um,

17   and, you know, that if she understood, that she'd mark on the

18   bottom right-hand corner, and then I told her that she should

19   read it herself, um, just to make sure that she understood.

04:22:31  20   Q    Okay.  And then she -- she executed on this front page here

21   where it says, "Person Viewing Photo Lineup"?

22   A    Yes.

23   Q    Okay.  So when Detective McIlrath came into the interview

24   room, he handed -- sorry -- he had the lineups with him,

04:22:49  25   correct?

1    A    Yes.

2    Q    Do you recall how many lineups he had?

3    A    I believe four.

4    Q    Okay.  Do you remember which lineup this one, No. 5038, was

04:23:00    5    of the four that you administered?

6    A    That should be the first one that we administered.

7    Q    Okay.  And when Detective McIlrath came in with the photo

8    lineup, what did he do with this particular photo packet?

9    A    Um, I -- I believe he handed it to me first.  I'm not

04:23:21    10    positive without --

11    Q    Okay.  But as you recall, he handed it to you?

12    A    I believe so.

13    Q    And do you recall if you did anything with it prior to

14    administering the lineup?

04:23:33    15    A    Prior to giving it to EZ?

16    Q    Yes, which we'll get to that.

17    A    Um, I think the only thing I did was after I read the

18    instructions to her, I checked to make sure that the, um -- that

19    the last sheet, which has the subjects in each spot, to make

04:23:52    20    sure that their names weren't -- to make sure that that page

21    wasn't there, which has their name and their position and

22    everything.  This is generated through Spillman.

23    Q    This lineup was generated using a Spillman system; is that

24    right?

04:24:05    25    A    Correct.

1    Q    Okay.  And --

2    A    And it will have that page included, um, when it's printed

3    off, and it will show each position and the name and the name

4    number, which is their Spillman, uh -- Spillman-specific number

5    for each person.  So I wanted to make sure that I didn't hand

6    that to her.

7    Q    Okay.

8    A    So I did flip through and check.

9    Q    So you -- you looked at the photos prior to handing them to

10   EZ to find that sheet or make sure it wasn't in there.

11   A    Yeah, just to make sure that that wasn't in there.  That

12   would have been not good.

13   Q    As you were doing that were you focusing on the photos?

14   A    Focusing on them, no.

15   Q    Okay.  So were you making note of who was in there?

16   A    No.

17   Q    Okay.  At the time, to the best of your recollection, at

18   the time that you began actually administering the lineup, did

19   you know which photo depicted the -- the suspect?

20   A    I don't -- I don't think I did.  I just -- after I just got

21   it from him?

22   Q    Yeah.

23   A    No.

24   Q    Okay.  Now, when you began administering the lineup to EZ,

25   what did you actually do with the photos, the six photos in this

04:24:18 (line 5)
04:24:32 (line 10)
04:24:46 (line 15)
04:25:04 (line 20)
04:25:17 (line 25)

1    particular lineup?

2    A    When I -- I handed them to her.  I don't know --

3    Q    Did you hand them to her all at once?

4    A    Yes.

04:25:29    5    Q    Okay.  We're going to take a small diversion here.

6         You've -- in between that lineup and now, you've become

7    somewhat familiar with Yakima County Sheriff's Office's lineup

8    policy or best practices?

9    A    Yes, I have.

04:26:00    10    Q    Are you aware that those policies recommend that the

11    lineups be administered sequentially?

12    A    I wasn't at the time, but --

13    Q    You weren't at the time.  You are now.

14    A    Yes.

04:26:11    15    Q    Okay.  And so the reason --

16         THE COURT:  Counsel, are you done with the Elmo?

17         MR. BURSON:  I am, Your Honor.  I'll probably come back

18    to it.

19         THE COURT:  All right.

04:26:22    20    BY MR. BURSON:  (Continuing)

21    Q    So you're aware of it.

22    A    Yes.

23    Q    But at the time you weren't -- you weren't aware of that

24    best practice.

04:26:27    25    A    I was not.

1    Q    Okay.  How long had you been a detective at that time?

2    A    Um --

3    Q    In June of 2019.

4    A    I would say -- would that be five months, maybe?

04:26:47  5    Q    Now, once EZ had the photos in her possession, what did she

6    start doing with them?

7    A    She started looking through them.

8    Q    Okay.  Was she looking through them one at a time?

9    A    Yes.

04:27:00  10   Q    At any point did she start comparing photos, anything like

11   that?

12   A    She just started looking through them one at a time, as I

13   can remember.

14   Q    As you recall?

04:27:09  15   A    Right.

16   Q    As you recall, did she identify -- did she point out --

17   sorry, did she make any identifications in that photo array?

18   A    Yes.

19   Q    Okay.  Do you recall which photo it was?

04:27:33  20   A    Um, which -- which number?

21   Q    Yes.

22   A    Uh, it was the second, I believe.

23   Q    Okay.  Okay.  And I'm showing you the cover sheet on

24   Government Exhibit 9 again.

04:27:51  25        THE COURT:  It's not showing up.

1          THE WITNESS:  I don't have it up.

2     BY MR. BURSON:   (Continuing)

3     Q     Where it says "Photo Number Selected" with a number "2"

4     handwritten there, is that indicating that a selection was made

04:28:08   5     and that it was Photo 2?

6     A     Yes.

7     Q     Okay.

8     A     She also made a notation on the photo itself.

9     Q     Okay.  And let's take a look at that.

04:28:21  10          This is Photo No. 2, correct (indicating)?

11     A     Correct.

12     Q     I mean, there's obviously a "2" at the bottom; is that

13     right?

14     A     Yes.

04:28:31  15     Q     This handwriting here (indicating), whose handwriting is

16     that, as you recall?

17     A     It's her handwriting.

18     Q     By "her," you're referring to?

19     A     EZ.

04:28:39  20     Q     And could you read that for us.

21     A     Well, I've only got the first line, but it says (reading):

22     Guy who shot Dennis.

23     Q     How about that (indicating)?

24     A     I can't really read what it says over the "Government

04:28:54  25     Exhibit 9," but it says (reading):  Guy who shot Dennis.

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                  227
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Williams/D/Burson*

1   Q    Okay.  So you can't tell what this marking is here

2   (indicating)?

3   A    I can't.

4   Q    Okay.  Does it look similar to you, from what you can tell,

5   to this mark here (indicating)?

04:29:13

6   A    It does.

7   Q    Okay.  Do you recall if EZ made any remarks in reference to

8   Photograph No. 2?

9   A    She -- I don't recall exactly, but -- her -- her exact

10  words, but she said something to the effect of "that's him" or

04:29:34

11  "this is him," something like that, when she got to that second

12  photo.

13  Q    Okay.  Do you recall --

14        MR. McENTIRE:  I'm going to object as misstating what

15  she said during the recorded interview.

04:29:51

16        MR. BURSON:  I didn't --

17        THE COURT:  Well, but -- hold on.  Hold on.

18        MR. BURSON:  -- understand that because of the mask, I

19  think.

20        THE COURT:  Overruled.  That's his recollection at this

04:30:01

21  point.

22        Go ahead.

23  BY MR. BURSON:   (Continuing)

24  Q    After she made the initial identification of the

25  photograph, did she make any more comments after that in

04:30:23

1    returning to Photograph No. 2?

2    A    I don't recall right now.  I'd have to review the video

3    again to --

4    Q    I'm sorry?

04:30:36    5    A    I'd have to review the video again to remember that.  I

6    don't remember at this point.

7    Q    So you don't recall from your own memory.

8    A    No.

9    Q    So, Detective Williams, we're not going to go over the

04:30:55   10    entire video with you, but there is a particular moment that I

11    would like to ask you some questions about.  And just for

12    context sake, I think we'll start at a position of the video

13    where I think you'll see that it appears as though the beginning

14    of this lineup is being administered.

04:31:27   15         MR. BURSON:  Can you switch us over, please?

16         THE COURT:  Just for the record, you're playing

17    exhibit ...?

18         MR. BURSON:  This is Exhibit 10, Your Honor.

19         THE COURT:  Thank you.

04:31:40   20    BY MR. BURSON:  (Continuing)

21    Q    So as you can see -- you can see that on your screen,

22    Detective?

23    A    Yes.

24    Q    All right.  And you can see, this is mostly for the benefit

04:31:48   25    of the record, but the time stamp in the bottom of the video,

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                     229
*Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020*
*Williams/D/Burson*

1   not the video player, is 13:47 and 17 seconds.

2   A    Yes.

3   Q    Oh, and can you identify the person the front side of this

4   video with the red shirt?

04:32:10  5   A    That is me.

6   Q    That's you?

7   A    With the red shirt, that's me.

8   Q    Okay.  And sitting across the table from you, that is?

9   A    EZ.

04:32:31  10       (Whereupon a video clip was played.)

11   Q    Let's pause it there for a second.

12        You previously testified about going through the lineup to

13   check for the -- the sheet that Spillman produces that has

14   identifying information on it.

04:32:40  15        Is that what you were doing in the last five seconds or so

16   there?

17   A    That's what I was doing right there, yes.

18        (Whereupon a video clip was played.)

19        THE COURT:  Does this have audio?

04:33:04  20        MR. BURSON:  It does, Your Honor, but we've been having

21   some audio difficulties.  I tried to work it out with court

22   staff, but for some reason it's just not --

23        THE COURT:  Okay.

24        MR. BURSON:  -- very audible.  I -- while we're on

04:33:19  25   topic, it wasn't the Government's intent at any point during its

1    presentation today to play the entire video.  We submitted it as

2    an exhibit --

3              THE COURT:  Counsel, I've watched the video --

4              MR. BURSON:  Okay.

04:33:30    5              THE COURT:  -- if that's what you're wondering.

6              MR. BURSON:  Which is what I was asking.  Since the fact

7    finder has already reviewed the video, the Government doesn't

8    intend on playing the whole video.

9              THE COURT:  Okay.  But I didn't know if you had

04:33:42    10   questions for him on that.  So that's why I was just letting you

11   go ahead and ask your questions.  But I have watched the video.

12             MR. BURSON:  Thank you, Your Honor.

13   BY MR. BURSON:   (Continuing)

14   Q    So you've been watching this, Detective?

04:33:55    15   A    Yes.

16   Q    Okay.  And it looks like she's starting to flip over the

17   second page, right?

18   A    I believe so.

19   Q    Okay.  While we're watching the video, I'd like you to pay

04:34:08    20   attention to you specifically here.

21             (Whereupon a video clip was played.)

22   Q    Okay.  In the last few seconds of that video you handed --

23   you moved the pen over to the side of the table; is that right?

24   A    I just moved the pen, yes.

04:34:28    25   Q    Okay.  And I understand that this was in June of 2019.

1      Correct?

2  A    Yes.

3  Q    Do you know -- well, first of all, do you recall, if you

4  hadn't seen the video, moving that pen?

04:34:45  5  A    Do I recall what?  I'm sorry.

6  Q    If I hadn't shown you this video just now or you hadn't

7  ever reviewed it for admissibility purposes, if I had asked you

8  today, do you remember moving a pen during this lineup --

9  A    I don't think so.

04:35:01  10  Q    Okay.  Now that you've seen the video, do you recall --

11  A    I know exactly why -- why I moved the pen.

12  Q    Okay.  So why don't you tell us what you were doing there,

13  what that action was with the pen.

14  A    It's hard without audio, but to -- but what happened when

04:35:19  15  she flipped the second photo, she -- like I said before, she

16  said something -- not exact words, but she said something to the

17  effect of, um, "this is the person."  That's not what she said,

18  but something to that effect.  And I realized she did not --

19      MR. McENTIRE:  And I'm got to object because that is

04:35:39  20  misstating what occurred during the video, just for record

21  preservation.

22      THE COURT:  Okay.  It's on the record.

23      MR. BURSON:  Your Honor, I'm going to ask that prior

24  inconsistent statements, if any --

04:35:52  25      THE REPORTER:  I can't hear you.

 1        MR. BURSON:  I'm going to ask that prior inconsistent

 2   statements be reserved for cross-examination, since they're not

 3   actually objections.

 4        THE COURT:  Okay.  That seems reasonable.  Go ahead.

04:36:01   5   BY MR. BURSON:   (Continuing)

 6   Q    All right.  So, Detective Williams, I believe you were just

 7   explaining what the movement of the pen was.

 8   A    Um-hmm.  When I moved the pen, she had made some sort of

 9   statement, um, as to -- as to identifying what photo she was --

04:36:19  10   you know, she was identifying the person in the photo.  I

11   realized she did not have a pen.  She needed a pen to make

12   her -- make a mark or sign her name, whatever she was going to

13   do, so I gave her -- I put the pen down.  That's as simple as it

14   is.

04:36:33  15   Q    Was your intent at the start of this lineup to have her

16   indicate if she made an identification by making a mark on the

17   photo itself?

18   A    Um, yes.

19   Q    And had she -- and I know we can't hear it in the video,

04:36:52  20   unfortunately, but to the best of your recollection, had she

21   already made a statement indicating identification prior to you

22   moving the pen?

23   A    She made some sort of statement, yes.  I just can't

24   remember exactly what she said.

04:37:06  25   Q    Okay.

1      (Whereupon a video clip was played.)

2    BY MR. BURSON:   (Continuing)

3    Q     Okay.  So, Detective Williams, I know you can't really

4    hear, but now that you've seen the footage of it, to the best of

04:38:02  5    your recollection, is that the point that we just watched, where

6    she makes her mark and that identifying statement on Photo

7    No. 2?

8    A     The whole -- the whole sequence, yes.

9    Q     Okay.  All right.  And am I correct in saying that

04:38:22  10   following this, it appears that she does have a pen on her

11   right-hand side, next to the water bottle there?

12   A     It looks like it.

13   Q     Okay.  And to the best of your recollection, did she retain

14   a pen of some sort for the -- for the remainder of the four

04:38:39  15   lineups, as best you recall?

16   A     I believe so.  I ...

17   Q     Now, as best as you recall, did she make any other

18   identifications that day in the other lineups?

19   A     I believe she identified, uh, one more person in the next

04:39:08  20   lineup.  I don't recall who that was at this time.  Um, and she

21   was presented two more, and I believe she was unable to make

22   identification on those two.

23        MR. BURSON:  Your Honor, if the Court will bear with me,

24   it appears that the video froze up.

04:39:52  25        THE COURT:  Take your time.

1    (Pause in proceedings.)

2        THE COURT:  Is it freezing up on you?

3        MR. BURSON:  It's freezing up on me, Your Honor.  I

4    don't think it's vital at this point.  I'd like to just go ahead

04:40:38   5    and continue on, if I may.

6        THE COURT:  Okay.  Yes.

7    BY MR. BURSON:    (Continuing)

8    Q    So, Detective Williams, when we last left the video before

9    these technical difficulties, you indicated that you agreed with

04:40:49  10    me that there was a pen on the right side of EZ, correct?

11    A    I believe so, yes.  That's what it looks like.

12    Q    And the second lineup, I believe you testified she made

13    another identification, to the best of your recollection.

14    A    Correct.

04:41:06  15    Q    Okay.  Do you recall making any similar movements with a

16    pen when she made an identification during the second lineup?

17    A    I don't believe I did.

18    Q    Okay.  And why wouldn't you have made a movement with a pen

19    during the second lineup?

04:41:20  20    A    Because I'd already given her a pen.

21    Q    Okay.  And to the best of your recollection, she still had

22    that pen?

23    A    Um-hmm.  Yes.

24    Q    And you administered two more lineups that day; is that

04:41:32  25    right?

1    A    Yes.

2    Q    Okay.  Did she make any identification in those lineups?

3    A    I don't believe she did on the last two.

4    Q    Okay.

04:41:56    5         MR. BURSON:  Your Honor, I have no further questions at

6    this time for Detective Williams.

7              THE COURT:  Very well.

8              MR. McENTIRE:  May I please have the --

9              THE COURTROOM DEPUTY:  Yes.

04:42:14    10         MR. McENTIRE:  Thank you.

11

12                        CROSS-EXAMINATION

13    BY MR. McENTIRE:

14    Q    Good afternoon, Detective Williams.

04:42:20    15    A    Good afternoon.

16    Q    You testified you've been a detective for approximately two

17    years.

18    A    Correct.

19    Q    And that at the time of this lineup, that you had been a

04:42:38    20    detective, roughly five months of experience at the time of this

21    lineup.

22    A    Correct.

23    Q    I'm showing you what's been marked as Defense Exhibit 1002

24    on your monitor.

04:42:51    25         Can you see that?

1    A    Yes, I can.

2    Q    This is the Yakima County Sheriff's Office Eyewitness

3    Identification Policy.

4        Are you familiar with this document?

04:43:00  5    A    Yes.

6    Q    Perhaps a clarifying question:  Are you familiar with this

7    document now?

8    A    Correct.

9    Q    It appears to be a four-page document.  What I'm going to

04:43:16  10   do is I'm going to scroll through each page, just to confirm

11   we're talking about the same thing.  This is Page 2.  Page 3.

12   Page 4 (indicating).

13       And you recognize this document?

14   A    Yes.

04:43:29  15   Q    Does this fairly and accurately represent the Yakima County

16   Sheriff's Office's identification policy?

17   A    Yes.

18       MR. McENTIRE:  Your Honor, I'd move to admit Defense

19   Exhibit 1002.

04:43:40  20       MR. BURSON:  No objection.

21       MR. SMITH:  No objection.

22       THE COURT:  It will be admitted.

23   (Defense Exhibit No. 1002 admitted into evidence.)

24   BY MR. McENTIRE:  (Continuing)

04:43:45  25   Q    Detective Williams, I want to draw your specific attention

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                237
Evidentiary Motion Hearing/Day 1, Volume I/September 30, 2020
Williams/X/McEntire

1    to 1002-2, Policy 603.6, Photographic and Live Lineup

2    Considerations.  And it's at the bottom of the page, this first

3    sentence reading (reading):  When practicable, the member

4    presenting the lineup should not be involved in the

04:44:12   5    investigation of the case or know the identity of suspect.

6         Turning to the next page (reading):  In no case should the

7    member presenting a lineup to a witness know which photograph or

8    person in the lineup is being viewed by the witness.

9         Did I read that correctly?

04:44:38  10    A    You read it correctly, yes.

11         (Court conferring with IT.)

12            THE COURT:  Sorry.  Go ahead.

13            MR. McENTIRE:  Thank you, Your Honor.

14    BY MR. McENTIRE:   (Continuing)

04:45:35  15    Q    Picking up where I left off, did I read that first sentence

16    correctly?

17    A    Yes, you did.

18    Q    In your review of the video that we just watched, that

19    segment of this identification or this lineup with EZ, in fact,

04:45:48  20    were you aware of the photographs that EZ was looking at at the

21    time of the lineup?

22    A    Can you repeat that question?

23    Q    You could see all of the photos.

24    A    When I flipped through them, yes, I could.

04:46:03  25    Q    You were sitting right in front of EZ at the same table.

1    A    You're -- you're saying all the photos?  I mean, I don't --

2    Q    Yeah.  Let me ask a better question.

3          You reviewed this stack of photos?

4    A    When I flipped through them to check for the card -- or for

04:46:20    5    the lineup card, yes.

6    Q    Correct.  And then you handed them to EZ.

7    A    Correct.

8    Q    And then EZ started going through them.

9    A    Correct.

04:46:28    10    Q    And during that time, there's nothing obstructing you

11    seeing what EZ could see during that time.

12    A    During that time, no.

13    Q    So you could see what photos --

14    A    When she was reviewing them, I could see them, yes.

04:46:39    15    Q    Exactly.

16          And so you would agree, knowing what you know now about the

17    Yakima County Sheriff's Office's policies, that by allowing you

18    to see everything that happened you committed a policy

19    violation.

04:46:50    20    A    Correct.

21    Q    I think an important clarification:  At the time that you

22    were doing this, you didn't intend to go into this lineup to

23    commit a policy violation.

24    A    No.

04:47:07    25    Q    It's just something that you weren't aware of.

1    A    Correct.

2    Q    And you would agree that this was an improper action for

3    you to take.

4    A    Well, it was a policy violation, if that's what you mean.

04:47:29    5    Q    But you weren't aware there was a policy violation.

6    A    At the time, no.

7    Q    And so it's possible to do something that was improper

8    without realizing it at the time.  Fair?

9    A    Sure.

04:48:06    10        MR. McENTIRE:  Your Honor, the next set of questions

11    basically is going to involve reviewing certain snippets from

12    the video, and we can take a shot at it.  I've got clips that

13    are pulled out.

14        THE COURT:  Let's try.  And, Counsel, if it doesn't

04:48:27    15    work, we can try to come up with a solution by tomorrow, but

16    apologies for that.

17        (Whereupon a video clip was played.)

18        MR. McENTIRE:  I think we're having the same audio issue

19    that we were having as the United States, Your Honor.  It may be

04:50:13    20    that this is the best time to ...

21        THE COURTROOM DEPUTY:  Judge, what we've done before is

22    put the microphone right next to the computer speaker.

23        THE COURT:  But if we do that, then we don't have the

24    video on the screen.

04:50:37    25        THE COURTROOM DEPUTY:  No, literally putting the

1    microphone down next to the computer speaker, we've done that

2    before and it's worked.

3         THE COURT:  But there's no audio on the speaker because

4    it's going through the system.  So if you unplug it, could you

04:50:50  5    unplug it and play the video and put the microphone there next

6    to the witness?

7         MR. BURSON:  If the computer has a VGA hookup, I believe

8    you can hook the video in where you're sitting, leave the green

9    plug out so that the audio will be going to the system but the

04:51:09  10   video will --

11        THE COURT:  That is way above my technology abilities.

12        THE COURTROOM DEPUTY:  Maybe that's what we had before,

13   but I just know it worked before, so ...

14        THE COURT:  No audio.

04:51:49  15   MS. YOUNGCOURT:  No audio at all with VGA.

16        MR. McENTIRE:  This may be a -- this may be a pause to

17   consult with the Court's technology for the day and see if we

18   can ...

19        THE COURT:  I think that's probably a fair assessment.

04:52:09  20   Let's -- let's do this:  Let's break.  I'm being told that there

21   are some difficulties with this that might -- may not be

22   resolved by the morning.  I can tell the parties that I have --

23   I have watched this with the audio, and I have heard the

24   statements.  I can tell you that I haven't paid as close

04:52:35  25   attention as apparently all of you have to pens moving around

1    and things being said.  So I can certainly do that, but I

2    imagine that there are questions to be asked.

3           So let's try to figure out how to play that, and we can

4    try and do that overnight.  So this is probably a good idea to

04:52:59  5    break at this time.

6           Detective, I'll remind you that not to discuss your

7    testimony with any of the parties or any other witness here

8    today, and with that -- actually, I do have other questions.

9    Let's -- for the attorneys, so at this point, sir, you are

04:53:20  10   excused.  Thank you.

11          THE WITNESS:  Thank you.

12          THE COURT:  The question that I have for you folks is

13   the amount of time that we need.  So I guess I need to know,

14   understanding how fast we've been rushing through all of this,

04:53:39  15   how much time you all need for the remainder of the witnesses

16   and argument.

17          MR. BURSON:  I don't see the Government needing another

18   hour in the morning for its final witness.  I don't know how

19   cross, how long cross will go with this particular witness.

04:53:59  20          THE COURT:  All right.  So that takes care of the one

21   witness.  And with regards to, it's my understanding there are

22   three witnesses for the defense.

23          MR. McENTIRE:  Your Honor, there are -- after Detective

24   Williams there are one additional witness for the United States,

04:54:19  25   which is Detective McIlrath.  I expect the cross-examination of

1    Detective McIlrath to be quite short, because it's largely going

2    to be addressed through questions towards Detective Williams.

3                THE COURT:  Okay.

4                MR. McENTIRE:  I think -- I believe that is all of the

04:54:39    5    United States' witnesses.

6                MR. BURSON:  That's correct.

7                MR. McENTIRE:  I have a short set of questions for

8    Investigator Chris Reyes regarding his interview with LL, and

9    then I think the most substantive block would be essentially

04:55:00   10    Dr. Cara Laney, the eyewitness identification expert.  And so I

11    don't envision the cross-examination of Detective Williams to

12    last that long in the morning.  It's just a few clips that I

13    plan on showing her [sic], and so I'm thinking under -- under

14    20 minutes in terms of questions, 15 minutes for Detective

04:55:21   15    Williams and a very few questions for Detective McIlrath, to

16    give the Court an idea of the cross-examination of the -- of the

17    Government's --

18                THE COURT:  I imagine that Dr. Laney is going to take a

19    bit.

04:55:32   20                MR. McENTIRE:  Correct, Your Honor.

21                THE COURT:  All right.  And Mr. Rojan?

22                MR. McENTIRE:  It would be Investigator Chris Reyes,

23    Your Honor, and I imagine my direct would be ten minutes.

24                THE COURT:  Okay.  And you have listed another witness

04:55:47   25    as well.

1        Is that witness not intending to testify?

2        MR. McENTIRE:  Both Chris Reyes as well as Cole Rojan

3    were present at the interview of LL.  I listed Cole Rojan as a

4    precaution; however, I intend to call just one of them, and it

5    would be Chris Reyes.

6        THE COURT:  Okay.  Why don't we do this:  Let's try to

7    be everyone here tomorrow at 8 o'clock instead of the 9:00 or

8    8:30.  I like 8:30, but given what's to come, I want to make

9    sure we finish.  So let's plan on -- everyone loves to get up

10   early, so let's all plan to be here at that time, and hopefully

11   we can figure out these issues.

12       Any other questions, Counsel?

13       MR. BURSON:  Not from the Government, Your Honor.

14       MR. McENTIRE:  And not from James Cloud.

15       MR. SMITH:  No, Your Honor.

16       THE COURT:  Very well.  Thank you for your presentations

17   today, and we will be in recess.  Thank you.

18       THE COURTROOM DEPUTY:  All rise.

19       Court is now adjourned.

20     (Court adjourned at 4:56 p.m.)

21

22

23

24

25

244

1                    C E R T I F I C A T E

2

3       I, KIMBERLY J. ALLEN, do hereby certify:

4              That I am an Official Court Reporter for the United

5    States District Court for the Eastern District of Washington in

6    Richland, Washington;

7              That the foregoing proceedings were taken on the date

8    and at the time and place as shown on the first page hereto; and

9              That the foregoing proceedings are a full, true and

10   accurate transcription of the requested proceedings, duly

11   transcribed by me or under my direction.

12             I do further certify that I am not a relative of,

13   employee of, or counsel for any of said parties, or otherwise

14   interested in the event of said proceedings.

15             DATED this 28th day of October, 2020.

16

17

18

19   _____

20   Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
     Washington CCR No. 2758
21   Official Court Reporter
     Richland, Washington
22

23

24

25