245

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No.
3                                ) 1:19-cr-2032-SMJ-1, 2
                    Plaintiff,   )
4                                ) September 30, 2020
v.                               )
5                                ) Yakima, Washington
JAMES DEAN CLOUD (01); and       )
6   DONOVAN QUINN CARTER CLOUD    ) Evidentiary Motion Hearing
    (02),                        ) Day 2, Volume II
7                                ) Pages 245 to 519
                    Defendants.  )
8

9
              BEFORE THE HONORABLE SALVADOR MENDOZA, JR.
10               UNITED STATES DISTRICT COURT JUDGE

11
                          APPEARANCES:
12

     For the Plaintiff:            Richard Cassidy Burson
13                                 Richard.c.burson@usdoj.gov
                                   Thomas Hanlon
14                                 Thomas.j.hanlon@usdoj.gov
                                   United States Attorney's Office
15                                 402 East Yakima Avenue
                                   Suite 210
16                                 Yakima, WA 98901
                                   509-454-4425
17

18   For the Defendant James       John B. McEntire, III
     Cloud (01):                   Jay_McEntire@fd.org
19                                 Lorinda Youngcourt
                                   Lorinda_Youngcourt@fd.org
20                                 Jeremy Sporn
                                   Jeremy_Sporn@fd.org
21                                 Federal Defenders
                                   Eastern Washington
22                                 10 N. Post Street
                                   Spokane, WA 99201
23                                 509-624-7606

24

25

```
 1    For Defendant Donovan Cloud    Richard A. Smith
      (02):                          Rasmith@house314.com
 2                                   Smith Law Firm
                                     314 North Second Street
 3                                   Yakima, WA  98901
                                     509-457-5108
 4

 5                                   Mark A. Larranaga
                                     Mark@jamlegal.com
 6                                   Walsh and Larranaga
                                     705 2nd Avenue
 7                                   Suite 501
                                     Seattle, WA  98104
 8                                   206-972-0151

 9

10

11    Official Court Reporter:       Kimberly J. Allen, CCR #2758
                                     United States District Courthouse
12                                   P.O. Box 685
                                     Richland, Washington 99352
13                                   (509) 943-8175

14    Proceedings reported by mechanical stenography; transcript
      produced by computer-aided transcription.
15

16

17

18

19

20

21

22

23

24

25
```

247

1                              **INDEX**

2    **Proceedings:**                                        **Page**

3              Argument by Mr. McEntire                   452
             Argument by Mr. Smith                       495
4              Argument by Mr. Burson                      499
             Rebuttal Argument by Mr. McEntire           516
5

6                          **WITNESS INDEX**

7    **Plaintiff Witness:**                                  **Page**

8

9    **BRIAN McILRATH**
             Direct Examination By Mr. Burson            255
10
     **MICHAEL WILLIAMS**
11             Continued Cross-Examination By Mr.          250
             McEntire
12
                              *****
13
     **Defense Witnesses:**                                  **Page**
14

15
     **CARA LANEY**
16             Direct Examination By Mr. McEntire          299
             Cross-Examination By Mr. Burson             406
17             Redirect Examination By Mr. McEntire        438

18   **CHRIS REYES**
             Direct Examination By Mr. McEntire          271
19             Cross-Examination By Mr. Smith             278
             Cross-Examination By Mr. Burson             287
20             Redirect Examination By Mr. McEntire        294

21

22

23

24

25

1                          **EXHIBITS ADMITTED**

2    **Plaintiff**
     **Number**          **Description**                              **Page**
3                         None

4

5    **Defense**
     **Number**          **Description**                              **Page**
6
        1000           Lineup 5033 (James Cloud)                        328
7       1007           James Cloud's Booking Photo -                    329
                       06.10.2019
8       1008           James Cloud Side-by-Side Photos                  329
        1010           October 1999 DOJ Eyewitness                      333
9                      Evidence, A Guide for Law
                       Enforcement
10      1022           Photo - F-250                                    387
        1024           Video Recording of Morris Jackson                395
11      1025           Lineup 5033 (Fillers) used for EZ                401
        1019           Lineup 5038 (James Cloud) - used                 404
12                     for EZ

13                          **GENERAL INDEX**

14                                                                  **Page**

15   Reporter's Certificate............................519

16

17

18

19

20

21

22

23

24

25

1   (September 30, 2020; 7:58 a.m.)

2        THE COURTROOM DEPUTY:  All rise.

3     (Call to Order of the Court.)

4        THE COURT:  Good morning.  Please be seated.

07:58:59  5        THE COURTROOM DEPUTY:  Matter before the Court is *United*

6   *States of America v. James Cloud and Donovan Quinn Carter Cloud*,

7   Cause No. 1:19-cr-02032-SMJ, Defendant 1 and Defendant 2.  Time

8   set for motion hearing.

9        Counsel, please state your presence for the record,

07:59:20  10  beginning with Government counsel.

11        MR. BURSON:  Good morning, Your Honor.  Richard Burson

12  and Tom Hanlon for the United States.  Sitting at counsel table

13  as well is Special Agent Troy Ribail with the FBI.

14        THE COURT:  Good morning to all three of you.

07:59:30  15        MR. BURSON:  Good morning.

16        MR. HANLON:  Good morning.

17        MR. McENTIRE:  Good morning, Your Honor.  Jay McEntire,

18  Lorinda Youngcourt, and Jeremy Sporn on behalf of James Cloud.

19        THE COURT:  Good morning.

07:59:40  20        MR. SMITH:  Good morning, Your Honor.  Mark Larranaga

21  and Rick Smith on behalf of Donovan Cloud.

22        THE COURT:  Good morning.

23        Good morning, gentlemen.

24        DEFENDANT JAMES CLOUD:  Good morning.

07:59:50  25        DEFENDANT DONOVAN CLOUD:  Good morning.

1    THE COURT:  Now, we last left on -- last left on

2    Detective Williams and his testimony.  We were having some

3    issues with the video.  Sounds like the video is as good as it's

4    going to get.

08:00:19    5    So I think we could proceed forward, Mr. McEntire.

6    MR. McENTIRE:  Correct, Your Honor.

7    THE COURT:  Okay.  So why don't we -- why don't we get

8    the detective back on.

9    (Witness MICHAEL WILLIAMS approached.)

08:00:49  10    THE COURT:  Good morning, sir.  You are still under

11    oath.

12    THE WITNESS:  Okay.

13    THE COURT:  Please have a seat.  And make sure that mic

14    is close to you so we can capture everything you're saying.

08:01:08  15    With that, Mr. McEntire, you can proceed.

16    MR. McENTIRE:  Thank you, Your Honor.

17

18                    CONTINUED CROSS-EXAMINATION

19    BY MR. McENTIRE:

08:01:13  20    Q    Good morning, Detective Williams.

21    A    Good morning.

22    Q    Detective Williams, when we left off yesterday we were

23    discussing Yakima County Sheriff's Office Policy 603.6.

24         Refresh your recollection on where we left off?

08:01:27  25    A    Yes.

1  Q    What I'd like to do is bring you back to that policy, same

2  page that we left off before, which is Defendant's

3  Exhibit 1002-3.  And what I'd like to do, Detective, is direct

4  your attention to the third paragraph down in that policy.

08:01:53  5        Reading, quote:  The member presenting the lineup to a

6  witness should do so sequentially; i.e., show the witness one

7  person at a time and not simultaneously.

8        Detective Williams, you indicated yesterday that you did

9  have an opportunity to refresh your recollection on the

08:02:15  10  interview that you did with EZ on June 10th.

11  A    Yes.

12  Q    And during the course of that, you watched the video start

13  to finish all the way through?

14  A    Yes.

08:02:29  15  Q    During the course of your interview with EZ, would you

16  agree that EZ was able to look at more than one photo at the

17  same time when she was going through the various lineups?

18  A    Yes.

19  Q    So you would agree, based upon your review of this policy

08:02:43  20  now, that that was not, in fact, a sequential lineup; that that

21  was a simultaneous.

22  A    Correct.

23  Q    Which, again, is in violation of YCSO policy.

24  A    Yes.

08:02:58  25  Q    Detective, I'm going back to the previous page, 1002-2, on

1    the YCSO policy.

2         Drawing your attention to this section (reading):  In order

3    to avoid undue influence, witnesses should view suspects or a

4    lineup individually and outside the presence of other witnesses.

08:03:24    5    Witnesses should be instructed to avoid discussing details of

6    the incident or of the identification process with other

7    witnesses.

8         Detective, when you left off the interview -- I guess maybe

9    let me start here:  Did the video recording capture the full

08:03:42    10    interaction that you had, as well as Detective McIlrath, with

11    EZ?

12    A    I believe it did, yes.

13    Q    So there weren't any substantive conversations that were

14    occurring before the -- the recording started.

08:03:55    15    A    No.

16    Q    Or after.

17    A    No.

18    Q    Do you recall, after refreshing your recollection to the

19    video, did you leave that interview with an instruction to EZ

08:04:06    20    not to discuss the interview that you just had with other

21    witnesses?

22    A    I don't think I did, no.

23    Q    Detective Williams, that's all the questions I have.  Thank

24    you.

08:04:43    25         THE COURT:  Mr. Smith?

1          MR. SMITH:  Pardon me?

2          THE COURT:  Any questions?

3          MR. SMITH:  No.  No questions, Your Honor.

4          THE COURT:  Okay.  Any additional questions?

08:04:54   5          MR. BURSON:  Nothing from the United States, Your Honor.

6          THE COURT:  Okay.  May this witness be excused?

7          MR. McENTIRE:  Yes, Your Honor.

8          THE COURT:  Mr. Burson?

9          MR. BURSON:  Yes, Your Honor.

08:05:04  10          MR. HANLON:  Yes, Your Honor.

11          THE COURT:  Okay.  Thank you.  You're excused.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Mr. Burson, if you would call your next

2    witness.

3        MR. BURSON:  Yes, Your Honor.  The United States calls

4    Detective Brian McIlrath with the Yakima County Sheriff's

08:05:55  5    Office.

6        THE COURT:  Thank you.

7        (Witness approached.)

8        THE COURTROOM DEPUTY:  Please raise your right hand.

9

08:06:06  10                    BRIAN McILRATH,

11    called as a witness on behalf of the Plaintiff, having first

12        sworn or affirmed, testified under oath as follows:

13        THE WITNESS:  Yes, ma'am.

14        THE COURTROOM DEPUTY:  Okay.  Go ahead and have a seat.

08:06:20  15        THE WITNESS:  Can I take my mask off?

16        THE COURT:  Yes.

17        THE COURTROOM DEPUTY:  When you are comfortable, would

18    you please state your first and last name, spelling both for the

19    record.

08:06:27  20        THE WITNESS:  Brian McIlrath; B-R-I-A-N,

21    M-C-I-L-R-A-T-H.

22        THE COURT:  Good morning.

23        THE WITNESS:  Good morning.

24        THE COURT:  Now, I'm sure you want to keep that mask on

08:06:40  25    during the course of your testimony.  If you do, you can do so.

 1    If you want to keep it off, you can certainly do that as well.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  All right.  Go ahead, Counsel.

 4              MR. BURSON:  Thank you, Your Honor.

08:06:51  5

 6                         DIRECT EXAMINATION

 7    BY MR. BURSON:

 8    Q    Good morning, Detective McIlrath.

 9    A    Good morning.

08:06:55 10    Q    Did I pronounce --

11    A    McIlrath.

12    Q    I think I mangled it.

13    A    That's fine.  I'm used to it.  McIlrath, or whatever you

14    want.  Brian is fine, too.

08:07:03 15    Q    Well, I don't know that it is for these proceedings.

16         You're an investigator or detective with Yakima County

17    Sheriff's Office; is that right?

18    A    Yes, sir.

19    Q    How long have you been a detective with Yakima County

08:07:17 20    Sheriff's Office?

21    A    Almost three years.

22    Q    Okay.  And how long in total have you worked for YCSO?

23    A    Um, let's see, I started in 2003.  Before that I worked at

24    the City of Wapato for two and a half years as a police officer.

08:07:32 25    Q    Okay.  And with YCSO, prior to becoming a detective three

1    years ago, you were in what capacity?

2    A    A deputy.

3    Q    While you were a deputy with YCSO, did you participate or

4    assist in investigations?

08:07:48  5    A    Yes.

6    Q    Okay.  And as a detective, I assume you participate more

7    fully in those investigations.

8    A    Yes.

9    Q    Do you lead some investigations as well?

08:07:57  10    A    Lead some, yes, sir.

11    Q    Okay.  In the course of your time as a detective with YCSO,

12    you've participated in suspect interviews?

13    A    Yes.

14    Q    How many would you say you participated in as a detective?

08:08:10  15    A    As a detective, uh, probably close to 100, I guess.

16         THE COURT:  Mr. Burson, could you pull that mic closer

17    to you.  Sometimes your voice drops off at the end, and I'm

18    going to start getting angry stares, you're going to start

19    getting angry stares from people in this courtroom, and I don't

08:08:30  20    think any of us want that.

21         MR. BURSON:  Thank you, Your Honor.

22         THE COURT:  All right.

23         MR. BURSON:  And I'll try to pick up the voice at the

24    end of my sentences as well.

25

 1    BY MR. BURSON:  (Continuing)

 2    Q    So, Detective, how many lineups would you say that you've

 3    conducted over the course of your career --

 4    A    Photographic lineups, um, in my whole career?

08:08:52   5    Q    Yeah.

 6    A    Uh, that's hard to say.  Fifteen or 20; around there.

 7    Q    Okay.

 8    A    I don't --

 9    Q    So I want to talk about a particular interview that

08:09:05  10    occurred on June 10th of 2019 at the Yakima County Sheriff's

11    Office.

12         Do you know which interview I'm referring to?

13    A    Yes, sir.

14    Q    Okay.  You were working that day; is that correct?

08:09:17  15    A    Yes.

16    Q    All right.

17    A    Uh, I got called in.  It's the homicide.

18    Q    Okay.

19    A    No, actually -- yeah, it's not my normal day.  I was

08:09:27  20    getting caught up on other stuff.

21    Q    Okay.  So you were getting caught up on other work on your

22    day off.

23    A    Yes.

24    Q    And leading up to that day, you're aware there was a

08:09:38  25    homicide in Medicine Valley two days prior.

1    A    Yes.

2    Q    Were you involved in that investigation over the course of

3    the weekend, let's say?

4    A    Yes.

08:09:47  5    Q    Come Monday, June 10th, were you still involved with that

6    investigation?

7    A    Um, I became involved again.

8    Q    Okay.

9    A    One of the witnesses came in to our office.

08:09:58  10    Q    Okay.  And -- and that's what we want to talk about today.

11    A    Um-hmm.

12    Q    Do you recall -- well, was that EZ?  We're going to use the

13    initials of the witness today.

14    A    Uh, okay.

08:10:14  15    Q    Were her --

16    A    Yeah.

17    Q    -- initials EZ?

18    A    Yes.

19    Q    Okay.  And do you remember why she initially came into the

08:10:21  20    office that day?

21    A    Um, not exactly.  Uh, I think just to give a statement for

22    us -- to us.

23    Q    Do you remember what that statement was regarding?

24    A    It was in reference to a homicide that happened on

08:10:36  25    Saturday.

1    Q    All right.  Do you know if that was related to a particular

2    investigation, multiple investigations?  What was the -- what --

3    A    Yeah, the --

4    Q    -- what particular investigation was it --

08:10:45    5    A    Out in White Swan, she was a victim.  She had been shot as

6    well.

7    Q    Okay.  So you were present in the interview room with

8    Detective Williams; is that right?

9    A    Yes, sir.

08:10:59    10    Q    And at some point during that interview a decision was made

11    to conduct a lineup, correct?

12    A    Yes.

13    Q    Whose idea was it to conduct the lineup?

14    A    Um, I'm not sure.  It wasn't my investigation.  It was

08:11:17    15    either our sergeant, Sergeant Towell, or else Detective Cypher

16    that was working the case.

17    Q    So were you --

18    A    And he wasn't there.

19    Q    Were either you or Detective Williams, aside from this

08:11:30    20    interview, involved with the murder investigation at this time?

21    A    No.

22    Q    So fair to say you were conducting the lineup at the behest

23    of an investigator who was still actively working on that

24    investigation?

08:11:42    25    A    Yes, sir.

1    Q    And prior to -- well, let's back up a little bit.

2         Did you -- did you ask EZ if she had done a lineup already?

3    A    Uh, I don't remember.

4    Q    Okay.  Do you remember if she said anything prior to you

08:12:03    5    deciding to conduct the lineup?

6    A    Um, I don't -- um, she just gave us a statement as to her

7    involvement in that incident.

8    Q    Okay.

9    A    And it's in my report, and it's all recorded.

08:12:18    10    Q    All right.  So this is -- this was a photographic lineup,

11    correct?

12    A    Yes, sir.

13    Q    So somebody had to compile the lineup.

14    A    Yes.  I did.

08:12:26    15    Q    You compiled the lineup.

16    A    Yes.

17    Q    Okay.  Where did you compile the lineup?

18    A    In my office and -- do you want me to go through it?

19    Q    Yes.

08:12:35    20    A    I went in my office, and I -- we have a software called

21    Spillman, and it takes suspects in the case, and it will make

22    a -- its own lineup.  It's a computer program, and it will --

23    you know, it -- it does -- actually, it does a really good job

24    at it, um, and then I just print it off, and that's how it

08:13:02    25    works.

1    Q    Okay.  So -- and I don't use lineup -- or Spillman

2    regularly, or at all.

3         Is it -- but my understanding is that it's possible to

4    build a lineup based either on physical description -- height,

08:13:18   5    weight, race --

6    A    Yeah.

7    Q    -- that kind of thing -- or it's possible just to build it

8    with a known suspect if their photo is already in the system

9    from prior law enforcement contact.

08:13:27   10        Is that correct?

11   A    Yeah, it takes, um, everybody in our system and it makes --

12   it kind of, you know -- if someone has a beard, everybody is

13   going to have a beard.  But we can also look at it, and if, say,

14   someone shows up in an orange jumpsuit, we can remove them,

08:13:45   15   because it's -- just to make it so it's not suggestive at all.

16   Q    In this particular instance, do you remember if you

17   constructed the lineup based off a physical description or off

18   of a known suspect?

19   A    A known suspect in the computer data.

08:14:02   20   Q    Okay.  And do you recall how many lineups you constructed

21   on that day?

22   A    Uh, four.

23   Q    Do you remember if -- do you remember the suspects that

24   were included in -- in those four lineups?

08:14:15   25   A    Yes.

1    Q    Could you tell us which suspects those were?

2    A    Um, Nathan Cloud, James Cloud.  Right?  Um, and then, uh, I

3    don't know.  I'd have to look at my report.  It's been so long,

4    the names --

08:14:33    5    Q    Could you repeat the two names that you just said.

6    A    Uh, yeah, Nathan and James Cloud.

7    Q    Okay.  So James Cloud.  And to the best of your

8    recollection, Nathan Cloud?

9    A    Yeah.

08:15:06    10    Q    I want to focus on one of those in particular, the James

11    Cloud lineup.

12        So that was -- that lineup in particular was generated

13    based off of a known picture of James Cloud; is that right?

14    A    Yes.

08:15:24    15    Q    And do you recall generating that lineup --

16    A    Uh --

17    Q    -- specifically?

18    A    -- vaguely.  Yeah, it's been awhile.

19    Q    Do you recall if when you generated the lineup and Spillman

08:15:36    20    provided the five filler photos, do you recall if you took any

21    action to clean up that lineup?

22    A    I don't remember that exactly, but, yeah.

23    Q    Okay.  Is that your normal process, to manipulate the

24    lineup after Spillman has produced it to make sure --

08:15:59    25    A    I just make sure there's nothing suggestive in there, you

1    know, like someone has long hair, and -- you know, just in case

2    the computer made a mistake, the program.

3    Q    So you typically will review a lineup before producing the

4    final product.

08:16:12    5    A    Yeah.

6    Q    Okay.  Once you had produced the lineup, did you return to

7    the interview room?

8    A    Yes, sir.

9        MR. BURSON:  If the Court will bear with me just one

08:16:52    10    moment, I'm going to pull out the Elmo.

11        THE COURT:  Sure.

12        THE WITNESS:  Is this water for me?

13        THE COURT:  Yes.

14        THE WITNESS:  Thank you.

08:16:58    15        THE COURT:  You can keep it.  Actually, you should take

16    it with you.

17        THE WITNESS:  Yeah, so someone else doesn't drink it.

18    BY MR. BURSON:   (Continuing)

19    Q    All right.  Detective, can you see this lineup?  I know

08:17:24    20    it's --

21    A    Yes, sir.

22    Q    There we go.

23        This has already been admitted as Government Exhibit 9.

24    I'm going to go ahead and flip through it.

08:17:34    25        Now that you've had a chance to see that -- and let me know

1    if you need more time to review it -- do you recall if that's

2    the lineup that included James Cloud that you produced that day?

3    A    Yes.  Yes, sir.

4    Q    When you entered the interview room with the four lineups,

08:18:12  5    including the lineup here, do you recall which lineup you

6    administered first?

7    A    I think it was this one (indicating).  I'd have to re --

8    look at my report.

9    Q    To the best of your recollection, was it this one?

08:18:31  10   A    Yeah.

11         MR. BURSON:  Could I have one second, Your Honor?  Thank

12   you.

13         THE WITNESS:  Bottom paragraph in my report.

14   BY MR. BURSON:  (Continuing)

08:19:04  15   Q    All right.  So you did author a report regarding this

16   interview and lineup; is that right?

17   A    Yes, sir.  Yes.

18   Q    All right.  If you had an opportunity to review that

19   report, do you think that would refresh your memory?

08:19:18  20   A    Yes.

21         MR. BURSON:  May I approach the witness, Your Honor?

22         THE COURT:  You may.

23         THE WITNESS:  Thank you.

24   BY MR. BURSON:  (Continuing)

08:19:39  25   Q    Please go ahead and review that, and when you're finished,

1    just look up at me.

2    A     Okay.  (Reviewing document.)

3          Yeah, the first one was of James --

4          THE COURT:  Hold on.  Hold on --

08:19:51  5          THE WITNESS:  Sorry.

6          THE COURT:  -- hold on.

7          THE WITNESS:  Oh.

8          MR. BURSON:  Your Honor, would you like a copy of the

9    report?

08:20:00  10          THE COURT:  No.  Thank you.

11   BY MR. BURSON:  (Continuing)

12   Q     Have you finished reviewing the relevant portions --

13   A     You just want to know --

14   Q     Hold on.  Have you finished reviewing the relevant

08:20:16  15   portions?

16   A     Yeah.

17   Q     Okay.  I'll take that back now.  Finished?

18   A     Um-hmm.

19   Q     Thank you.

08:20:25  20          All right.  Detective, now that you've reviewed your

21   report, do you recall which lineup was administered first?

22   A     Uh, the one of James Cloud.

23   Q     Okay.  Now -- and we're still on just James Cloud's

24   lineup -- do you recall if you -- after entering the interview

08:20:45  25   room, do you recall if you reviewed the -- the photo montage

1    before handing it either to Detective Williams or to EZ?

2    A    Um, yes.

3    Q    Okay.  Could you describe that review of the photo montage

4    for us?

08:21:03  5    A    Um, well, when it -- when it prints off, it -- um, seven

6    pages come out and the seventh page is like a name page.  It's

7    like a cheat sheet, and it gets in there, and I wanted to verify

8    that wasn't mixed up with the photos.

9         Does that make sense?

08:21:22  10   Q    Yes.

11   A    So there's a sheet with the names of everybody, and I don't

12   want that being presented to a witness.

13   Q    Okay.  Do you recall who it was that actually administered

14   the lineup?  And what I'm asking is, do you recall who it was

08:21:39  15   that actually gave the photographs to EZ?

16   A    I believe I handed them to Detective Williams, and he

17   handed them to her.

18   Q    Okay.  Once EZ began looking at the lineup, is it -- am I

19   correct in saying she had all six photographs at once?

08:21:59  20   A    Yes, sir.

21   Q    Okay.  And was she just kind of free to flip through those?

22   A    Yes, sir.

23   Q    Do you recall at any point if she made any identification?

24   A    Yes.

08:22:09  25   Q    Okay.  Do you recall which photograph that was?

 1   A    That was James Cloud.

 2   Q    Was it this photograph here (indicating)?

 3   A    Yes.

 4   Q    And for the record, that's Photograph No. 2 in Exhibit 9.

08:22:40  5        Do you recall what she initially said when she saw that

 6   photograph?

 7   A    I -- I want to say she said it's the guy wearing red, but

 8   I'm not 100 percent, because there was another photo lineup she

 9   picked someone out.  She said something.  I don't -- I don't

08:22:59 10   recall.  I'd have to watch the video.

11   Q    Okay.  And that was the second photograph.

12        Did she continue going through the lineup after that?

13   A    Yeah.

14   Q    Did she look at all six photos, to the best of your memory?

08:23:16 15   A    I believe so.

16   Q    Okay.  Did she ever come back to this photo?

17   A    Yeah.

18   Q    Did she make any additional statements when she came back

19   to this photo?

08:23:25 20   A    Um, I don't know.  I'd have to watch the video.

21   Q    So I'd like to direct your attention back to this same

22   exhibit and the same photo.  There is some handwriting at the

23   bottom of the photo that says, "Guy who shot Dennis."

24   A    Yes.

08:23:52 25   Q    Do you see that?

1    A    Yes.

2    Q    Who made that indication there?

3    A    Uh, the witness.

4    Q    EZ?

08:24:01  5    A    Yeah.  I believe that's her signature underneath it.

6    Q    Do you -- now that you're seeing that marking on the photo,

7    do you recall her -- actually seeing her sign that?

8    A    Yes.  Yes.

9    Q    Okay.  And do you recall what was being said by the parties

08:24:22  10   at that time?

11   A    You know, I -- I -- I thought she said, uh -- well, she

12   said, "This is the guy who shot Dennis," and she -- and, uh,

13   something about a red shirt or ...

14   Q    Okay.  And you indicated that she wrote "guy who shot

08:24:39  15   Dennis" on that photograph.

16        Did someone actually say those words, to the best of your

17   recollection, prior to --

18   A    We'd have to -- we'd have to watch the video again.

19   Q    Okay.  Do you recall if you said anything to her as --

08:24:56  20   either as or just prior to her making that indication on the

21   bottom of the photograph?

22   A    I don't remember.

23   Q    Do you recall any additional lineups in which she made an

24   indication that day?

08:25:28  25   A    Um, she identified another, um, male out of the lineup.

1    Q    Do you recall which -- which suspect that was?

2    A    Um, M -- I think it's -- he's MJ or --

3    Q    Those are his initials, MJ?

4    A    Yeah.  Yeah.

08:26:01    5         MR. BURSON:  Your Honor, I have no further questions.

6              THE COURT:  Okay.  Mr. McEntire?

7              MR. McENTIRE:  No questions, Your Honor.

8              THE COURT:  Okay.  Any questions, Mr. Smith?

9              MR. SMITH:  No.  Thank you, Your Honor.

08:26:20   10         THE COURT:  All right.  May this witness be excused?

11             MR. McENTIRE:  Yes, Your Honor.

12             THE WITNESS:  Thank you.

13             MR. BURSON:  Yes, Your Honor.

14             THE COURT:  Thank you very much.

08:26:28   15         THE WITNESS:  Thank you.

16             THE COURT:  Does the Government have any additional

17   questions?

18             MR. BURSON:  No, Your Honor.

19             THE COURT:  All right.  Thank you.

08:26:55   20         THE COURTROOM DEPUTY:  You can leave it -- you can leave

21   it on.

22             MR. BURSON:  Leave it?

23             THE COURTROOM DEPUTY:  Yeah.

24             THE COURT:  Just for the Court's clarification, will the

08:27:06   25   parties be needing the video?

1          MR. McENTIRE:  I apologize, Your Honor.  I missed that

2     question.

3          THE COURT:  Will the parties be needing that video?

4     Curt loves being here, he enjoys all of you, I'm sure he wants

08:27:21  5     to be in this courtroom; however, he does have other things.  So

6     if you -- if you intend to have that video, I can have him stay

7     here.  If not, he can go.

8          MR. McENTIRE:  Your Honor, for the next witness, Chris

9     Reyes, we do not need the video.  For the direct testimony of

08:27:43 10    Dr. Cara Laney, we will be playing clips from the video.

11         THE COURT:  Okay.

12         MR. McENTIRE:  I think we have the clips isolated and

13    will run it through external speaker, to the best of our

14    abilities, and so I -- at this time, I don't know if we need --

08:27:58 15    perhaps Curt reasonably available, but --

16         THE COURT:  Again, he enjoys being here, so he can -- he

17    can enjoy the next witness.

18         MR. McENTIRE:  Thank you, Your Honor.

19    /

20    /

21    /

22    /

23    /

24    /

25    /

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    271
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Reyes/D/McEntire*

1    THE COURT:  All right.  So -- and that next witness is.

2    MR. McENTIRE:  Chris Reyes, Your Honor.

3    THE COURT:  All right.

4    (Witness approached.)

08:28:16  5

6                    CHRIS REYES,

7    called as a witness on behalf of the Defendant James Cloud,

8    having first sworn or affirmed, testified under oath as follows:

9    THE WITNESS:  Yes.

08:28:40  10    THE COURTROOM DEPUTY:  Will you state your -- go ahead

11    and have a seat.

12        Will you state your first name for the record, spelling

13    your first and last name?  There's a water for you; make sure

14    you take it with you when you go, and you can take your mask off

08:28:54  15    when you testify.

16    THE WITNESS:  It's Chris, C-H-R-I-S; last name Reyes,

17    R-E-Y-E-S.

18    THE COURT:  Go ahead.

19    MR. McENTIRE:  Thank you, Your Honor.

08:29:01  20

21                    DIRECT EXAMINATION

22    BY MR. McENTIRE:

23    Q    Good morning, Mr. Reyes.

24    A    Good morning.

08:29:04  25    Q    Would you kindly tell the Court where you work.

1   A   I work with the Federal Defenders here in the Yakima branch

2   office.

3   Q   And how long have you worked there?

4   A   Just a little over 16 years.

08:29:13   5   Q   And what is your position at Federal Defenders?

6   A   I'm an investigator.

7   Q   And as an investigator, what do your responsibilities

8   include?

9   A   Uh, reviewing discovery, uh, meeting with clients,

08:29:25   10   reviewing discovery with clients, interviewing witnesses,

11   requesting records; uh, things of that nature.

12   Q   And you carry a caseload?

13   A   Yes.

14   Q   And are you one of the investigators on James Cloud's case?

08:29:41   15   A   Yes.

16   Q   In your responsibilities assigned to James Cloud's case,

17   have you gone out and interviewed witnesses?

18   A   Yes.

19   Q   And is one of the witnesses you interviewed ████████

08:29:56   20   ███████ -- LL?  Apologies.

21   A   Yes.

22   Q   When did you interview LL?

23   A   I believe it was August 7th of 2020; last month.

24   Q   Where was the interview?

08:30:08   25   A   It was at his residence, which is just outside of Wapato.

1    Q    Did you go with anyone?

2    A    Yes.

3    Q    Who?

4    A    Cole Rojan.

08:30:18    5    Q    And who is Cole Rojan?

6    A    Cole is another investigator in our Yakima office.

7    Q    When you and Mr. Rojan got to LL's house, what happened?

8    A    Uh, a lady came out the back and asked if she could help

9    us.  Um, I told her that we were looking for LL, and then she

08:30:42    10   asked, uh, who we were, and so we identified ourselves to her,

11   and then she went in and, uh, got Mr. LL.

12   Q    During your interview with LL, did you ask him who he

13   believes the red-shirted male with the gun was from this case?

14   A    Yes.

08:31:09    15   Q    Who?

16   A    James Cloud.

17   Q    Why does he believe that?

18        MR. BURSON:  Objection.  Can we -- that calls for

19   speculation.  I think that -- it would be more appropriate to

08:31:24    20   ask what did he say.

21        THE COURT:  I'm going to sustain that.  Just --

22   BY MR. McENTIRE:  (Continuing)

23   Q    Did you follow up as to why he made that identification?

24   A    I did.

08:31:31    25   Q    And what did he say?

1    A    He said after the incident he had spoke to two or three

2    friends of his, and they talked about -- or they told him that

3    the Clouds were involved with the incident in White Swan.

4    Q    Did they provide any additional specifics about the Clouds

08:31:49  5    and their involvement directly related to LL?

6    A    Well, they -- they told ████ -- or LL that the Clouds

7    were responsible for the shootings.

8    Q    Did you ask LL if he could remember the names of the

9    individuals that he spoke to?

08:32:08  10    A    I did.

11    Q    And what did he say?

12    A    I asked him several times, and he could not recall the

13    names of the individuals that he spoke to.

14    Q    But he spoke to those individuals shortly after the

08:32:19  15    shooting?

16    A    Yes.  And I asked him when those conversations occurred,

17    and he said that they were days after the incident.

18    Q    Did you ask him if there are any other reasons why he

19    believes the Clouds were responsible?

08:32:32  20    A    I did.

21    Q    And what did he say?

22    A    Uh, he spoke with a reporter from the *Yakima Herald*.

23    Q    And when did that conversation take place?

24    A    Well, he didn't recall exactly when that conversation took

08:32:49  25    place.

1    Q    Do you recall when that conversation took place?

2    A    Yes.

3    Q    And is that based upon your review of the discovery?

4    A    Yes.

08:32:55    5    Q    And when did that conversation take place?

6    A    Uh, June 14th.

7    Q    Roughly -- less than a week after this.

8    A    Yes.

9    Q    And what did the reporter tell him?

08:33:09    10    A    Uh, the reporter gave him background information on the

11    Clouds and their arrest for the murders.

12    Q    Did you attempt to do some follow-up along this line of

13    questioning?

14    A    I did.

08:33:24    15    Q    What other details could you pull out from LL?

16    A    That was about it, regarding the background information.

17    Q    Was he able to remember any specifics?

18    A    Not really, other than background information on the Clouds

19    and their arrest for the murders.

08:33:41    20    Q    Did you ask LL who he believes the blue-shirted male with a

21    gun was?

22    A    I did.

23    Q    And what did he say?

24    A    Donovan.  Donovan Cloud.

08:33:53    25    Q    Did you ask LL who he believes shot him?

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                            276
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Reyes/D/McEntire*

1   A    I did.

2   Q    And what did he say?

3   A    Donovan Cloud.

4   Q    Did you ask him whether or not he believes James -- he

08:34:07  5   selected James Cloud during the lineup?

6   A    Yes.

7   Q    What did he say?

8   A    He believes he selected James Cloud in the lineup.

9   Q    Did you ask him whether or not he's seen James Cloud

08:34:19  10   before?

11   A    I did.

12   Q    And what did he say?

13   A    "Yes."

14   Q    That they've met before.

08:34:23  15   A    Yes.

16   Q    When?

17   A    Uh, he said it was about a year to a year and a half before

18   this incident.

19   Q    What were the circumstances?

08:34:32  20   A    Uh, James came over to his house with James' sister Tara,

21   to LL's house.

22   Q    So fair to say that LL knows James Cloud?

23   A    Yes.

24   Q    Enough so where he could recall meeting him at his home?

08:34:49  25        MR. BURSON:  Objection.

1              Withdraw that objection.

2              THE COURT:  Go ahead.

3       A    Yes.

4       BY MR. McENTIRE:   (Continuing)

08:35:00    5       Q    Did you ask LL about his health?

6       A    I did.

7       Q    What did he tell you?

8       A    Uh, he said he had suffered from lung cancer and had

9       actually had a lung removed, went through chemo.

08:35:12    10      Q    When?

11      A    Um, he indicated that it was right before the incident in

12      White Swan.

13      Q    Did he indicate that he was taking chemo during the --

14      right before this event or the shooting in Medicine Valley?

08:35:25    15      A    Yes.

16      Q    Did you ask him how the chemo impacts his memory?

17      A    I did.

18      Q    What did he say?

19      A    He said he suffers from short-term memory loss, and he

08:35:35    20      forgets things -- forgets things easily and gets confused.

21              MR. McENTIRE:  No further questions, Your Honor.

22              THE COURT:  Any additional questions -- any questions?

23              MR. SMITH:  Yes.  Yes, Your Honor.

24              THE COURT:  All right.

08:36:00    25              MR. SMITH:  Your Honor, as a concession to my poor

1    hearing, I'm going to take a seat right here, if it's all right.

2         THE COURT:  That's fine.

3         MR. SMITH:  Thank you.

4

08:36:10  5                    CROSS-EXAMINATION

6    BY MR. SMITH:

7    Q    Mr. Reyes, you were -- now, you said that you -- you

8    interviewed LL on August 7th, correct?

9    A    Correct.

08:36:25  10   Q    And when you interviewed him, you were aware of the

11   January 27th, 2020, interview that was conducted by Agent Terami

12   and Agent Ribail, correct?

13   A    Correct.

14   Q    And would you agree with me that that was, at least in some

08:36:38  15  part, the impetus for your contact with LL?

16   A    Yeah.

17   Q    Well, was it -- is it fair to say that, in fact, during

18   that interview, you had received a report that had been authored

19   by, as we know, from Agent Ribail and Agent Terami, correct?

08:36:56  20  A    Correct.

21   Q    And in it -- and you know that in that report there was no

22   mention of Donovan Cloud, correct?

23   A    Correct.

24   Q    And, in fact, the -- the agent, pursuant to his report, had

08:37:11  25  identified only a man in blue or a man wearing blue, correct?

1          MR. BURSON:  Objection; leading, unless we're -- unless

2     it's a cross-examination.

3          THE COURT:  It is.

4          MR. BURSON:  Understood.

08:37:22  5          THE COURT:  Go ahead.

6     BY MR. SMITH:  (Continuing)

7     Q    You can answer.

8     A    Correct.

9     Q    And -- but when the name of James Cloud was mentioned in

08:37:33  10    that January 27th, 2000 [sic] interview, according to the agent,

11    when -- when LL was asked how he knew it was James Cloud, he

12    said from hearing it on the news and talking to other people.

13         Is that a fair statement?

14    A    Yes.

08:37:53  15    Q    Okay.  All right.  Now -- so based upon that January 27th

16    interview, then, you were directed to contact LL; is that right?

17    A    Correct.

18    Q    And you were accompanied by another investigator, Cole

19    Rojan, correct?

08:38:17  20    A    Correct.

21    Q    And were you also accompanied by any attorney?

22    A    No.

23    Q    So it was -- it was simply you and your fellow investigator

24    who went and spoke with LL.

08:38:26  25    A    Correct.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                     280
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Reyes/X/Smith*

1    Q    And if I understand it, it was -- did you speak to him

2    outside?  It was outside his home?

3    A    Yes.

4    Q    Was he -- did -- did you take a seat or were you standing,

08:38:38  5    you know, in close -- I mean, still this was in the COVID

6    environment, so --

7    A    Yes.

8    Q    -- you gave him a mask?

9    A    Yes.

08:38:45  10   Q    And you interviewed him right there in the yard?

11   A    Uh, he was in the yard.

12   Q    Okay.

13   A    We were on the outside of the fence.  There's a fence that

14   divides the yard from the kind of parking area.

08:38:57  15   Q    Okay.  And during that interview, you recorded it by taking

16   notes or -- or you recorded it in writing.  You didn't have an

17   audio or video recording.

18   A    No.

19   Q    Okay.  All right.  And when you questioned him, was it --

08:39:14  20   was it one of the investigators that was questioning him?

21   A    I primarily asked the questions.

22   Q    Okay.  All right.  And when you were asking him the

23   questions, you didn't show him any -- you didn't -- you didn't

24   show him any photos, did you?

08:39:29  25   A    No.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    Q    You didn't show him -- what I'm referring to is it isn't

2    like you took the montage where he had previously identified two

3    individuals, you didn't show him those.

4    A    No.

08:39:43    5    Q    Okay.  And -- and when -- when you interviewed LL, you were

6    aware that he had previously identified Morris Jackson as the

7    man wearing blue with the shotgun, correct?

8    A    Correct.

9    Q    And you were aware that -- that Natasha Jackson, another

08:40:15    10    witness of -- of some of these events, or purported witness,

11    that she had identified Morris Jackson, her uncle, as the man

12    with a shotgun.

13    A    I -- it's been a minute since I've reviewed Natasha's

14    statement, so ...

08:40:37    15    Q    You don't recall?

16    A    I don't recall that.

17    Q    All right.  You were aware that Morris Jackson himself in

18    an interview with, I believe it was Agent Ribail had identified

19    himself as wearing a blue shirt, correct?

08:40:54    20    A    I believe so.

21    Q    The -- do you -- do you remember whether -- when Morris

22    Jackson was arrested, that he -- some of the clothing that he

23    was wearing was a baseball cap?

24    A    Yes, I believe so.

08:41:17    25    Q    Okay.  And that's from your review of the discovery,

1    correct --

2    A    Yes.

3    Q    -- in this case?

4         And that he was wearing shorts, correct?

08:41:24  5    A    Correct.

6    Q    All right.  Okay.  So you had said that -- that when --

7    that when you identified or when you spoke with LL, that you

8    knew he hadn't identified Donovan Cloud in any capacity

9    previously, correct?

08:41:41  10    A    Correct.

11    Q    And it wasn't -- it wasn't your -- you didn't go to speak

12    with LL to attempt to have him identify Donovan Cloud.

13    A    No.

14    Q    How -- how would you characterize his -- his -- his

08:42:10  15    mentioning of the name Donovan Cloud with regard to your

16    questioning?

17              MR. BURSON:  Objection; vague.

18              THE COURT:  Sustained.

19              MR. SMITH:  I didn't hear the objection, Your Honor.

08:42:24  20              MR. BURSON:  "Vague."

21              THE COURT:  "Vague."

22              MR. SMITH:  "Vague."  All right.

23    BY MR. SMITH:  (Continuing)

24    Q    Who was the first person to mention the name Donovan Cloud?

08:42:32  25    A    In the interview with LL, you're talking to -- about?

1    Q    Yes.

2    A    Uh, LL.

3    Q    Okay.  And -- and that was -- as I understand it, that was

4    in response to a question that you made to him with regard to

08:42:47    5    the man wearing blue.

6         Correct?

7    A    I'm trying to remember the chronological order of how that

8    happened.  Um, the first line of questioning was about what he

9    remembered, um, and it was at that point that, um, he mentioned

08:43:10    10    the guy in blue had the shotgun, the guy in red had the rifle.

11    And then upon further questioning along those lines, he

12    mentioned Donovan Cloud as the guy with the shotgun and in blue.

13    Q    Okay.  My -- my -- let me see if I can make this clear.  My

14    question to you is:  Did you ask him who the person in blue with

08:43:44    15    the shotgun was?

16    A    Yes.

17    Q    And in response to that, he said Donovan Cloud.

18    A    Yes.

19    Q    He didn't say the name James Donovan?

08:43:58    20    A    No.

21    Q    Okay.  So when he said the name Donovan Cloud, did you --

22    did you follow up on that -- on that answer?

23    A    I asked him if he knew who Morris Jackson was.

24    Q    If he knew who Morris Jackson was?

08:44:22    25    A    Yes.

1  Q    Yes.  And his response to that was?

2  A    He was -- I don't remember if he said "no," but he kind of

3  had a dumbfounded look on his face.

4  Q    Okay.  So from your observation, it didn't appear that he

08:44:36  5  knew who Morris Jackson was.

6  A    Yes, that's correct.

7  Q    Did you -- did you ask him how he knew that -- or how he

8  believed that Donovan Cloud was the man wearing blue?

9  A    Yes.  During the interview, I'd asked him if he had talked

08:44:55  10  to anybody, and that's where the prior testimony came out about

11  him talking to two or three friends.

12  Q    Okay.  But was it -- was -- you're saying that in general,

13  but I'm asking you specifically, once he mentioned the name of

14  Donovan Cloud, did you ask him specifically why he believed

08:45:12  15  Donovan Cloud was the man wearing blue?

16  A    I don't recall if I specifically asked any question about

17  that.

18  Q    Did you ask him specifically why or how it is that he came

19  to this belief, that Donovan Cloud was the man wearing blue?

08:45:40  20  A    I don't believe there was any specific just about Donovan.

21  It was more in general about the Clouds.

22  Q    Is it a fair statement, then, that once he had mentioned

23  the name Donovan Cloud, you didn't ask him any specific

24  questions about how or why with regard to Donovan, you simply

08:45:59  25  used the term, "the Clouds"?

1   A    I believe so.

2   Q    And he said -- and according to your testimony, he said

3   that he had heard about the Clouds during his interview on

4   June 14?

08:46:16   5   A    At that time, yes.  And then also I'd mentioned he had

6   spoke to two or three friends.

7   Q    Afterwards?

8   A    After the incident, yes.

9   Q    All right.  And -- and as I recall, when you asked him when

08:46:29  10   that occurred, he couldn't tell you, when the conversation with

11   the friends occurred?

12   A    It was generally two to three days after the incident.

13   Q    And he couldn't tell you who they were?

14   A    No.

08:46:42  15   Q    Did he say that -- that -- when you interviewed him on

16   August 7th, did he say that -- that he had been interviewed by

17   law enforcement at any time between January 27th and August 7th?

18   A    No.

19   Q    Did you ask him?

08:47:07  20   A    I don't believe so.

21   Q    Am I -- am I correct that you -- that you did ask him if he

22   remembered being shown a photo array shortly after the incident?

23   A    I did.

24   Q    And when you asked him about being shown a photo array, did

08:47:43  25   you ask him if he recalled identifying anyone?

1    A    I did.

2    Q    And did you ask him if he recalled identifying the -- well,

3    did you ask him what he recalled about identifying someone in a

4    photo montage?

08:48:05    5    A    I asked him if he recalled identifying the man in blue.

6    Q    You didn't use the name?

7    A    No.

8    Q    And he responded to that?

9    A    He responded to that with he identified the guy in red as

08:48:20    10    James Cloud.

11    Q    All right.  So he didn't specifically respond to your

12    question whether -- whether he recalled identifying a man in

13    blue.

14    A    No.

08:48:36    15    Q    So I'm assuming that that was the end of the conversation

16    with regard to his recollection of -- of his identification of a

17    man in blue on the photo array June 9th.

18    A    I believe after that, when he made that comment, I believe

19    that's when I asked him if -- if he knew who Morris Jackson was.

08:49:02    20    Q    And you said that he was --

21    A    Right.

22    Q    -- bewildered.

23    A    Yeah.

24    Q    Thank you, sir.  I have no other questions.

08:49:16    25    A    Thank you.

1    THE COURT:  Counsel?

2    MR. BURSON:  Thank you, Your Honor.  One second, if I

3  may.

4                    CROSS-EXAMINATION

5  BY MR. BURSON:

6  Q    First, good morning, Mr. Reyes.

7  A    Good morning.

8  Q    You testified that you took some notes from the interview

9  with LL.

10  A    Yeah.  Well, Mr. Rojan took down the notes.  I was asking

11  the questions.

12  Q    Okay.  And was a report drafted after that or was it just

13  the notes?

14  A    Just the notes.  No report.

15  Q    Do you have a copy of the notes that were taken during that

16  interview?

17  A    I do.

18  Q    Okay.  Can we have a copy of those?

19  A    I guess you'd have to talk to counsel about that.

20    THE COURT:  Counsel, why has that not been turned over?

21    MR. McENTIRE:  Your Honor, my -- Your Honor, my

22  understanding with respect to rough notes is that neither side

23  has disclosed rough notes, uh, just formal reports.  And so I

24  suppose if there's a reciprocal agreement on turning over all

25  rough notes, then happy to do so.

1    THE COURT:  Well, here's the thing:  I don't care

2    whether there's an agreement of turning over rough notes.

3    Typically, that's a motion that's filed early on.  I don't know

4    if there has been that motion.  I would have ruled on that

08:50:58    5    already.  I expect an equal exchange of discovery going both

6    ways.

7         So, Counsel, you made that request.  The Court is

8    granting your request.  The defense is to provide rough notes

9    over.  Likewise, the Government is to provide rough notes of

08:51:19   10    their investigators to the other side.  That's the Court's

11    ruling on that point.

12         So do we need a break so that you may review those rough

13    notes?

14         MR. BURSON:  Yes, Your Honor.

08:51:30   15    THE COURT:  Okay.  So we will take a recess at this time

16    so that you may prepare your cross-examination appropriately.

17    We'll take a 15-minute recess.

18         THE COURTROOM DEPUTY:  All rise.

19         Court is now in recess.

08:51:54   20    (Recess taken: 8:51 a.m. to 9:07 a.m.)

21         THE COURTROOM DEPUTY:  All rise.

22    (Call to Order of the Court.)

23         THE COURT:  Please be seated.

24         Mr. Burson, are we ready to proceed?

09:07:36   25    MR. BURSON:  I am, Your Honor.  Thank you.

1          THE COURT:  Okay.  Go ahead.

2    BY MR. BURSON:   (Continuing)

3    Q     So, Mr. Reyes, you've been with the Federal Defenders as an

4    investigator for 16 years, correct?

09:07:47  5    A     Correct.

6    Q     And prior to that, were you -- what was your experience

7    prior to that?

8    A     None.

9    Q     Nothing relevant, at least.

09:07:56  10    A     Yes.

11    Q     In the 16 years that you have been an investigator with the

12    Federal Defender's Office, you've participated, I assume, in a

13    number of investigations in Indian country, correct?

14    A     Yes.

09:08:11  15    Q     Okay.  Including the Yakama Reservation?

16    A     Correct.

17    Q     And then I assume this isn't the first time you've heard

18    the name Cloud.

19    A     Correct.

09:08:23  20    Q     In fact, George Cloud was convicted of murder recently in

21    this courthouse, correct?

22    A     Correct.

23    Q     Okay.  And you're probably aware Keaston Cloud (phonetic

24    spelling) went through the federal court --

09:08:38  25          MR. SMITH:  Your Honor, I'm going to object to this on

1    relevance.

2              MR. BURSON:  It will become clear, Your Honor.

3              THE COURT:  Okay.  I'll allow it.  Go ahead.

4    BY MR. BURSON:  (Continuing)

09:08:47  5    Q    So are you aware that a Nicole Cloud has been through the

6    federal court system here?

7    A    I believe so, yeah.

8    Q    Okay.  What about a Nathan Cloud?  Have you heard that name

9    before?  Is it someone who went through the federal court

09:08:59  10   system?

11   A    Yes.

12   Q    Okay.  And -- so that's two in addition to George Cloud.

13        Are you aware of an area off of 97 colloquially referred to

14   as Cloudville?

09:09:14  15   A    I'm not sure that is off of 97, but I'm familiar with the

16   area known as Cloudville.

17   Q    As Cloudville?

18        Due to the prevalence of Clouds in the Yakama Reservation.

19   A    I guess.

09:09:30  20   Q    Okay.  You testified earlier that LL had told you that

21   friends had told him that the Clouds were responsible for the

22   murders in Medicine Valley, but not that -- they hadn't

23   identified James or Donovan Cloud.

24        Is that correct?

09:10:03  25   A    Correct.

1  Q    They had only -- he only told you that people had told him

2  the Clouds had been responsible for the homicides and the

3  shootings.

4        Is that right?

09:10:15  5  A    Yes, but I --

6  Q    As best as you recall.

7  A    As best I recall at that point.

8  Q    So could have been referring to any number of Clouds; isn't

9  that right?

09:10:28  10  A    Well, it became clear in our interview that he believed it

11  was Donovan and James.

12  Q    But I'm only talking about what other people had, quote,

13  told him.

14        And as far as you know, other people had only told him,

09:10:41  15  "the Clouds"; is that right?

16  A    That's how it was worded initially.

17  Q    And yet, he identified James and Donovan Cloud as two of

18  the individuals that were at Medicine Valley that day.

19  A    Correct, later on in the interview.

09:11:04  20  Q    You testified earlier that LL had indicated that he -- did

21  he -- that he knew James Cloud beforehand; is that right?

22  A    Yes.

23  Q    Okay.  There's -- there's a comment in your notes, and if

24  you need to --

09:11:23  25  A    I recall the comment.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                              292
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Reyes/X/Burson*

1    Q    Okay.  That says, "Didn't know the Clouds before this day."

2         Is that correct?  Is that reflected in your notes?

3    A    Initially in the interview we'd asked him if --

4    Q    That was a "yes" or "no" question.

09:11:34  5         Is that reflected in your notes?

6    A    Yes.

7    Q    Okay.  And there's another comment in your notes -- this is

8    in your notes if you recall -- "Didn't know anyone there of the

9    three guys he saw."

09:11:50  10        That's in your notes as well, correct?

11   A    Correct.

12   Q    Okay.  You testified earlier that he recalls being able to

13   pick out James Cloud in a lineup; is that right?

14   A    Correct.

09:12:10  15   Q    Your notes include the line "thought he picked out James

16   Cloud."

17        Is that correct?  Do you recall --

18   A    That might be how it's worded in the -- in the notes, yeah.

19   Q    Okay.  He told you also that he was confident that James

09:12:44  20   shot Dennis; is that right?

21   A    Correct.

22   Q    Okay.  He also commented that he saw James a couple feet

23   from the truck, correct?

24   A    Correct.

09:12:54  25   Q    And that he saw him well, correct?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    A    Correct.

2    Q    So do you understand the difference between recognizing

3    someone by their facial features and knowing their name?

4    A    I guess.

09:13:31   5    Q    Okay.  For example, do you -- do you know my name?

6    A    Yes.

7    Q    What's my name?

8    A    Rick Burson.

9    Q    Okay.  All right.  Let's say you didn't know my name.

09:13:44   10   Would you recognize me, if you saw me in this courthouse --

11   because we've been in the same courtroom before, right?

12   A    Probably, yeah.

13   Q    Okay.  So you recognize my face, and you know my name.  But

14   those are two different facts, correct?

09:13:57   15   A    Correct.

16   Q    So it's possible to recognize a face, correct?  And then

17   find out the name later; is that right?

18   A    Sure, that's possible.

19   Q    And I just want to confirm something from direct, going

09:14:24   20   back to the interview with LL.

21        He identified James Cloud as the person in red, correct?

22   A    Correct.

23   Q    Not the person in blue.

24   A    Correct.

09:14:37   25   Q    Not the third male that he also indicated was there.

1   A    Correct.

2   Q    Okay.  And he identified Donovan Cloud as the person in

3   blue; is that right?

4   A    Correct.

09:14:52   5   Q    Not the person in red.

6   A    Correct.

7   Q    Not the third guy that was there.

8   A    Yes.

9   Q    And you've -- you've reviewed discovery.

09:15:06  10        And does that include the interview with EZ?

11   A    Yes.

12   Q    And you've reviewed the lineup that she -- that she marked

13   up, right, that was administered on her?

14   A    Yes.

09:15:24  15   Q    And I know we're here today to contest it, but that

16   indicates that she identified James Cloud as the person in red

17   as well, correct?

18   A    Correct.

19        MR. BURSON:  No further questions, Your Honor.

09:15:42  20        THE COURT:  Go ahead.

21        MR. McENTIRE:  Thank you, Your Honor.

22

23                   REDIRECT EXAMINATION

24   BY MR. McENTIRE:

09:15:46  25   Q    Mr. Reyes, on cross, the Government referenced many Clouds

1    that have been involved in the criminal justice system here in

2    federal court.  And you indicated that you are familiar with

3    those -- the other Clouds as either part of your investigations

4    or just general knowledge.

09:16:15   5    A    Uh, both.

6    Q    During the course of your interview with LL, when he

7    referenced the Clouds, did it become clear to you he was

8    referring to Donovan and James Cloud?

9    A    Yes, very clear.

09:16:41  10    Q    Why?

11        MR. BURSON:  Objection; calls for speculation.

12        THE COURT:  Sustained.

13    BY MR. McENTIRE:  (Continuing)

14    Q    Did you ask him follow-up -- did you ask him follow-up

09:16:58  15    questions about the Clouds?

16    A    Yes.

17    Q    What did you ask him?

18    A    Well, I guess, at what point?

19    Q    Did you ask him questions to clarify which Clouds he was

09:17:11  20    referring to?

21    A    Yes.

22    Q    And what did he say?

23    A    Well, that Donovan was the guy in blue and James was the

24    guy in red.

09:17:20  25    Q    So LL provided answers to clarify that the information he

1    received from two to three people regarding the Medicine Valley

2    killings were referring to James and Donovan Cloud.

3              MR. BURSON:  Objection; misstates testimony.

4              THE COURT:  Overruled.

09:17:36    5    A    Correct.

6    BY MR. McENTIRE:   (Continuing)

7    Q    And no other Clouds.

8    A    The only other Cloud that was mentioned was Tara Cloud.

9    Q    Mr. Reyes, on cross you were asked about the comment

09:18:01   10    "didn't know the Clouds" that was contained in your notes.

11    A    Yes.

12    Q    You started to respond, "initially in the interview," but

13    you were cut off.

14              Would you explain what you were trying to answer on cross?

09:18:26   15    A    Well, he indicated early on in the interview that he didn't

16    know the Clouds, and later on he clarified that he knew a Tara

17    Cloud through the casino, and James Cloud and Tara Cloud had

18    come to his house a year to a year and a half before, and that's

19    where he met James Cloud.

09:18:48   20    Q    So fair to say in working through your notes, you are

21    capturing statements chronologically, and as the interview

22    progressed, it became clear that, in fact, he had met James

23    Cloud before?

24    A    Yes.

09:19:10   25              MR. McENTIRE:  No further questions, Your Honor.

1      MR. SMITH:  No questions, Your Honor.

2      MR. BURSON:  No further questions, Your Honor.

3      THE COURT:  May this witness be excused?

4      MR. McENTIRE:  Yes, Your Honor.

09:19:18    5      THE COURT:  Mr. Smith?

6      MR. SMITH:  Yes.

7      MR. BURSON:  Yes, Your Honor.

8      THE COURT:  Very well.  Thank you.  You're excused.

9    /

10   /

11   /

12   /

13   /

14   /

15   /

16   /

17   /

18   /

19   /

20   /

21   /

22   /

23   /

24   /

25   //

1          THE COURT:  And your next witness?

2          MR. McENTIRE:  Dr. Cara Laney.

3      (Witness approached.)

4          THE COURTROOM DEPUTY:  Good morning.

09:20:06  5          THE WITNESS:  Good morning.

6          THE COURTROOM DEPUTY:  Raise your right hand please.

7

8                          CARA LANEY,

9    called as a witness on behalf of the Defendant James Cloud,

09:20:17  10  having first sworn or affirmed, testified under oath as follows:

11          THE WITNESS:  I do.

12          THE COURTROOM DEPUTY:  Go ahead and have a seat.  And if

13  you'll state your full name for the record, spelling your first

14  and last name.  Take your mask off if you wish; and water, just

09:20:31  15  take that with you when you go.

16          THE WITNESS:  Thank you.  My name is Cara Laney; C-A-R-A

17  L-A-N-E-Y.

18          THE COURT:  Good morning.

19          THE WITNESS:  Good morning.

09:20:41  20          THE COURT:  Go ahead, Counsel.

21          MR. McENTIRE:  Thank you, Your Honor.  And then,

22  Ms. Cruz, may I please have the controls?

23          THE COURT:  That water is for you, if you'd like, and

24  when you're done testifying, if you could please take it with

09:21:09  25  you.

1    THE WITNESS:  Take it with me?  I'll do my best to do

2    that.

3    THE COURT:  Thank you.

4    THE WITNESS:  Although, I have heard memory is not

09:21:17   5    entirely reliable, so if I mess up, I apologize.

6

7                       DIRECT EXAMINATION

8    BY MR. McENTIRE:

9    Q    Dr. Laney, good morning.

09:21:25  10    A    Good morning.

11    Q    Would you kindly tell the Court what you currently do.

12    A    I am an associate professor of psychology at the College of

13    Idaho in Caldwell.

14    Q    And what classes do you teach?

09:21:38  15    A    I teach classes in cognitive psychology, legal psychology,

16    research methods, um, and occasional intrapsychology and

17    professional pathways.

18    Q    Would you kindly move that microphone --

19    A    How about if I move a little bit --

09:21:52  20    Q    Thank you.

21    A    -- closer to it.

22         Is that better?

23    Q    Do you have a particular specialty within the field of

24    psychology?

09:21:59  25    A    Yes.  I study human memory and the ways it can go wrong,

1    especially.

2    Q    Is human memory relevant when understanding the science

3    behind eyewitness identifications?

4    A    Absolutely.  It's hugely relevant to the area of eyewitness

09:22:14  5    testimony and eyewitness identifications.

6    Q    In addition to teaching, you also do consulting on cases?

7    A    Occasionally, yes.

8    Q    And do those cases include cases involving eyewitness

9    identifications?

09:22:26  10    A    Yes.

11    Q    And as part of your teaching, have you done any research in

12    the area of eyewitness identification?

13    A    Yes, absolutely.

14    Q    On what?

09:22:37  15    A    On many, many different aspects of memory and eyewitnesses.

16    Um, research with my students, um, my own research for about

17    20-plus years has been largely in the area of memory as it

18    applies to legal situations.

19    Q    I'm sorry.  Did you say "legal situations"?

09:22:54  20    A    Yes.  The law, memory and the law.

21    Q    Got it.

22         Let's talk about the path to your profession.  So you

23    attended college here in the Pacific Northwest?

24    A    Yes, I did.

09:23:03  25    Q    And when did you graduate?

1    A    In 2000.

2    Q    And then you obtained a master's?

3    A    Yes.

4    Q    And when was that?

09:23:09  5    A    Uh, in 2004.

6    Q    And then a Ph.D. after that?

7    A    Yes, 2006.

8    Q    And what was your Ph.D. in?

9    A    Psychology and social behavior.

09:23:20  10   Q    Does that Ph.D., I guess, strengthen and inform your work

11   on human memory?

12   A    Yes, absolutely.  All of the research I did in my Ph.D.

13   program was in human memory.

14   Q    And it looks like you taught at a few schools over the

09:23:35  15   course of your professional career.

16   A    Yes.

17   Q    Have you published?

18   A    Yes, more than 30 publications, all having something to do

19   with memory; mostly memory and the law.

09:23:47  20   Q    I notice that in some of your publications they're

21   coauthored with a woman by the name of Elizabeth Loftus.

22        Who is that?

23   A    She is -- well, she wrote the book on eyewitness testimony,

24   which I have with me (indicating).  She's a very, very big name;

09:24:05  25   has been doing this research since the 1970s.  Um, I've been

1    working with her for almost 20 years publishing constantly.  She

2    was also my Ph.D. supervisor.

3    Q    So you've been working with Ms. Loftus -- I don't know if

4    it's Dr. Loftus --

09:24:19   5    A    Oh, it's definitely Dr. Loftus.

6    Q    Okay.  You've been working with Dr. Loftus for quite some

7    time.

8    A    Yes.

9    Q    Are you familiar with the task force that was put together

09:24:31  10    by the Third Circuit on eyewitness identifications?

11    A    Yes.

12    Q    Was Dr. Loftus part of that committee?

13    A    Yes.

14    Q    And she was involved in helping form the best practices and

09:24:41  15    opinions from the Third Circuit.

16    A    Yes.

17    Q    Are you working with Dr. Loftus right now?

18    A    Uh, yes.  We're actually -- I'm in the process of rewriting

19    this book that, again, was published in the 1970s, hasn't been

09:24:52  20    updated since then.  I'm doing a major rewrite of it.

21    Q    Dr. Laney, have you been qualified as an expert in the area

22    of human memory or eyewitness identification --

23    A    Yes.

24    Q    -- in courts?

09:25:04  25    A    Yes.

|   |   |   |
|---|---|---|
| 1 | Q | In state court? |
| 2 | A | Yes. |
| 3 | Q | How many times? |
| 4 | A | Four, I believe. |
| 09:25:13 5 | Q | How about in federal court? |
| 6 | A | Yes, twice. |
| 7 | Q | Same areas? |
| 8 | A | Across a few areas related to memory, um, including |
| 9 |   | eyewitness identifications but also interviewing, um, witnesses |
| 09:25:27 10 |   | and victims and related areas. |
| 11 | Q | Maybe a better way to ask this question is:  Have you |
| 12 |   | always been qualified as an expert? |
| 13 | A | Yes. |
| 14 | Q | What I'd like to pivot to is talking about some of the |
| 09:25:43 15 |   | information that you relied on in arriving at your opinions. |
| 16 |   | Did you review the entire discovery file? |
| 17 | A | Yes, I did, but I pulled out those documents that were |
| 18 |   | relevant to my area of expertise. |
| 19 | Q | But fair to say that I pushed over to you everything? |
| 09:25:57 20 | A | Yes.  Yes, I have access to a massive stack of documents. |
| 21 | Q | And that includes the Yakima County Sheriff's Office |
| 22 |   | policies? |
| 23 | A | Yes. |
| 24 | Q | As well as the FBI's policies? |
| 09:26:06 25 | A | Yes. |

1    Q    Did it also include DOJ's guidance from 1999?

2    A    Yes.

3    Q    As well as DOJ's guidance from 2017?

4    A    Yes.

09:26:19  5    Q    Did you also look at the parties' briefing in this case?

6    A    Yes.

7    Q    As well as the Third Circuit's report on eyewitness

8    identifications?

9    A    Yes.

09:26:27  10    Q    Anything else?

11    A    I reviewed the academic literature in eyewitnesses and

12    memory.

13    Q    On the particular areas that were becoming relevant, as you

14    were working this case?

09:26:41  15    A    Yes.

16    Q    Do you feel you have enough information based on everything

17    that you've reviewed to arrive at informed opinions in this

18    case?

19    A    Yes.

09:26:52  20    Q    So, Dr. Laney, before we unpack the three lineups that are

21    at issue in the motions here, I'd like to just talk or ask you

22    some questions generally about human memory.

23         Does memory work like a Polaroid picture?

24    A    No, it's not.  This is actually something I spent a lot of

09:27:09  25    time working with my students on.  Um, very often people have a

1    sort of common sense notion that memory does work rather like a

2    Polaroid picture or a video.  Sometimes when you're trying to

3    remember something from your past, it can kind of feel like

4    you're sort of mentally hitting a "rewind" button to a

09:27:26    5    particular point in time and hitting "play," and it feels like

6    you're playing through a memory.  But, no, that is very much not

7    how it actually work.

8    Q    How does it work?

9    A    Instead, memory is a reconstructive process, which means

09:27:37    10    that every time you remember a particular event, you're not

11    finding a particular location in your brain and unpacking that

12    little memory.  Instead, you're actually building up that memory

13    out of a bunch of different parts.

14    Q    Two points:  One, I guess, Dr. Laney, would you mind

09:28:02    15    speaking just a little bit more slowly for purposes of the court

16    reporter.

17    A    I will do my best.  Apologies.

18    Q    And then second, you describe building up a memory in the

19    human brain.

09:28:13    20         Is there a metaphor that you use to explain this?

21    A    Yes.

22    Q    And what is that?

23    A    So Elizabeth Loftus uses a memory of a Wikipedia page that

24    you can go in and -- or that you can go in and make changes to

09:28:23    25    your memory but so can other people.

1    I find that to be a little bit too static, so the metaphor

2    that I use is a big box of Legos.  So imagine that you're a

3    small child sitting on the living room floor with your big box

4    of Legos, and you take your hand and reach in and pull out a

09:28:44    5    pile of Legos, and you use them to build up a Lego wall.  It's a

6    lovely wall.  That's the memory in this metaphor you have

7    created it.

8    But your mom brain doesn't allow you to hold on to that

9    wall forever.  Instead, you have to take back apart the wall,

09:29:03    10    put the Legos back in the big Lego bucket.

11    You can, of course, go back anytime you want and build a

12    new wall, right?  You reach in, you pull out Legos, you build a

13    wall.  It looks more or less the same.  It feels very much the

14    same, like it's the same thing, but it's not.  It's -- every

09:29:22    15    time you do it, it's going to be built out of somewhat different

16    Legos.  There are different parts.  You're pulling information

17    from different places.

18    And then in the metaphor, those individual Legos are

19    hopefully some original bits of information from the original

09:29:37    20    event, but also your own personal biases, information that

21    you've learned after the event, your own perspective from before

22    the event.  Leading questions can bring in new information, um,

23    information from media sources can bring in new information.

24    There's all sorts of different things that you can use to build

09:30:00    25    up this Lego wall each time you do it.

1    Q    So when someone is remembering something, they think

2    they're rebuilding the same Lego wall.

3    A    Or they think that they're holding on to that wall, because

4    it feels like it's been the same wall all along, that they've

09:30:17    5    never had to take it apart and put it back together.  But every

6    time you remember something, you're putting it back together.

7    Q    Does it have the potential to create problems when it comes

8    to reconstructing memory?

9    A    Well, you're reconstructing a memory differently every

09:30:31   10    time.  So it's going to be changing over time, and there are

11    lots of different things that can make it change.

12    Q    So with this Lego metaphor in mind, I'd like to turn to the

13    first lineup that involved JV.

14         Was your ability to review this lineup's integrity impeded?

09:30:57   15    A    Yes.

16    Q    How?

17    A    It wasn't recorded.

18    Q    Is it important to record a lineup?

19    A    Yes, it is important, because a video or even audio can

09:31:06   20    provide a lot of additional information about what happened

21    during the lineup that someone's memory in a report a long time

22    later cannot provide.

23    Q    Is it one way that academics or fact finders help assess

24    whether or not a lineup is unduly suggestive?

09:31:24   25    A    Absolutely.

1    Q    What does "unduly suggestive" mean?

2    A    "Unduly suggestive" means that, um, there was --

3         MR. BURSON:  I'm going to object, actually, Your Honor.

4    That is a legal term of art from case law.  I don't know that

09:31:38    5    the doctor is qualified to opine on that.

6         MR. McENTIRE:  Your Honor, she not only has over nearly

7    two decades of research in this, but also specifically focuses

8    on memory and the law, and testified to teaching a number of

9    classes on how memory interacts with the law.

09:31:57    10        THE COURT:  Overruled.  She can answer.

11   A    So "unduly suggestive" means that, um, information, um, is

12   coming from places other than just the witness' memory in order

13   to produce the outcome of the lineup.  So there may be leading

14   questions, there may be suggestions, there may be glances; any

09:32:22    15   number of other outside factors that are not just the memory of

16   the eyewitness that are leading to that outcome.

17   BY MR. McENTIRE:  (Continuing)

18   Q    Are these outside factors or influences always intentional?

19   A    Definitely not.

09:32:42    20   Q    Meaning a well-intentioned officer can unknowingly shape a

21   lineup.

22   A    Absolutely.

23   Q    Have you seen this happen in research?

24   A    Yes, for decades.

09:32:52    25   Q    Have you seen it happen in the research you've done?

1    A    Yes.

2    Q    Dr. Laney, is there scientific consensus on this point?

3    A    Yes.

4    Q    How long has there been scientific consensus on this point?

09:33:06    5    A    Decades.

6    Q    How does it happen?

7    A    Because of how memory works.  Memory being reconstructive

8    means that it can adopt new information along the way.  Uh --

9    Q    Does this happen even when you have an experienced, let's

09:33:29    10    say, law enforcement officer administering a lineup?

11    A    Yes, absolutely.

12    Q    Are there studies showing that well-intentioned,

13    experienced law enforcement officers influence lineups?

14    A    Yes.

09:33:40    15    Q    Are there studies showing that well-intentioned,

16    experienced officers influence lineups unknowingly?

17    A    Yes.

18    Q    Dr. Laney, can something as small as a gesture influence an

19    ID?

09:33:57    20    A    Yes.

21    Q    How?

22    A    Humans are social creatures.  We are very, very good at

23    picking up or -- on cues from each other.  Um, we respond to all

24    sorts of different communication, um, and particularly in a --

09:34:14    25    when a witness is doing a lineup, they know they're in this very

1    important situation, it really matters, they really want to do

2    well, and that actually makes them somewhat more, um,

3    susceptible to any kind of information that they can get from

4    another person.

09:34:29  5    Q    So how does recording help address this concern?

6    A    It makes some, at least, of that information apparent, if

7    it's happening, and also apparent if it's not happening, right?

8    This works both ways.  So some sorts of glances, words, gestures

9    can be picked up in video, especially, and so we can know

09:34:51  10   whether they're happening or not.

11   Q    What does -- when we say recording a lineup, what does that

12   mean to you, recording?

13   A    Ideally, a video recording, um, that shows both the witness

14   and the, um, person who's conducting the lineup, and also

09:35:07  15   ideally shows what it is that the witness is looking at.

16   Q    Is a certain type of recording equipment required?

17   A    No.

18   Q    Could a cell phone work?

19   A    Yes.

09:35:19  20   Q    Is recording a generally accepted best practice?

21   A    Yes.

22   Q    Is it a generally accepted best practice that was

23   identified by the Department of Justice?

24   A    Yes.

09:35:27  25   Q    Is it a generally accepted best practice that was

1  identified by the Third Circuit's task force?

2  A    Yes.

3  Q    Is that best practice part of the Yakima County Sheriff's

4  Office's policies?

09:35:58  5  A    Yes, I believe it is.

6  Q    Dr. Laney, I'm pulling up Defense Exhibit 1002, which has

7  been previously admitted.

8       Is that up on your monitor?

9  A    Yes.

09:36:22  10  Q    Under the Section 603.5, referring to eyewitness

11  identification (reading):  Whenever feasible, the eyewitness

12  identification procedure should be audio and/or video recorded,

13  and the recording should be retained according to current

14  evidence procedures.

09:36:39  15       Did I read that correctly?

16  A    Yes.

17  Q    And so that is something that was included in the Yakima

18  County Sheriff's Office's policies.

19       MR. BURSON:  Objection; asked and answered.

09:36:46  20       THE COURT:  Overruled.  Go ahead.

21  A    Yes.  Correct.

22  BY MR. McENTIRE:  (Continuing)

23  Q    Dr. Laney, in your review of the discovery and the lineup

24  involving JV, was there more than one law enforcement officer

09:36:55  25  that was present that day?

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                312
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1    A    My understanding is yes; there were two.

2    Q    Not only was -- there was a special agent from the FBI, but

3    there was another officer as well.

4         Do you recall where that officer was employed?

09:37:08    5    A    At the Yakima County Sheriff's Office.

6    Q    Do you remember the -- the officer's name?

7    A    Dan Cypher, I believe.

8    Q    Dr. Laney, based upon your review of the discovery, was

9    that policy followed during the course of the administration of

09:37:46    10    the lineup on JV?

11    A    No.

12    Q    Dr. Laney, is the "recording a best practice," was it part

13    of the 2013 FBI's manual?

14    A    I believe it was not there.

09:37:59    15    Q    To your knowledge, was that shortcoming addressed in any

16    materials put out by the Department of Justice in 2017?

17    A    Yes.

18    Q    Dr. Laney, I'm drawing your attention to Defense

19    Exhibit 1009.

09:38:29    20         Are you familiar with this document?

21    A    Yes.

22    Q    Are you familiar with the policies that are attached to

23    this document?

24    A    Yes.

09:38:44    25    Q    Drawing your attention specifically to 1009-7, there's a

1   section here titled "Documentation," and it references video and

2   audio recording.

3   A    Yes.

4   Q    Would you say that DOJ's 2017 guidance is consistent with

5   best practices?

6   A    Yes.

7   Q    Dr. Laney, there's been a suggestion that it doesn't matter

8   whether or not a lineup was recorded as with respect to JV's

9   lineup because it didn't ultimately identify -- JV didn't

10  ultimately identify James Cloud.

11       Does recording still matter when you're recording -- when

12  there's a nonidentification?

13  A    Yes, it definitely does.

14  Q    Why?

15  A    Because especially in this situation where that is the

16  first, um, time that the particular witness was exposed to a

17  lineup, um, what that person said, how they reacted to the

18  photographs in that lineup absolutely matters.  We want to know

19  how he responded.  We want to know, um, how -- what information

20  he received from the, um, investigators at that time as well.

21  Q    Does the certainty of a nonidentification matter?

22  A    Yes.

23  Q    Why?

24  A    Because there are multiple different layers, levels of

25  certainty even for a nonidentification.  Um, there is -- there

1    is limited certainty in, "Nah, I don't know, it might be one of

2    these guys.  I'm leaning towards this one, but I'm not quite

3    ready to say it's him" versus "I am absolutely positive it's not

4    that person," and anything in between.

09:40:39   5    Q    Again, which is why recording helps a fact finder assess

6    that situation.

7    A    Correct.

8    Q    Having covered recording, I want to pivot to a couple of

9    questions about documentation.

09:40:53   10        Is documentation -- documenting a lineup in detail

11   important?

12   A    Yes.

13   Q    Why?

14   A    For the same reasons.  Um, it is -- it is definitely a, um,

09:41:06   15   lesser -- it provides less information than does a recording,

16   but document -- other sorts of documentation can still provide

17   important information.  And it's part of the policy requirements

18   of these various agencies that, um, recordings be made so that

19   people can go back later and check to find out what happened.

09:41:27   20   Q    Is the sooner something is documented the better?

21   A    Yes, definitely.

22   Q    Is that especially true when the only notes preserving an

23   incident is what was written down on a Yakima County Sheriff's

24   Office's office lineup instructions?

09:41:42   25   A    Absolutely.

1   Q     Why?

2   A     Because like witness memory, investigator memory can also

3   fade over time; also, um, is subject to distortion in all sorts

4   of different ways.  It's less subject to those distortions

09:41:58  5   immediately as it's happening or immediately after than it will

6   be later on.  The investigator's memory changes too over time,

7   so we want to create that documentation as early and as

8   thoroughly as possible.

9   Q     Dr. Laney, there was a delay in the documentation of five

09:42:20  10  days.

11        Is that something that makes a difference?  Four days, I

12  believe.

13  A     Yes, that -- that is something definitely that makes a

14  difference.  Try and -- just as an example, try and figure out

09:42:30  15  where you were four days ago and describe in detail everything

16  that was said, everything that happened.  Trust me, it's not

17  going to be a very accurate record.

18  Q     Dr. Laney, I'd like to direct your attention to Defense

19  Exhibit 1011, which is the FBI's eyewitness policy manual from

09:42:51  20  November 2013.

21        Is that up on your monitor?

22  A     Yes.

23  Q     And I'd like to direct your attention specifically to

24  Section 3.9 titled "Recording Identification Results."

09:43:27  25        There's a section here in the FBI policy that discusses

1   (reading):  Other investigators assisting in the lineup must

2   prepare reports describing their roles in the lineup.

3        As we talked about with respect to JV's lineup, you

4   mentioned there was another investigator there.

09:43:42   5   A    Correct.

6   Q    And that individual was from the Yakima County Sheriff's

7   Office.

8   A    I believe so, yes.

9   Q    To your knowledge in reviewing the discovery, did that

09:43:50   10   detective prepare any reports documenting the lineup?

11   A    As far as I know, no, there was no such report in the

12   discovery.

13   Q    Why is that policy important?

14   A    For the same reasons that documenting quickly matters,

09:44:14   15   having two different people who -- who, um, witnessed -- so

16   investigators here are also witnesses; they're witnessing this

17   lineup procedure -- um, two witnesses are going to provide

18   somewhat different perspectives, potentially remember different

19   details than each other.  Therefore, having both of them create

09:44:32   20   reports is providing more information than just one.

21   Q    Two heads is better than one.

22   A    Yeah.

23   Q    Let's pivot with respect to JV's lineup, Dr. Laney, and

24   talk about how it was administered.

09:45:01   25        Were you in court yesterday?

1   A    Yes.

2   Q    Did you listen to the entire testimony?

3   A    Yes.

4   Q    You had an opportunity to hear Special Agent Ribail

09:45:09  5   describe how he administered the lineup on JV?

6   A    Yes.

7   Q    And that he also described using the same procedure with

8   respect to not only JV but also LL.

9   A    Yes.

09:45:22  10   Q    Before we get into the specifics, what is scientifically

11   the best way to administer a lineup?

12   A    Wherever possible, lineups should be administered

13   double-blind.

14   Q    What does double-blind mean?

09:45:34  15   A    Double-blind means that neither the person doing the actual

16   administration of the lineup nor the witness is informed as to

17   which photograph is the photograph of the lineup.

18   Q    Is that the same standard that's used in, for example,

19   pharmaceutical trials?

09:45:52  20   A    Yes, it is.  Um, so in a placebo-controlled trial, excuse

21   me, in double-blind research in medicine, and in other areas of

22   science, the person who is handing out the pills to the patient

23   doesn't know which condition the patient is in, neither does the

24   patient know which condition they're in.  And that's so that no

09:46:11  25   one has an opportunity to give information, whether

1    intentionally or not, that would create a placebo effect; that

2    is, that would change the behavior of the person taking the

3    pills because of their own expectations that they're getting a

4    real drug or not getting a real drug.

09:46:29  5    Q    Same principle applies with respect to lineup

6    administration.

7    A    Absolutely.

8    Q    Is double-blind generally recognized as the best practice?

9    A    Yes.

09:46:36  10    Q    Is there consensus on this point?

11    A    Absolutely.

12    Q    In your review of the discovery, as well as briefing, there

13    are some exceptions where double-blind may not be, while always

14    preferred, not feasible.

09:46:54  15    A    Correct.

16    Q    What are one of the examples of when it's not feasible?

17    A    When a person cannot be found to administer the lineup who

18    doesn't know who the suspect is.

19    Q    And from your understanding and review of briefing and

09:47:08  20    discovery, that -- that is a reason provided as to why a

21    double-blind lineup was not administered on either JV or LL?

22    A    Correct.

23    Q    When did you first learn what the procedure was that was

24    administered on JV's lineup?

09:47:35  25    A    From the Government's response to the motion to suppress

1    the lineup.

2    Q    So that was the first instance where you learned

3    specifically the type of procedure that was employed.

4    A    Yes.

09:47:50    5    Q    From your understanding, the FBI/Special Agent Ribail

6    administered a blinded lineup.

7    A    He administered what he called a blinded administration,

8    blinded lineup.

9    Q    Or a single-blind lineup?

09:48:10    10    A    Correct.

11    Q    And would you kindly tell the Court what a single-blind

12    lineup is as opposed to a double-blind lineup.

13    A    So a single-blind lineup means that the witness is not

14    informed who the suspect is and also that procedures are put

09:48:27    15    into place so that, um, the investigator doesn't know which

16    photograph, um, the witness is looking at at any one time, and

17    therefore doesn't have the opportunity, whether intentionally or

18    unintentionally, to provide hints as to how the witness should

19    respond.

09:48:46    20    Q    So you had an opportunity to listen to the explanation of

21    the lineup administered on JV on the hood of the car in his

22    driveway.

23    A    Yes.

24    Q    Based on the explanation that you heard from Special Agent

09:49:01    25    Ribail, is that a blinded lineup?

1    A    No.

2    Q    Why not?

3    A    Because, um, the pictures were handed off one at a time and

4    handed back.  They weren't -- the FBI has, um, procedures that

09:49:17   5    suggest you should put the pictures in folders so that the

6    investigator can't see which photograph, um, is being given to,

7    uh, the witness.  Um, the photographs should also be randomized

8    so that the, um -- again, so that the investigator doesn't know

9    which particular photograph, uh, the witness is looking at.

09:49:39   10         None of that happened.  Pictures were handed over out in

11    bright sunlight, where I suspect even if -- oops, apologies --

12    even if they were being held, um, even if, um, excuse me, as

13    they were being held, even if, um, Special Agent Ribail was not

14    looking over the shoulder of the witness, in bright sunlight he

09:50:07   15    would be able to see through the pictures and see --

16         MR. BURSON:  Your Honor, I'm going to move to strike.

17    The doctor is an expert in eyewitness identification and memory.

18    I don't believe she's an expert in sunlight optics or the

19    weather.

09:50:19   20         THE COURT:  Sustained.

21    BY MR. McENTIRE:   (Continuing)

22    Q    Dr. Laney, setting aside sun or light --

23    A    Yes.

24    Q    -- causing a photograph to be transparent, is the

09:50:33   25    information that you heard concretely on what Special Agent

1  Ribail did, did he unblind that lineup?

2  A    Yes.  Well, he didn't blind it to begin with.  The photos

3  weren't randomized.  He told us that he kept them in the same

4  order for everyone and from when he made them.

09:50:50  5  Q    There were questions yesterday or responses from Special

6  Agent Ribail that he did not necessarily memorize the -- the

7  photographic order.

8       Does that make it any -- does that save this?

9  A    No.

09:51:07  10  Q    Why?

11  A    Because he was looking at these pictures repeatedly.

12  Whether he was trying to pay attention to which order they were

13  in or not, he's likely to have, um, absorbed that information.

14  And, again, he's doing the same thing over and over again; a

09:51:25  15  pattern is established.

16  Q    Because he administered four lineups --

17  A    Yes.

18  Q    -- back to back to back to back and presented the

19  photographs in the same order.

09:51:35  20  A    Yes.  And then he did the whole thing again with another

21  witness.

22  Q    With James Cloud's photograph being in the same order each

23  time.

24  A    Correct.

09:51:45  25  Q    The same position.

1    A    Yes.

2    Q    Dr. Laney, I want to talk about the concept of opportunity

3    to view.

4         Based on your not only review of the discovery but also

09:52:10  5    listening to the testimony from Special Agent Ribail regarding

6    the conditions that day and where he was, do the circumstances

7    that you heard provide JV with an opportunity to view what

8    happened over the course of several minutes?

9         MR. BURSON:  Could I hear the question one more time?

09:52:40  10    Sorry.  I didn't catch the last part.

11    BY MR. McENTIRE:   (Continuing)

12    Q    Did the circumstances that were testified to yesterday

13    present JV with an opportunity to view what unfolded over the

14    several minutes?

09:52:53  15    A    Yes.

16    Q    There was testimony about that there was -- this elapsed

17    over several minutes, not seconds.

18    A    Correct.

19    Q    And does that time differential make a difference,

09:53:07  20    scientifically speaking?

21    A    Yes.  For opportunity to view, we're usually worried, um,

22    in the literature, if it's a matter of seconds.  Um, a very,

23    very brief view of a crime or a -- or a suspect is a problem,

24    but if it goes on for several minutes, we worry much less.

09:53:25  25    Q    Is the fact that there was an interaction or a dialogue

1    between JV and the individual that he was interacting with also

2    a factor that's taken into account for opportunity to view?

3    A    Yes.

4    Q    Especially when they communicate with each other.

09:53:40    5    A    Yes.

6    Q    Is opportunity to view an important factor in assessing the

7    reliability of an eyewitness identification?

8    A    Yes.

9    Q    Why?

09:53:57    10    A    Because, um, establishing a memory takes a little bit of

11    time.  Um -- uh, noticing a face, seeing a face, processing that

12    face takes a little bit of time.  Um, adjusting even a little

13    bit to what's happening is -- is something that takes a little

14    bit of time, um, to be able to have enough attentional resources

09:54:25    15    to pay attention to what is going on, and you have to be able to

16    pay attention to what is going on at the time in order to be

17    able to remember it later.

18    Q    I want to pivot, Dr. Laney, and specifically talk about

19    the -- the photograph that JV reviewed.

09:54:43    20        One way that an individual, an eyewitness can review a

21    lineup is simultaneous.

22        What does simultaneous mean?

23    A    It means that all of the individuals or photographs are

24    seen at the same time.

09:54:58    25    Q    What are the cons of a simultaneous administration?

1    A    So lots and lots of research, again, has shown that this

2    leads people to make a comparison judgment.  So rather than

3    necessarily looking for "where is the bad guy," they end up

4    looking for "which of these people looks the most like the bad

09:55:18    5    guy," which is not ideal.  A categorical judgment one way or the

6    other, "is this person the person who I saw at the crime or

7    not," is a better -- produces better outcomes.

8    Q    From the testimony that you heard, the lineup that Special

9    Agent Ribail administered was not a simultaneous but actually a

09:55:42    10    sequential lineup.

11    A    Yes.

12    Q    How is that different?

13    A    Pictures or people are seen one at a time rather than all

14    together, and this leads people -- leads the witness to make a

09:55:56    15    categorical judgment:  Yes or no, is this person the person I'm

16    looking for?

17    Q    Is there scientific consensus that supports one version

18    over the other?

19    A    Yes.

09:56:05    20    Q    Which one?

21    A    Sequential has been -- has been shown to be better.

22    Q    Why?

23    A    Because it produces fewer false positive identifications.

24    Q    And this is what the research shows?

09:56:16    25    A    Yes.

1   Q    Is there scientific consensus on this?

2   A    Yes.

3   Q    Has there been for a while?

4   A    Yes.

09:56:36  5   Q    Dr. Laney, I'm pulling up a defense exhibit marked 1000,

6  which has been previously admitted, which is the Lineup 5033

7  administered by Special Agent Ribail on JV involving James

8  Cloud's photograph.

9      Have you had an opportunity to review this?

09:56:57  10  A    Yes.

11  Q    How many photographs were presented?

12  A    Six.

13  Q    Is that typical?

14  A    Yes.  It's a little on the low side, a few more would be

09:57:07  15  better; but yes, it's typical.

16  Q    This is -- I'm pulling up 1000-3.  This is Mr. Cloud's

17  photograph.  This is a -- an 8 1/2 x 11-piece of paper, and the

18  photograph isn't quite the full 8 1/2 x 11 but large.

19      Would you agree?

09:57:37  20  A    Yes.  Good size, clear picture.

21  Q    Dr. Laney, does size matter when it comes to photographic

22  viewing?

23  A    Yes.  Closer to life-like is better, life-size.

24  Q    When did JV view this photo?

09:57:56  25  A    Uh, the day after the incident.

1    Q    Is there a significance to timing on viewing, having a

2    lineup administered?

3    A    Yes, the sooner the better.

4    Q    Is there research showing that as time progresses, quality

5    goes down with respect to memory?

6    A    Yes, absolutely.  Within hours is the best time to do a

7    lineup, but if that's not possible, then within a couple of days

8    is still relatively okay.

9    Q    So timing speaks to an identification's reliability?

10   A    Correct.

11   Q    Or maybe, put differently, timing also speaks to a

12   nonidentification's reliability?

13   A    Yes.

14   Q    Do we know how long JV viewed James Cloud's photo?

15   A    No.

16   Q    Why not?

17   A    Because it was not recorded or otherwise documented.

18   Q    Is that something that's important to be documented?

19   A    Yes.

20   Q    Why?

21   A    Because, um, whether the witness stared at a photograph for

22   a long time, um, before making a decision versus did so very

23   quickly makes a difference in terms of the reliability of that

24   identification or nonidentification.

25   Q    Where did JV view this lineup?

09:58:14  (line 5)
09:58:35  (line 10)
09:58:48  (line 15)
09:58:54  (line 20)
09:59:13  (line 25)

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    327
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1    A    In his driveway, apparently.

2    Q    Does that matter?

3    A    Yes.

4    Q    Why?

09:59:23    5    A    Um, so there's -- there's a phenomenon called

6    state-dependent or context-dependent learning, um, which

7    suggests that remembering is somewhat easier and somewhat more

8    accurate in the same circumstance where that memory was created.

9        So if he interacted with these individuals in his own

09:59:45    10    driveway in front of his house, then having the lineup, um,

11    occur in that same place is actually probably somewhat

12    beneficial to memory.

13    Q    So having a lineup administered in literally the location

14    where this happened scientifically helps support an

10:00:04    15    identification's reliability?

16    A    Yes.

17    Q    Or, in this case, an identification -- a

18    nonidentification's reliability?

19    A    Yes.

10:00:14    20    Q    James Cloud was arrested, I guess I would call it either

21    late Sunday night or super early Monday morning on -- early

22    morning on June 10th.

23        Do you recall that from -- in your review of the discovery?

24    A    Yes.

10:00:32    25    Q    What I'd like to do is I'd like to pull up the booking

1    photo from his arrest on June 10th, 2019.

2        Are you familiar --

3        THE COURT:  Counsel, before we move on with regards to

4    Exhibit 1000, is -- do your records indicate that that was

10:00:54   5    admitted?

6        MR. McENTIRE:  Your Honor, co-counsel just advised me

7    that my records suggest that was not admitted, and I would ask

8    the Court to move for its admission.

9        THE COURT:  Any objection?

10:01:06   10        MR. BURSON:  No objection.

11        THE COURT:  All right.  It will be admitted.

12        MR. McENTIRE:  Thank you, Your Honor.

13        (Defense Exhibit No. 1000 admitted into evidence.)

14    BY MR. McENTIRE:   (Continuing)

10:01:10   15    Q    Dr. Laney, I've pulled up Defense Exhibit 1007.

16        In your review of the discovery and the filings in this

17    case, did you become familiar with this photograph --

18    A    Yes.

19    Q    -- described as the -- the booking photo of James Cloud

10:01:25   20    arrested on June 10th, 2019.

21    A    Yes.

22    Q    Does this fairly and accurately represent the photograph

23    that was provided from the Government over the course of this

24    case?

10:01:35   25    A    Yes.

1          MR. McENTIRE:  I'd move for the admission of Defense

2     Exhibit 1007.

3          MR. BURSON:  No objection.

4          THE COURT:  It will be admitted.

10:01:40  5     (Defense Exhibit No. 1007 admitted into evidence.)

6     BY MR. McENTIRE:  (Continuing)

7     Q    Dr. Laney, I'm pulling up a different exhibit, Defense

8     Exhibit 1008.  This is a side-by-side.  On the left you have

9     James Cloud's lineup photo; on the right you have James Cloud's

10:02:07  10    booking photo from how he looked when he was arrested on

11    June 10th, 2019.

12         Based upon your review of the discovery and the filings,

13    are you familiar with both of these photographs?

14    A    Yes.

10:02:18  15    Q    Does this document fairly and accurately represent the

16    photographs that were used or provided from the Government over

17    the course of discovery?

18    A    Yes.

19         MR. McENTIRE:  I'd move for the admission of Defense

10:02:29  20    Exhibit 1008.

21         MR. BURSON:  No objection.

22         THE COURT:  It will be admitted.

23         (Defense Exhibit No. 1008 admitted into evidence.)

24    BY MR. McENTIRE:  (Continuing)

10:02:37  25    Q    So, Dr. Laney, let's take a look at the side-by-side here,

1    comparing the photograph that JV reviewed with James Cloud's

2    booking photo.

3        You've seen quite a few lineups in your years in this

4    field?

10:02:50  5  A    Yes.

6    Q    How did Spillman do in selecting an ID photo that actually

7    captures how Mr. Cloud looked on the day that he allegedly

8    committed this offense?

9        MR. BURSON:  I'm going to object, Your Honor.  I believe

10:03:02  10  that's outside the qualifications.  Photo comparison?

11       THE COURT:  I'm going to sustain that objection.

12   Perhaps you can ask it differently.

13   BY MR. McENTIRE:  (Continuing)

14   Q    Dr. Laney, let's walk through some of the characteristics

10:03:15  15  that these photographs shared.

16       In your review of these comparison photographs, it's

17   important, in your skills and experience, that certain

18   identifying characteristics in a photograph may stand out to

19   someone.

10:03:33  20  A    Yes.

21   Q    And so it's important to try to get a photograph used in a

22   lineup that is as closely resemblant to the individual.

23   A    Yes.

24   Q    So with that knowledge in mind, let's talk about hair.

10:03:50  25       Dr. Laney, as you look at these photographs, do you see

1    something unique that stands out with respect to James Cloud's

2    hair in these photographs?

3    A    Um, it sort of comes to a peak on top of his head.

4    Q    Sort of like an --

10:04:04    5    A    Yeah.

6    Q    -- apex-type thing?

7    A    Sure.

8    Q    In your experience, is that something that stands out as a

9    unique feature that individuals would look at when trying to

10:04:15    10    place or recognize a photograph?

11    A    Yes.

12    Q    It's present in both photos?

13    A    Yes.

14    Q    In your review of hair color, does it appear to be similar?

10:04:24    15    A    Yes.

16    Q    Hair length?

17    A    Yes.

18    Q    And that's short hair.

19    A    Yes.

10:04:29    20    Q    Similar facial hair?

21    A    Yes, mustache and goatee.

22    Q    No apparent differences in aging?

23    A    No, not particularly.

24    Q    All in all, a pretty good side-by-side comparison?

10:04:43    25    A    There's actually a scar, too, that is clearly visible in

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    332
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1    both pictures.  Yes, quite similar.

2    Q    Is having a good comparison photo important for an

3    identification or nonidentification's reliability?

4    A    Yes.

10:04:56  5    Q    Why?

6    A    Because what the witness is being asked to do is to compare

7    the lineup photo to their memory, their hopefully very recent

8    memory, of what the perpetrator looked like, and the closer they

9    are, the easier that comparison is.

10:05:13  10   Q    So to recap this, we have a, in your opinion, a good

11   comparison photo.

12   A    Yes.

13   Q    Viewed in a -- in a good environment, at JV's residence.

14   A    Yes.

10:05:24  15   Q    Close in time to when the alleged -- or when the assault

16   occurred.

17   A    Yes.  The next day, yes.

18   Q    Dr. Laney, before we get to the photo that caused ████████

19   ██ to walk back his nonidentification, I want to talk about

10:05:47  20   outside influence.  And to do that I want to take you back in

21   time; specifically, to 1999.

22       Are you familiar with what's currently on your monitor,

23   which is Defense Exhibit 1010?

24   A    Yes.

10:06:09  25   Q    Is this a document that you've come across in your

1    research?

2    A    Yes.

3    Q    A document that you've reviewed --

4    A    Yes.

10:06:17  5    Q    -- front to back?

6    A    Years ago and also recently.

7    Q    I'm turning to the last page of it.  It's quite a long

8    document, a, in total, 55-page document.

9         Dr. Laney, would you -- does the document that I presented

10:06:38 10   here as Defense Exhibit 1010 fairly and accurately represent the

11   document that you've reviewed as the Department of Justice's

12   1999 eyewitness identification guide?

13   A    I have not seen all of the pages in the middle, but I am

14   sure it is.

10:06:52 15        MR. McENTIRE:  Your Honor, previously this document was

16   provided -- offered up under conditional admissibility, and I'd

17   now move for its complete admissibility as Defense Exhibit 1010.

18        MR. BURSON:  No objection.

19        THE COURT:  It will be admitted.

10:07:08 20   (Defense Exhibit No. 1010 admitted into evidence.)

21   BY MR. McENTIRE:   (Continuing)

22   Q    Dr. Laney, are you familiar with the research underpinning

23   this guide?

24   A    Yes.

10:07:21 25   Q    This was a guide based on cutting research at the time?

1   A    Yes.

2   Q    And this guide was published by Department of Justice after

3   a working group that -- had researched the best practices in

4   eyewitness identification?

10:07:36   5   A    Yes.  It was a collaboration between academics and members

6   of law enforcement and, um, the legal system.  And my

7   understanding is it was actually less contentious than those

8   groups tend to be.

9   Q    I'd draw your attention to Defense Exhibit 1010-27 where

10:08:00   10   there's a series of -- apologies.  Go back to 1010-26.  There's

11   a section here entitled "Obtaining Information From the

12   Witnesses."

13   A    Yes.

14   Q    Do you recognize this section?

10:08:13   15   A    Yes.

16   Q    It lays out several guidelines for agents administering

17   lineups to follow.  Six are set forth on this page.

18   A    Um-hmm.

19   Q    I want to direct your attention to the following page,

10:08:31   20   which contains Point 7 and Point 8.  And I'd like to draw your

21   attention first to the instruction on instructing witnesses to

22   avoid discussing details of the incident with other potential

23   witnesses.

24   A    Yes.

10:08:56   25   Q    So this isn't actually discussing a technique to gather

1    information.  We're talking actually about an instruction given

2    to a witness.

3    A    Correct.

4    Q    Do instructions like this have a general name in the

5    scientific community?

6    A    Cautionary instructions.

7    Q    What is the purpose behind a cautionary instruction?

8    A    They're intended to limit exposure of witnesses to further

9    information that could, um, corrupt their memory for what they

10   witnessed.

11   Q    Ah.  Important point.  Further information that could

12   corrupt.

13        Is that -- did I capture that correctly?

14   A    Yes.

15   Q    Are cautionary instructions reserved for simply protecting

16   the integrity during the lineup itself?

17   A    No.

18   Q    Are cautionary instructions also meant to protect

19   individuals against outside influences after the lineup is over?

20   A    Yes, definitely.

21   Q    Why is that important?

22   A    Because the lineup is not the end-all be-all.  The witness,

23   um, is also presumably going to be testifying at some point.

24   Um, they may encounter additional information, um, between the

25   lineup and further testimony.  They may make other statements.

1      And we -- the system would like to keep their memories as intact

2      as possible for the duration.

3      Q    Is there a scientific principle that describes taint that

4      can happen from an outside influence that occurs after a lineup

10:10:30    5      concludes?

6      A    Yes, it's called the misinformation effect.

7      Q    And what is that?

8      A    The misinformation effect is the effect of additional

9      post-event information on memory for what happened during that

10:10:44    10     event.  It's been studied since -- very actively since the

11     1970s, hundreds of studies, tens of thousands of subjects in

12     this area.

13     Q    Can the misinformation effect change what a witness thinks

14     they saw?

10:11:01    15     A    Absolutely.

16     Q    Can misinformation change who a witness thinks they saw?

17     A    Yes, absolutely.

18     Q    How?

19     A    Because memory is a reconstructive process and, um,

10:11:15    20     additional information in the forms of questions, in the forms

21     of media, information, um, information from co-witnesses, all of

22     those things can form the additional bricks, going back to my

23     brick -- my Lego brick metaphor, all of those things can

24     contribute -- sorry -- to the information available for that

10:11:38    25     witness who is then reconstructing their memory later.

1    Q    Is a witness conscious of this happening?

2    A    No.

3    Q    In 1999, 20 years ago, 21 years ago, was there scientific

4    consensus on this issue?

10:11:52    5    A    Yes.

6    Q    So the takeaway is that outside information can corrupt a

7    witness' memories.

8    A    Yes.  And, actually, it was consensus in 1979, when this

9    was published.

10:12:04    10    Q    And is the consensus that outside information can influence

11    a witness not only during a lineup but after as well?

12    A    Yes.

13    Q    Is this part of the reason why courts caution jurors every

14    time they leave not to contact any sort of -- have any contact

10:12:26    15    with any information?

16    A    Yes.  Also why jurors are often selected on the basis of

17    not having too -- had too much contact with relevant outside

18    information.

19    Q    So there's a recognition even in the court system itself

10:12:39    20    that outside information can influence a fact finder.

21    A    Yes.

22         MR. McENTIRE:  Your Honor, I know that the Court takes

23    typically its break at 10:15, and I'm at a pausing point.  I

24    don't know if the Court would -- if this seems like a good

10:12:56    25    opportunity, or I'm happy to press on.

1      THE COURT:  I was just going to ask folks if they wanted

2  a break.  We took one early on, but we can take another one if

3  we need to.

4      Do we need to?

10:13:08  5      MR. BURSON:  Government is okay, Your Honor.

6      MS. YOUNGCOURT:  I hate to be the person --

7      THE COURT:  No, that's okay.  That's okay.  Why don't we

8  take a 15-minute break.  We'll be back at 10:30.  Thank you.

9      THE COURTROOM DEPUTY:  All rise.  Court is in recess.

10:13:35  10  (Recess taken: 10:13 a.m. to 10:30 a.m.)

11      THE COURTROOM DEPUTY:  All rise.

12  (Call to Order of the Court.)

13      THE COURT:  Please be seated.

14      Go ahead, Counsel.

10:31:01  15      MR. McENTIRE:  Thank you, Your Honor.

16  BY MR. McENTIRE:    (Continuing)

17  Q    Dr. Laney, we left off discussing the Department of

18  Justice's 1999 guidance, and I'd like to fast forward to 2013

19  with the FBI policy manual, which I'm pulling up as Defense

10:31:21  20  Exhibit 1011.

21      Dr. Laney, are you familiar with this policy manual?

22  A    Yes.

23  Q    Is this something that you've reviewed?

24  A    Yes.

10:31:30  25  Q    Is this something where, after studying it, you're familiar

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                                    339
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1    with not only the manual but also the science underpinning it?

2    A    Yes.

3    Q    I want to draw your attention to one particular point.  I'm

4    pulling up 1011-5.  And under the "Instruction" section,

10:32:02    5    (reading):  Ask that the witness not discuss the photographic

6    identification procedure or its results with any other witness

7    involved in this case ...

8         And I'm going to pause right there.

9         Are you familiar with this cautionary instruction?

10:32:14    10    A    Yes.

11    Q    This is a cautionary instruction that you saw back in the

12    1999 DOJ guide.

13    A    Version of, yes.

14    Q    Version of.

10:32:26    15         Still present --

16    A    Yes.

17    Q    -- fourteen years later.

18    A    Yes.

19    Q    So my question, Dr. Laney, is:  During the 14-year period

10:32:33    20    between Department of Justice's 1999 publication and the 2013

21    policy, has the research changed on how eyewitness -- excuse

22    me -- on how outside influence can impact or corrupt a witness?

23    A    Yes, there's been much more of it, and the conclusions have

24    become much stronger.

10:32:52    25    Q    So the science has changed in the sense that it's been

1    bolstered.

2    A    Yes.

3    Q    But not the underlying conclusion that this is an important

4    cautionary instruction.

10:33:01    5    A    Correct.

6    Q    I'm going to pivot back to Defense Exhibit 1010-27, which

7    is returning, again, to the Department of Justice's 1999

8    publication.

9        Instruction No. 7, which is (reading):  Encourage the

10:33:27    10    witness to avoid contact with the media or exposure to media

11    accounts concerning the incident.

12        You mentioned that you're familiar with this instruction.

13    A    Yes.

14    Q    And you're familiar with the science underpinning this

10:33:40    15    instruction.

16    A    Yes.

17    Q    Why is this cautionary instruction important?

18    A    Because media exposure is a very common source of

19    misinformation.

10:33:53    20    Q    And you're referring to -- does that tie into the concept

21    of misinformation effect that you were discussing earlier?

22    A    Yes, exactly.

23    Q    It's a form of outside influence?

24    A    Yes.  It's a form of post-event information, is the

10:34:08    25    technical term.

1  Q    In 1999, was there scientific consensus on this idea that

2  post-event information, such as contact with media or exposure

3  to media accounts, could influence an eyewitness?

4  A    Yes.

10:34:24  5  Q    And, again, we're not talking about just literally during

6  the lineup.

7  A    Right.

8  Q    We're talking about after as well.

9  A    Right.  Yes.

10:34:33  10  Q    Because, presumably, that witness is going to testify

11  somewhere.

12  A    Right.

13  Q    And the gravity of these instructions are, in fact, to help

14  preserve the integrity of that testimony for presentation to a

10:34:45  15  fact finder.

16  A    Correct.

17  Q    And, again, this goes back to why cautionary instructions

18  are provided to jurors regarding not looking things up on social

19  media.

10:35:03  20  A    Yes.  To preserve their memory for what they've heard,

21  during the trial.  For the witness, it's what they've

22  experienced themselves during the event.

23  Q    Cabining the information that a witness receives.

24  A    As much as possible, yes.

10:35:20  25  Q    And obviously it's impossible to eliminate outside

1    influence.

2    A    Right.

3    Q    The goal is to minimize.

4    A    Yes.

10:35:29    5    Q    Going back to the 2013 policy, Defense Exhibit 1011-5, go

6    back to that bullet point that we just --

7    A    I can still see Page 27 -- oops.

8    Q    There we go.

9    A    Okay.  Good.

10:35:51    10    Q    To complete this sentence (reading): ... with any other

11    witness involved in the case and request the witness not have

12    contact with the media.

13        Dr. Laney, are you familiar with the science underpinning

14    this instruction?

10:36:08    15    A    Yes.

16    Q    How does the science interpret -- what is science referring

17    to when it's referring to "media"?

18    A    Very much a common sense --

19        MR. BURSON:  Objection, Your Honor.  This isn't a

10:36:21    20    scientific document.

21        THE COURT:  Overruled.  She can answer if she knows.

22    A    Very much a common sense definition of the word "media."

23    So the news, newspapers, social media, all of that applies.

24    There's actually a whole area called media psychology that

10:36:40    25    studies the influence of the media on people.

1    Q    In your experience in reviewing literature in this field,

2    have you seen contact with the media refer to more than

3    literally contacting the press?

4    A    Yes.  It's -- it's interactions with the media, and

5    usual -- in the literature, this is all talking about influence

6    of the media on the person, the witness.

7    Q    This policy isn't asking an eyewitness to never turn on

8    their computer again, is it?

9    A    No.

10    Q    What's the goal?

11    A    The goal is to have the witness, um, as much as possible,

12    avoid corrupting their own memory for the event that they

13    witnessed.  So if they're flipping through the TV channel at

14    11 o'clock at night, and they think something -- the -- the

15    crime that they were a witness to may be on news, we ask that

16    maybe they don't -- change the channel, watch something else.

17    Don't seek out information that could be relevant to the case.

18    Q    Would it make sense for contact with the media to be

19    restricted to literally just contacting a newspaper or TV

20    station?

21    A    No, not at all, because that wouldn't be affecting

22    someone's memory for what happened.  That's -- that's irrelevant

23    to the process of maintaining the consistency and accuracy of

24    that witness' memory.

25    Q    Based on your understanding of the science underpinning

1   what "the media" means, do you view this as an extension of the

2   cautionary instruction provided in Department of Justice's 1999

3   manual, 14 years earlier?

4   A    Yes.

10:38:30   5        MR. BURSON:  Objection.  I don't think the witness is

6   familiar with the drafting of the FBI policy and what the

7   authors were thinking.

8        THE COURT:  Hold on.

9        Overruled.  It's based upon what she views.

10:38:53   10       Go ahead.

11   A    Yes.  And I am familiar with the underlying science that

12   produced this.

13   BY MR. McENTIRE:   (Continuing)

14   Q    Would taking a narrower view run contrary to the DOJ

10:39:07   15   working group research in 1999?

16   A    Yes.

17   Q    Would taking a narrower view run contrary to all science on

18   this subject?

19   A    Yes.

10:39:15   20   Q    Based upon your review of the 2013 FBI manual, you would

21   agree that the cautionary instructions within that manual are

22   designed to minimize, as much as possible, outside influence.

23   A    Yes.

24   Q    Would -- in your opinion after reviewing this, as well as

10:39:30   25   the science underpinning it, if you were to interpret "the

 1   media" as just the press, would that yield an instruction that

 2   is internally inconsistent with the manual itself?

 3   A    If I were to interpret it as just the witness contacting

 4   the media, yes, that would be internally inconsistent.

10:39:52  5   Q    Why?

 6   A    Because, again, that isn't what should affect the witness'

 7   memory, and all of this is about outside influences that should

 8   affect the witness' memory or could affect the witness' memory.

 9   Q    Between 2013 and present day, has the research on outside

10:40:14 10  influence such as social media developed?

11   A    Yes.  Like I said, there's a whole new area of psychology

12   called media psychological which deals with other things as well

13   but does address this.

14   Q    Is DOJ's policy on media exposure first stated in 1999

10:40:33 15  consistent with best practices?

16   A    Yes.

17   Q    Would you view as the FBI's 2013 manual on cautioning

18   against this broader version of outside media as consistent with

19   best practices?

10:40:45 20  A    Yes.

21   Q    Circling back to this concept that exposure to media can

22   impact or corrupt an eyewitness, is that corruption rare or

23   common?

24   A    Common.

10:40:59 25  Q    Is that why we're here?

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    346
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1    A    Yeah.

2    Q    Did it --

3    A    Partially.

4    Q    Did it happen multiple times in this case?

10:41:05  5    A    Yes.  Twice, obviously.

6    Q    Due to a cautionary instruction that was not provided.

7    A    Yes.

8         MR. BURSON:  Objection.  Witness is speculating.

9         THE COURT:  Sustained.

10:41:17  10  BY MR. McENTIRE:  (Continuing)

11   Q    Dr. Laney, were you here yesterday listening to the

12   testimony --

13   A    Yes.

14   Q    -- of Special Agent Ribail?

10:41:22  15   A    Yes.

16   Q    Did Special Agent Ribail, to your recollection, testify

17   that he did not administer this lineup instruction to JV?

18   A    Yes, he did.  He said that he did not do it, yeah.

19   Q    Did Special Agent Ribail also say that he applied the same

10:41:38  20  practice from the lineup instruction with JV to LL?

21   A    Yes, he did.

22   Q    So to clarify the testimony from yesterday, it was Special

23   Agent Ribail's testimony he did not provide this instruction to

24   JV.

10:41:50  25   A    Correct.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*          347
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1    Q    And he didn't document that either.

2    A    Correct.

3    Q    In fact, he commented that he -- to his recollection, he

4    did not feel JV was the, paraphrasing, the type of person that

10:42:05  5    needed this instruction.

6    A    Correct.

7    Q    Dr. Laney, let's pivot to Defense Exhibit 1006.

8         Do you recognize this document?

9    A    Yes.

10:42:32  10    Q    This is the wanted poster that JV viewed?

11    A    Yes.

12    Q    Based upon your review of the discovery, as well as

13    listening to testimony, do you have an understanding for how JV

14    came across this wanted poster?

10:42:53  15    A    Yes.

16    Q    How?

17    A    Internet searching, scrolling Facebook, looking for

18    information about the case.

19         MR. BURSON:  Objection.  I'm going to move to strike.

10:43:02  20    There is no evidence he was looking for information about the

21    case.

22         THE COURT:  Sustained.

23    BY MR. McENTIRE:  (Continuing)

24    Q    Is your recollection of the testimony and reviewing

10:43:09  25    discovery that JV, in fact, did engage in online research,

1    including getting on Facebook?

2    A    Yes.

3    Q    And that he encountered this wanted poster on the Yakama

4    Nation's Facebook page.

10:43:23    5    A    Apparently, yes.

6    Q    Is your interpretation of Facebook that it's a form of

7    social media?

8    A    Yes.

9    Q    Is it your understanding, after seeing this wanted poster,

10:43:46    10    that he contacted law enforcement to let them know he had a

11    change of opinion on his lineup?

12    A    According to, um, Special Agent Ribail's testimony, yes.

13    Q    When you see a photo like this, one photo, is there a term

14    that this is referred to?

10:44:04    15    A    A show-up.

16    Q    What is a show-up?

17    A    So a show-up is like a lineup but with just one person

18    rather than a selection of people.

19    Q    Are show-ups problematic?

10:44:18    20    A    Uh, yes, they're quite problematic in several different

21    ways.

22    Q    Why?

23    A    So although, um, one positive about a show-up is that they

24    do encourage a categorical yes-or-no judgment of the kind that I

10:44:34    25    mentioned earlier, um, a show-up doesn't have any of the

1    safeguards in place that a traditional lineup does.  Uh, there

2    are no fillers, there are no, um -- care is not often taken to

3    make sure that the photo itself or the, um, live show-up is

4    unbiased.  Um, very often in live show-ups the suspect is seated

10:45:03  5    in the back of a police car or otherwise doing something or

6    shown in a situation that -- that makes them look guilty.

7         Um, in addition ...

8         The problem with being a memory expert is that my memory

9    doesn't always work perfectly either.  I had something I was

10:45:22  10   going to say after that.

11        Um, there are years of research showing that show-ups are

12   quite problematic.

13   Q    Is there scientific consensus on this point?

14   A    Yes.

10:45:33  15   Q    Let's talk about the photo itself or the wanted poster

16   itself.

17        There are two photos in this one poster?

18   A    Yes.

19   Q    Fair to say that these are smaller than the lineup photo

10:45:48  20   that was shown to JV during the lineup administration?

21   A    Yes.  Also less clear; they're a little pixilated, even at

22   this size.

23   Q    Are those two factors that would make a difference in terms

24   of reliability?

10:46:02  25   A    Yes.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                          350
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1   Q    From your review of the photograph, does the hair appear to

2   be different?

3   A    A little, yes.

4   Q    How so?

10:46:10   5   A    Well, you can't see the unique-ish feature, um, that was

6   apparent before of the little apex or hill on top of his head,

7   and it's a little longer.

8   Q    Let's talk about clothes.  Was -- in there -- in James

9   Cloud's lineup photograph, was he wearing any particular clothes

10:46:34   10   that stood out?

11   A    No.  A t-shirt.

12   Q    How about in this photo?

13   A    He's wearing what looks to me to be a prison jumpsuit.

14   Q    Is that a problem?

10:46:42   15   A    Yes, it suggests guilt.

16   Q    Let's talk about the background.

17        What was the background in the lineup photo that was

18   administered to JV?

19   A    Plain.  Innocuous.

10:46:54   20   Q    Is that what you want?

21   A    Yes.

22   Q    What's the background in this photo?

23   A    Height chart.

24   Q    Why is that a problem?

10:47:01   25   A    Suggests criminality.

1    Q    What else do you see in this wanted poster that stands out

2    to you as problematic?

3    A    Uh, the paragraph, the text above it.

4    Q    Walk us through what troubles you.

10:47:18    5    A    Uh, kind of all of it.  So "due to misidentification" is

6    definitely a problem.  I'm happy to go into that.  Um --

7    Q    Let's pause there.

8    A    Start --

9    Q    "Due to misidentification"; why does that concern you?

10:47:35    10    A    It concerns me, despite the extensive, uh, explanation we

11    heard before, because as someone without information about all

12    of that, as I was, and as I would think JV may have been when he

13    saw this, it looks like someone made a misidentification error,

14    and that's why this bad guy is on the loose.

10:47:58    15    Q    And let's put this in the context of chronology.

16         Your understanding is that this lineup occurred on

17    June 9th.

18    A    Um-hmm.

19    Q    We don't know specifically when, but some point in the

10:48:08    20    early afternoon.

21         And when was this bulletin wanted poster issued?  Same day

22    as the lineup?

23    A    Yes, five in the afternoon, according to it.

24    Q    Within hours.

10:48:22    25    A    Yeah.  So JV made a nonidentification and then saw this

1    that says "due to misidentification."

2              MR. BURSON:  Move to strike.  There's no question.

3              THE COURT:  Sustained.

4    BY MR. McENTIRE:  (Continuing)

10:48:39  5    Q    What else troubles you about this paragraph?

6    A    Uh, "suspect remains at large in the five murders" and the

7    name James Cloud, it's -- it's very, um, suggestive of all sorts

8    of terrible things.  "Armed and extremely dangerous," also.  And

9    that being linked to the "due to misidentification," it sounds

10:49:04  10    like not only was there a big error, but that that error has led

11    to serious outcomes, danger.

12    Q    Now, Special Agent Ribail didn't literally hand JV this

13    wanted poster.

14    A    Correct.

10:49:21  15    Q    He saw it a few hours later on social media.

16    A    Yes.

17    Q    From a scientific perspective, does this change your

18    opinion about the integrity of the subsequent identification?

19    A    The fact that it wasn't handed to him?  Let me try and

10:49:39  20    understand clearly.

21          No, that does not matter.

22    Q    Why not?

23    A    Because, um, the fact that there was an outside influence

24    that is likely to change memory, where it came from isn't the

10:49:52  25    most important thing about -- it's the fact that it exists, is

1    the -- is what can change memory.

2    Q    Is -- in your experience, is it possible for a witness to

3    look at a wanted poster like this, filter everything out and

4    just focus and come to -- just focus on the photo itself rather

10:50:14    5    than what surrounds it?

6    A    No.

7    Q    And there's research on this?

8    A    Sure.  Yes.

9    Q    Why?

10:50:19    10    A    Because humans are really terrible at filtering out context

11    information.  Um, the information is dramatically coloring how

12    that -- the person looks in that picture.

13    Q    Now, we heard testimony from Special Agent Ribail that

14    after viewing this wanted poster, JV was 100 percent certain

10:50:42    15    that this was the individual.

16        That sounds like a high level of confidence.

17    A    It does.

18    Q    What do you make of that?

19    A    Not very much.  Unfortunately, um, confidence in this kind

10:50:55    20    of judgment is not a very good predictor of accuracy.

21    Q    Why?

22    A    Because of many things.  Uh, confidence itself is actually

23    quite malleable, so it is possible to change confidence in all

24    sorts of ways that have no effect on the accuracy.  If the two

10:51:13    25    are independent of each other in that sense, then confidence

1    cannot be a very good predictor of accuracy.

2    Q    And did that statement of confidence happen actually during

3    the lineup?

4    A    Uh, no.

5    Q    It happened --

6    A    After.

7    Q    -- later.

8    A    Yes.

9    Q    From your perspective and experience -- effectively you

10   have two viewings, if you will.

11   A    Yes.

12   Q    The viewing that occurred actually during the lineup.

13   A    Yes.

14   Q    And the viewing that occurred a few hours later on social

15   media.

16   A    Yes.

17   Q    From a scientific perspective, which one counts?

18   A    The first one.

19   Q    And when you -- why?

20   A    There's actually very specific literature that addresses

21   this issue, research literature, um, testing, um, multiple, when

22   the same witness is exposed to multiple different sorts of

23   lineups and show-ups and whatever, the -- the only one that

24   predicts, um -- the only one that is -- or the one that is most

25   likely to be accurate is the first one.

 1      If multiple different lineups happen with the same person,

 2  the subsequent ones are much more likely to be problematic, less

 3  likely to be accurate.  It's the first one that matters.

 4  Q    Fair to say research has actually run scenarios and tests

10:52:40  5  on the exact factual scenario that we have here?

 6          MR. BURSON:  Objection.  That can't possibly be true.

 7  With a Yakama Nation --

 8  A    Well, it depends what you mean by exact, but --

 9          THE COURT:  Hold on, hold on, hold on.  I'm going to

10:52:54  10  sustain the objection.

11          MR. McENTIRE:  Let's try this again.

12          THE COURT:  Good try, though.

13  BY MR. McENTIRE:  (Continuing)

14  Q    Is it fair to say that research has been conducted

10:53:02  15  simulating where there is a nonidentification followed up by a

16  highly suggestive photograph or wanted poster?

17  A    Yes.

18  Q    And what does that research tell us?

19  A    It tells us that the first one is predictive of accuracy

10:53:22  20  and the later ones are not.

21  Q    Is there consensus on that point?

22  A    Yes.

23  Q    Has there been consensus on this point for quite some time?

24  A    The specific research addressing the -- that very precise

10:53:39  25  situation is relatively new, but the broader point that it is

1    the first identification is the one that matters, yes, there is

2    consensus on that.

3    Q    There's been suggestion that viewing a -- that this wanted

4    poster essentially constitutes a form of a public safety

5    announcement and that a witness should not be prohibited from

6    viewing or encountering a public safety announcement.

7         Do you have thoughts on that point?

8    A    I don't think that witnesses should be kept in the dark

9    from things that could keep them safe, as a rule, no.  However,

10   we should worry about the memory of a witness who has been

11   exposed to highly suggestive public service announcements of

12   this variety, the subsequent-to-that-point memory of the

13   witness.

14   Q    So it's a factor that the fact finder needs to take into

15   account, that they were -- that they encountered this

16   information.

17   A    Yes.

18   Q    So, Dr. Laney, we have a problematic wanted poster that

19   caused JV to change his mind on his nonidentification.

20   A    Apparently, yes.

21   Q    Let's talk solutions.

22        You mentioned that you've studied eyewitness

23   identifications in the legal setting.

24   A    Yes.

25   Q    Is there a lot of research in this area?

1    A    Uh, yes.

2    Q    Why?

3    A    Because it's important.  Um, yes, there's extensive

4    research because the academic community, um, especially in the

10:55:40    5    area of memory, is very interested in, um, producing work that,

6    um, is useful to applied settings, including the law.

7    Q    Are there times where jury instructions could help

8    ameliorate a corruption that occurred during an eyewitness

9    identification?

10:55:55    10    A    Yes.

11    Q    How?

12    A    Jury instructions can be helpful in directing witness -- or

13    jurors' attention to specific details, um, and potentially away

14    from some sorts of specific details.  So, yes, it can -- it can

10:56:17    15    guide, um, juries to some extent, as to what they might want to

16    focus on.

17    Q    Are they a cure here?

18    A    No.

19    Q    Why?

10:56:27    20    A    Because, um, any instruction to completely ignore a

21    particular witness, which is what would be required in this

22    situation, um, is likely to be resoundly ignored by jurors.

23    Q    Is there -- is there research on this point?

24    A    Yes, there is.

10:56:46    25    Q    Is there general scientific consensus on this point?

1    A    Yes.

2    Q    So the takeaway is you can instruct, but it won't cure the

3    issue.

4    A    Correct.

10:57:03    5    Q    Would cross-examination help?

6    A    Potentially.

7        MR. BURSON:  I'm going to object, Your Honor.  Based on

8    the expert reports that I have, there is information on here

9    about how memory can't be corrected, but not specifically about

10:57:17    10    trial procedures, jury instructions; things of that nature.  So

11    I think this falls outside of the doctor's expertise.

12        THE COURT:  Sustained.

13        MR. McENTIRE:  Yeah, Your Honor, may I be heard?

14    There's actually -- this is the final opinions in Dr. Laney's

10:57:31    15    report, specifically tied to jury instructions,

16    cross-examination, and whether or not it would cure it.

17        THE COURT:  Why don't you lay the supportive testimony

18    for that.

19    BY MR. McENTIRE:   (Continuing)

10:57:46    20    Q    Dr. Laney, in your research involving eyewitness

21    identification and memory, you indicated that you've taught

22    classes that have to do with how this relates to the legal

23    world.

24    A    Yes.

10:57:59    25    Q    And when I say "the legal world," specifically how

1    eyewitness identification and memory is -- plays out in the

2    courtroom setting.

3    A    Yes.  Also jury decision-making.

4    Q    And so this is an area that you've researched?

10:58:13    5    A    Yes.

6    Q    Is there a lot of research in this particular area?

7    A    Yes.

8    Q    Is this something that you've been familiar with over the

9    course of your career?

10:58:23    10    A    Yes, I've taught master students and undergraduate students

11    for close to 20 years on this material exactly.

12    Q    Dr. Laney, did you offer, based upon your skills,

13    knowledge, experience, education, and training, opinions in this

14    case, specifically as it relates to cross-examination and jury

10:58:45    15    instructions?

16    A    Yes.

17    Q    Not only with respect to JV but also with respect to LL.

18    A    Yes.

19    Q    As well as EZ.

10:58:54    20    A    Yes.

21    Q    So in each of those three different reports, you offered

22    expert opinions on whether or not these issues can be cured.

23    A    I believe I referred in at least one of them to another

24    one, but, yes.  Yes.  If -- if "please see my comments on the

10:59:17    25    other report on these direct issues" is relevant, then, yes.

1          MR. McENTIRE:  Your Honor, I don't know if that

2     addresses the Court's, I guess, foundational question.

3          THE COURT:  I want to hear argument on it now.

4          So I'll hear your objection.  Go ahead.

10:59:35  5          MR. BURSON:  So referring -- referring to the report on

6     JV, I believe it's Opinion No. 4, which addresses the curation

7     aspect -- and I want to be clear.  My objection is not that the

8     witness can't testify to how hard it is to cure a memory later

9     on or -- or -- or a misidentification.  My objection is to her

11:00:01 10     testimony regarding the mitigation effects of jury instructions,

11     the mitigation effects of cross-examination, the mitigation

12     effects of closing arguments, the mitigation effects of expert

13     testimony.  That specifically I don't see the qualification for,

14     certainly not in the report that was proffered, and the

11:00:24 15     testimony hasn't changed my mind in that regard.

16          MR. McENTIRE:  Your Honor, my response would be, is that

17     in Dr. Laney's report, Page 11 in the expert opinion, Opinion

18     No. 5, the specific opinion is -- and I can pull it up, which is

19     currently on the monitor -- (reading):  JV's identification of

11:00:45 20     James Cloud after exposure to the press release should not be

21     presented to the jury because it is un -- likely to be unduly

22     influential in their decision-making process.

23          And then Dr. Laney goes in and provides not only the

24     bases for the opinion on the research regarding how it can

11:01:00 25     impact jurors in the decision-making process, but also the

1    underlying authority for it.

2          And this was an opinion that was provided not only in

3    the expert report regarding JV but also LL and also EZ.  This is

4    an area that Dr. Laney has testified that she is well versed in,

11:01:16  5    well researched in, that she is -- there's ample amount of

6    research on this specific subject where essentially models or

7    simulations have been run and conducted and tested on how jurors

8    are impacted by this information.  And so I think it is well

9    within her province in this area to opine how a curative

11:01:36  10   instruction can or cannot, how cross-examination can or cannot,

11   impact an individual, or fact finders particularly, in assessing

12   an identification's reliability.

13          THE COURT:  Anything else?

14          MR. BURSON:  No, Your Honor.

11:02:01  15          THE COURT:  I'm not going to allow that opinion.  I'm

16   going to sustain the objection.

17   BY MR. McENTIRE:   (Continuing)

18   Q    Dr. Laney, in your experience, in the history of eyewitness

19   identification, has it resulted in -- has it been tied --

11:02:22  20   wrongful identifications, do they exist?

21   A    Yes.

22   Q    From your research.

23   A    Yes.

24   Q    And we're not talking about in testing or models but

11:02:29  25   actually in actual court cases.

 1    A    Yes.

 2    Q    Has this particular issue that we're discussing here, in

 3    terms of post-event information, been tied to wrongful

 4    convictions?

11:02:40  5    A    Yes.

 6    Q    Dr. Laney, I want to pivot and talk about the problems --

 7    we've talked about the problems with respect to JV's

 8    identification.  I want to pivot, actually, now and let's talk

 9    about LL in sort of a short -- short form, since we covered this

11:03:11 10    in detail with JV.

11         Were the agents -- one agent -- were the law enforcement

12    officers the same with respect to JV's lineup as with respect to

13    LL?

14    A    That is my understanding.

11:03:24 15    Q    One FBI agent, one Yakima County Sheriff's Office

16    detective?

17    A    Yes.

18    Q    Was -- did they fail to record this lineup as well?

19    A    Yes.

11:03:35 20    Q    Violating the same Yakima County Sheriff's Office policies

21    that we discussed with JV's lineup?

22    A    Yes.

23    Q    And violating the same best practices that you're aware of?

24    A    Yes.

11:03:45 25    Q    And also violating the same policies set forth in the

1    Department of Justice's update or memorandum, if you will, in

2    January of 2017.

3    A    Yes.

4         MR. McENTIRE:  Your Honor, may I please have permission

11:04:45  5    to approach the podium to use the Elmo?

6         THE COURT:  Yes.

7         MR. McENTIRE:  And, Ms. Cruz, may I please have the

8    Elmo?

9    BY MR. McENTIRE:  (Continuing)

11:05:10  10   Q    Dr. Laney, I'm showing you what's been marked and

11   previously admitted as Defense Exhibit 1023.

12        Are you familiar with this document based upon the -- what

13   occurred yesterday?

14   A    Yes.

11:05:26  15   Q    And I want to draw your particular attention to

16   Exhibit 1023, Page 20, Section 3.9 having to do with recording

17   identification results.

18        Can you see that on your monitor?

19   A    Yes.

11:06:12  20   Q    And I want to take you down to the second bullet point

21   that's identified here, which discusses (reading):  Recording

22   both identification and nonidentification results in writing,

23   comma, including the witness' statement of certainty regarding

24   his or her degree of certainty.

11:06:33  25        So I guess what I'd like to unpack here for a moment is,

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

364

1    are those two separate things that need to be documented,

2    meaning the identification and the degree of certainty?

3    A    Yes.

4    Q    So the first part is essentially a thumbs-up or a

5    thumbs-down.

6    A    Yes.

7    Q    And then the second part is unpacking that in terms of the

8    level of certainty on the thumbs-up or thumbs-down.

9    A    Correct.

10   Q    Would you agree that it is consistent with policy to just

11   record thumbs-up and thumbs-down without recording the second

12   part?

13   A    No.

14   Q    Why?

15   A    Because degree of certainty matters, and especially degree

16   of certainty at the time that the lineup happens.

17   Q    And specifically referring to this, degree of certainty

18   matters not only with respect to the identification but also

19   with respect to the nonidentification.

20   A    Correct.

21   Q    And we covered that earlier.

22   A    Yes.

23   Q    Dr. Laney, I want to pivot to talk about the -- are you

24   familiar with the January -- the FBI's January 2020 interview

25   that occurred with LL?

 1    A    Yes.

 2    Q    You're familiar with this from essentially, I suppose,

 3    three places.  The first would be is the 302 documenting this by

 4    both Special Agent Ribail and Jennifer Terami?

11:08:35  5    A    Yes.

 6    Q    The second place that you're familiar with it is the

 7    follow-up investigation done by Investigators Chris Reyes as

 8    well as Cole Rojan?

 9    A    Yes.

11:08:47 10    Q    And the third place is you're familiar with it from the

11    testimony that you heard yesterday.

12    A    Yes.

13    Q    Dr. Laney, during the -- during the interview with the FBI,

14    and I'm paraphrasing here, but it -- when LL started referring

11:09:14 15    to the red-shirted male as James Cloud, it caught the agents off

16    guard or by surprise, or words to that effect.

17    A    That was my impression as well.

18    Q    And that was just happening during the normal course of

19    conversation.

11:09:30 20    A    Again, that's my impression as well.

21    Q    What stands out to you scientifically about what is going

22    on there?

23    A    Um, that was new information, and they -- I -- I would

24    think that they should have followed up on that information

11:09:43 25    carefully.

1          MR. BURSON:  Move to strike as nonresponsive.  I'm not

2     sure what is scientific about that statement.

3          THE COURT:  Sustained.

4     BY MR. McENTIRE:  (Continuing)

11:09:58  5     Q    When the agent asked LL to clarify where this -- or provide

6     information of where this came from, referred to:  After seeing

7     James Cloud's face and hearing his name on the news.

8     A    Yes.

9     Q    Scientifically, what troubles you about that information

11:10:17  10    that LL provided to the FBI?

11    A    It contradicted what he had said before.

12    Q    And where did that contradiction come from?

13    A    According to his statement, it came from the news; that he

14    had received outside information after the lineup.

11:10:38  15    Q    Does that trouble you with respect to the LL's statement

16    regarding now who he believes is the red-shirted male?

17    A    Yes.

18    Q    Why?

19    A    Because it's -- outside information seems to have changed

11:10:55  20    his memory relative to what he said during the lineup.

21    Q    So let's talk about, fast forwarding from January 27th,

22    2020, to August 7th, 2020, when LL was interviewed by

23    investigators from the Federal Defender's Office.

24         LL had indicated that a few days after the shooting that he

11:11:23  25    had spoke with some people who told him that he was shot by the

1    Clouds.

2        Does that trouble you, when examining LL's opinion

3    regarding who he identified and who shot him?

4    A    Yes.

11:11:41  5    Q    Why?

6    A    That suggests additional outside information that may have

7    affected his memory, apparently has affected his memory for what

8    he had said before.

9    Q    Does it trouble you that LL could not remember the names of

11:11:55 10    the individuals that he spoke with?

11    A    Yes.

12    Q    Why?

13    A    Because not only has this information apparently changed

14    his memory, but he's willing to change his memory without even

11:12:06 15    knowing where that information came from.  That suggests he has

16    a very low threshold for being willing to change his memory.

17    Q    Do we know whether or not this was, these two to three

18    individuals were other witnesses in the case?

19    A    No.

11:12:19 20    Q    So we have no context on who these individuals were.

21    A    Indeed.

22    Q    Or how reliable their information was.

23    A    Indeed.

24    Q    Mr. -- excuse me.  LL also mentioned speaking with the

11:12:35 25    *Yakima Herald Republic* reporter just a few days after the

1   shooting, during an interview where a connection was formed

2   between the Clouds and the Medicine Valley -- these Clouds and

3   the Medicine Valley murders.

4       What stands out to you, again scientifically, about what is

11:12:55   5   going on there?

6   A   Again, another source of post-event information about, um,

7   what he witnessed.

8   Q   Dr. Laney, during your review of the discovery, do you --

9   who did LL identify originally during his lineup as the

11:13:18   10   blue-shirted male who shot him?

11   A   Morris Jackson.

12   Q   Based upon your review of the discovery, as well as

13   listening to testimony, has that opinion changed?

14   A   Yes.

11:13:36   15   Q   Who does he now believe has shot him?

16   A   He now believes the man in the blue was Donovan Cloud.

17   Q   What's going on here?

18   A   His memory has changed over the course of those months,

19   apparently due to outside post-event information.

11:13:57   20   Q   During his original lineup, LL did not identify James Cloud

21   as the red-shirted male who shot Dennis Overacker.

22   A   Correct.

23   Q   Today he believes James Cloud is the red-shirted male that

24   shot Dennis Overacker.

11:14:18   25   A   Apparently.

1    Q    What is going on here?

2    A    Same thing.  His memory has changed over those months,

3    apparently due to post-event information.

4    Q    You also heard that LL actually believes that he picked out

11:14:30    5    James Cloud to begin with originally.

6    A    Yes.

7    Q    Even though we know objectively he did not.

8    A    Yes.

9    Q    What's going on here?

11:14:41    10    A    His memory has been updated, and he is unaware that his

11    memory has been updated.  So to go back to the metaphor about

12    the bricks, his current wall has substantially different bricks

13    in it than it did when he first, um, reviewed the lineup, the

14    actual lineup, and he is unaware that there are substantially

11:15:07    15    different bricks in that memory wall.  And that's not surprising

16    to me.

17    Q    He literally remembers two things that never happened.

18    A    Yes.

19    Q    Is this a real-life example of memory corruption in action?

11:15:21    20    A    Yes.  False memory even, yes.

21        MR. McENTIRE:  Your Honor, I'm going to ask this

22    question for record preservation purposes.

23        THE COURT:  Um-hmm.

24    BY MR. McENTIRE:  (Continuing)

11:16:04    25    Q    Dr. Laney, based upon your extensive research in this

1   field, is this something that can be corrected or ameliorated

2   through either jury instructions or cross-examination?

3         MR. BURSON:  Objection; same as before.

4         THE COURT:  Sustained.

11:16:30  5         MR. McENTIRE:  Your Honor, for the record, I think I

6   would proffer that, based upon her extensive experience, that

7   this is an area where she believes she would -- jury

8   instructions and cross would not be able to cure this, for

9   purposes of the record.

11:16:44  10         MR. BURSON:  Move to strike.

11         THE COURT:  I'll overrule that request to strike.

12  BY MR. McENTIRE:   (Continuing)

13  Q    Dr. Laney, let's talk about familiarity.

14       LL has met James Cloud before.

11:17:01  15  A    So he says, yes.

16  Q    Encountered him within the last 12 to 18 months-ish for an

17  interaction at his home.

18  A    Yes.

19  Q    How does that impact things?

11:17:16  20  A    If he had met Mr. Cloud, was familiar with Mr. Cloud before

21  the events, um, that should have made it much easier to

22  recognize him in the lineup, especially if he was also the

23  perpetrator.

24  Q    But he did not select him from the lineup.

11:17:34  25  A    Correct.

1   Q    What does that tell you with respect to reliability of the

2   nonidentification?

3   A    It increases the reliability of the nonidentification.

4   Q    Based upon what you've heard on the testimony regarding the

11:17:53  5   encounter with LL, was he simply putting names to faces?

6   A    I don't know what that means in this context.  That didn't

7   make sense to me.

8   Q    Let's talk about health.  LL advised Mr. Reyes that he was

9   going -- he was battling cancer last summer, he actually had had

11:18:20  10   a lung removed, and was going through chemo right before the

11   events in Medicine Valley.

12   A    Yes.

13   Q    In your experience, have you done any research into the

14   term chemo brain?

11:18:37  15   A    Yes.

16   Q    What does that mean?

17   A    Uh, it's a fairly common experience among patients

18   undergoing chemotherapy that their cognitive function declines

19   and they suffer some memory problems.

11:18:49  20   Q    Does that impact reliability?

21   A    It suggests that there may be an explanation for him not

22   remembering as much, yes.

23   Q    Another factor for the fact finder to consider?

24   A    Yes.

11:19:02  25   Q    Dr. Laney, I want to pivot now to the final identification

1    here, lineup, and that involves EZ.

2        Are we dealing with the same agents?

3    A    No.

4        MR. McENTIRE:  Your Honor, this is where we're going to

11:19:31  5    take a shot at trying to play a couple of video clips.

6    BY MR. McENTIRE:   (Continuing)

7    Q    A couple of preliminary questions.

8        From a documentation standpoint, what is the first thing

9    that stands out to you regarding this lineup?

11:19:47  10   A    Uh, it was recorded.

11   Q    Video and audio.

12   A    Yes.

13   Q    You've reviewed this video?

14   A    Yes.

11:19:57  15   Q    Did it make a difference in your assessment?

16   A    Yes.

17   Q    So let's unpack what happened, and I'd like to play --

18   Dr. Laney, what I'd like to do is play a couple of snippets for

19   you in successive order, and then ask questions related to those

11:20:27  20   snippets.

21       MR. McENTIRE:  And then, Your Honor, these are all

22   snippets from the recorded interview which has been previously

23   admitted as an exhibit in this case.

24       THE COURT:  Any objection to that presentation, Counsel?

11:20:42  25       MR. BURSON:  No, Your Honor.

1           THE COURT:  Okay.

2           (Court, IT, and counsel conferring.)

3           (Whereupon a video clip was played.)

4    BY MR. McENTIRE:   (Continuing)

11:21:19  5    Q    The one individual in that clip is EZ?

6    A    Yes.

7    Q    The second individual in that clip is Detective Mike

8    Williams?

9    A    Um-hmm.

11:21:26  10   Q    And from what you could hear, the context of that was

11   Detective Williams referring to the fact that EZ was allowing

12   the driver of this vehicle, the truck, Dennis Overacker, who was

13   using marijuana, to drive both her and her child around that

14   day.

11:22:05  15        (Whereupon a video clip was played.)

16           MR. BURSON:  Your Honor, I'm going to object to this

17   point.  I think we've done enough at this point --

18           (Whereupon a video clip was played.)

19           THE REPORTER:  Counsel, I can't hear you while that is

11:23:27  20   playing.  I'm sorry.

21           MR. BURSON:  I'm going to object at this point, Your

22   Honor.  I think we've played enough snippets to refresh the

23   witness' memory of the clips she's already viewed.  I know the

24   Court's already reviewed it.  At this point it just appears that

11:23:45  25   we're cherry-picking statements out of the ten-minute

1    discussion.  So unless there's going to be questions about these

2    specific statements, I'm not sure what the relevance is.

3         MR. McENTIRE:  There absolutely is going to be questions

4    about these specific statements.

11:24:07    5         THE COURT:  Okay.  Overruled.

6         Go ahead.

7         MR. McENTIRE:  And there's only two more.

8         (Whereupon a video clip was played.)

9    BY MR. McENTIRE:  (Continuing)

11:24:37   10    Q    So, Dr. Laney, you've had an opportunity to review not only

11    the full video but these clips as well.

12    A    Yes.

13    Q    You heard testimony yesterday that part of the provenance

14    of these questions is, from Detective Williams, is this started

11:24:52   15    out as a, I guess a child endangerment, CPS-type inquiry that

16    morphed into the Medicine Valley investigation.

17    A    Yes.

18    Q    Dr. Laney, is there research that exists discussing how --

19    how do you -- how do these comments fit into your research -- or

11:25:31   20    fit into the research regarding properly conducting a lineup?

21    A    So, um, there are lots of different things about, um, the

22    experience of being interviewed, um, and the process of

23    conducting a lineup that can affect responses.  Among those

24    things are, um, how, uh, the witness is doing emotionally at the

11:26:05   25    time that they're -- that they're asked to complete the lineup

1    or participate in the lineup.

2         Um, in this situation, um, Detective Williams' questions --

3    and I hesitate to use the term "questions," because it seemed

4    much more like moralizing lecturing.  Um, in an interview, it's

5    supposed to be information-gathering, and this didn't seem

6    information-gathering.  But the net effect of this interaction

7    was that EZ slumped down in her chair, she started to cry; she

8    clearly was in a very different emotional place after

9    experiencing these -- this line of questioning than she was

10   before it.

11        And there is extensive research, um, showing that, um, low

12   self-esteem can increase suggestibility in a way that's relevant

13   for lineups, and also that sadness actually can dramatically

14   increase suggestibility in a way that's relevant for lineups.

15   Q    Now, just to be clear on the chronological order of these

16   for an accurate record, with the exception of the last clip,

17   which there was a comment from Detective Williams on "you fucked

18   up," the previous clips were all taken before the lineup was

19   administered.

20   A    Yes.

21   Q    The last clip occurred after the lineup was administered.

22   A    And, therefore, could not have affected the outcome of the

23   lineup.  But the others certainly could.

24   Q    Now, there was testimony yesterday on how sort of the

25   justification or explanation for this was that Detective

 1    Williams was there in part, or at least initially, as he

 2    testified to before pivoting, there to conduct a CPS child

 3    endangerment investigation.

 4        Does that fact fit into the calculus when you are assessing

 5    how this information impacted EZ?

 6    A    No.

 7    Q    Why?

 8    A    Because it doesn't matter what the purpose was of asking

 9    the questions.  What matters is the effect on EZ and what it did

10    to her right before she completed this lineup.

11    Q    You heard testimony yesterday from Detective Williams, and

12    wrapping it up this morning, that there were two Yakima County

13    Sheriff's Office policies that were violated during the

14    course -- more than that.  Let me clarify.

15        Detective Williams acknowledged violating a few different

16    Yakima County Sheriff's Office's policies during the course of

17    this lineup.

18    A    Yes.

19    Q    The tail end involved him not cautioning EZ against

20    performing outside research.

21    A    Yes.

22    Q    But during the lineup, Detective Williams also acknowledged

23    he did not conduct a sequential lineup; he conducted a

24    simultaneous one.

25    A    A blend, but yes.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*          377
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1    Q    In violation of policy.

2    A    Correct.

3    Q    He also recognized that he conducted an unblinded lineup.

4    A    Yes.

11:29:34  5    Q    In the hierarchy of things, where does conducting an

6    unblinded lineup fall in terms of importance of things to do

7    when administering a proper lineup?

8    A    Very high.

9    Q    Why?

11:29:47  10   A    Because if a lineup is properly conducted in a genuinely

11   blinded way, especially double-blind, then there are many, many

12   fewer opportunities for, um, information -- biassing information

13   to come from the person conducting the lineup to the witness.

14   Q    There's research that suggests that there's a near zero

11:30:12  15   chance of an unblinded lineup not impacting the witness at all.

16        Would you agree with that?

17   A    I would agree with that, yes.

18   Q    Why?

19   A    Because whether the person conducting the lineup to means

11:30:30  20   to or not, there are just so many ways that information can be,

21   um, shared between people.

22   Q    Is there a scientific principle that applies to this, the

23   expectation principle?

24   A    Yes.

11:30:43  25   Q    What is that?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1   A    It's also called experimenter bias, in my world.  But yes,

2   that is the idea that the person here conducting a lineup,

3   otherwise conducting research, can influence the results thereof

4   a myriad different ways, again, without necessarily wanting to

11:31:05   5   or intending to at all.  Um, the mere presence of -- of

6   knowledge on the part of the person conducting the lineup and

7   interaction between that person and the witness, information is

8   exchanged.

9   Q    What I want to do next is play one clip where the

11:31:22  10   identification occurred that includes both before and after, and

11   then I have a few questions for you from that.

12   A    Okay.

13        (Whereupon a video clip was played.)

14   BY MR. McENTIRE:   (Continuing)

11:33:30  15   Q    Let's unpack what that 1 minute and 42 seconds, what

16   happened during that time.

17        What are some things that stood out to you?

18   A    Again, very much not blinded.  Everyone could see the

19   pictures.  Um, everyone in the room could see what EZ was

11:33:46  20   looking at.  Um, she was flipping through the pictures and, to

21   some extent, comparing them to each other um, which suggests

22   that -- so the lineup is neither blinded nor truly sequential.

23   Q    So that's the procedure itself, which we've covered.  What

24   I want to pivot to and draw your attention to --

11:34:07  25   A    Yes.

1   Q    -- is did anything in reviewing this 1 minute 42 second

2   clip stand out to you regarding what the detectives were doing?

3   A    Yes.  They were exchanging knowing glances, it seemed, and

4   moving pens around.

11:34:22  5   Q    If this was a blinded lineup, would any of that have

6   happened?

7   A    No.

8        MR. BURSON:  Objection; calls for speculation.

9        THE COURT:  Sustained.

11:34:33 10   BY MR. McENTIRE:  (Continuing)

11   Q    If this was a blinded lineup, would the detectives know

12   which photo she's looking at?

13   A    No.

14   Q    Would the detectives --

11:34:58 15        I want to unpack a couple of questions regarding subtlety.

16        Did you notice anything during that 1 minute 42 second clip

17   of Detective Williams or Detective McIlrath saying something as

18   obvious as, "Are you sure about Photo No. 2?"

19   A    No.

11:35:22 20   Q    Does that change your opinion regarding the problems

21   regarding what the detectives were doing with respect to -- to

22   their reactions?

23   A    No.

24   Q    Why?

11:35:33 25   A    Because it doesn't have to be dramatically obvious outward

1   interactions.  Again, it doesn't have to be intentional.  Humans

2   are, um, susceptible to very, very subtle cues from other

3   humans.

4   Q    So an individual can be influenced by cues that we can't

11:35:56  5   pick up on.

6   A    Yes.

7   Q    That we can't see, for example, what Detective Williams'

8   facial expressions are.

9   A    Indeed.

11:36:04  10  Q    If this was a blinded lineup, would either of those

11  detectives been able to have those reactions and gesticulations?

12  A    Not in a way that's associated with who the suspect is.

13  Not in a way that matters here.

14  Q    The tough question here is:  Can you quantify how the

11:36:35  15  detectives' behaviors changed EZ's -- we see her -- let me

16  unpack this.

17       MR. BURSON:  While counsel is thinking about how to ask

18  the question, I'm going to object because of the word

19  "quantify."  I think that calls for a little bit too much

11:36:55  20  exacting that would require some speculation.

21       THE COURT:  Let's hear the question.  We'll go from

22  there.

23  BY MR. McENTIRE:  (Continuing)

24  Q    Dr. Laney, do we know how much these -- the detectives'

11:37:25  25  behaviors contributed or impacted EZ?  Can we sit here and

1    measure that?

2    A     No.

3    Q     Is that a problem?

4    A     Yes.

11:37:34  5    Q     Why?

6    A     Because that means there's no immediate solution for it.

7    We can't undo it because we can't measure exactly what's

8    happening.

9    Q     So if I understand the research on this, we know that an

11:37:55  10    unblinded lineup has a near zero chance of being harmless.

11    A     Correct.

12    Q     But we just don't -- we can't quantify how much it actually

13    impacted EZ.

14    A     Correct.

11:38:06  15    Q     And therein lies the problem.

16    A     Yes.

17    Q     So it's a corruption level that we cannot quantify.

18    A     Yes.

19    Q     Were there reactions or things that EZ stated during the

11:38:28  20    course of that 1 minute and 47 seconds that suggests she was

21    impacted, from your review?

22    A     She did focus more on pictures after the pen was laid on

23    pictures, perhaps, but it's -- it's hard to quantify or it's

24    hard to -- to be precise in those ways.

11:38:55  25    Q     And did she say any statements --

1    A    No.

2    Q    -- during that 1 minute and 47 seconds?

3    A    Oh.  Did she say --

4    Q    Make comments.

11:39:08    5    A    Yes, rather vague ones.

6    Q    Let's talk about guns.

7         You read reports on what unfolded with EZ during the

8    afternoon of June 8th.

9    A    Yes.

11:39:38   10    Q    As described, saw her friend get shot in the front seat of

11   her car -- or the front seat of this truck.

12   A    Yes.

13   Q    What is weapons focus?

14   A    Weapon focus is a long-established phenomenon whereby, um,

11:39:52   15   a weapon or a bloody wound or something else that is visually

16   very exciting, uh, in the middle of a scene tends to attract a

17   witness' attention, so they end up focusing some amount of their

18   attention on that weapon or that bloody wound.  Um, often they

19   end up able to describe the details of those, um, attention

11:40:16   20   magnets, we call them, um, well.  But that comes at the expense

21   of having attention left over for other -- other visual

22   information.

23   Q    Does it impact reliability?

24   A    Yes.

11:40:28   25   Q    Is there scientific consensus on this point?

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    383
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1   A    Yes.

2   Q    Similar question to -- with respect to the unblinded

3   lineup:  Is it possible to quantify what -- how much weapons

4   focus impacts an eyewitness?

11:40:46   5   A    No.  We can just talk about situations where it's more and

6   less likely to happen.

7   Q    Then are we able to quantify how concerned we should be

8   about it?

9   A    No.

11:41:07   10   Q    I'd like to ask a couple of questions about emotional

11   attachments to life events.

12        Dr. Laney, in reconstructing my Lego wall, I can remember

13   where I was when September 11th happened with clarity, I think.

14        Why is it that a human is able to recall an emotional or a

11:41:32   15   significant event with such clarity so many years later?

16   A    There are a few different answers but, largely, emotional

17   involvement with an event, um, increases the vividness of a

18   memory.  Um, it also, to some extent, increases the accuracy.

19   So we remember the big, important days in our lives, which is a

11:41:54   20   good thing, because we would get in trouble if we didn't

21   remember the big, important things in our lives.  And that is

22   largely about the emotionality of those.

23        So in -- in -- very briefly, in brain terms, um, emotion

24   involves your amygdala, and when you involve the amygdala in the

11:42:11   25   process of laying down memories, it's an advantage.  You do a

1    little bit better for broadly emotional events than nonemotional

2    events.

3    Q    On June 8th, EZ experienced an emotional event.

4         Why wouldn't this create the same level of clarity as when

5    I can remember September 11th?

6    A    Because the emotion she was experiencing was stress, and

7    stress actually has its own set of effects on memory.

8    Q    Has this been extensively studied?

9    A    Yes.

10   Q    Are there any studies that stand out?

11   A    Yes.  So, in general, creating extreme stress in the

12   laboratory is not something that we do, for ethical reasons, but

13   there -- really, we try hard -- but there's actually a series of

14   studies that were conducted, uh, in a military survival training

15   camp.  So soldiers were being trained to deal with stressful

16   experiences, so researchers came in and worked with them to

17   understand what was happening in those stressful circumstances.

18   So the soldiers are sleep-deprived and food-deprived and

19   experience really intense interrogations.

20   Q    And that is to generate stress.

21   A    Right.  Right.  It's -- they're experiencing stressful,

22   very stressful experiences, and so we can use that as a model

23   for other very stressful experiences that we couldn't produce in

24   a lab.

25        And in the classic one of these studies, um, actually,

1    across several different studies, um, the soldiers were actually

2    randomly assigned to two different conditions with two different

3    levels of interrogation.  So in the less stressful condition,

4    the soldiers were interrogated for a good half hour across a

11:43:57  5    table in a -- sort of similar to a police interrogation style.

6        In the other condition, the interrogators actually got

7    right up in their faces and demanded eye contact and yelled in

8    their faces.  So that's the higher stress version.  And then the

9    next day, after everyone had slept and eaten, um, they did a

11:44:17  10    lineup, basically.  They took a bunch of soldiers, um, and put

11    them together in a live lineup.  And one of the soldiers was the

12    interrogator who was standing in here for a perpetrator, the

13    interrogator, again, that had sat across the table from them or

14    been right up in their faces yelling at them the day before.

11:44:37  15        And broadly, this seems like this should be the most easy

16    lineup identification task ever:  Which of these people was the

17    guy that yelled at you a whole bunch yesterday?  Seems very

18    straightforward.  But it turns out stress is not very good in

19    this situation.

11:44:51  20        Um, in the low interrogation condition, where they were,

21    again, interrogated across the table, about two-thirds of the

22    soldiers were able to pick the right interrogator out of the

23    lineup.

24        In the high stress, where, again, the guy was right up in

11:45:07  25    their face yelling at them, only about a third of those soldiers

1    were able to pick the correct guy out of the lineup.

2    Q    So we're talking about a study where for not just minutes,

3    roughly 30 minutes was within a few feet of that individual.

4    A    Yes.

11:45:29    5    Q    Speaking of distractions, did EZ -- was there mention in

6    the discovery of the fact was she -- was there another member of

7    her family inside that truck?

8    A    Yes, her six-month-old son, I believe, was sitting on her

9    lap.

11:45:45    10    Q    What role does the presence of her child play, from a

11    reliability standpoint?

12    A    There is not very specific research, that I'm aware of, on

13    exactly this point, but there's every reason to believe that her

14    son was absorbing some of her attention, hopefully, right?  So

11:46:00    15    she does talk about diving to protect her son, which, again,

16    suggests that his presence there was absorbing some of her

17    attention, which means she had less attention left over for

18    other things.

19    Q    In your review of the video, is there anything that causes

11:46:17    20    you to come to the conclusion that EZ was, in fact, impacted by

21    stress that day?

22    A    The way she describes the events suggests that, yes, she

23    was very stressed that day.

24    Q    Anything that stands out in particular for those

11:46:28    25    descriptions?

1    A    She was shot; she witnessed deaths of friends.  Um, it was

2    a very, very stressful experience.  Also trying to protect her

3    son probably would fit into that as well.

4         MR. McENTIRE:  Ms. Cruz, may I please have the ...

11:47:06  5   BY MR. McENTIRE:   (Continuing)

6    Q    Dr. Laney, I'm showing you what's been marked for

7    identification purposes as Defense Exhibit 1022.

8         Are you familiar with this photograph from the discovery?

9    A    Yes.

11:47:16  10  Q    And what is this a photograph of?

11   A    Um, the truck that EZ and others were sitting in when they

12   arrived at the Medicine Valley.

13   Q    Does this photograph fairly is and accurately depict the

14   back half of this truck?

11:47:29  15  A    I believe so, yes.

16        MR. McENTIRE:  I'd move for admission of Defense

17   Exhibit 1022.

18        MR. BURSON:  No objection.

19        THE COURT:  It will be admitted.

11:47:40  20      (Defense Exhibit No. 1022 admitted into evidence.)

21   BY MR. McENTIRE:   (Continuing)

22   Q    Dr. Laney, from your review of the discovery, EZ identified

23   sitting in the back left of the -- I guess it's not a full quad

24   cab, so jumper seat, if you will.

11:48:01  25  A    Yeah, I don't know what the seats looked like, but yes, in

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*            388
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Laney/D/McEntire*

1    the back there.

2    Q    Are there, from a reliability standpoint, things about

3    where she was sitting that give you pause on her opportunity to

4    view?

11:48:13   5         MR. BURSON:  Objection, Your Honor.  I don't believe the

6    expert is qualified to testify about how someone had the

7    opportunity to view or not.

8         THE COURT:  Hold on.

9         I'm going to sustain that objection.

11:48:38   10   BY MR. McENTIRE:  (Continuing)

11   Q    Dr. Laney, you've testified that during the course of your

12   experience and training in eyewitness identification that one of

13   the areas that you've studied is opportunity to view.

14   A    Yes.

11:48:52   15   Q    And during your course of studies in that area, you've

16   become familiar with various factors that may impact an

17   individual's opportunity to view.

18   A    Yes.

19   Q    Factors such as lighting.

11:49:04   20   A    Yes, distance.

21   Q    Factors such as visual obstructions.

22   A    Yes.

23   Q    Have you studied research in those particular areas, on

24   such as lighting and visual obstructions, that may impact an

11:49:16   25   individual's opportunity to view?

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1   A    Yes.

2   Q    Based on that research and experience, are there items

3   within this truck that give you pause regarding things that may

4   impact -- I'm not asking you to quantify it but just may impact

11:49:38   5   EZ's opportunity to view?

6   A    Yes.

7   Q    And what are those?

8   A    The very dark tinting on the back window and the, uh,

9   roll-bar, whatever that thing is on the back that seems to be

11:49:48   10   blocking some view out the back of the truck.  I am not a car

11   expert and will not claim to be such.

12        MR. BURSON:  I'm going to object to using this photo for

13   this purpose, Your Honor.  It was a bright, sunny day on the

14   date of the incident, and the truck was outside.  In this photo

11:50:04   15   it is clearly in a sheltered garage.  You can't actually see the

16   back window, nor can you see the front windshield, which is

17   where at least half of the observations would have taken place

18   through, if not the driver's side window, which is only

19   partially in this photo and clearly not as tinted as the rear

11:50:20   20   passenger window.  So I just don't think it's an appropriate

21   exhibit for anyone to try and figure out what could or could not

22   be seen outside of this truck.

23        THE COURT:  Overruled.

24   BY MR. McENTIRE:  (Continuing)

11:50:37   25   Q    Dr. Laney, when reviewing the discovery regarding EZ's

1  interview with agents -- detectives, excuse me, she described a

2  conversation that occurred over several minutes that was a

3  distance away.

4      In your experience, does distance play a role in

5  opportunity to view?

6  A    Yes.

7  Q    How?

8  A    If you can't see it clearly, you're not going to remember

9  it clearly.

10  Q    During that interview, without going to the specific clips,

11  did you hear answers or explanations from EZ indicating that she

12  had used both methamphetamine and marijuana shortly before

13  driving out to Medicine Valley?

14  A    Yes.

15  Q    Have you, in the course of your studies and research,

16  reviewed studies on the impact of either methamphetamine or

17  marijuana on an individual's ability, memory?

18  A    Yes, both.

19  Q    And what does the research tell us?

20  A    Uh, methamphetamine creates all sorts of, um -- uh,

21  problems for cognitive functioning and memory, um, use and

22  long-term abuse.  Both, um, have been shown in various kinds of

23  studies to produce quite significant problems for people's

24  thinking, clarity, and their subsequent memory for events.

25      Uh, marijuana, actually there is fairly recent research

1    demonstrating that, uh, those on marijuana are more likely to

2    form false memories than those not.

3    Q    During the course of the interview, we don't know how much

4    she smoked with respect to methamphetamine.

11:52:35  5    A    No.

6    Q    We don't know how much she smoked with respect to

7    marijuana.

8    A    True.

9    Q    We just know from the -- her interview answers that this

11:52:42  10    was before she headed out to Medicine Valley.

11    A    Correct.

12    Q    So, again, this impacts our ability to know how much this

13    impacted her memory.

14    A    Sure.  It's a concern.

11:52:56  15    Q    We just know that the science says that it does.

16    A    Yes.

17    Q    Dr. Laney, I want to pivot, and I want to talk to you about

18    cross-racial identification.

19         And I think we'll --

11:53:53  20         THE COURTROOM DEPUTY:  Mr. McEntire, just to let you

21    know, let me know when you're ready to display your screen.

22         MR. McENTIRE:  We're ready.

23    BY MR. McENTIRE:  (Continuing)

24    Q    Dr. Laney, just a few questions to lay the foundation for

11:54:07  25    this.

1       During the course of your review of the discovery, you had

2   an opportunity to review several videos.

3   A    Yes.

4   Q    Besides the video that involved EZ, there was also --

11:54:16  5   another of the videos that was present in discovery involved a

6   recorded interview with Morris Jackson.

7   A    Yes.

8   Q    And an interview that occurred on June 20th.  It involved

9   Special Agent Ribail as well as Special Agent Jennifer Terami.

11:54:32  10  A    Yes.

11  Q    I'm showing you what's been marked for identification

12  purposes as Defense Exhibit 1024.

13       Dr. Laney, have you had an opportunity to review this video

14  in full?

11:55:06  15  A    Yes.

16  Q    It's quite a long recorded interview.  What I'd like to do

17  is show you a portion of this and ask whether or not this

18  refreshes your recollection.

19       This is Morris Jackson --

11:55:29  20       MR. BURSON:  Your Honor, before we start playing videos,

21  is it going to be moved for admission?

22       MR. McENTIRE:  And I would be moving to admit this, Your

23  Honor.

24       MR. BURSON:  And we'd object on relevance.

11:55:38  25       THE COURT:  What's the relevance?

1          MR. McENTIRE:  It goes straight to the cross-racial

2     identification issue that exists with respect to EZ.

3          MR. BURSON:  The interview of Morris Jackson?

4          MR. McENTIRE:  Absolutely.  Would the Court like more

11:55:51  5     context?

6          THE COURT:  I need more information than that.

7          MR. McENTIRE:  Certainly, Your Honor.

8          In this recorded video, Morris Jackson is stating that

9     he is, in fact, the individual that went out to the gate to meet

11:56:04  10    the black F-250 that approached the Medicine Valley residence,

11    claiming himself that he was the one doing this.

12         During EZ's identification -- during the interview with

13    the detectives, she proceeds to describe the individual that

14    came up to the gate and confuses him with James Cloud.

11:56:29  15    So this speaks directly to the idea that Morris

16    Jackson -- excuse me, ▮▮▮▮▮▮▮ -- apologies, EZ, who is

17    Hispanic, was confusing one Native American for another in terms

18    of who came up and actually met the vehicle, which is

19    significant because she is describing the individual that she

11:56:50  20    met at the vehicle as a red-shirted male.

21         THE COURT:  Has there been testimony of EZ's ethnicity?

22    I don't recall that.

23         MR. McENTIRE:  There's about to be.

24    BY MR. McENTIRE:  (Continuing)

11:57:08  25    Q    Dr. Laney, during the course of your review of the

1    discovery, did you review discovery and reports that discuss the

2    fact of EZ's ethnicity?

3    A    Yes.

4    Q    And what was disclosed with respect to EZ's ethnicity?

11:57:27    5    A    That she is Hispanic.

6    Q    During the course of your review of the testimony, as well

7    as the discovery, was there information that came about on the

8    ethnicity of Morris Jackson?

9    A    Yes.

11:57:40    10    Q    And what is his ethnicity?

11    A    Native American.

12    Q    And with respect to James Cloud, are you familiar with

13    respect to what his ethnicity is?

14    A    Yes.

11:57:49    15    Q    And what is that?

16    A    Native American.

17        THE COURT:  What's the nature of the objection?

18    Relevance?

19        MR. BURSON:  Relevance.

11:58:00    20        THE COURT:  Overruled on that basis.

21    (Whereupon a video clip was played.)

22    BY MR. McENTIRE:  (Continuing)

23    Q    Dr. Laney, have you viewed this video in full?

24    A    I've reviewed parts of it, and I read the transcript in

11:58:37    25    full.

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                    395
Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020
Laney/D/McEntire

1    Q    From the context, Morris Jackson was referring to running

2    up to the truck that was approaching.

3    A    Yes.

4    Q    Was that the truck that was containing EZ?

11:58:46    5    A    Yes.

6    Q    And so Morris Jackson is indicating in his interview with

7    Special Agent Ribail, as well as Special Agent Terami, that he

8    was, in fact, the individual that was approaching to meet the

9    truck as it approached Medicine Valley's gate.

11:59:00    10    A    Correct.

11    Q    And I would like to offer --

12         THE COURT:  Oh, go ahead.

13         MR. McENTIRE:  And I would like to offer this exhibit,

14    Your Honor, as Defense Exhibit -- and I will offer the entire

11:59:09    15    video for complete context, as Defense Exhibit 1024.

16         MR. BURSON:  No objection.

17         THE COURT:  It will be admitted for this purpose.

18    (Defense Exhibit No. 1024 admitted into evidence.)

19         THE COURT:  And, Counsel, it's noon or -- it's noon, so

11:59:27    20    we will take our noon recess.

21         Before I tell you when we have to come back, I guess I

22    need to know:  How long do you have left?

23         MR. McENTIRE:  Approximately five to seven minutes of

24    questions, and then I will be done with direct.

11:59:42    25         THE COURT:  Then we're waiting five to seven minutes.

1    MR. McENTIRE:  Thank you.

2    THE COURT:  All right.

3  BY MR. McENTIRE:   (Continuing)

4  Q    So, Dr. Laney, you had an opportunity to review the entire

11:59:57  5  interview involving EZ and you read the transcript.

6  A    Yes.

7  Q    EZ indicated that the individual that ran up to the truck

8  was wearing a red shirt.

9  A    Yes.  One of the times, yes.

12:00:12  10  Q    And indicated that the red-shirted male looked white from a

11  distance but you could tell he was Native as he got closer.

12  A    Yes.

13  Q    Later in the interview, Dr. Laney, EZ selected Morris

14  Jackson as the individual who shot LL.

12:00:30  15  A    Yes.

16  Q    And described him as looking white from a distance but as

17  you -- as he got closer, you could tell he was Native.

18  A    Yes.

19  Q    What is going on here?

12:00:44  20  A    Confusion.  Her memory is, again, um, changing based on

21  additional information that she's, um, experiencing over the

22  course of this interview.

23  Q    And so she's quite literally confusing one Native American

24  male for another Native American male?

12:01:01  25  A    Yes.

1    Q    And, here, does -- this quite literally involves the

2    individual who it was that was wearing a red shirt and shot

3    Dennis Overacker.

4    A    Indeed.

12:01:12   5    Q    Is there a scientific name for this principle?

6    A    Several, actually; cross-race identification bias is -- I

7    won't give you 12 different words; there's lots of different

8    versions.  But yes, cross-race identification bias.

9    Q    Which is?

12:01:27   10   A    Which is -- this always feels so horrible to explain.  It

11   basically is, um, all of those people in category X look the

12   same.  So you sound like a terrible racist person by saying all

13   those Chinese people or all of those black people or all of

14   those Native Americans look the same, but it turns out our

12:01:50   15   brains kind of are a little bit racist in that way.  Um, people

16   that are of a different race than us, than one's self, look more

17   similar than other people of our own race.  And this is no

18   matter what race one is one's self.  It's other people get sort

19   of collapsed into a broader racial category, and we're less good

12:02:11   20   at distinguishing between individuals within other races.

21   Q    Is this something that is borne out in the research?

22   A    Yes.

23   Q    Extensively?

24   A    Yes.  Decades.

12:02:19   25   Q    Has it been shown to impact reliability?

1    A    Yes.

2    Q    How so?

3    A    Um, people are substantially more likely to falsely

4    identify someone of another race than of their own race.

12:02:31    5    Q    And so during the course of this interview, when you see EZ

6    confuse one Native American for another, that suggests to you

7    cross-racial identification is a factor that's played in this

8    identification?

9    A    It certainly seems so, yes.

12:02:45    10    Q    Or misidentification.

11    A    Indeed.

12    Q    We had a brief discussion earlier about timing of a lineup

13    and how that's important.  This lineup occurred a few days

14    later.

12:03:08    15        So the chronology is JV's lineup occurred the next day

16    after --

17    A    Correct, a few, yes.

18    Q    As did LL's.

19    A    Yes.

12:03:22    20    Q    EZ's was another day after that.

21        Does that additional day make a difference with respect to

22    timing and memory?

23    A    Yes.  The longer you wait, the -- the more problematic --

24    problems are going to be introduced, so the less reliable the

12:03:35    25    eyewitness is.

1    Q    Last point that I want to bring up is, Dr. Laney, in your

2    research -- not just in your research -- in the research that

3    you've reviewed, has there been extensive research into what I

4    will refer to as the Biggers factors?

12:04:00  5    A    Yes.

6    Q    These are factors developed by the Supreme Court back in

7    the '60s.

8    A    Correct.

9    Q    To assess the reliability of a lineup.

12:04:09  10         And have those factors been researched?

11    A    Yes, extensively.

12    Q    Specifically, the five factors that weigh into a

13    reliability analysis.

14    A    Yes.

12:04:17  15    Q    What does the research show?

16    A    The research shows that there is some evidence that each of

17    them is relevant, to some extent, but much more, there are many

18    other factors that are not included in those criteria that

19    matter a whole lot to the reliability of eyewitnesses and

12:04:38  20    identifications.  And, also, the factors actually interact with

21    each other in complicated ways that are not addressed in the

22    factors themselves.

23    Q    What are the factors that are missing from the Biggers

24    analysis when a Court is conducting a reliability analysis?

12:04:54  25    A    Lots of things.  Um, so the cross-race identification bias

1    is one big one that is not included there.  Um, the complicated

2    factors that it can influence confidence, so the Biggers factors

3    address how confident the witness is, but not all of the other

4    things that can produce that confidence as well.

12:05:17    5        Um, there are lots of others that I'm not coming up with

6    off the top of my head, but ...

7    Q    Suffice to say that the Biggers factors have been

8    researched and the general consensus in the scientific community

9    is that they are ...

12:05:30   10    A    Incomplete.

11    Q    Incomplete.

12    A    Incomplete.  Substantially incomplete.

13    Q    Dr. Laney, I'm going to show you one last document that I

14    am marking as Defense Exhibit No. 1025.

12:05:54   15        MR. McENTIRE:  And, Your Honor, may I have permission to

16    approach the Elmo for purposes of setting this down?

17        THE COURT:  Yes.

18    BY MR. McENTIRE:  (Continuing)

19    Q    Dr. Laney, during the course of your review of the

12:06:12   20    discovery, was information included in the discovery about the

21    fillers that were used in James Cloud's lineup?

22    A    Yes.

23    Q    Specifically, Lineup No. 5033.

24    A    Yes.

12:06:29   25    Q    I'm showing you again what's been marked as Defense

1    Exhibit -- marked for identification purposes as 1025.

2         Do you recognize this document?

3    A    Yes.

4    Q    And it's a two-page document, including a second page on --

12:06:46  5    and what is this?

6    A    Um, describing the basic, uh, factors of the filler

7    individuals.

8    Q    Does this document fairly and accurately represent the

9    discovery that was received by the United States regarding the

12:06:59  10   fillers from Lineup No. 5033?

11   A    Yes.

12        MR. McENTIRE:   Your Honor, I would move to admit this

13   document.

14        MR. BURSON:   No objection.

12:07:06  15       THE COURT:   It will be admitted.

16        (Defense Exhibit No. 1025 admitted into evidence.)

17   BY MR. McENTIRE:   (Continuing)

18   Q    Dr. Laney, are fillers important, selecting -- the

19   selection of fillers important?

12:07:19  20   A    Absolutely.

21   Q    Was there a different -- were the fillers -- were there two

22   sets of lineups used in this case?

23   A    Yes.

24   Q    There was a lineup that was used involving James Cloud for

12:07:33  25   purposes of LL and JV, and that was the one administered by

1    Special Agent Ribail.

2    A    Yes.

3    Q    Then there was a subsequent lineup that was prepared, as

4    Detective McIlrath testified today, regarding a lineup --

12:07:49  5    lineups that he prepared during the course of his interview with

6    EZ.

7    A    Correct.

8    Q    I want to draw your attention to those sets of lineups, and

9    that's where this information comes from.

12:07:59  10   A    Okay.

11   Q    Why are fillers important?

12   A    Fillers are important because their role in a lineup is to,

13   um, provide, um, safeguards for the purposes of the suspect.  So

14   they're supposed to, um, look similar to the suspect.  They're,

12:08:21  15   um, supposed to reflect the, um, descriptions of the suspect

16   that the witnesses have provided.  Um, they're supposed to make

17   the witness -- or excuse me, make the suspect not stand out to

18   someone who did not actually witness the crime.

19   Q    During the course of your review of the discovery on

12:08:48  20   heights and weights, did you come across information on James

21   Cloud's height and weight at the time of 2019?

22   A    Yes.

23   Q    Approximately 195 pounds?

24   A    I -- sure.  Yes.  I don't remember exactly, but yes.

12:09:03  25   Q    I'd proffer --

1    A    Approximately.

2    Q    -- 6 foot 1, 195 pounds.

3    A    That sounds accurate, yes.

4    Q    Dr. Laney, is it problematic if one of the fillers, for

12:09:14    5    example, is four inches shorter and 65 pounds heavier?

6    A    Yes, that suggests a very different body shape.

7    Q    So there's -- there's -- height differential between

8    fillers and the actual suspect can make a difference?

9    A    Yes, even if you're not seeing the whole height because it

12:09:34    10    reflects in the overall body shape of the person.

11    Q    And weight differentials can make a difference with respect

12    to assessing the reliability of a lineup.

13    A    Clearly so, yes.

14    Q    And one of the things that Detective McIlrath spoke to

12:09:52    15    earlier today is you want to make sure --

16        MR. McENTIRE:  And then may I please pivot, Ms. Cruz,

17    from the Elmo -- thank you.

18        THE COURT:  Counsel, are we still at seven to ten

19    minutes or are we a little bit beyond that?

12:10:15    20        MR. McENTIRE:  This is my last two questions, Your

21    Honor.

22        THE COURT:  All right.

23    BY MR. McENTIRE:  (Continuing)

24    Q    One of the things that Detective McIlrath testified to

12:10:21    25    earlier this morning that's important to weed out, if you will,

1    is, for example, if an individual -- the suspect has short hair,

2    you want to make sure that the fillers don't have long hair.

3    A    Yes.

4    Q    So, for example, in taking a look at this lineup, what's

12:10:36  5    marked for identification purposes as Defense Exhibit 1019, do

6    you recognize this?

7    A    Yes.

8    Q    This is the lineup that was administered on EZ involving

9    James Cloud.

12:10:50  10    A    Yes.

11    Q    And scrolling through this, does this document fairly and

12    accurately represent the lineup that was shown not only to EZ

13    but also provided in discovery?

14    A    Yes.

12:11:01  15         MR. McENTIRE:  I would move to admit this exhibit, Your

16    Honor.

17         MR. BURSON:  No objection.

18         THE COURT:  It will be admitted.

19         (Defense Exhibit No. 1019 admitted into evidence.)

12:11:07  20    BY MR. McENTIRE:  (Continuing)

21    Q    Dr. Laney, so, for example, on 1019-4, is this an

22    individual that clearly, from looking at the photograph, has a

23    ponytail?

24    A    Yes.

12:11:16  25    Q    Is this the type of information or the type of filler that

1    you would want to, quote, weed out when you are trying to put

2    together a proper set of fillers?

3    A    Yes.

4         MR. McENTIRE:  No further questions, Your Honor.

12:11:30    5         THE COURT:  All right.  Counsel, we are going to take

6    our noon recess at this time.  We will be back here at 1:30.

7         Again, for the Court's planning, how long do we

8    anticipate for cross on this witness?

9         MR. BURSON:  I wouldn't expect more than an hour, Your

12:11:56   10    Honor, and I think that's on the conservative side, so I expect

11    it to be less than that.

12         THE COURT:  Okay.  All right.  Okay.  Then why don't we

13    come back here at 1:30, and we will continue with the testimony.

14    Thank you.

12:12:10   15         THE COURTROOM DEPUTY:  All rise.

16         Court is now in recess.

17    (Recess taken: 12:12 p.m. to 1:31 p.m.)

18         THE COURTROOM DEPUTY:  All rise.

19    (Call to Order of the Court.)

01:31:44   20         THE COURT:  Please be seated.

21         Mr. Smith, do you have any cross?

22         MR. SMITH:  No, Your Honor.  Thank you.

23         THE COURT:  Okay.

24         Mr. Burson.

01:32:19   25         MR. BURSON:  Yes, Your Honor.  Thank you.

1      THE COURT:  All right.

2

3                      CROSS-EXAMINATION

4   BY MR. BURSON:

01:32:22   5   Q    Good afternoon, Doctor.

6   A    Hello.

7   Q    So I went over your qualification, and I know you went over

8   them with -- with counsel earlier, but sounds like you've read a

9   lot of studies regarding eyewitness identification.  And you

01:32:39   10   yourself have -- was it -- were you the sole author on 30

11   publications and then you coauthored some things or --

12   A    I'm the sole author on a couple; mostly coauthor.  That's

13   how we do it in academia.

14   Q    Okay.  But you've signed off on -- on to 30 publications;

01:32:58   15   is that right?

16   A    I have written at least most of 30 publications.

17   Q    The majority of these, I assume, were related to memory.

18   A    Yes.

19   Q    And were -- how many of them related to eyewitnesses able

01:33:14   20   to recall events?

21   A    Depends on how you mean that.  Um, virtually all of them

22   are directly relevant to the eyewitness situation.

23   Q    Okay.  And you -- you talked a little bit with counsel

24   about some so-called Biggers factors, and I believe you

01:33:36   25   classified them as, and I may be paraphrasing here, but

1    outdated.

2    A    I don't think I used that word, but I would be happy to use

3    that word.

4    Q    So I assume, then, most of the publications that you've

01:33:49    5    authored are somewhat critical of the way courts currently

6    evaluate the reliability of eyewitness identification.

7    A    Some of them are.  I don't think I would say a majority

8    are.

9    Q    And do any of your publications, have any of them addressed

01:34:06    10    the weight that juries give to eyewitness identification?

11    A    Book chapters that I've written do directly address that

12    issue, and I've also conducted research that directly addresses

13    that issue that hasn't yet been published.

14    Q    Okay.  And so most of them, I assume, stand for the

01:34:25    15    position that juries give too much weight to eyewitness

16    identification.

17    A    The literature far beyond me says that.

18    Q    Okay.  So fair to say that you are overall critical of

19    eyewitness identification and its current -- the current view on

01:34:42    20    its reliability, nonscientific view on reliability?

21    A    My research, and that of lots and lots of other people like

22    me, suggests that there are limitations to eyewitness

23    testimony --

24    Q    Okay.

01:34:54    25    A    -- or eyewitness memory.

1    Q    And that's the -- the opinion you had prior to coming into

2    this evaluation, correct?

3    A    Yes.

4    Q    And we'll try not to jump around on topics but sometimes

01:35:16    5    with cross and redirect, it's a little harder to sort of map

6    out.

7         You and counsel also talked about the phrase "unduly

8    suggestive."

9         Is that correct?

01:35:24    10    A    Yes.

11    Q    You would agree that "unduly suggestive" is a heightened

12    standard above and beyond just suggestive, right?

13    A    Yes.

14    Q    You would agree that "unduly," the common definition is

01:35:41    15    excessive.

16    A    A common definition of "unduly," yes.

17    Q    And before we get into the -- the lineup specifically, I'm

18    going to talk a little bit about background and -- and policy,

19    sort of like you did with counsel at times.

01:36:05    20         You talked a lot about audio and video recording.  And I

21    want to show you the DOJ publication that you went over with

22    counsel quickly.

23         THE COURT:  Counsel, can we identify -- oh, there it is.

24    Thank you.

01:36:34    25         MR. BURSON:  This is Exhibit 1009-7.

1   BY MR. BURSON:   (Continuing)

2   Q    Do you recall this publication?  This is the DOJ --

3   A    So this is the 2017 rather than the 1999 DOJ document.

4   Yes.

01:36:48   5   Q    Yes, ma'am.  Yes.

6        And 9.1.1, you would agree says (reading):  Video or audio

7   recording of the photo array is a suggestion, or the

8   administrator immediately writing down as close to verbatim as

9   possible, so on and so forth.

01:37:06  10        Right?

11   A    Yes, that's what it says.

12   Q    So you would agree that video or audio recording is an

13   option, the other being documentation.  And we can get into the

14   scope of documentation.  But you would agree that that provides

01:37:20  15   for either video recording or documentation.

16   A    Yes.  But video --

17   Q    I didn't ask for a "but," though.

18        Actually, while I have your attention on this exhibit, can

19   you see that clearly, actually, the footnote?

01:37:49  20   A    Yeah.  It's fine.

21   Q    Okay.  So Footnote 3, you would agree, reads as follows

22   (reading):  Electronic recording serves several important

23   purposes.  It preserves the identification process for later

24   review in court, protects officers from unfounded claims of

01:38:02  25   misconduct, allows fact finders to directly evaluate a witness'

1    verbal and nonverbal reactions and any aspects of the array

2    procedure that would help to contextualize or explain the

3    witness' selection.

4    A    Yes, that's what it says.

01:38:16    5    Q    Okay.  And you agree with that footnote.

6    A    I would add to it, but what it says is fine.

7    Q    But would you agree that, generally speaking, the audio or

8    visual recording of a lineup doesn't actually influence the

9    witness, correct?

01:38:38    10    A    If -- I assume they don't usually see it, so -- it might

11    influence their behavior to some extent to know that they're

12    being audiotaped or videotaped.

13    Q    Okay.

14    A    But apart from that, it shouldn't influence their -- it

01:38:54    15    shouldn't influence them.

16    Q    So, for example, EZ was -- was shown a lineup while she was

17    being audio and video recorded.  It's hard to tell whether she

18    knew that the audio and video recording was on or not.  We

19    don't -- we don't know whether she was informed beforehand.  But

01:39:12    20    let's assume for the purposes she didn't know; she just thought

21    she was in an interview room.

22        That wouldn't influence her lineup, correct?

23    A    Right, if she didn't know that she was being videotaped,

24    then the fact that she's being videotaped shouldn't influence

01:39:27    25    her.

1    Q    So what if we were in a situation where we weren't in an

2    interview room but one person was administering the lineup and

3    another person was standing off to the side or in a way that he

4    could see the witness or the investigator somewhere in the area

01:39:47   5    with a smartphone pointing it at them with the record button on,

6    and maybe the flash is on, too, because we don't know the

7    lighting, but that's an outside influence, correct?

8    A    I don't think it's more of an outside influence in that

9    circumstance than it would be in -- in a witness room in a

01:40:08   10    police station when the person does know that they're being

11    videotaped, which I assume they normally do.

12    Q    Okay.  So if someone knows they're being videotaped, that

13    could influence the lineup.

14    A    To some extent it's possible, yes.

01:40:21   15    Q    We just don't know how.

16         Is that correct?

17    A    That's true.

18    Q    And regarding the FBI policy, the FBI policy that was

19    issued in 2013 did not contain any advisal that the interview

01:40:53   20    should be audio or visually recorded, correct?

21    A    I believe that is correct.

22    Q    And that wasn't added until 2019; is that right?

23    A    To the policies that -- the FBI-specific policies that I

24    have seen, that's true.

01:41:10   25    Q    And the FBI policies that you reviewed, those were

1    entered -- well, they're dated the same date that the lineup in

2    this -- in this case -- well, two of the lineups in this case

3    were administered.

4         Is that right, based on your review of discovery and the

01:41:31  5  date on that report?

6    A    Yes.

7    Q    You also mentioned that FBI policy either recommends or

8    advises the use of -- of envelopes to -- like during the -- the

9    lineup to sort of make it more blind or truly blind.

01:42:01  10       Do you remember where you read that in FBI policy?

11   A    Uh, I don't remember.  I'd be happy to look, if that's

12   acceptable.

13   Q    Well, I don't know if we want to take up the Court's time,

14   but you don't recall where you read that in FBI policy?

01:42:18  15  A    I don't remember exactly which policy that was in.

16   Q    Okay.

17   A    And I think it said, um, either envelopes or manila

18   folders, but the idea is so that the -- the investigator can't

19   see which picture is being viewed at the time.

01:42:37  20  Q    We touched on documentation previously as an option for

21   recording the results of a lineup.  And you know there's some

22   disagreement as to whether it's -- the documentation here met

23   the guidelines or not, but regarding time frame, you

24   testified -- actually, I'm going to withdraw that question for

01:43:03  25  now.

1    I want to stick to the identification procedures first.

2    You testified earlier that regarding the time between the crime

3    and the lineup being administered or some other identification

4    technique being administered, that, quote, a couple days is

01:43:22  5    okay.

6        Correct?

7    A    In the context of relative to months, it's better.  A small

8    number of hours is much better still.

9    Q    Okay.  But a couple days is okay.

01:43:34  10    A    Relative to months.

11    Q    So two months -- or, sorry, two days after the crime would

12    be okay, in your words.

13    A    I'm going to stick with better than months or even weeks.

14    Q    Have you ever yourself looked at a photo of someone you

01:44:03  15    knew and not recognized them in the photo?

16    A    I -- I do not -- I can't answer that question.  I don't

17    know whether I've had that experience or not.

18    Q    Have you heard of that experience happening with people, or

19    even saying the phrase, "Oh, I don't recognize you in this

01:44:27  20    photo"?

21    A    In situations where someone has aged or changed

22    substantially, yes, sure.

23    Q    So you agree it's possible to look at a photo and not

24    recognize someone in it that you've seen before.

01:44:40  25    A    Yes.

1    Q    You would also agree that it's possible to look at a

2    different photo of that person and recognize them in that photo,

3    correct?

4    A    Yes.

01:44:53  5    Q    Is it possible that JV, for instance, did not recognize

6    James Cloud in the lineup photo but then did recognize him in

7    the media -- the PSA photo, because they were different photos?

8    Is that in the realm of possibility?

9    A    Considering that the lineup photo actually looked much more

01:45:23  10   like he looked at the time, that seems highly unlikely to me.

11   Q    But it's in the realm of possibility.

12   A    Sure.

13   Q    And I actually had a question about this photograph.  And

14   I'm using Defense Exhibit 1000-3.  This is the second page of

01:45:49  15   that lineup.  And this is actually the -- the lineup version of

16   it.  I believe you were looking at a side-by-side earlier when

17   you made the comment that this is a much -- I believe you said

18   this is a clear photo?

19   A    The other version, I think, was slightly clearer than this

01:46:11  20   one, but yes, it's a reasonably clear photo.

21   Q    And you noted that there was a -- I believe your words were

22   clearly visible scar.

23   A    Yes.

24   Q    Where is that --

01:46:24  25   A    Above his left eyebrow.

1   Q    Okay.  Regarding media avoidance and the advisal that you

2   and counsel talked at at length, I'd like to talk about that a

3   little bit and the -- and the policies that surround that.

4        So this is Exhibit 1010-27.  This is the 16th page of that

01:47:16   5   document, the 27th page, I guess, of the exhibit.

6        Do you remember reviewing this with counsel earlier?

7   A    Yes.

8   Q    Okay.  And so the -- this C-7, which is a policy

9   recommendation that you discussed earlier, it says (reading):

01:47:32   10   Encourage the witness to avoid contact with the media or

11   exposure to media accounts concerning the incident.

12        You would agree that, based on the reading of this

13   sentence, "contact with the media" and "exposure to media

14   accounts" are two different things, the way they're laid out in

01:47:49   15   this sentence?

16   A    Or one is a clarification of the other.  I'm -- I'm

17   considering the underlying research, which would not distinguish

18   in the way that you're trying to, I believe, to distinguish.

19   Q    This document wasn't written for scientists, right?

01:48:06   20   A    Um, it was written by scientists.

21   Q    For nonscientists, correct?

22   A    Yes.

23   Q    So we would assume they used plain language, correct?

24   A    I think most of the scientists use very plain language,

01:48:18   25   actually.

1    Q    Even when it's written for lay people nonscientists?

2    A    Yes.  I think scientists try very hard to use plain

3    language most of the times, my kind of science.  I will agree

4    physicists and some other kinds of scientists use some very

01:48:34  5    technical language.  Psychology actually tries quite hard to use

6    pretty straightforward language.

7    Q    Okay.  And I just want to be clear before we move on.  Your

8    testimony is that you think that "contact with media" and

9    "exposure to the media" is the same thing.

01:48:49  10   A    I think "exposure to media" is adding additional

11   clarification to what "contact with the media" means.

12   Q    Not a different thing.

13   A    Right.

14   Q    Now showing you Exhibit 1011-5, and particularly where I'm

01:49:13  15   indicating here, where it says (reading):  Ask that the witness

16   not discuss the photograph lineup identification procedure or

17   its results with any other witness involved in the case, and

18   request the witness not have any contact with the media.

19        You would agree that's a different advisal than what's in

01:49:29  20   the DOJ guidance.

21   A    It's more limited.

22   Q    More limited.

23   A    In that wording, it's more limited.

24   Q    So it's more limited in that it only includes "contacts

01:49:39  25   with the media."

1    A    I mean, in the plain language sense, it doesn't include the

2    extra information that was included in the -- in the prior

3    sentence, in the prior version.

4    Q    You'd agree that this policy was written for FBI agents,

01:49:52   5    correct?

6    A    Uh, yes, I believe so.

7    Q    Okay.  And I think you would agree that most FBI agents

8    aren't scientists.

9    A    Yes.

01:50:01   10    Q    And -- we'll stop there.

11        And so your testimony today is that a nonscientist would

12    read "contact the media" as not only engaging with the media in

13    an interview or calling them or anything, really, where you

14    actually have contact with media, you think that phrase also

01:50:27   15    includes watching the news -- you think a layperson understands

16    that to mean watching the news.

17    A    I'm not a layperson in this particular context.  It's hard

18    for me to put myself in that -- in that frame.  But I'm speaking

19    for all of the underlying science that went into the DOJ

01:50:45   20    statement that this seems to be a product of, and that was a

21    very broad definition of "media."

22    Q    You talked a little bit about show-ups with counsel.  It

23    sounds from your testimony there's like varying degrees of

24    show-ups.

01:51:22   25        Correct?

1    A    I'm not sure what you mean by that.

2    Q    Yeah, that was confusing.  Let me explain.

3         So, for example, there's the show-up where police bring a

4    guy in handcuffs, drag him in front of a witness and say, "Was

01:51:37  5    this the guy?"

6         And then there's sort of the more neutral show-up of, let's

7    say, police talking to a suspect nearby and the witness

8    observing that.

9         Both those things would be show-ups, in your opinion,

01:51:59  10    correct?

11    A    Yes.

12    Q    And then -- well, we'll stop there, actually.

13         So now we want to talk -- now I actually want to talk about

14    the lineup procedures with JV.

01:52:19  15         So I want to be clear, before we get going here, the wanted

16    poster as -- as it was called earlier, that was posted on the

17    Internet, viewed by JV after the lineup, that had no impact on

18    the lineup, correct?

19    A    Correct.

01:52:37  20    Q    Okay.

21    A    The lineup being the thing where he did not identify, yes.

22    Q    Right.

23         And the procedure as described by the testimony of Agent

24    Ribail earlier described a lineup procedure where he did not see

01:52:56  25    the photographs as they were being handed to JV and did not know

1    which photograph JV was looking at, correct?

2    A    I still don't think that is entirely true, but that's what

3    he -- that's his claim, yes.

4    Q    Okay.  And so that would be a blinded technique, would it

01:53:17    5    not?

6    A    Partially.

7    Q    What's the part that wouldn't be blinded?

8    A    For it to be blinded, the photos needed to be randomized.

9    And, ideally, they should be, um, again, in some sort of

01:53:30    10    covering or something so that he really -- the investigator

11    really can't see which photo is being viewed.

12    Q    But you heard him testify that he didn't know which photo

13    was being viewed, right?

14    A    Yes.

01:53:42    15        MR. McENTIRE:  I'm going to object.  I don't know

16    that's -- I don't think that's an accurate characterization of

17    exactly what he testified to.

18        THE COURT:  Overruled.  Go ahead.

19    BY MR. BURSON:  (Continuing)

01:53:51    20    Q    You did hear Agent Ribail testify that he could not see

21    which -- see or know which photo was being viewed by JV.

22    A    That was the impression that I got from what he said.

23    Q    And that being the case, if that's true, that would be a

24    blinded lineup, even if not using the exact techniques that you

01:54:09    25    would prefer, correct?

1    A    No, because he still didn't randomize the photos, and he

2    said he didn't randomize the photos.  And I believe that Agent

3    Ribail -- Ribail can probably count from 1 to 6, which means --

4    Q    But --

01:54:22    5    A    -- he put them together, he knew what order they were.  If

6    he was handing them in order ...

7    Q    Okay.  So let's assume that we're dealing with a lineup

8    that's not blinded.

9        That in and of itself is not a suggestion of who to

01:54:40    10    identify in a lineup, correct?  It's a protective measure.

11    A    It is a very necessary protective measure because it opens

12    the door very wide for there to be suggestions.

13    Q    Okay.  Similarly, the audio/video recording, a protective

14    measure, for later review, correct?  That doesn't actually

01:55:06    15    suggest anything.

16    A    Well, the other thing in that footnote that you read --

17    another thing in the footnote that you read was that it sort of

18    puts the investigator on their best behavior because they too

19    know they're being, um, videotaped, which is another important

01:55:21    20    protective measure there.

21    Q    Protective measure --

22    A    Yes.

23    Q    -- correct?

24        You said protective measure?

01:55:28    25    A    Yes.

1    Q    So not a suggested tool.

2    A    Again, it's about -- missing protective measures means the

3    door is wide open for suggestion.

4    Q    And based on your review of the discovery in this case and

01:55:44    5    Agent Ribail's testimony, which you sat through, there's no

6    evidence of suggestion in the administration of JV's lineup; is

7    that right?

8    A    The point is that --

9    Q    I just ask that question, though.  There's no evidence of

01:56:00    10    suggestion in the lineup.

11    A    Absence of evidence -- absence of the kind of direct

12    evidence that you're looking for is not evidence of absence.

13    Q    All right.  So -- but there is absence of evidence.  Can we

14    agree on that?

01:56:12    15    A    I don't expect there to be evidence, so that's -- so the

16    question is pointless, as far as I'm concerned.

17    Q    Well --

18    A    Sorry.  It is.

19    Q    And, in fact, JV didn't identify anyone in that lineup,

01:56:27    20    correct?

21    A    Correct.

22    Q    That itself would be evidence that there was no suggestion?

23    A    No.  It would be evidence that there was not enough

24    suggestion and/or that he did not adopt the suggestion.

01:56:41    25    Q    Okay.  So if there was suggestion, it had no impact.  He --

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                          422
Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020
Laney/X/Burson

1    A    It did not have enough impact to change his answer at that

2    moment.  Sometimes these suggestions can have an effect later

3    on.

4    Q    Again, we don't know that that happened here either,

01:56:58  5    correct?  There's no evidence of that?

6    A    Because there can't be evidence of that.  Or there --

7    there -- there usually won't be evidence of that.

8    Q    I would like to show you -- I'm going to show you Defense

9    Exhibit 1006 again.  I'm showing you defense's version.

01:57:34 10         This is what you reviewed earlier.

11   A    Um-hmm.

12   Q    We talked about the language up here (indicating)  --

13   A    Yes.

14   Q    -- at the top.

01:57:44 15         You've described that language as troubling.

16        You would agree that it's probably a responsible message to

17   make -- for the government to make, given the circumstances

18   described in this bulletin, correct?  Setting aside witness

19   issues that we talked about, informing the community there's a

01:58:03 20   suspect at large in a murder who might be armed and dangerous --

21   A    Is presumably a reasonable thing to do, yes.

22   Q    Okay.  And we also talked about the phrase here that says,

23   "due to misidentification."

24   A    Yes.

01:58:16 25   Q    And I know that can be interpreted several different ways.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    I want to be clear:  There's no evidence in discovery to

2    indicate how it was that JV interpreted that when he read it.

3    A    True.

4    Q    Okay.  Did you review all four of the lineups that --

01:59:05    5    all -- did you review discovery related to all four of the

6    lineups that were administered on JV?

7    A    Yes.

8    Q    So you're familiar with the lineup involving Donovan Cloud

9    as well?

01:59:15    10    A    I'm not sure I remember all of the details, but yes, I

11    certainly did review it.

12    Q    Okay.  And an identification was made in that lineup; is

13    that right?

14    A    I would have to look at it again even to be sure of that.

01:59:28    15    I don't trust my own -- I've studied memory enough to not trust

16    my own very well.

17    Q    Consistent.

18    A    It's true.

19         When I wrote my report, I was certainly looking at it.

02:00:13    20    Q    Do you recognize -- and this has already been admitted into

21    evidence.  Do you recognize this document?  Did you review

22    this --

23    A    Yes.

24    Q    -- previously?

02:00:22    25         Okay.  So this was previously identified as the cover sheet

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                                424
Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020
Laney/X/Burson

1    that was on a lineup that included Donovan Cloud, that was

2    administered to JV.

3    A    Okay.

4    Q    I'm going to direct your attention to No. 5034, the person

02:00:44  5    not at issue in this case.  That refers to the lineup, and it

6    says No. 4, indicating the photo within that lineup.  And I

7    should add an addendum to what I said previously.  This cover

8    sheet was actually referring to all four lineups that were

9    administered on JV.

02:01:03  10   A    Indeed.

11   Q    So you have actually probably reviewed this.

12   A    Yes.

13   Q    Yeah.

14   A    Definitely.

02:01:08  15   Q    Okay.  So with that addendum, 5034 refers to a separate

16   lineup, again, with the subject not -- not at issue in this

17   case, in Picture No. 4, and it says (reading):  Looks similar in

18   the eyes, more facial hair, and shotgun.

19        That in conjunction with Agent Ribail's memory of the

02:01:37  20   lineup, is that not sufficient documentation -- or a level of

21   certainty of a nonidentification?

22   A    I think it could be asked much more clearly and

23   straightforwardly than, "How confident are you?"  That is some

24   evidence in that general direction, but a "how confident are

02:01:59  25   you" question doesn't seem unreasonable to me.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    Q    What about the note by Agent Ribail next to what's

2    marked -- or 5032 that says (reading):  Looks like guy had

3    pistol to son's head?

4         Is that a pretty good note of the -- the identification

02:02:23    5    made?

6    A    There's actually two different ways to interpret that, too.

7    Either "I think it is the guy" or "it looks like the guy," which

8    goes back to the categorical versus comparison.  But it's --

9    it's -- it could be much worse.

02:02:39    10    Q    And you would agree that "teared up almost immediately" is

11    a pretty good recordation of a sign of certainty exhibited by

12    the witness.

13    A    As a sign of an emotional response, that could be

14    interpreted as certainty --

02:02:54    15    Q    Okay.

16    A    -- potentially.

17    Q    So moving on to the lineup with LL, you're not aware of any

18    suggestion that was given during that lineup, correct?

19    A    To get back into the right -- same answer as before.  I

02:03:56    20    don't remember an obviously outwardly recordable level of

21    suggestion, not that there was a record, a thorough record

22    anyway.

23    Q    And -- scratch that.

24         In your report regarding the lineup administered on LL, you

02:04:29    25    noted that it's unclear what effects the drugs in LL's system

1    would have had on the initial identification when he was going

2    through the lineup; is that right?

3    A    It's hard to say without knowing how much and how long and

4    other things, just that there's a risk of an effect.

02:04:52   5    Q    Okay.  But I would assume it would have a negative impact

6    on his ability to identify someone in a lineup.

7    A    It should have a negative impact on his ability to encode a

8    memory for the event, and that should lead to problems with

9    identification.

02:05:08   10   Q    Okay.  What about if he was sober at the time that he had

11   seen the crime and then on drugs when the lineup was

12   administered?  Certainly that would reduce his ability to pick

13   the person out of the lineup.

14   A    Potentially.  I don't know certainly, but not unlikely.

02:05:27   15   Q    Okay.  And later on, when he's sobered up, I assume maybe

16   he would be in a better position to identify the person?

17   A    If he were sobered during the original event and had a good

18   memory laid down, then that's much more likely.

19   Q    Now, later on, as we've heard, LL made an identification

02:05:51   20   of -- of James Cloud, correct?

21   A    I hesitate to call what he did an identification, but he

22   claimed that, yes.

23   Q    Okay.  And as you recall, he claimed that he had

24   associated -- he had learned that the man -- and I know you

02:06:09   25   disagree with his statement, but he had learned that the man in

1    the red shirt was James Cloud by seeing him and hearing about

2    him on the news, from what he told FBI agents, and then from

3    hearing from other people, according to what he told a

4    subsequent investigator.

02:06:25    5         Is that right?

6    A    Correct.

7    Q    Okay.  And you called that a contradiction of the earlier

8    photo lineup; is that right?

9    A    In the photo lineup, he did not identify.  And he's later

02:06:39   10    saying that he does know who the person is.  So I call that a

11    contradiction, yes.  He's contradicting himself.

12    Q    Okay.  But I do want to be clear here.  There's a

13    difference between being unable to pick someone out of a lineup

14    and then recognizing them later on, based on another image or

02:06:57   15    something like that, right?  So it's not necessarily a

16    contradiction, correct?

17    A    I don't think -- I don't think it is being unable to

18    identify someone out of a lineup.  He -- he said, no, this

19    person -- the person who committed this crime is not in this

02:07:13   20    lineup.  That's not an "I can't do it."  That's an "it's not --

21    I don't see him here."  So I do think it really is a

22    contradiction between "I do not see him here" and I do then

23    later say that that's him.

24    Q    "I do not see him here in this photograph," right?

02:07:30   25    A    In this set of photographs.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    Q    And so wouldn't the contradiction be if he looked at the

2    same photograph later on and said "that's the guy"?  I mean,

3    that would be a direct contradiction, correct?

4    A    That would be a direct contradiction.  I guess I don't

02:07:45    5    necessarily see the distinction otherwise.

6    Q    Similar to with JV, although I'm not sure I asked this

7    directly with JV, isn't it possible that LL saw an image that

8    was different than the lineup image, and even though he didn't

9    recognize James Cloud in the lineup image, recognized him in the

02:08:18    10    subsequent image?  It's within the realm of possibilities?

11    A    It is within the realm of possibility.

12    Q    So I would like to talk about EZ.

13         During your testimony about EZ, you said that some research

14    has found -- I'm sorry, your words during testimony was

02:09:10    15    "extensive research" has found a negative relationship between

16    self-confidence and suggestibility.

17    A    If that's what I said.

18    Q    Okay.  Your report uses similar language and said "some

19    research" has found a negative relationship between self-esteem

02:09:30    20    and suggestibility.

21         Is one of those words more appropriate than the other?

22    A    It is not an area that has been studied as thoroughly as

23    some of the other things that I'm talking about today.  Perhaps

24    "plenty of research" is -- somewhere in the middle is an

02:09:51    25    appropriate sort of -- I'm not meaning to change my mind.  It's

1    just a different word.

2    Q    Okay.  And there was a -- on that topic about the

3    self-esteem, because it's relevant here because of the

4    conversation about EZ's child, et cetera, prior to the lineup,

02:10:13    5    that type of conversation that could impact self-esteem prior to

6    a lineup, again, that is not suggestive.  It merely opens the

7    door to suggestion, correct?

8    A    Yeah, I'm not -- I'm not saying that that is the

9    suggestion.  I'm saying that it puts her in a state that makes

02:10:31    10    her more -- more susceptible to suggestion.  And even apart from

11    the self-esteem, the obvious sadness.  Sadness as an emotional

12    response has also been studied and shown to increase

13    suggestibility.

14    Q    In that video, you would agree that, although there were

02:10:52    15    some policy violations, it did follow policy regarding audio and

16    visual recording of the interview, although -- I don't recall at

17    the moment whether it actually is YCSO policy, but it follows

18    the best practice regarding audio and video recording, correct?

19    A    I believe it is the Y -- the Yakima County Sheriff's

02:11:10    20    Office's policy, and it was recorded.  It wasn't a perfect

21    recording, but it was certainly much better than a lack of

22    recording.

23    Q    Okay.  And yet, you would agree that it's only been

24    somewhat helpful in determining whether there was suggestion or

02:11:28    25    not, right?

1  A    I disagree.  It gave us a whole lot of information about,

2  um, the sorts of interactions that happened there and also about

3  other procedural -- procedural elements.

4  Q    Well, for example, one key element here is a certain

02:11:46  5  statement that's made in the video.

6       You've reviewed the whole video, correct?

7  A    Yes.

8  Q    There's -- there's -- I don't know if you're aware -- well,

9  you've read the parties' briefing, correct?

02:11:57  10  A    Yes.

11  Q    So you're aware there's a dispute as to a certain statement

12  that's said when EZ originally comes upon James Cloud's photo.

13  You're aware of that?

14  A    Yes.

02:12:06  15  Q    You would agree that the disagreement comes from the fact

16  that that audio recording isn't great, right?

17  A    Like I said, it could -- the recording itself could have

18  been better.  It also could have showed everyone's faces better.

19  Q    Okay.  But that's the technology we generally have --

02:12:24  20  A    Indeed.  Indeed.

21       But look how much less we have to rely on our memories for

22  what happened there.

23  Q    You recall -- you testified earlier that EZ had made some

24  vague statements regarding the identification and throughout the

02:12:47  25  lineup, I think.

 1      You would agree that "that's the guy who shot Dennis" is

 2   not a vague statement, correct?

 3   A    I would agree.

 4   Q    The statement --

02:12:58  5   A    Yes, I said I would agree.

 6   Q    Oh, okay.  Thank you.

 7   A    And perhaps "disputed statement" is a better phasing than

 8   "vague."

 9   Q    We talked -- or, I'm sorry, you and counsel talked about

02:13:13  10   weapons-focus as well.

 11      Does the degree to which weapons-focus affects any

 12   particular witness, that's probably witness-dependent, and, I

 13   would assume, has -- is somewhat affected by if that person has

 14   seen guns before.

02:13:37  15      Correct?

 16   A    Whether they have very extensive experience with guns.

 17   And, again, it isn't just guns.  I know it's called

 18   weapon-focus, but it's also like big, gaping wounds and other

 19   things that sort of soak up attention.

02:13:52  20      So, yes, how much experience you have with those may, to

 21   some extent, affect how much you're affected by victim-focus --

 22   weapon-focus.  Excuse me.

 23   Q    So JV, LL, EZ all of them had an encounter that involved

 24   weapons, correct?

02:14:08  25   A    Correct.

1    Q    In fact, LL and EZ's were basically identical, since they

2    were sitting pretty close to each other.

3    A    Similar, probably.

4    Q    You only mention the weapons-focus in the report regarding

02:14:22  5    EZ; is that right?

6    A    I believe that to be the case.

7    Q    Why is that?  Why not mention it in LL or JV's?

8    A    So I didn't mention it with respect to JV because that, um,

9    crime, the event seemed to last several minutes, a longer period

02:14:41  10   of time.  And, um, weapon-focus is actually only really a

11   problem for quite short, quick events.  The idea is that, um,

12   your -- your attention is soaked up quite dramatically initially

13   by a gun being pointed at you or a big, gaping wound, or

14   whatever, and then if the crime or other event continues for

02:15:03  15   some number of minutes after that, it can be enough time for

16   your attention to be sort of let go from that, and you actually

17   have a chance to move around and look at other things as well.

18        So that's the distinction between JV, where I -- for the

19   first few seconds of the gun being pointed at his son's head, I

02:15:20  20   would expect a witness -- excuse me, a weapon-focus situation

21   there, but that -- that encounter lasted for minutes after that,

22   so there should have been plenty of time for that to wear off.

23        Um, for LL, um, you're right, it could affect LL, to some

24   extent, as well because it was the same shortish event.  I

02:15:45  25   believe he was in the front seat, so he might have had a little

1   bit better view, but broadly the same.

2   Q    Okay.  Do you recall the chart that you made in your report

3   on EZ that --

4   A    The table?

02:16:27  5   Q    The table, yes, that's a better word.

6        -- that has the time and then the lineup in question and

7   then comments about the lineup.  Process and outcome --

8   A    I do not remember every word in it, but I certainly

9   remember that I made it and broadly what it says.

02:16:43  10   Q    Okay.  Regarding the first time that EZ -- I'll just use

11   the words of the report (reading):  The first time EZ reaches

12   No. 2, parentheses, James Cloud, close parentheses, she

13   comments:  I don't think he was the guy wearing the red shirt.

14        That wasn't her full comment, though, was it?

02:17:01  15   A    I do not remember off the top of my head.

16   Q    Do you recall that she also stated, before saying that,

17   actually:  This guy, I think I recognized him.  Then:  I don't

18   think he was the guy wearing the red shirt?

19   A    I think I talk about her saying that she recognized him

02:17:26  20   somewhere else in the report.  So, yes, I do remember that she

21   said that.

22   Q    Okay.  But you -- so you would agree that "this guy, I

23   think I recognized him" is what we would call an inculpatory

24   statement.

02:17:39  25   A    Potentially.

1  Q    And you would agree, again, the United States, as you're

2  aware, disputes the accuracy of the quote --

3  A    Right.

4  Q    -- but you would agree that "I don't think he was the guy

02:17:51  5  wearing the red shirt" would be what we call an exculpatory

6  statement.

7  A    Yes.

8  Q    Is there a reason you included the exculpatory statement

9  but not the inculpatory statement?

02:18:03  10  A    Um, because I was highlighting the change in her, what

11  seemed to be the change in her statement, I believe.

12  Q    Change -- sorry.  I'm confused with that.

13       Change from what statement?

14  A    From "I don't think this is the guy" to then identifying

02:18:26  15  him the second time through.

16  Q    This was -- both of these statements were on the first time

17  through.

18  A    Right, but I was looking at the change from when she said

19  "I don't think it's him" to when she said "I do think it's him."

02:18:43  20  The fact that he's familiar actually has two different

21  interpretations, as I talk about.  That could be an example of

22  unconscious transference.  And I did talk about that.  I just

23  talked about it later.

24  Q    You also note in your report that Detective McIlrath told

02:19:01  25  EZ to write "guy who shot Dennis," correct?

1   A    Uh, yes, I believe so.

2   Q    You would agree that he told her -- the full statement was:

3   "Just write 'guy who shot Dennis' -- I'm sorry.  The full

4   statement was:  This is the guy who was wearing the red shirt,

5   the one who shot Dennis, or whatever, if that's what you think.

6   A    I don't remember precisely, but I believe that to be the

7   case.

8   Q    Okay.  Is there any particular reason you just wrote that

9   he told her to write "guy who shot Dennis"?

10  A    Because she did write "guy who shot Dennis."

11  Q    Okay.  You would agree that she said also, "This is the guy

12  who shot Dennis" when she viewed his photo the second time.

13  A    Yes.

14  Q    In the third opinion of your report regarding EZ you note

15  that it's possible that EZ recognized some of the individuals in

16  the lineups because of prior familiarity.

17       Do you recall that opinion --

18  A    Yes.

19  Q    -- in your report?

20  A    Yes.

21  Q    You're not aware of any such prior familiarity, are you?

22  A    No.

23       MR. BURSON:  Just one minute, Your Honor.

24       THE COURT:  Sure.

25       (Counsel conferring.)

1    BY MR. BURSON:    (Continuing)

2    Q    So you gave an opinion regarding LL, multiple opinions

3    regarding LL and his identification, correct?

4    A    Yes.

02:21:45  5    Q    And you based that opinion, in part, on his conversation

6    with an investigator for the defense, correct?

7    A    The very last opinion, I believe, was, uh -- referred to

8    that.  Before that, I didn't even know -- most of what I wrote

9    was before I heard that there was this, um -- uh, uh, interview.

02:22:09  10    Q    Okay.  So you would agree that that suggests that LL and

11    his interview with the media was open to being interviewed by

12    folks working for the defense in this case, correct?

13    A    I suppose.

14    Q    Okay.  And you would agree that the person that interviewed

02:22:25  15    him is not a scientist.

16    A    As far as I know.

17    Q    As far as you know.

18         You would agree that your opinion would have been better

19    formed scientifically had you interviewed LL yourself, correct?

02:22:42  20    A    I'm here to speak for what the science says about these

21    phenomena in general and then sort of apply them to the specific

22    case to some extent.  Whether I talk -- I don't -- I'm not in a

23    position to out and interview people involved in cases.  It's

24    not part of what I do.

02:23:01  25    Q    Well, before we get to the feasibility of it, I think you

1    can agree that you would have known what questions to ask a

2    little better than the investigator here.

3    A    I think the investigators asked perfectly reasonable

4    questions.  I may have asked additional questions, but I had no

02:23:16  5    complaints with what I heard of that interview.

6    Q    But the additional questions that you may have asked, I

7    assume, would have helped you form your opinion a little better.

8         Correct?

9    A    Not that I know of.

02:23:28  10    Q    Okay.

11    A    I don't -- I mean, I really can't think of other questions

12    that I would have asked.

13    Q    Okay.  So your testimony today is that had you interviewed

14    LL yourself, as a scientist, in order to form a scientific

02:23:42  15    opinion, that would have added no value to your opinion.

16    A    I can't know that for sure one way or the other.  But I

17    don't have any particular expectation that that would have been

18    better.

19    Q    And you made no attempt to interview him, correct?

02:23:54  20    A    True.

21    Q    Okay.  And you have a cell phone, correct?

22    A    I do.

23    Q    That interview could have been conducted over the phone.

24    A    What's that?

02:24:03  25    Q    That interview could have been conducted over the phone.

1    As far as you know, there's no reason that it couldn't have.

2    A    I suppose.

3    Q    And -- stop there.

4         MR. BURSON:  No further questions, Your Honor.  Thank

02:24:18   5    you, Doctor.

6         THE COURT:  Go ahead, Counsel.

7         MR. McENTIRE:  Ms. Cruz, may I please have ...

8         THE WITNESS:  Ms. Cruz has big power, and she can share

9    it when she wants to.

10        THE COURT:  She does.

11        THE WITNESS:  Use it wisely.

12

13                   REDIRECT EXAMINATION

14   BY MR. McENTIRE:

02:25:02   15   Q    Dr. Laney, on redirect you were asked a couple of questions

16   about the 2017 DOJ memorandum and the policies and procedures

17   attached to.

18   A    Yes.

19   Q    You were specifically asked, essentially, under Section

02:25:20   20   9.1, that the DOJ's policy provides two alternatives to clearly

21   documenting a lineup:  Either A, via video or audio recording

22   the photo array; or B, the administrator immediately writing

23   down as close to verbatim as possible.  The two -- the two

24   options --

02:25:40   25   A    Yes.

1    Q     -- that you were provided.

2          In terms of the second option, that implies that there was,

3    in fact, immediately writing down what happened.

4    A     And verbatim.  Like what everyone said.

02:25:56  5    Q     And from your review of the discovery, was this interview,

6    the lineups for both JV and LL, documented immediately?

7    A     No.

8    Q     Besides --

9    A     Well, little -- there were tiny, little notes that were

02:26:10  10   immediate.

11   Q     Was the short-form comments made on the YCSO lineup policy

12   as close to a verbatim report as possible?

13   A     Definitely not.

14   Q     So it would be your opinion that the documentation here did

02:26:32  15   not -- was not, let's say, up to snuff with 9.1.2 on immediately

16   documenting as close to verbatim as possible what happened?

17   A     My opinion is that --

18         MR. BURSON:  I'm going to object.  Because the witness

19   wasn't present through the lineups, JV and LL's, she can't

02:26:50  20   actually say what was recorded verbatim and what wasn't.  There

21   are notes on the lineup sheets.

22         THE COURT:  Overruled.

23   A     My opinion is that neither of these happened, neither of

24   these options happened in this particular situation.

25

BY MR. McENTIRE:   (Continuing)

Q    Dr. Laney, you were also asked about Footnote 3 from this 2007 memorandum, and counsel raised three -- essentially three points that electronic recording serves, and you had started to identify that there was an -- additional ones that you would add to this but couldn't complete your answer.

     What was the additional ones that you would add to this?

A    I would add that it allows people like me, people like, um, various counselors, um, to review what actually happened during the course of the lineup for good and for bad, find out what went well, find out what did not go so well.  And also to provide a record, in addition to the memories of the particular people who were there, as to what happened during the lineup.

Q    All going to the point of trying to help either the fact finder or the folks trying to inform the fact finder regarding what happened during those lineups.

A    Exactly.

Q    Dr. Laney, you were also asked where the source was for the blinded procedure regarding the folders, where you sourced that, and you couldn't recall it off the top of your head.

A    I was not positive, yes.

Q    I'm drawing your attention to the same exhibit.  This is 1009-5.  This is the 2017 DOJ memorandum, Section 5.3.2, and it specifies here "if sequential administration ..."

     And would you agree that, as you've testified --

1      THE COURT:  Counsel, that's not what is up on the

2    monitor.

3    A     Yeah.  We're looking at 6.3?

4         MR. McENTIRE:  I apologize.  5.3.2.

02:29:02   5    A   There we go.  Now it's there.

6         MR. McENTIRE:  I apologize.  I had it frozen on the

7    wrong screen.

8         THE COURT:  Oh.

9    BY MR. McENTIRE:  (Continuing)

02:29:07  10    Q   Now on your screen is 1009-5, Section 5.3.2.  First

11    question is:  As you've testified before, if I recall, this was,

12    in fact, a sequential administration.

13    A     Yes.

14    Q     And from this policy, if sequential administration, it

02:29:25  15    references putting each photograph in its own physical folder,

16    shuffling the order of the folders, and standing where the

17    administrator cannot see which photographs the witness is

18    viewing.

19    A     Standing where, but yes.

02:29:38  20    Q     And so when you were referencing physical folders in your

21    testimony, that's where you were drawing this from.

22    A     Apparently so, yes.

23    Q     Dr. Laney, during your testimony -- during -- during cross,

24    you were asked questions by counsel --

02:30:07  25         MR. McENTIRE:  And I'm pulling up, Your Honor, Defense

1    Exhibit 1008.

2    BY MR. McENTIRE:   (Continuing)

3    Q    -- essentially whether it's possible that JV didn't

4    recognize James Cloud from the lineup photo as to compare how he

02:30:31   5    actually looked.  And I think your answer was something to the

6    effect of it's not outside the realm of -- of possibility.

7        Drawing your attention again back to Defense Exhibit 1008,

8    in your opinion, having reviewed many, many lineup photos, is

9    there a substantial difference between the lineup photo

02:30:53  10   administered and how James Cloud looked the very next day when

11   he was arrested?

12       MR. BURSON:   Objection; relevance to the question that

13   was asked on cross.  None of the witnesses saw the booking photo

14   after the fact, that I'm aware of.

02:31:09  15       THE COURT:   Okay.  Overruled.

16       Go ahead.

17   A    No, there's nothing that stands out as dramatically

18   different between these two photos.

19   BY MR. McENTIRE:   (Continuing)

02:31:39  20   Q    Dr. Laney, I'm drawing your attention back to

21   Exhibit 1010-27, which counsel was also asking you a few

22   questions on regarding on cross.

23       And back to this discussion of media.  And if I recall your

24   testimony, you indicated that between 1999 and 2013, that the

02:32:09  25   research had only gotten stronger regarding the -- the presence

1    or influence of media or outside influence on an eyewitness.

2    A    That's correct.

3    Q    And just to re -- make sure I capture this correctly, is it

4    your opinion today that if "media" was interpreted as simply

02:32:44  5    contacting the press, it would create an FBI policy that is

6    inconsistent -- not only internally inconsistent but also

7    inconsistent with the research?

8    A    Yes, absolutely.

9    Q    Dr. Laney, also on cross you were asked about the spectrum

02:33:15  10    of show-ups, if you will.

11    A    Yes.

12    Q    And I believe the language that I quoted counsel asking you

13    a question was "a more neutral show-up."

14        Is there such a thing as a neutral show-up?

02:33:29  15    A    Not really, no.

16    Q    Dr. Laney, you were present for the entirety of Special

17    Agent Ribail's testimony regarding his administration of the

18    lineup on JV.

19    A    Yes.

02:33:49  20    Q    As well as LL.

21    A    Yes.

22    Q    When asked about the blinding procedure that he recorded,

23    do you recall a statement to the effect of, "I probably did see

24    the photos when he handed them back to me, but I did my best not

02:34:13  25    to, but it's hard when the photos are under someone else's

1  control"?

2  A    Yes, I do remember that.

3  Q    And is that part of the information that you were taking

4  into account in assessing whether or not Special Agent Ribail

02:34:29  5  had conducted a blinded lineup?

6  A    Yes.

7  Q    And so "I -- I probably did see my photos but did my best"

8  is problematic from a scientific standpoint when trying to

9  conduct a blinded lineup.

02:34:43  10  A    Yes.

11  Q    Dr. Laney, I'm drawing your attention to Defense --

12  apologies.  My microphone was off.

13      I'm drawing your attention to Defense Exhibit 1006.  This

14  is the wanted poster that was issued by --

02:35:11  15  A    Someone.

16  Q    -- Yakama Nation/Yakama Tribal police -- some entity.  And

17  counsel asked you some questions on whether or not this was

18  presumably a reasonable thing to do, issuing a public safety

19  announcement.

02:35:29  20  A    Right.

21  Q    Does that excuse the impact that it had here,

22  scientifically speaking?

23  A    No.

24          MR. BURSON:  Objection --

02:35:36  25          THE COURT:  Hold on.

1          MR. BURSON:  Objection.  I don't know what it means to

2     excuse an impact.

3          THE COURT:  Sustained.  If you can clarify the question.

4          MR. McENTIRE:  I will, Your Honor.

02:35:45  5  BY MR. McENTIRE:  (Continuing)

6     Q    Because it was a public safety announcement, does that --

7     does science give that a -- say then it's okay to have an

8     eyewitness view a wanted poster like this?

9     A    Um, whether it was appropriate to issue it for whatever

02:36:05  10  purpose is unrelated to the effect that it is likely to have on

11    the witness.

12    Q    And that's the point, is that there's two independent

13    inquiries here.  One is whether or not it's appropriate to put

14    out --

02:36:17  15        MR. BURSON:  Objection.  Counsel is testifying.

16         THE COURT:  Not yet he hasn't.

17         So finish the question.

18         MR. McENTIRE:  Thank you, Your Honor.

19    BY MR. McENTIRE:  (Continuing)

02:36:25  20  Q    There's two inquiries here.  One is whether it's

21    appropriate to put out a public safety announcement, and the

22    other is whether or not that public safety announcement impacts

23    an eyewitness' reliability.

24    A    Absolutely.

02:36:42  25  Q    Would you agree that they're separate inquiries?

1    A    Absolutely.  And, again, what the purpose of releasing it

2    was is completely unrelated to how likely it is to affect the

3    witness' memory.

4    Q    Dr. Laney, you were asked some questions about level of

02:37:15   5    certainty.

6    A    Yes.

7    Q    Would you agree that what scientists are looking for

8    regarding level of certainty is the functional equivalent of:

9    How confident are you in this selection?

02:37:35   10    A    Yes.  A clear question, a plain statement, um, and then a

11    recording an immediate recording of what that -- what the

12    person -- what the witness' answer is.

13    Q    And that's how you properly document certainty.

14    A    Yes.

02:38:14   15    Q    Dr. Laney, you were asked questions along to the -- to the

16    tune of LL making an identification -- and just to be clear

17    here, is it your opinion or testimony that LL, in fact, made an

18    identification here?

19    A    No.  As I think I said, he made a nonidentification in a

02:38:36   20    lineup, and then he did something else afterward that I would

21    not call an identification.

22    Q    Does it stand out to you, Dr. Laney, that after seeing --

23    after speaking with two to three individuals and speaking with

24    the *Yakima Herald Republic* reporter, that LL never contacted

02:39:10   25    police?

1    A    I don't know that it's my job to judge, but that does seem

2    strange.  But then, again, he did actually believe -- he does

3    apparently believe that he originally made an identification, so

4    as far as he's concerned there may not be anything to correct.

02:39:35    5    Q    There was a discussion you had, Dr. Laney, on

6    cross-examination about contradiction and whether or not a

7    nonidentification of LL is -- was, in fact, a contradiction

8    later on.

9    A    Um-hmm.

02:40:07    10    Q    Is it fair to say that that's why FBI policy looks for

11    agents to document level of certainty on nonidentifications as

12    well?

13    A    I think that's a very good reason for that policy, yes.

14    Q    And that wasn't done here.

02:40:22    15    A    Correct.

16    Q    Also on cross, counsel asked you a few questions about --

17    again, in reference to LL's January 27th, 2020, interview.

18         In reviewing the -- essentially whether or not he -- he saw

19    a subsequent photo of -- of James Cloud, from your -- from the

02:41:07    20    testimony that you've heard, as well as the discovery and

21    investigation reports that you've reviewed, one source for where

22    LL stated was that he spoke with two to three people.

23    A    Yes.

24    Q    No reference that those individuals provided a subsequent

02:41:25    25    photograph of James Cloud during that time.

1    A    Since we don't know who the individuals are, we don't know

2    very much.  But no evidence that there is a photo, yes.

3    Q    And no evidence that during the conversation with the

4    *Yakima Herald Republic* reporter that a subsequent photo was

02:41:42    5    actually provided to LL at that time either.

6    A    That's true.

7    Q    And so the supplemental -- the evidence that we have

8    essentially before the Court is that there was additional

9    information that LL heard but not necessarily saw.

02:41:56    10    A    His --

11        MR. BURSON:  Objection.  That misstates prior testimony

12    of another witness who recorded saw James Cloud and heard his

13    name on the news.

14        THE COURT:  I'll say I don't recall.  I'm going to

02:42:11    15    sustain the objection.

16    BY MR. McENTIRE:   (Continuing)

17    Q    There was also a discussion on cross, Dr. Laney, about the

18    video with EZ and the fact that it was video and audio recorded.

19    A    Yes.

02:42:36    20    Q    Without that video, Dr. Laney, would we know that this was

21    a simultaneous lineup?

22    A    No.

23    Q    Without that video with would we know that this was an

24    unblinded lineup?

02:42:49    25    A    No.

1    Q    Without this video would we know about all of the various

2    behaviors that occurred during the lineup?

3    A    Highly unlikely, no.

4    Q    Without that video would we know that at the conclusion of

02:43:03    5    it that there was no instruction for EZ not to provide or not to

6    contact, have any contact with witnesses?

7    A    No.

8    Q    So that video shed quite a bit of light on what reports

9    don't.

02:43:16    10    A    Yes, very much so.  It also reduces the limitations of

11    people there.  We're not focusing on the memory of other people

12    in that room -- people in that room.

13    Q    Dr. Laney, you were asked about the statement that EZ made,

14    "This guy, I think I recognize him," and as disputed, "I don't

02:43:35    15    think he was wearing the red shirt."  And counsel asked you,

16    "This guy, I think I recognized -- I think I recognize him" in

17    reference that this was an inculpatory statement.

18    A    Yes.  And I said there are two interpretations there.

19    Q    Following that, "I don't think he was wearing the red

02:43:59    20    shirt," would you classify that as an exculpatory statement?

21    A    One more time.

22    Q    "I don't think he was wearing the red shirt."

23    A    Yes.

24    Q    Would you -- would you label comments such as -- in your

02:44:27    25    experience, based upon what you've seen, that "I don't think" or

1    "I think I recognize" as not 100 percent -- not high on the

2    certainty factor?

3    A    Yes, I would say that.

4    Q    Then there's a change shortly after, "I don't think he was

02:44:51  5    wearing the red shirt."

6    A    Yes.

7    Q    A reversal, if you will.

8    A    Yes.

9    Q    Does that reversal right after an exculpatory statement

02:45:01  10    give you pause regarding the fact that this was an unblinded

11    lineup?

12    A    Yes.

13    Q    Why?

14    A    Because we can suggest there -- there -- there are possible

02:45:13  15    things we can see as to what happened in there, but even if

16    there's nothing, even if we are unable to see anything happening

17    between those two time points, why, why is she changing her mind

18    direct -- substantially right in the middle of this lineup,

19    right?  Something is happening.  It might be something that's --

02:45:32  20    she's not even aware of, it's unconscious to her; it may be

21    something that is not intentional on the part of anyone else.

22    But something seems to be happening in there, and we want to

23    know as much as possible about what that is, or at least be very

24    concerned that something is happening between those two time

02:45:50  25    points.

1   Q    But we don't know what that is.

2   A    Right.

3   Q    And that speaks to the insidious nature of unblinded

4   lineup.

02:45:56   5   A    Absolutely.

6       MR. BURSON:  Objection.

7       THE COURT:  Sustained.

8   BY MR. McENTIRE:  (Continuing)

9   Q    You were asked a few questions about the follow-up

02:46:06  10   interview with LL and whether or not you had reached out to

11   speak to LL himself.

12   A    Yes.

13   Q    Did the questions that were asked by Investigator Chris

14   Reyes give you enough information to arrive at an informed

02:46:20  15   opinion on LL's -- the evolution of what happened, from a

16   nonidentification to referring to James Cloud as the red-shirted

17   male?

18   A    Yes.

19   Q    And did you have enough information to arrive that -- did

02:46:38  20   you -- would you need more information in the form of a personal

21   interview to arrive at the conclusion that there was an

22   unreliable?

23   A    No, definitely not.

24       MR. McENTIRE:  No further questions, Your Honor.

02:46:53  25       THE COURT:  Any additional questions, Counsel?

1           MR. BURSON:  No, Your Honor.

2           THE COURT:  May this witness be excused?  May this

3     witness be excused?

4           MR. BURSON:  Yes, Your Honor.

02:47:02  5           MR. McENTIRE:  Yes, Your Honor.

6           THE COURT:  All right.  Thank you, Doctor.

7           THE WITNESS:  Thank you.

8           THE COURT:  All right.  Any additional witnesses,

9     Counsel?

02:47:22 10           MR. McENTIRE:  No, Your Honor.

11           MR. BURSON:  No, Your Honor.

12           THE COURT:  Very well.  Why don't we take our afternoon

13     break at this time, and we'll hear argument on -- on these

14     motions.  Okay?  All right.

02:47:35 15           THE COURTROOM DEPUTY:  All rise.

16           Court is now in recess.

17     (Recess taken: 2:47 p.m. to 3:07 p.m.)

18           THE COURTROOM DEPUTY:  All rise.

19     (Call to Order of the Court.)

03:07:28 20           THE COURT:  Please be seated.

21           Very well.  Why don't we start with you, Mr. McEntire.

22     This is a defense motion.  And we could do it a couple different

23     ways.  Why don't we just stick to the arguments.

24           Do you want to argue them all together or -- I think it

03:08:58 25     might makes sense to do that.

1      MR. McENTIRE:  Your Honor, I believe it does make sense

2   to argue them all together, and I did prepare essentially a

3   presentation that goes through them and cabins them one by one,

4   which I think will kind of help the Court --

03:09:13   5      THE COURT:  Perfect.

6      MR. McENTIRE:  -- in navigating through these motions.

7      THE COURT:  Perfect.  All right.  Why don't we start.

8      MR. McENTIRE:  Your Honor, yesterday morning the Court

9   articulated a couple of things that were on its mind in terms of

03:09:41  10   issues that the Court wanted the parties to direct their

11   attention to for both testimony and argument, and I recorded

12   five.  One had to do with the coordination; two, on just unduly

13   suggestive; three, reliability; four, opportunity to view; and

14   then five, 403 concerns about JV's testimony, and specifically

03:10:03  15   as it related to its probative value.

16      So what I did, Your Honor,  is take those concerns, fold

17   them into essentially the -- peppered them throughout this

18   presentation, and I'll specifically highlight those places when

19   they come up, because I just appreciate that the Court was

03:10:24  20   honing us in on where the Court has concerns --

21      THE COURT:  Okay.

22      MR. McENTIRE:  -- or pause.

23      And I think an important place to begin, Your Honor, is

24   starting specifically with the standard itself, just because

03:10:35  25   throughout the briefing there's definitely been argument, if you

1    will, or disagreement on the standard itself.  And I think that

2    there's four takeaways that I wanted the Court to --

3                THE COURT:  Let me stop you here.

4                MR. McENTIRE:  Certainly, Your Honor.

03:10:49  5                THE COURT:  Your first square:  Did the police engage in

6    misconduct --

7                MR. McENTIRE:  Yes, Your Honor.

8                THE COURT:  -- and you seem to implicate that *Perry*

9    stands for the proposition that improper procedure, based upon

03:11:07  10    looking at that, is sufficient.

11                I'm not sure that that's what *Perry* says.

12                MR. McENTIRE:  It's a great question.

13                And so turning to this first point, this is a quote

14    pulled directly from *Perry v. New Hampshire,* Your Honor, which

03:11:21  15    is (reading):  The due process check for reliability *Brathwaite*

16    made plain comes into play only after defendant establishes

17    improper police conduct.

18                And so that's the phraseology, essentially, that *Perry*

19    provides as the template to work from, and then, of course, the

03:11:37  20    question is what that is.

21                In a lovely way, the Supreme Court, of course, doesn't

22    find -- define what "improper" means for purposes of giving us

23    some guidance on what improper is with respect to police

24    conduct.

03:11:51  25                THE COURT:  Isn't that the whole thing that Sotomayor is

1    complaining about?  She goes on and on about how, you know, the

2    majority seems to equate and -- and, frankly, I agree that her

3    analysis of the majority opinion is correct, that it seems to

4    equate that improper police conduct with that coordination,

03:12:16    5    that -- that that is what the majority seems to have in mind.

6    MR. McENTIRE:  I think Justice Sotomayor's dissent is

7    focused on essentially the fact that there was an anchor

8    attached to there needing to be improper police conduct to

9    trigger the due process test to begin with, and I think that

03:12:34    10    that was her frustration in going through sort of the

11    chronological history of, you know, the precedent dating back to

12    *Wade* in 1967 and leading us up to 2012 with this decision is --

13    her frustration was we've never before done this, it doesn't

14    make sense to do this, and so why are we cabining or narrowing

03:12:53    15    so intensely what's necessary to trigger the due process test.

16    And so I think that's -- if I were to capture, I think, what the

17    crux of her frustration coming from the dissent was --

18    THE COURT:  Hold on.  Let me quote you what she says.

19    (Reading):  The majority does not simply hold that an eyewitness

03:13:11    20    identification must be the product of police action to trigger

21    or -- our ordinary two-step inquiry; rather, the majority

22    maintains that the suggestive circumstances giving rise to the

23    identification must be police arranged, police rigged, police

24    designed, or police organized.

03:13:32    25    And so that's -- again, we can quibble with what *Perry*

 1    says, but isn't she right about what the majority stands for?

 2    Whether it's right or wrong, that's what the *Perry* indicates.

 3              MR. McENTIRE:  And what Justice Sotomayor, I think, is

 4    going through with respect to that in terms of clock ticking off

 5    these components of police designed, police arranged is the fact

 6    that police is -- has their hands in this in some way, shape, or

 7    form.  And when trying to define what improper police conduct

 8    means as defined -- as set forth by Justice Ginsburg in the

 9    majority opinion, where I went to, Your Honor, candidly, to try

10    to find guidance on this is I started with a dictionary

11    definition -- right? -- of what "improper police conduct" means.

12              And the definition that I found from Merriam-Webster's

13    definition is:  Not in accord with fact, truth, or right

14    procedure.

15              And so I think when we don't have guidance from the

16    Supreme Court's majority opinion on what improper police -- so

17    what we know is that's what is necessary in order to trigger it,

18    improper police conduct, made very clear by Justice Ginsburg's

19    decision.  The question is what is improper.  Without that

20    definition, I went to Webster's to pull what "improper" is, and

21    they talk about not in accordance with right procedure, which I

22    think fits really, really well here in terms of capturing what

23    the police are looking for.  And it ties in, I think, Your

24    Honor, quite well with -- we know police officers were

25    involved --

1    THE COURT:  Well, but if the Supreme Court wanted to

2    say -- wanted to say "improper police procedure," they would

3    have said "improper police procedure."  They didn't say that.

4    MR. McENTIRE:  They didn't say that.  But I think if

5    they -- if the majority opinion had -- had used the word

6    "improper police procedure," then if a super outdated Yakima

7    County Sheriff's Office policy or a super outdated, you know,

8    FBI policy, for example, didn't articulate a particular

9    procedure, then you would have an individual clearly the

10   product, let's say, of law enforcement coordination or

11   arrangement, and because it wasn't contained in the procedure

12   itself, then no problem.

13   And so I don't think that they were willing, in the

14   majority 8-1 decision, to commit to cabining it to procedure

15   itself.  I think they used a broader definition of "conduct,"

16   recognizing that there's going to be a variety of circumstances

17   of when law enforcement's touch is going to be upon a lineup or

18   an identification procedure that's going to cause problems.

19   And -- and it speaks to a big point that I think is

20   involved and honed in on in Justice Sotomayor's dissent, and it

21   has to do with intent.  And two cases I think stand out with

22   this.  The first one that I'm pulling a quote here from, Your

23   Honor, is *United States v. Emanuele*, which is (reading):  A

24   series of events that is suggestive and creates a substantial

25   risk of misidentification is no less a due process violation,

1    even absent evil intent on the part of the government.

2           And that was honed in especially with Justice Sotomayor

3    in her dissent.  And, importantly, this isn't just her off

4    yelling into the wind, you know, as the lone dissenter in this

03:17:01   5    particular case.  She was spot on when she cited *Wade* and said

6    our precedents make no distinction between intentional and

7    unintentional suggestion.  And I think that's a correct,

8    absolutely a correct interpretation when she directly cited

9    *United States v. Wade*, going back to 1967, saying:  We've

03:17:19  10    never -- you know, we've never said that in order to trigger the

11    due process test, two officers have to sit there, right before

12    they go into a lineup, and say, "You know what we're going to

13    do?  Let's see if we can press our thumbs on the scales of this

14    thing a little bit."

03:17:33  15           And I think that that's important, is that when we're

16    looking at whether or not the due process test is triggered for

17    improper police conduct, it's not just triggered under the

18    circumstances by two officers walking into an interview room, or

19    wherever the lineup procedure happens to occur, and say, "We're

03:17:49  20    going to press our thumbs on the scale of this interview

21    intentionally."  I don't think that that's what is captured in

22    the 8-1 decision, that they're trying to say it only has to be

23    intentional, malicious, or as the Third Circuit describes, an

24    evil intent that needs to be there.  It doesn't.

03:18:06  25           What we're looking for is are their fingerprints traced

 1    back to law enforcement here that weren't in accord with

 2    procedure.  And that is what I believe that *Perry* is looking

 3    for, and ultimately what Justice Sotomayor was taking umbrage

 4    with, is the fact that it was cabining it just to some sort of

03:18:29    5    improper conduct by police.  I think my interpretation of her

 6    dissent is that the due process protections should be much more

 7    broad just when unduly suggestive circumstances come up,

 8    generally speaking.

 9           And so it brings me to the related question --

03:18:50    10    right? -- which is on that sort of first branch of improper

 11    police conduct, the backup plan, if you will, right?  And there

 12    has been extensive, I would say, both briefing and disagreement

 13    on whether or not 403 serves as a catchall or a safety net here.

 14    And, again, direct quote from *Perry v. New Hampshire*, which is

03:19:13    15    (reading):  When no improper law enforcement activity is

 16    involved, we hold it suffices to test reliability through.  And

 17    in laying out several of the afforded rights, one is the

 18    protective rules of evidence.  And it doesn't say all of the

 19    protective rules of evidence except 403.  It doesn't carve that

03:19:30    20    out.  And, importantly, you have *Dennis*, which I cited

 21    extensively in the briefing, which is a Third Circuit decision,

 22    2016, so post-*Perry*, and it has --

 23           THE COURT:  Counsel, I agree with you that if you get

 24    beyond that first-step analysis, the Court would look at 403,

03:19:48    25    so ...

1    MR. McENTIRE:  I'll pass on this then.

2    THE COURT:  Pass on that.

3    MR. McENTIRE:  Done.

4    And that brings us to another interesting point that I

03:19:59  5    don't think has necessarily been contested, but it certainly

6    hasn't been explicitly discussed, which is the siloed nature of

7    the inquiry here.  Right?  So when the Court's assessing,

8    let's -- and going through a due process inquiry, the Court is

9    not looking at the expansive allegations that have been made,

03:20:17  10    all the evidence coming in.  In fact, what *Greene*, a Fourth

11    Circuit decision from 2013 here, and it comes directly from the

12    language of *Manson* itself, including in the concurrent opinion

13    in *Manson,* that the Supreme Court is looking for extrinsic

14    evidence -- like, set aside everything on the sides here; we are

03:20:38  15    looking exclusively at this lineup -- and not be like, well, I

16    mean, in the totality of the circumstances, there's a lot of

17    evidence that suggests that this individual is guilty.  That is

18    not what this due process test is looking for when the Court's

19    moving through it.

03:20:53  20    And so I just think it's important that the due process

21    test, if the Court finds that it is applicable in JV's lineup,

22    LL's lineup -- and I don't believe that it is triggered in LL's

23    lineup, but in EZ's lineup, the Court effectively has legal

24    blinders on with respect to what it can consider; it's focused

03:21:14  25    on the facts and circumstances surrounding the identification

1    or, in this case, nonidentification coupled with reversal.

2          The last point, just in the standard itself, which I

3    think is -- is unique or interesting and worth taking into

4    account is that the corrupting event doesn't literally have to

03:21:37  5    occur during the lineup itself.  And one of the things that

6    struck me from *United States v. Emanuele* is in that particular

7    situation, the facts were -- is you had a bank teller from a

8    bank robbery who, in the first lineup, actually did identify the

9    suspect but was a little hesitant on what was happening; a

03:21:57  10   subsequent lineup where the bank teller did not identify the

11   suspect; and then finally, that bank teller, as well as another

12   one, were sitting outside a courtroom when the defendant was

13   escorted in shackles by the US Marshals Service passed and

14   that's what hung up --

03:22:16  15         THE COURT:  And what is the corrupting event in our

16   facts?

17         MR. McENTIRE:  For which -- for each -- in terms of

18   walking through each lineup?

19         THE COURT:  Right.

03:22:25  20         MR. McENTIRE:  So for JV, the corrupting event that

21   happened occurred within a couple of hours afterwards.  I would

22   say it's two parts that are connected.  The first part is

23   Special Agent Ribail's failure to advise JV on that he shouldn't

24   have performed outside research.  Within hours of that

03:22:50  25   noninstruction, JV is on the Internet, on a Facebook page

1    looking at a wanted poster.  And so that is the corrupting

2    event.

3            And so if we're looking back to improper police conduct,

4    I think the question that the Court is assessing, if you will,

03:23:07    5    is:  Can I take a thread and connect the thing that went wrong

6    during the lineup -- no instruction -- with the thing that

7    screwed the identification up?  And so -- and that's why I think

8    it's important to sort of draw out that we have two different

9    concepts here.  One, which is the lineup itself; and then the

03:23:31    10   second is the integrity of the identification, which is really

11   what is at the heart of the due process inquiry, when you have a

12   witness who is subsequently coming into trial and testifying

13   about something, and so just putting literally blinders onto,

14   well, we're not going to take into account any kind of taint

03:23:51    15   whatsoever that happens once the lineup is done.  After that --

16   I don't think that that's what the due process inquiry is -- is

17   telling the Court to do, just to shut the door and stop

18   considering all evidence that happens the moment the door closes

19   on the lineup up until the moment that we have in-court

03:24:11    20   testimony.

21           Instead, what we're looking at is we're talking about

22   fundamental fairness here under due process.  And what happens

23   when you have corrupting events in some way, shape, or form that

24   are tied to what happened during the lineup that cause problems

03:24:27    25   here with the lineup's reliability.

1    So pulling back out of the standard, what I want to do,

2    Your Honor, is move through each of these in sequential fashion,

3    starting with JV.

4    And the first factor is going to improper police

5    misconduct.  And I've touched on this already, which is we have

6    a concession by Special Agent Ribail that he provided no warning

7    on -- on media during his instructions.  And I think the thing

8    that particularly struck me or troubled me is -- and this is a

9    paraphrase -- felt like this is the type of guy who wouldn't go

10   and contact the media.  And this is the exact reason that

11   cautionary instructions exist, which is removing subjectivity,

12   you know, from an agent's assessment, "Oh, I didn't need to

13   provide those instructions because I felt pretty good about this

14   guy."  You know, that was the same lineup procedure that he

15   administered with LL and didn't provide the same cautionary

16   instruction, and we don't have testimony as to whether or not

17   he, quote, felt like this was the type of guy that wasn't going

18   to go out and perform outside research.

19   But those cautionary instructions exist for a reason,

20   and the goal is, especially when thinking about what was in the

21   Third Circuit's eyewitness identification massive report that it

22   issued, is this idea that even the best intentioned officers can

23   end up putting their thumbs on the scale of a lineup without

24   even realizing it.  And that's why standardization, recording,

25   and all of these procedures are in place.  They are meant, they

1    are designed to minimize, as the 2013 FBI policy talks about,

2    updated later on in -- or revised in 2016, to minimize outside

3    influence.

4         And one of the best ways that you can do that is through

03:26:11  5    standardizing the process.  And what you have here is that there

6    wasn't a standardization or not following that particular

7    process.

8         The second point that I wanted to bring up regarding

9    improper procedure is for sure, as the Court has heard in terms

03:26:25  10   of testimony from Dr. Laney, that there's a vigorous debate on

11   what "media" means with respect to the FBI's policy.  And I

12   hammered this point in the briefing, but it just strikes me

13   as -- if you take a step back from the weeds and look at the

14   holistic policy of -- of what the FBI is trying to do, what best

03:26:50  15   practices are trying to do, what the Yakima County Sheriff's

16   Office's office is trying to do is the language from the 2013

17   policy was:  Doing what you can to minimize outside influence.

18   And so it strikes me as amazing that you would have that north

19   star, if you will, as your guide for when you're trying to

03:27:10  20   construct and administer a lineup, that you are trying to

21   minimize outside influence as much as possible, and then you

22   come to the conclusion that having an individual go onto

23   Facebook or outside research or social media and -- and perform

24   those acts isn't somehow going to compromise or affect or impact

03:27:30  25   the purpose behind these policies is to minimize that outside

1    influence and to have that instruction, that policy read so

2    remarkably narrowly that it excludes what -- I mean, it's not

3    only internally inconsistent with the FBI's policy, I would also

4    say it runs contrary to common sense, if you look at what the

03:27:51    5    objective of what the policies are, of what the research that

6    Dr. Laney testified of what we're trying to do with respect to

7    lineups.

8         And the Court has experience with this in the trials

9    that it has run in the cautionary instructions that it gives to

03:28:05    10    the witnesses every time they go on a break:  Don't do outside

11    media research.  Don't talk to anybody else.  Don't talk to your

12    friends and family about this.  Don't do any type of other

13    independent research, because that outside information is going

14    to impact your ability to neutrally assess the facts that are

03:28:25    15    occurring in this case.

16         And so I think we see a parallel -- right? -- a parallel

17    between what the FBI's and other police agencies' instructions

18    are trying to do, and what the cautionary instructions that the

19    Court administers, that have been signed off by the Ninth

03:28:42    20    Circuit.  And what I'd note is the Ninth Circuit's instructions,

21    the model jury instructions, if you look at the evolutionary

22    history of them from 2011 up to 2000 -- now, '20, that

23    instruction on cautioning witnesses hasn't narrowed over the

24    course of that seven- or eight-year period.  It has expanded to

03:29:02    25    include things such as social media:  Tweeting, twittering

1    Instagraming; things like that.  The instruction has expanded

2    consistent with what research is showing is problematic.

3            And so point takeaway is that that's not what "media"

4    means.

5            And finally tied into this, and Dr. Laney touched upon

6    this point, but I think it's worth hammering, which is, what

7    happens after a lineup matters.  We don't just simply turn

8    blinders on.  And that's played out literally through the facts

9    of *Emanuele* itself, for example, which is that bank teller did a

10   lineup, had a soft identification; then did another lineup, and

11   had no identification.  And the corrupting event that the Third

12   Circuit focused in on and found was intolerable was the fact

13   that there was then, after all of this, after the lineup

14   happened, that the two eyewitnesses happened to be sitting

15   outside the U.S. Attorney's Office as the defendant was walking

16   by in shackles escorted by the U.S. Marshals to the, quote, to

17   the tune of it reeked of criminality.

18           And so, again, I think what you have in circuit

19   decisions, as well as district court decisions, is courts

20   focusing on just not blinders for what happened during the

21   lineup itself, but also what happened afterwards in terms of

22   taking this into account and assessing and applying *Manson*'s due

23   process inquiry.

24           We've got into quite a bit of a debate in testimony in

25   the last two days on recording.  And -- and I think the takeaway

03:29:17    5
03:29:38    10
03:29:59    15
03:30:16    20
03:30:33    25

1    is -- that I want to leave the Court with is recording matters

2    because -- specifically uniquely here, one, you have a wonderful

3    juxtaposition where the Court can literally see what you can't

4    see when a lineup is not recorded and what you can see when a

03:30:57    5    lineup is recorded, and it's a lot.

6             And the second component of that is I'm not just

7    literally talking about recording with respect to audio and

8    video.  Also talking about recording with respect to intense

9    documentation, such as a nonidentification, the level of

03:31:15   10    confidence with respect to that, because it's important to

11    understand when a -- when we don't have a video, did a witness

12    say, "No, no," or no -- "definitely not, definitely not,

13    definitely not."  We don't know.

14             And the reason why, you know, the United States has

03:31:35   15    raised this point multiple times in briefing and has brought up

16    testimony regarding this, which is:  What does it matter?  The

17    two lineups that weren't recorded, LL and JV, didn't result in

18    an identification, so who cares?

19             My response to that is, especially speaking to this

03:31:52   20    policy of you want to record the level of certainty of a

21    nonidentification, is we need to know how committed the

22    nonidentification was because then I think it helped quantifies

23    the gravity of the reversal that happened so the Court can

24    appreciate how tainting that subsequent information was.  That's

03:32:13   25    why I think recording matters even when it resulted in a

1    nonidentification.

2           Bringing us to the second point, Your Honor, on the

3    test, which is:  Did the misconduct result in an unnecessarily

4    suggestive ID?

03:32:30    5           And as I mentioned to the Court before, there needs to

6    be a link, right?  There needs to be a link that I can -- I can

7    put a thumbtack in what happened with respect to what law

8    enforcement did and then drawn a string in terms --

9           THE COURT:  How is it unnecessary, Counsel?  How is it

03:32:44   10    unnecessary?  You had the tribe issue a statement indicating

11    that all folks are -- are accounted for here.  That was clearly

12    wrong.  And so they did -- isn't what they did the next

13    responsible thing, which is indicate, These -- this particular

14    individual is still outstanding.  Police are looking for that

03:33:12   15    individual," and based upon the information they have, the

16    person is armed and dangerous, et cetera.  I mean, why -- why is

17    it unnecessarily so?

18           MR. McENTIRE:  It is a great question, because it's also

19    the exact same point that the Government is bringing up.  And I

03:33:28   20    would agree with the Court that yes, a public safety

21    announcement when there was an initial error issued by the

22    Yakama Tribal Police or Yakama Nation at 2 o'clock that

23    incorrectly what was going on, that is a proper public safety

24    announcement that should come out.  I'm not disputing that.

03:33:48   25           I think the issue is -- is that the concern I -- the

 1    concern that I think that the United States is trying to link is

 2    a false comparison, which is, courts don't look, when engaging

 3    in a due process inquiry, and be like, "Well" -- and where this

 4    comes from, by the way, the provenance, I think, will help

 5    answer this question, the United States cited *Stovall v. Denno*,

 6    which is the Supreme Court case from back in the '60s or maybe

 7    early '70s, can't remember exactly when, and the Court, in those

 8    circumstances, what they were looking at what the facts were, a

 9    woman was stabbed.  She was literally on the deathbed.  It was

10    unclear as to whether or not she was going to make it.  And

11    there was no identification at all.  And so police brought in

12    essentially an individual for a show-up, which they -- and what

13    *Stovall v. Denno*, the majority said is:  For sure we have a

14    show-up here.  For sure that's super offensive.  Under these

15    circumstances, it was necessary to obtain an identification in

16    the first place.  That's the key difference that I think we have

17    here.

18            We already had an identification in the first place, or,

19    to be more accurate, a nonidentification in the first place.

20    And so this is factually distinct from the situation in *Stovall*

21    *v. Denno*, where the Supreme Court tolerated it there because

22    they said under this unnecessary, it was necessary there to get

23    an identification to begin with.  And so I think that's how the

24    Court can look at this situation and carve out, I think, a

25    meaningful distinction between what was barely tolerated in

1    *Stovall v. Denno* versus what actually happened here, which is

2    there wasn't -- this public safety announcement happened after

3    there was a lineup in the driveway of JV's home where six

4    photographs were presented in a non-rushed manner.  And so they

03:35:50    5    are two totally different comparisons.

6            And so when I think when the Court is assessing was it

7    unnecessarily suggestive, it's talking about, in the lineup

8    itself at that time, how necessary was it to tolerate some sort

9    of inflammatory procedure.  And here we don't have that.  What

03:36:09    10    happened later on was the inflammatory action after the lineup

11    was complete, and I think that is a critical distinction between

12    why the Supreme Court tolerated it in *Stovall v. Denno* and why

13    the Court shouldn't tolerate it here.

14            This is a -- this is tantamount to a show-up, this

03:36:29    15    wanted poster.  And the cases that I cited in the briefing, Your

16    Honor, are replete with referencing how show-ups -- and any,

17    whether it's in person, whether it's looking at a wanted poster,

18    even the FBI's policy literally talks about you want the

19    identification to occur in a situation where you don't see other

03:36:47    20    things, such as, for example, a wanted poster, which is exactly

21    what we have here.

22            And I think one of things that struck me about the

23    United States' response in JV's motion is the fact that

24    virtually zero comments were made about the wanted poster

03:37:07    25    itself.  We -- counsel for Government focused on the photos

 1    itself and whether or not the photos were similar or were more

 2    accurate or were a better representation.  That's true.

 3        But what was not focused on is the fact that what --

 4    everything else around the photograph itself and how offensive

03:37:26   5    it was.  And so I think that what is truly not disputed here is

 6    that that wanted poster was outrageously offensive, and I think

 7    that the question that the Court is grappling with on the

 8    "unnecessarily suggestive" prong is:  Was that thing necessary?

 9    For a public safety announcement later on, yes.  But what the

03:37:48  10    Supreme Court is focusing on with respect to the due process

11    inquiry, no.  That's what's focusing on was there -- was that

12    needed to get the identification to begin with, and it wasn't,

13    by all accounts.

14        THE COURT:  Again, even though JV did the research on

03:38:04  15    his own?  I mean, the police department did not -- well, the

16    investigating officers did not put that out.

17        MR. McENTIRE:  The investigating officer -- well, two

18    points.  The investigating officer from the FBI did not put that

19    information out.  However, that information came from either the

03:38:23  20    Yakama Nation or the Yakama Nation Tribal Police, which is one

21    of the investigative agencies that was involved in this case.

22    And so you have a law enforcement agency that was putting out

23    this wanted poster, essentially.

24        And so I think truly the fingerprint that the Court is

03:38:39  25    looking for is:  How did JV get from the lineup to that wanted

1    poster?  And it was from the failure for a proper policy

2    instruction or a cautionary instruction to be administered to

3    begin with.

4         I think aggravating the situation is the fact that that

03:38:56  5    wanted poster came from essentially the Yakama Nation Tribal

6    Police or some entity of the Yakama Nation.  I think even if it

7    came from the 6 o'clock news -- right? -- if the 6 o'clock news

8    had constructed the wanted poster and had put that on their

9    Facebook profile, and JV had gone out and saw it, I'd still

03:39:15  10    think that we'd have the exact same due process problem because,

11    again, the question is, from an unnecessarily suggestive

12    standpoint, do we have a link between something improper that

13    occurred during that lineup, and can I tie a thread to what

14    happened with JV?

03:39:29  15         And I'm not saying that JV needs to be cabined and

16    sequester and is absolutely prohibited from engaging in any

17    online research, and Dr. Laney testified about that, that that's

18    an unreasonable restriction.  The point that we're looking for

19    from this due process inquiry is:  Was that instruction provided

03:39:48  20    so if JV went out and did this after the instruction was

21    provided -- right? -- so let's say Special Agent Ribail went

22    through -- Ribail, excuse me -- went through and provided a

23    full-throated, you know, do not engage in social media, do not

24    do this, made it explicitly painfully, painfully obvious, and

03:40:08  25    then right afterwards JV went out and did those things, I think

1    I'd have a much weaker argument in making to the Court that we

2    have police misconduct because they did exactly what they were

3    supposed to do; and instead, I'd be moving to exclude it

4    exclusively under Rule 403 as we have a problem here that has

03:40:25    5    tainted the identification.

6         But that's not the circumstances that we have, which is

7    why the procedural vehicle that I chose here is to advance it

8    under a due process inquiry because I think I can tie it to

9    fingerprints from what law enforcement did that was incorrect.

03:40:40    10        Bringing us to this last prong, if you will -- and,

11    again, sort of lost in the ether of a lot of briefing that the

12    Court has reviewed in the course of these three motions -- that

13    this is a burden-shifting standard.  And so -- and I think it's

14    just -- it's important to -- it's important to have that in the

03:41:04    15    mind, which is I carry the burden on prong one, of showing that

16    we have police misconduct -- improper police misconduct --

17    improper police conduct.  I carry the burden on prong two, of

18    showing that this was unnecessarily suggestive.  However, if

19    met, the United States needs to come back -- and intuitively, it

03:41:27    20    makes sense from the movement of this due process test, that now

21    they're trying to show, "Well, yeah, we've got something that is

22    a serious problem here, but here are the things, Your Honor,

23    that we can point to that say that this was nevertheless

24    reliable under the totality of the circumstances."  That's where

03:41:42    25    you have the Biggers factors that come into play, which, as

1    we've talked, about are crafted from the 1960s, slightly dated

2    on the scientific research -- significantly dated on the

3    scientific research.

4         But I think the *Dennis* opinion does a very nice job of

03:42:03   5    talking about how *Perry* has integrated those factors in.  It

6    didn't literally add factors 6, 7 and 8.  But if you look

7    through the *Perry v. New Hampshire* opinion, even Justice

8    Ginsburg is specifically talking about, in the context of the

9    majority opinion, how there are other factors that the Court

03:42:22   10   recognizes that play into the context of a reliability analysis.

11   And I believe that the majority opinion references, you know,

12   weapons-focus and other components.  A nod -- right? -- an

13   explicit nod that the opinion, while it didn't literally add a

14   6, 7 and 8 factors under Biggers, it does recognize that, under

03:42:43   15   still this totality of the circumstances umbrella, that the

16   Court is taking into account all of the scientific updates that

17   have happened since.

18        But just focusing on those five factors itself:

19   Opportunity of the witness to view.  We've -- the Court has

03:42:58   20   heard testimony regarding what happened, that this wasn't -- and

21   I'm referring just to JV -- this didn't happen over seconds;

22   this happened over minutes.  And, of course, that there's a

23   reasonable debate.  You know, if you're being followed with a

24   firearm or there's weapons-focus that was going on, that is

03:43:15   25   true.  You also heard Dr. Laney testify either this morning or

1    afternoon that essentially the duration of the weapons-focus,

2    sort of its -- its an intensely strong factor if it's a

3    multi-second identification.  It becomes --

4        THE COURT:  Counsel, you can continue arguing about the

03:43:31  5    Biggers factors.  I seem to agree with the defense position that

6    those seem to have been met.  I seem to disagree with the

7    Government that they do not apply.  I disagree with the

8    Government on that.  So you can skip this argument --

9        MR. McENTIRE:  Done.

03:43:47  10        THE COURT:  -- and move on to the others.

11        MR. McENTIRE:  I'll move on.

12        THE COURT:  Okay.

13        MR. McENTIRE:  And I think ultimately, under the

14    totality of the circumstances, Your Honor, these are the two --

03:43:55  15    this is the photo on the left of what was shown to JV; this is

16    how James Cloud looked when he was arrested the next morning

17    (indicating).  And so I would leave the Court with just this

18    simple point that stands out to me, which is:  It's not the

19    photo but it's what is around it in terms of what caused --

03:44:12  20    there's not a meaningful distinction here.  I think objectively,

21    subjectively, from a layperson, when you look at these two

22    photos, that the lineup photo that Special Agent Ribail

23    administered to JV and LL fairly captures how James Cloud looked

24    that day.

03:44:28  25        This quote stuck out to me, Your Honor (reading):

1    Whether subsequent viewings create a substantial risk of

2    misidentification may depend on the strength and propriety of

3    the initial identification.

4         And from what we know of the initial identification here

03:44:44   5    is that there was a nonidentification.

6         *Beeler*, Your Honor is a decision that I did cite in the

7    opening brief of JV, and it's a decision that I think

8    particularly stands out to me.  (Reading):  Here, where the

9    eyewitness fails to identify the defendant as the perpetrator of

03:45:01   10   a crime in a fair, non-suggestive pretrial lineup, that

11   eyewitness will not be given a second chance in court, where the

12   surrounding strongly suggests that the person accused of the

13   crime is the actual perpetrator.

14        Even -- almost pulls upon the comment that the Court

03:45:15   15   made yesterday with respect to counsel for Donovan Cloud and

16   getting a second bite at the apple.  And I think that that's

17   what the *Beeler* decision is speaking to here, which is, no, when

18   you have a nonidentification in a procedure, you don't get a

19   second bite at the apple here.  And I think that that is what

03:45:37   20   *Beeler* is speaking to.  And, importantly, *Beeler* went on to talk

21   about containment measures, right?  Because one of the things

22   that the United States hammers in their briefing is saying there

23   are containment measures that the Court can put in so they're

24   not eliminating JV's in-court identification, but we can do

03:45:55   25   damage control, effectively.

 1          And, again, another meaningful quote, I think, from

 2   *Beeler* (reading):  Though an in-court protective measure may be

 3   the remedy for suggestive identification procedures in some

 4   situations, here, where the eyewitness' identification is

03:46:10   5   unreliable because of his prior failure to identify the

 6   defendant in a fair pretrial lineup, the Court holds that the

 7   appropriate remedy is to exclude any attempted in-court

 8   identification.

 9          And, importantly, the remedy that we're asking for, with

03:46:24  10   respect to JV, is not that JV shouldn't be allowed to be called

11   as a witness by the Government.  Not what I'm asking for.  Not

12   what we moved.  JV is welcome to come in and testify as to the

13   multitude of factors that he can testify to under 701 as a

14   percipient witness.

03:46:42  15          What we are limiting is the ability for JV to sit in

16   court and point out that man right there, James Cloud, and say

17   that that is the individual that he saw that day.  And the

18   reason is, again, based upon the problems that I've set forth.

19          Turning briefly to the 403, because the Court expressed

03:47:05  20   a concern about the -- the, quote, you know, very probative

21   nature of JV's testimony.  And I guess my response to that is

22   the probative value, and what I would encourage or urge the

23   Court to -- to weigh is that the probative value of JV's

24   testimony under Rule 403, if we got to that analysis as the

03:47:28  25   backup plan, the probative value is -- what the Court's looking

1    for is what happened during the lineup, and what was said during

2    the lineup?  As Dr. Laney testified, it's what happened during

3    the lineup that matters.  That's the identification or

4    nonidentification that matters.  And so I think that's where the

03:47:47  5    Court has the probative value that it's assessing.

6          This isn't the probative value that we're talking about

7    (indicating).  And that gets to sort of the sliding scale, if

8    you will, under the 403 analysis.  And so I think that as we

9    move down, JV's nonidentification:  Probative.  That's the one

03:48:06  10    that came out of the lineup.  JV's reversal later on:  That is

11    the one that carries far less be probative value, and under the

12    Ninth Circuit case law, the level of prejudice needed to be

13    shown slides down anyway, even though I believe the prejudice is

14    still sky high in terms of what happened here.

03:48:25  15          That brings us to the point of that language from the

16    wanted poster that particularly sticks out, which is the "due to

17    misidentification."  Not disputing what happened behind the

18    scenes from law enforcement, that there was a game of telephone

19    of how information was relayed from Oregon State Police to

03:48:46  20    whatever agency to cause the incorrect public safety

21    announcement to be issued to begin with.  None of that is

22    explained in this wanted poster.  None of that information --

23    there's no testimony that was provided to the Court that law

24    enforcement called JV and said, "Don't worry, you know, JV, this

03:49:06  25    'due to misidentification,' that wasn't you.  That was something

1    else that happened.  This was an internal mix-up."

2         Objectively, when you're looking at this wanted poster,

3    when JV sets his eyes upon it, as I did when I first set my eyes

4    upon it, and as Dr. Laney when she first laid her eyes on it,

03:49:22   5    "due to misidentification" -- this came out literally hours

6    right after this lineup, hours, and said, "Due to

7    misidentification, this guy is still at large."  And the

8    connection or link that the Court can intuit what happened from

9    when an individual would read that, such as JV -- I just did a

03:49:46  10    lineup, and now I'm seeing a public safety announcement saying

11    due to misidentification, me, this is still someone out at

12    large -- that that is, again, an additional problem that

13    compounds the prejudice that happened here.

14         Pivoting from JV to LL, we don't have an identification

03:50:08  15    to begin with.  Again, just like JV.  And I think when I was --

16    when I was thinking about this statement in terms of what

17    happened, but for the January 27th, 2020, interview, you wonder

18    whether or not the United States would have called LL as a

19    witness to begin with.  It's an open question, right?  Had

03:50:39  20    participated in a lineup, had not identified James Cloud as the

21    red-shirted male.

22         And so suddenly, you know, six months, when sort of

23    there was no debate that he did not pick James Cloud out of the

24    lineup, and then now this sort of is just merged in and happens,

03:50:59  25    and now we have a full-throated defense of LL and his reversal

 1    as a -- as reliable and it should come in court, and it strikes

 2    me as amazing that LL was conversing with the agents during this

 3    January 27th, 2020, interview, and he was thinking that this is

 4    what happened all along.  Right?  He was using this in

 5    conversation.  He didn't go to the agents, and it's not

 6    documented in the 302, and that's not the testimony that we

 7    heard, that LL said, "Wanted to let you guys know, I had an

 8    opportunity to talk to a few people, and I agree, after speaking

 9    with those people, and, you know, talking with the *Yakima Herald*

10    *Republic* reporter, yes, this is what happened.  This was the

11    individual."

12        It was unconscious.  And I think it's telling, when

13    you're trying to incorporate Dr. Laney's testimony about memory

14    and this reconstructive Lego wall that happens, which is, he has

15    reconstructed a memory that straight up did not happen.

16        And what I think is particularly troubling is we have

17    the fact that he talked to a reporter, we have the fact that he

18    talked to a few people, and now today, or at least as of

19    August 7th, 2020, when he was interviewed by Chris Reyes and

20    Cole Rojan, he believes he selected James Cloud to begin with.

21    That is a memory he now has and believes as true.  He believes

22    Donovan Cloud shot him, even though he had previously identified

23    a different individual, Morris Jackson, as the blue-shirted male

24    who had shot him, which is corroborated by multiple other

25    witnesses.  And as Special Agent Ribail testified, he couldn't

1   remember who, but one of the ones that he could remember is that

2   Natasha Jackson, one of the other witnesses, who is Morris

3   Jackson's niece, identified Morris Jackson as the individual

4   with the shotgun who shot LL.

03:53:00   5          And so what the Court is seeing is two memories that we

6   objectively know -- the Court doesn't need to engage in a

7   reliability or a credibility analysis on this -- two memories we

8   objectively know never happened.

9          THE COURT:  Why can't you just cross-examine him on

03:53:14   10   that?  Why can't you just say:  LL, you said X on this date.

11   You then went out, you talked to the reporters, you then had

12   conversations with all of these other folks, and -- and -- and

13   lo and behold, now you have a different memory.  Isn't that a

14   coincidence?

03:53:36   15          And do all that you need to do to cross-examine that

16   individual in front of the jury, and the jury to make the

17   decision about whether or not they're going to believe LL?  Why

18   isn't that the proper process here and the proper procedure

19   here.

03:53:52   20          MR. McENTIRE:  My response would be a couple-fold.  The

21   first is, and I can't remember which justice articulated this

22   opinion, that there is almost nothing more convincing to a jury

23   that an eyewitness who sits down in court, points a finger at

24   someone, and with full conviction and belief says, "That is the

03:54:11   25   individual that shot me."  There is research that shows that

1    one-third of the Innocence Project wrongful convictions that

2    happened resulted from misidentifications when individuals

3    confidently sat in court and said that.

4         In the preamble of the 2019 Third Circuit report on

03:54:32  5    eyewitness identifications, it talked about the basis of why the

6    Third Circuit convened this working group to study eyewitness

7    identification had to do with *Flowers* case, which is a woman who

8    claimed she was raped by Mr. Flowers sat in a witness stand and

9    said with 100 percent conviction, 100 percent certainty, "I

03:54:53  10    swear that is the individual," and was subsequently exonerated

11    by DNA.  That is the problem --

12         THE COURT:  Counsel, I had that exact case myself.  I

13    had a witness, a rape victim, who was violently raped by, in her

14    opinion, my client at the time.  And she was 100 percent

03:55:15  15    certain.  And ten months later, when we finally got the DNA

16    results, that turns out not to be the case.

17         Now, here's the thing:  The problem I'm having with

18    regards to this particular witness is that there seems to be a

19    standard that has been set by the different courts about what --

03:55:40  20    how juries should interpret this.  Does it sort of shock the

21    conscience?  Is the testimony by Mr. -- well, LL going to invite

22    the jury to render a verdict that's improper -- that's an

23    improper emotional bias?

24         Is that the case?  Is that -- is that what is happening

03:55:59  25    here.

1    MR. McENTIRE:  No, I don't think so.  Because I think

2  we're looking under a different -- and I recognize that evidence

3  can be excluded under various subprovisions that are under 403,

4  and one of them is that the jury would reach an improper

03:56:13    5  emotional decision.  And I'm not advocating here that the

6  concern here is that the jury is going to reach an emotional

7  decision.  My concern here is that the credibility of an

8  individual who stands up with conviction and certainty --

9    THE COURT:  But am I going to then stand in the place of

03:56:30   10  the jury?  And why not let the jury make that decision?  Why --

11  why am I -- why am I going to stand in their place and make that

12  decision on my own based upon what -- do I believe LL?

13    MR. McENTIRE:  I think, Your Honor --

14    THE COURT:  Because that's what you're asking me to do.

03:56:48   15  You're asking me to say:  LL -- what happened here is -- is in

16  my judgment improper, and we're going to exclude LL.

17    Why not let the jury make that decision.

18    MR. McENTIRE:  I think what's telling -- if that was

19  the -- in facts such as these, when we can objectively show that

03:57:11   20  these are memories ███████████████  now believes that never

21  happened to begin with, we have a -- otherwise, when would

22  Rule 403 be used?  Right?  I mean, Rule 403 is a -- is a, by

23  definition, an evidentiary gatekeeping rule by the Court to

24  recognize, "You know what?  There are times and places and

03:57:34   25  certain things that this jury should not hear."

1          Otherwise, all sorts of things under 403 should come in,

2     and we just say free-for-all.  Let the Court -- let the jury

3     weigh these things.  The jury is capable of discerning these

4     things through proper jury instructions.

03:57:49    5          And so I think, Your Honor, the reason we have 403, the

6     reason that we have the Court engaging in an evidentiary

7     gatekeeping function is the recognition that we have certain

8     pieces of inflammatory evidence that are dangerous for a jury to

9     hear.  And I think that that's why the Ninth Circuit --

03:58:09   10          THE COURT:  And you're saying that the inflammatory

11     evidence is the LL identifying him, because that's --

12          MR. McENTIRE:  After the original nonidentification.

13     And I think that's why the Ninth Circuit's sliding scale of

14     Rule 403 is particularly informative and telling here, because

03:58:25   15     what the Court is trying to engage on a sliding scale test is:

16     How probative is this?  How probative is this evidence?  If it

17     is incredibly probative and driving, then there's a really high

18     bar that James Cloud needs to meet to keep this out under 403.

19     But when we know objectively that he is testifying to memories

03:58:44   20     that never happened, we are in a probative value that is --

21          THE COURT:  Why do we know that?

22          MR. McENTIRE:  He --

23          THE COURT:  Why --

24          MR. McENTIRE:  The evidence before the Court is he

03:58:55   25     identified that he picked James Cloud all along.  And we know

1   that not to be so.  The evidence before the Court is that he

2   selected Donovan Cloud as the blue-shirted male, when we know

3   objectively that that's not what happened.  And so we know that

4   the crux of what the United States wants to use this testimony

03:59:12   5   for is that he identified James Cloud.  He didn't.  He didn't do

6   that in a lineup.

7          And as Dr. Laney has testified, that that is -- when we

8   are looking at the lineup and what happened, we look -- that is

9   the best example or the best information that we draw in terms

03:59:32   10   of whether or not it was informative, what the Court is looking

11   at in terms of meaning, and what we credit, is the language that

12   she was using, what we credit.

13          And what we credit here is not what happened in

14   January -- or a few days after the event or on January 27th,

03:59:50   15   2020, or later on on August 7th, 2020.  What we credit is what

16   happened during the lineup administration itself and there was a

17   nonidentification there.

18          THE COURT:  Okay.

19          MR. McENTIRE:  Turning to the last one, Your Honor, I

04:00:08   20   had clips.  I'm just going to go -- I'm going to move through

21   them in the sense of not play them, because the Court has

22   reviewed this.  I also don't have the audio, and I understand

23   where the Court is from the time of the day.  But I don't think

24   there's a debate here as to whether or not the first threshold

04:00:28   25   test is met in terms of -- you know, in this flowchart whether

1    or not improper police conduct.  We have both -- we have

2    Detective Mike Williams recognizing explicitly that there were

3    two policy violations.  There's actually three that he admitted

4    to.  But two that directly control and inform a problematic

5    lineup, and that was a nonsequential lineup in violation of

6    Yakima County Sheriff's Office policy, as well as an unblinded

7    lineup.

8            So moving through these --

9            THE COURT:  Wait.  Hold on.  But under *Perry*, isn't the

10   analysis whether or not the police arranged, rigged, organized,

11   designated, or otherwise manipulated the photo lineup so that EZ

12   would identify Mr. Cloud?

13           MR. McENTIRE:  Hmm.  Um --

14           THE COURT:  Isn't that the analysis?

15           MR. McENTIRE:  No, I don't think it is, Your Honor.

16           THE COURT:  Okay.

17           MR. McENTIRE:  And so I think, again, speaking back when

18   we were discussing the standard, that a critical inquiry, that

19   Justice Sotomayor discusses, rightfully citing *Wade*, is that we

20   are not looking at intent.  Right?  We're not looking at an evil

21   intent that -- and this is why in the cross-examination of

22   Detective Williams I specifically asked him, you know, "Did

23   you -- did you know about this policy?"

24           "No.

25           "So you didn't go into this interview looking to put

1    your thumbs on the scale and intentionally violate this policy

2    to create a more suggestive lineup?

3         "No."

4         But it happened.  And so I think that's where the

04:02:00  5    standard is so important for the Court here in this inquiry on

6    EZ is evil intent versus it happened is not a distinction that

7    Supreme Court precedent makes.  And so you don't need Detective

8    Williams or Detective McIlrath, because, otherwise, that's a

9    threshold that is -- I don't know what -- it would be incredibly

04:02:24  10   hard to show.  It would be incredibly hard to show, almost

11   insurmountable, that you pick inside the brain, because no

12   officer is going to get up there and say, "I intentionally went

13   into this lineup wanting to mess with it."  I think what we can

14   show there -- maybe those facts will present themselves, Your

04:02:40  15   Honor.  But I think that is not the standard that the Supreme

16   Court is setting in *Perry*.

17        What the standard that the Supreme Court is setting is:

18   Can we show improper, not in accordance with procedures, police

19   conduct, whether they knew about the fact that they were

04:02:54  20   screwing up the policies or not?

21        And both detectives, Detective Williams indicated that

22   he was five months into becoming a detective, and either wasn't

23   aware of, didn't review closely, it's unclear --

24        THE COURT:  I think the testimony is that there were --

04:03:09  25   that there were several things that were not complied with with

1    regards to policy.  So let's dispense with that.  We understand

2    that that's something that occurred.

3            MR. McENTIRE:  Done.

4            Your Honor, turning to essentially the unnecessarily

04:03:24  5    suggestive component with respect to EZ's lineup, um, I classify

6    this or I've referred to this in the briefing as, quote,

7    unquote, a moralistic lecture.  And I understand that Detective

8    Williams offered supplementation or clarifying testimony that,

9    you know, initially he was going in there as part of a CPS

04:03:43  10    investigation into child endangerment or child welfare, and

11    so -- but the -- you know, the query, essentially, once he

12    realized that was a weak case, quickly pivoted over to the

13    Medicine Valley murders themselves.

14            And so I understand that, from the United States'

04:04:01  15    perspective, and that, you know, counsel for the Government

16    might stand up here and -- and advocate that this isn't -- you

17    know, he was -- he was an officer doing his job and

18    investigating the child endangerment.

19            The testimony from Detective Williams is that quickly,

04:04:17  20    shortly into the interview, it pivoted and it transitioned from

21    child endangerment to investigating the Medicine Valley murders.

22    And even then, I still think that the -- I would -- I think that

23    the Court needs to divorce itself from this concept that somehow

24    that as long as he was investigating child endangerment, that

04:04:37  25    that made that line of sort of query okay.

1          And what Dr. Laney was testifying about is whether or

2    not it was appropriate to do that line of questioning or not,

3    that's not what science focuses on.  For purposes of assessing

4    this lineup, and whether or not it was unnecessarily suggestive,

04:04:54  5    were there things that impacted EZ to cause her to become more

6    susceptible to suggestiveness later on?  And I think that that's

7    where the comments that Detective Williams made, how it

8    influenced it.

9          And this is -- and this is -- and I commented on this in

04:05:23  10    the reply brief with respect to EZ, because one of the things

11    that I struggle with fundamentally, that just seems so

12    internally inconsistent with respect to the due process

13    standard, is how, when the policy that was not followed,

14    unblinding the lineup, allows a variety of unconscious behaviors

04:05:51  15    to bleed into the interview process, that it puts James Cloud at

16    a remarkable disadvantage to try to sit there and tease out

17    things that are unconsciously administered by the officers, that

18    they're not aware that they're doing, and unconsciously absorbed

19    by EZ.  And I think it's just -- it's a point that I bring up

04:06:11  20    that it's a -- it's difficult that we can show.  And so I was

21    trying to quantify or literally show a situation of where I

22    think we can --

23          THE COURT:  Well, Counsel, isn't it the case that before

24    any bookmarking happens, what she's indicating, EZ is

04:06:27  25    indicating, "Yeah, I think this is the guy," and then moves on

USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2                490
Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020
Argument by Mr. McEntire

1    to the next picture, and then comes back within 30 seconds, and

2    says, "Yep, that's the guy."

3          MR. McENTIRE:  And what I would ask the Court to do is

4    when the Court goes back and looks at this specific section of

04:06:41    5    the video, and I think what stands out, and this was why I was

6    drawing such attention to it, is EZ's comments are, "This guy, I

7    think I recognize him.  I don't think he was wearing the red

8    shirt" followed by comments and placement --

9          THE COURT:  There's a dispute about what she said.

04:07:00    10          MR. McENTIRE:  There certainly is, Your Honor.  And I

11    understand that the parties disagree on whether or not it was "I

12    don't think" or "I don't know."

13          THE COURT:  Right.

14          MR. McENTIRE:  But I think what the Court can do is

04:07:11    15    bookend what we have, which is either an ambivalent statement or

16    an exculpatory statement made by EZ.  Accepting my proffer of

17    what the video shows, which is, "I don't think he was the one

18    wearing the red shirt" to 20 seconds later, "This is the guy,"

19    the question is -- is there's a change in position there, right?

04:07:33    20    And so what happened in between.  And --

21          THE COURT:  Well, taking your version of it.  Taking the

22    other version it's, "Yeah, this is the guy.  Yeah, the guy with

23    the red shirt.  Yeah, this is the guy."

24          There's a difference.

04:07:45    25          MR. McENTIRE:  There is and -- but --

1    THE COURT:  Which makes more sense?  That's the

2   question.

3    MR. McENTIRE:  And the question is even under the

4   Government's version, "I think I recognize this guy.  I don't

04:07:54   5   know if he was the one wearing the red shirt," I still think

6   that you have an ambivalence that then 20 seconds later comes

7   to, "This was the guy."  And so you have, again, ambivalence or

8   exculpatory.  Under either interpretation to 20 seconds later,

9   you have a change in position and --

04:08:11  10    THE COURT:  Okay.

11    MR. McENTIRE:  -- so the question is:  What happened in

12   between?  And I can't sit here and point to the Court and be

13   like -- and so I tried to say --

14    THE COURT:  You can say that putting a pen down -- was

04:08:21  15   that it?  Is that the gesture that you're talking about?

16    MR. McENTIRE:  The two objective things that I can see

17   from the video that stand out to me --

18    THE COURT:  Sure.

19    MR. McENTIRE:  -- are one is the pen placement above

04:08:32  20   James Cloud's photo.  And then the second --

21    THE COURT:  But that happens after she says, "I think

22   this is the guy."

23    MR. McENTIRE:  (Shook head.)  That pen placement happens

24   after the, "I don't think this is the guy wearing the red

04:08:44  25   shirt."  That's when the pen placement happens.  It is after

1    that, and it is before she says --

2          THE COURT:  I'll look at it again.  I'll look at it

3    again.

4          MR. McENTIRE:  And so that's what I would encourage the

04:08:55    5    Court to take a look at, is what happened between the either

6    ambivalent or exculpatory statement to the point where she comes

7    back around and says something different one way or the other

8    and what happened in between.

9          And I -- I realize that I'm struggling to show -- not

04:09:10   10    struggling.  I think I can point to certain facts that stand

11    out.  But this is the inherent problem here, which is the

12    procedure that they violated, the science shows that the

13    influence that happened is on an unconscious and on a

14    subconscious level, and so that's what is difficult for me to

04:09:29   15    argue, and the Court to grapple with, and it's a frustrating

16    inconsistency, I think, in the standard itself that this unique

17    violation -- you know, if I had my -- if I was arguing to -- if

18    I was arguing to the Court on what a better standard would be is

19    if there's a violation that's established that shows that the

04:09:50   20    violation -- the policy violation, the improper police conduct

21    was an unblinded lineup, then I think automatically that the

22    unnecessarily suggested prong would be met.  And I'm not saying

23    that that is the standard.  I'm just saying that that seems a

24    more -- when you have a --

04:10:06   25          THE COURT:  I want to circle back to what you're arguing

1   now and, really, what you argued at the beginning, which is, you
2   know, they violated these procedures.
3        Well, they really didn't violate the procedures, did
4   they?  Because these procedures, even according to their own
5   policy manual, indicates that these are suggested procedures
6   that -- you know, in some cases; you know, you don't have to
7   necessarily follow.  These are sort of best practices, but
8   they're not necessarily violations.  Or are they violations.
9        MR. McENTIRE:  In the Yakima County Sheriff's Office
10  policy it is "in no circumstances," or words to that effect,
11  should you ever do this.  And I don't think that that is, "This
12  is the best practice.  You should think about this."  That is
13  very bold language that the Yakima County Sheriff's Office
14  office uses whether it's -- I can't remember if it's 603.5 or
15  603.6, but it is in no circumstances, Your Honor.  And so I
16  think that is powerful statement on what you are not to do, and
17  it is exactly what did happen.
18       THE COURT:  Okay.  Counsel, wrap up.
19       MR. McENTIRE:  Will do, Your Honor.
20       Going to the rest of the totality of the circumstances,
21  Your Honor, I think that what stands out is the cross-racial
22  identification that occurred here.  And it truly is a remarkably
23  troubling fact that EZ, during that interview, unquestionably
24  confused James Cloud for Morris Jackson during the course of
25  this lineup.

1     And I'm pulling a snippet from the transcript right

2     here, Your Honor, of the interview with Detective Williams when

3     he is asking EZ:  What did he, the person that met them at the

4     gate, the person that met them at the gate -- which Morris

04:11:53  5     Jackson indicated was him -- what did he look like?

6         (Reading):  He was wearing a red shirt.  At first, from

7     far away, I thought he was maybe white, but the closer you got,

8     you could tell he was Native.  I'd say 19 to 23.

9         These are descriptions that the United States is

04:12:08  10     providing in its briefing saying this is a reliable

11     identification of James Cloud.  It's actually what she was using

12     to describe Morris Jackson.

13         And so, again, I think when the Court is assessing the

14     totality of the circumstances on reliability, it is something

04:12:21  15     that is hugely important from a cross-racial identification that

16     we are watching that objectively in action; that she is

17     confusing one Native American suspect from another Native

18     American suspect on a hugely important fact in terms of who shot

19     Dennis Overacker.

04:12:39  20         In terms of wrapping up, Your Honor, I think we've

21     covered these components on the various totality of the

22     circumstances, as well as the ill-fitting fillers that we have

23     here, and they stand out.

24         The point that I would leave the Court with is this:  We

04:13:02  25     have two reversals, two reversals in one case.  I think that

 1    that should give the Court -- should trouble the Court at an

 2    incredible level in terms of what we're talking about here.

 3            Does the Court have any other particular questions that

 4    I can answer regarding these three motions?

04:13:24  5            THE COURT:  I don't.

 6            MR. McENTIRE:  Thank you, Your Honor.

 7            THE COURT:  All right.  Mr. Smith?

 8            MR. SMITH:  Thank you, Your Honor.

 9            Your Honor, to tell you the truth, I'm embarrassed at

04:13:55 10    the -- the small argument that I have to make in this, but I

11    think it's important to make it.  And, truly, I could make it

12    even smaller by saying -- I've never done this, but "what

13    Mr. McEntire said," because he has covered everything so fully.

14            But there still is a distinction that I want to -- to

04:14:21 15    address to the Court with regard to this alleged -- and I think

16    even Dr. Laney, Cara Laney, she put these air quotes around this

17    identification, because it's not.  It's -- it's a name.  And

18    it's the attachment by -- apparently by LL of a name to I

19    couldn't tell you what.  Neither could she, and neither can the

04:14:53 20    Government.  In fact, when they -- when they cross-examined the

21    doctor, they didn't even address this issue, and there's a

22    couple reasons why.

23            But the -- the fact is -- is -- I mean, it's -- it's a

24    situation or a circumstance that I've really never been

04:15:10 25    confronted with before.  Because the -- the initial

1    identification, and we heard this -- this kind of argument about

2    whether there was a contradiction between a non-ID and then an

3    ID, but that wasn't the case for Donovan Cloud or this issue

4    with regard to Donovan Cloud.  LL identified Morris Jackson as

5    the person with the shotgun and the person in the blue shirt.

6    And after he did that or, you know, as he did that --

7         THE COURT:  I'm going to ask you -- let me ask you the

8    same question --

9         MR. SMITH:  Yes.

10        THE COURT:  -- I asked earlier --

11        MR. SMITH:  Yes.

12        THE COURT:  -- which is:  Why isn't that then up for the

13   jury to decide and just point out the fact that he's talking

14   about a different guy over here, here's what he did, and --

15        MR. SMITH:  Well, there's a couple -- there's couple

16   reasons why you shouldn't do that.  And one of them is, is

17   that -- and I'll say this one:  You wouldn't let just somebody

18   come into this courtroom and testify that Donovan Cloud shot

19   somebody, without some foundation, some foundation to that --

20   that statement, and we don't have that here.  In fact, the

21   Government --

22        THE COURT:  But we do.  He was there.  LL was there.

23        MR. SMITH:  He was there, but whether or not Donovan

24   Cloud was there is up in the air.  That's not a circumstance

25   that he ever testified to, that he ever saw Donovan Cloud, knew

1   Donovan Cloud, knew of Donovan Cloud.  And he didn't identify

2   him.  And more than that, the person that he did identify,

3   there's so much substantial corroboration to that.  The

4   Government -- in fact, when this first came -- when this

04:16:49   5   first -- when this issue first came up, I thought, well, really

6   the Government needs to respond to this, to this statement that

7   was included in the James Cloud briefing about, you know, the

8   name Donovan Cloud was mentioned, because what that says is that

9   the -- the investigation that they did, where his niece

04:17:18   10   identifies him as wearing a blue shirt and having a shotgun,

11   Morris Jackson identifies himself as wearing a blue shirt, the

12   clothes that -- that -- that LL identifies as -- as belonging to

13   the person that had the shotgun was wearing, when they -- when

14   they arrested him, he was wearing those clothes.  He made an

04:17:44   15   accurate identification, and it was corroborated by their

16   investigation, by Morris Jackson himself.

17          And when they go out to talk to him later on, on this

18   January 27th interview, there's no mention of him.  They talk

19   about the man wearing blue.

04:18:06   20          Well, they -- they've already identified the man wearing

21   blue, and that -- that is Morris Jackson.  And then when the

22   investigator goes out there and has no intent to, you know,

23   muddy any -- any identification at all, but he says, "I identify

24   James Cloud" -- or he says the name James Cloud at that point in

04:18:35   25   time.  And the investigator is following up on the -- what

1    the -- what the agents' interview was.  And in the agents'

2    interview he said James Cloud.

3         "Well, how do you know that?

4         "Because I heard it, and I saw him on the news."

5         And then it turns out that he says that he had seen him

6    some other time, you know, with Tara Cloud.

7         But what Mr. Reyes said was -- with regard to -- with

8    regard to Donovan Cloud, he said the name Donovan Cloud.  "I

9    think Donovan Cloud shot me."

10        Okay.  Well, how did he know that?  Never said.  No

11   evidence of how he knew.  Well, where did he get that

12   information?  There's nothing there.  It's a complete void.

13   It's just simply blank.  It's simply the fact that however,

14   whatever that name entered his head, and he said it.

15        But there is nothing to attach that to.  And -- and

16   whether we call it post-event information, post-event

17   misinformation, or a drug-addled brain or chemotherapy or

18   whatever we say it is, the fact is it's not linked to anything

19   that this Court could have -- make a determination of the

20   reliability of that, other than it is unreliable or so

21   unreliable for him to say that name.  Just say it.  And then if

22   you address, like Mr. McEntire has -- has argued, I say there is

23   absolutely no probative value to the name Donovan Cloud.

24        So the prejudicial effect to have him say that in this

25   Court to a jury is overwhelming, and we'd ask the Court to

1    prohibit it.

2            Thank you.

3            THE COURT:  Thank you.

4            Mr. Burson?

04:20:46    5            MR. BURSON:  So, Your Honor, I want to start off by

6    talking about the two tests that we're dealing with here.  One

7    is the due process clause test under *Perry*.  And we call it the

8    due process test, but what it really is it's an exclusionary

9    rule case.  Why do we exclude evidence when it's obtained under

04:21:15   10    the due process?  We exclude evidence when it's obtained in

11    violation of due process because we want to deter certain police

12    misconduct.  We don't do it to remedy the due process violation.

13    The due process violation already happened.

14            THE COURT:  Counsel argues that the misconduct is the

04:21:37   15    policy violations, and they articulate several; that that's the

16    reason, and specifically one of them which led, with regards to

17    LV, to -- in their argument is that led them to -- him to go out

18    and investigate the Internet and get this additional

19    information.

04:21:59   20            MR. BURSON:  So I'll start by talking about policy

21    violations.

22            THE COURT:  Okay.

23            MR. BURSON:  So the test under *Perry* is that before we

24    get into a judicial inquiry into reliability of eyewitness

04:22:11   25    identification, we have to ask whether that identification was

1    procured under unnecessarily suggestive circumstances arranged

2    by law enforcement.

3          The policy violations at issue here did not create an

4    unnecessarily suggestive lineup.

04:22:31   5    THE COURT:  They argue that it was arranged in the sense

6    that they failed to follow their own policies in telling the

7    witness, "Hey, don't go and look at the media," number one; and

8    that -- and their -- in their mind, that that is a -- that that

9    is a violation, and therefore it was, in fact, arranged.

04:22:57   10   MR. BURSON:  So I do want to focus, then, on the policy

11   itself.  The policy itself is to advise -- or to request that

12   witnesses do not contact the media.  And the reason it says

13   "request," I believe it's dropped in a footnote at least in the

14   2019 policy, is because agents cannot instruct --

04:23:15   15   THE COURT:  Right.

16   MR. BURSON:  -- people not to talk to the media.

17         And I think that's significant in two ways.  So the

18   phrase "contact the media," what does that mean?  And there

19   actually is no dispute over what "media" is.  That's not the

04:23:33   20   dispute.  I agree social media is media.  The dispute is over

21   the word "contact."

22         And we can sit here in this room as lawyers, and

23   Dr. Laney can sit there as a scientist, and we can quibble over

24   what "contact" means.  What it is -- what it means to contact

04:23:55   25   the media.  But the fact is, this policy wasn't written for

 1    lawyers.  It wasn't written for scientists.  It's not a piece of

 2    legislation that we're going to dig into the legislative history

 3    on and try and figure out what "contact" means.  This was

 4    straightforward policy advice presented for FBI agents;

 5    nonlawyers, nonscientists.

 6            I think it's unreasonable, given the audience for that

 7    phrase, "contact the media," to define that as:  Don't view

 8    media.  Don't look at Facebook.

 9            THE COURT:  You -- you agree that -- I mean, I think the

10    testimony bears out that the special agent did not advise him

11    not to do that.

12            Correct?

13            MR. BURSON:  I agree that Special Agent Ribail did not

14    advise him to do that.  However, there's no connection between

15    him failing to advise him to do that and JV viewing Facebook.

16    And the reason I say that is because let's say Agent Ribail had

17    walked up to JV -- or they're already together -- after the

18    lineup had instructed JV verbatim from the FBI policy.  JV, he's

19    not even an FBI agent.  He certainly is not a lawyer, and he's

20    not a scientist.  "By the way, I'm required to request that you

21    do not contact the media."

22            No normal person thinks that means that I can't get on

23    my computer and look on the Internet.  And so that's what JD did

24    anyway.  So the failure to tell him "do not contact the media"

25    didn't change his behavior in any way, because JV didn't call

1    the media, he didn't -- he didn't contact the media, not in the

2    way that normal people speak.

3              And under the definition, as the defendant wants it, of

4    "contact the media," I think it's important to consider what

04:25:54  5    that would include, because if there is causation here between

6    the failure to advise "do not contact the media" and seeing the

7    public safety announcement, for there to be causation to exist,

8    that means their definition has to include public safety

9    announcements.  So not only don't contact the media, don't look

04:26:16 10    at news sites, don't look at Facebook, don't look at public

11    safety announcements.

12              So even in this situation, where your family has been

13    attacked, someone held a gun to your kid's head, tried to kidnap

14    him, took your car, terrorized your family for a span of

04:26:35 15    minutes, and they're still at large and believed to be armed and

16    dangerous, and you know, because your a resident of White Swan,

17    that they just killed five other people nearby, don't view any

18    public safety announcements.

19              That cannot be the advisal, and that cannot be included

04:26:57 20    in the definition of "contact the media."  That's an

21    unreasonable way to interpret that phrase.

22              But in order for, like I said, in order for the failure

23    of Agent Ribail to tell him "do not contact the media," in order

24    for there to be causation between that and him seeing that

04:27:13 25    wanted poster, the definition of "contact the media" would have

 1    to include that poster.

 2            THE COURT:  What about the other argument that -- that

 3    while -- that announcement with the poster of James Cloud was

 4    arranged, I guess it would be, by the agencies that were being

04:27:39    5    overlooked by the FBI or working in coordination with the FBI,

 6    because that came out of an advisory from, yes, the tribe, but

 7    the tribe got it from someone, presumably, you know, another

 8    agency, maybe the tribal police or -- I mean, what about that

 9    argument, that it was coordinated in that way?

04:28:02    10            MR. BURSON:  Are we talking about the first advisal or

 11    the second advisal?  I just want to know for --

 12            THE COURT:  The second.  Well -- yeah, the second one is

 13    what I'm referring to.

 14            MR. BURSON:  The second one, I believe, was someone with

04:28:16    15    Yakama Nation Tribal Police --

 16            THE COURT:  Correct.

 17            MR. BURSON:  -- who called Yakama Nation, the Tribal

 18    Council's office, essentially, who runs that Facebook page,

 19    after they found out, oh, no, these aren't the guys, or those --

04:28:31    20    those weren't the people that were arrested, or at least not

 21    James Cloud at that time.

 22            Even if, even if we consider that law enforcement

 23    involvement, I don't think that --

 24            THE COURT:  Was that tribal police?  Or was there

04:28:48    25    evidence that -- let me ask it this way:  Was there evidence

1    that that was tribal police presented in this hearing?

2         MR. BURSON:  There was not, although following

3    testimony, I reviewed the reports again, and so I can shed some

4    light on it in a little more detail, if the Court would like --

04:29:03    5         THE COURT:  You're not a witness, Counsel.

6         MR. BURSON:  -- but I don't know that it's helpful.  But

7    it was -- there was some involvement of tribal police telling

8    the council's office to, "Hey, they're not actually in custody."

9    That led to the posting.

04:29:18    10         THE COURT:  Okay.

11         MR. BURSON:  Who drafted it, who typed it is unclear,

12   and I'm afraid probably going to be lost to the sands of time.

13   My understanding is someone in the Council's office.

14         But certainly we can't include that as the misconduct.

04:29:38    15   That was a necessary posting.  It was necessary from a public

16   safety standpoint.  I don't think that that is the type of

17   conduct that we want to deter.  And that's the whole point of

18   the exclusionary rule, is to deter.

19         If this happened all over again, would we want the

04:30:00    20   Tribal Council to second-guess should we put this information

21   out there?

22         No, of course not.  No resident of White Swan would want

23   that.  No resident of Yakima would want that.

24         And the other policy violations -- this is what I

04:30:21    25   touched on -- they themselves don't create a suggestive

1    circumstances.  There's no evidence that Agent Ribail created

2    any suggestive circumstance.  Even Dr. Laney could not point to

3    any evidence that there was any suggestion going on with this

4    lineup.  And without some sort of suggestion created by law

04:30:50    5    enforcement improperly, we don't even get to a judicial inquiry

6    under the Biggers factors, or whatever factors the Court wants.

7    The Court wanted to add more factors.  I think the Court should

8    stick to the Biggers factors, and I can address that briefly, if

9    the Court would like, but I think -- understood.

04:31:11    10        I do also want to talk about Rule 403, because Rule

11    403 -- I will concede that Rule 403 is -- is theoretically

12    applicable here, and I will concede that there is language in

13    decisions that are either precedential or -- or what are called

14    persuasive -- I don't find them persuasive, I'll get to the why

04:31:37    15    in a second, but that are generally called persuasive, that

16    suggests that Rule 403 is applicable here.

17        Now, other courts have explicitly said that Rule 403

18    could be explicable with eyewitness identification, even where

19    there is no exclusionary rule culpability, as here, frankly.

04:31:55    20        But I want to re-emphasize the word "theoretical" when I

21    say that, because as a practical matter, it just doesn't happen.

22    It -- the defense relies heavily on *Dennis*.  I believe it's the

23    case out of the Third Circuit -- it is the case out of the Third

24    Circuit.  I believe -- I believe they mentioned it in their

04:32:17    25    closing argument.  In their words, it was a tour de force.

1          Well, first, *Dennis* was Brady decision.  It was an en

2     banc or en banc decision, however you pronounce it, by the Third

3     Circuit, which means up to 12 judges.  Of the 12 judges or so,

4     one wrote this part of the opinion, the concurring opinion that

04:32:38   5     is relied on by the defense.  One other joined it.

6          And I think it's important to notice -- to note what's

7     happening in that concurring opinion.  That concurring opinion

8     is detailed, and it spends most of its time talking about the

9     eyewitness identifications that were at issue in *Dennis*.  The

04:33:02  10     whole issue in *Dennis* was there were eyewitnesses presented at

11     trial, and the State didn't turn over some Brady material that

12     would have been able to impeach those eyewitnesses, or at least

13     reduce their credibility.  I believe there were two witnesses at

14     issue; three Brady violations in total.

04:33:21  15          The -- the en banc opinion just found that, yeah, that

16     is a Brady violation.  Why?  Because that evidence could have

17     been used to impeach at trial.  They never said:  Because that

18     evidence could have been used to exclude the evidence altogether

19     under Rule 403.

04:33:36  20          So the concurring opinion goes into detail about some of

21     the problems with eyewitness identification, and the Court heard

22     a lot about that today.  And some of the terms would sound

23     familiar from -- from that concurring opinion, such as other

24     witness reactions influencing other witnesses, photo arrays and

04:33:57  25     lineup construction, blinded techniques.  You know, the judge in

1    that concurring opinion says, look, blinded techniques are

2    important.  And as to why it's important, the *Dennis* jurors

3    would have been in a far better position to assess the

4    reliability of the three courtroom identifications had they been

04:34:19    5    informed of the importance of blinding procedures.

6          Keyword:  The jurors.

7          With respect to lineup construction, the district court,

8    according to the concurring opinion, should have provided the

9    jury with an explanation of how this may have affected the

04:34:36    10   witness' identifications.

11         Other witnesses influencing witnesses.  The jurors

12   should have been instructed about this possibility.

13         The opinion also talks about stress, as did Dr. Laney;

14   weapons-focus, as did Dr. Laney; memory decay over time.  And

04:34:59    15   all of it the recommendation is the jurors should have been

16   informed of these variables.  This is not an opinion saying that

17   this evidence should have been excluded under Rule 403.

18         *Jones*, which is cited by the defense as well, in that

19   case, it's an interesting fact pattern.  The witnesses at issue

04:35:24    20   were inadvertently informed of the defendant's identity, given

21   his name, by the state prosecutor's office.  It ended up being

22   an adopted case federally.  They Googled the person, found his

23   mugshots online, told investigators, "Hey, this is the guy.  We

24   found him online," before even being asked questions by the FBI,

04:35:47    25   and were allowed to make an in-court identification.  That

 1   district court, again, cited by the defendants, said, okay, Rule

 2   403 applies.  But in the availability of cross-exam, jury

 3   instructions, expert testimony, unfair prejudice is adequately

 4   mitigated.

 5          Which brings me to my point about unfair prejudice.

 6   This is not a prior conviction or a prior bad act that rings a

 7   bell that kind of sits by itself in a vacuum.  It's hard to

 8   imagine bringing an expert and explaining to the jury why that

 9   prior felony is so bad.  Right?  It's hard to imagine a closing

10   argument that can fully mitigate what's been done there.  And

11   it's hard to imagine jury instructions, although we have them,

12   that can fully push back.

13          Here, with eyewitness identifications, we do have

14   experts, as we saw today, who come in and say, look, this was a

15   non blinded procedure.  That's why this is important.  Look,

16   there was suggestion going on here, possibly.  We don't know,

17   but all these procedures that went wrong, we don't know; there

18   could have been suggestion.  That's essentially what Dr. Laney

19   was testifying to today.

20          There's -- there's jury instructions that are -- that

21   are fulsome.  That was what the Third Circuit was advocating

22   for, primarily, that concurring opinion was fulsome jury

23   instructions to explain to a jury, look, eyewitness

24   identifications have problems.

25          And, finally, there's cross-exam --

1    THE COURT:  I want to turn your attention, if you could,

2    to LL.  Both Mr. McEntire and Mr. Smith talk about the courts,

3    in their request to exclude LL -- LL's identification because,

4    in the words of Mr. Smith, it's coming out of nothing.  That is,

04:37:42  5    that, you know, first there was a nonidentification.  Then there

6    was sort of a comment made, and it sounds like that might have

7    been related to -- that happened after media interviews and

8    meetings with his family about who were the Clouds.

9        And why shouldn't the Court, under that -- those

04:38:07  10    circumstances, exclude that identification as nonreliable?

11    MR. BURSON:  Because I think that -- so now is a good

12    time to talk about, I guess, probative value and prejudice.  And

13    I think the point here is -- unfair prejudice.  Keyword.  And I

14    think the point here is that the unfair prejudice factor can be

04:38:34  15    mitigated.  I don't dispute the fact that it is significant to a

16    jury when someone stands up and points at the defendant's table

17    and says, "I recognize that person" --

18    THE COURT:  Right.

19    MR. BURSON:  -- from the -- from the incident," which,

04:38:48  20    by the way, brings me to a side note.  No one is going to come

21    in here and say, "James Cloud shot me."  Okay?  We understand

22    the Court wouldn't allow that without mountains of foundation.

23    That's not what we're asking for here, at least not someone

24    without prior knowledge who we can't lie a foundation for.

04:39:08  25        But Mr. Smith is right.  That's not what we're talking

1    about today.  What we're talking about today is recognition.

2    And there are plenty of questions that can be asked on

3    cross-examination to cast doubt on the reliability of someone's

4    recognition.  And there's also explanations for --

04:39:28    5         THE COURT:  But I think the argument is that the Court

6    wouldn't typically just allow any Joe Schmo to come in here and

7    say, "Yep, yep, that's the one, right there.  That's the guy

8    that did this," and, in their view, that this identification by

9    LL is tantamount to that, in that there was a nonidentification,

04:39:50   10    and then only through these other series of events that now,

11    apparently, there is more than that.  I mean, I think that's the

12    argument.  And so it's -- it's a little different.

13         MR. BURSON:  It is different from a typical

14    identification in that there was originally a nonidentification,

04:40:08   15    and then subsequent to that, during an interview with the FBI,

16    there was an identification by name, associating it with an

17    individual in a red shirt.

18         But that can be asked on cross-examination.  And there

19    may very well be an answer for it.  The answer may be, "Yeah, I

04:40:30   20    didn't know it was James Cloud at the time, and I didn't

21    identify him in the lineup, but then I saw a picture later, and

22    I recognized him when I saw him on TV, and I also learned his

23    name was James Cloud."  It's a very reasonable explanation.

24    We're just asking that he be able to provide it to the jury

04:40:53   25    after, presumably, he's asked about it on cross.  That is called

1    a trial.  And that is how unfair prejudice is mitigated.  That's

2    all we're asking for.

3            Defense is asking to skip the jury instructions, skip

4    cross-examination, skip presentation of expert testimony on

04:41:16  5    eyewitness identification, skip any commands from the Court,

6    cautions from the Court, skip closing argument regarding

7    eyewitness identification, and jump right to Rule 403, which I

8    don't think it's controversial to say Rule 403 is a last resort.

9    When those other things cannot adequately mitigate unfair

04:41:36  10   prejudice, then we have Rule 403.  Defense kind of wants it both

11   ways.  They want -- they want to look at the Court and say:

12   Your Honor, look how unreliable this ID is.  He -- he first made

13   a misidentification, and then later on he said, "Oh, that's --

14   that's -- that's James Cloud."  And then with another defendant

04:41:59  15   he said, "Your Honor" -- or he said, "No, that's" -- too many

16   names at this point -- "that is somebody not here," and then

17   later on says, "That's Donovan Cloud."

18            THE COURT:  Um-hmm.

19            MR. BURSON:  They -- they put that forth, rightly so, to

04:42:21  20   the Court to say:  Clearly there is no probative value here.

21   But at the same time, they act as though a jury won't be able to

22   take that very simple evidence, very easy to comprehend -- he

23   didn't pick him out of the lineup, he attached a name later, he

24   confused a guy in blue shirts -- that very presentable,

04:42:43  25   easy-to-digest information, they act as though that will not

1    mitigate any of the prejudice, and that's just not true.  It's

2    just not reasonable.

3          THE COURT:  Can we move on to EZ?  And I think it's been

4    established, certainly by the testimony and by the admission of

04:43:00  5    the deputy, that, you know, he made some mistakes.  He

6    acknowledges those, and -- and in not following a certain set of

7    procedures.

8          Counsel argues that those specific violations

9    potentially result -- well, really, that there's no way of

04:43:21 10    knowing, necessarily, how that influenced the -- the not having

11    a real blind presentation or double-blind presentation versus

12    having him look at it and then, in their view, gesturing or

13    conveying other nonverbal cues.

14          And I guess in -- don't they have a point about that?

04:43:49 15          MR. BURSON:  They do have a point that there is an issue

16    with nonblinded lineup procedures, as the Court in -- or, I'm

17    sorry, as the concurring opinion in Dennis said:  Look, there's

18    a problem when you don't use nonblinded procedures.  These

19    things are important.

04:44:06 20          But also like that concurring judge in Dennis, I think

21    the remedy is jury instructions coupled with eyewitness

22    testimony -- I'm sorry, expert testimony regarding eyewitnesses,

23    like Dr. Laney will testify about the importance of blinded

24    procedures.  The jury will understand that.  It's not so hard to

04:44:28 25    digest that this Court is the only body that can make that

1    ruling.  And that's your mitigation.

2          Now, if there were procedures here in this lineup that

3    actually were suggestive, we might have a different

4    hypothetical.  But we don't.  And I know there's some

04:44:49  5    disagreement about what that pen was.  Frankly, I think because

6    it was made after a recognition, I think it's -- defense is

7    really overplaying what that was.  And I think similarly to the

8    suggestion to write on the lineup what the witness had just said

9    I don't think is suggestive.  I certainly don't think it's

04:45:10  10   unduly suggestive, which is the keyword here.

11          THE COURT:  So let me ask you this:  So you're conceding

12   that you're going to allow expert testimony on eyewitness

13   identification in this case?  Should the Court allow this?

14          MR. BURSON:  I think we're -- we're too early there,

04:45:23  15   Your Honor, to decide.  Well --

16          THE COURT:  You just made the argument, Counsel.  You

17   can't have it both ways.

18          MR. BURSON:  There's -- there's a lot of factors that go

19   into it.  There's scope of expert testimony, who the expert is,

04:45:32  20   is it always allowable.  But we'll certainly entertain it, and I

21   invite the Court or defense to use my words against me --

22          THE COURT:  Well, believe me, I will not be using your

23   words against you.  I have a feeling I know who will, but I will

24   not be using your words against you.

04:45:49  25          MR. BURSON:  I invite that.  But for today, I just want

 1    to focus on is Rule 403 applicable.  My point here is there are

 2    tools to mitigate prejudice down to the point where it's no

 3    longer unfairly prejudicial.  Counsel for the defense is right;

 4    a lot has been learned over the years with respect to eyewitness

 5    identification.  And it's because of that we have the jury

 6    instructions we do now, we have expert testimony on this -- on

 7    these things, defense attorneys are more equipped with a little

 8    more knowledge so they can do cross-examination, they know what

 9    to say during closing argument.  We've come a long way.

10         As we learn more about misidentification, the dangers of

11    it, we've learned how to mitigate it, and we're just asking that

12    those tools be used --

13         THE COURT:  Well, and the defense is saying:  Yeah, you

14    learned a lot, but you didn't follow them.  That's what they're

15    saying.

16         MR. BURSON:  I disagree.  I actually --

17         THE COURT:  Okay.

18         MR. BURSON:  I actually do think courts have been

19    adapting.  And I understand that, like with everything else,

20    court precedent doesn't necessarily keep up to science.  Not --

21    I think it would be naive to make that suggestion.  But the fact

22    that we have opinions like *Dennis*, concurring opinions like

23    *Dennis*; the fact that we do have courts entertaining Rule 403

24    applicability, although not really applying it to eliminate

25    evidence, but at least considering Rule 403 in the context of

1    eyewitness identification, the fact that we have those things,

2    that shows that courts have come around on this issue.  But they

3    still let juries hear it.  Where they have changed is they allow

4    the admissibility of expert testimony.

04:47:35    5        I quoted some cases in my briefing where experts were

6    actually disallowed.  Now, I want to make clear, I didn't do

7    that because I'm making an argument now that expert testimony

8    isn't relevant.  I was showing the inapplicability of other

9    cases.  But my point in bringing it up now is to show that I

04:47:51    10   think if you looked at the landscape for excluding testimony

11   now, I think we would be in a different landscape, which is to

12   say that even though courts have learned more, the -- the result

13   of courts learning more about eyewitness identification is to

14   let in certain evidence that maybe they thought irrelevant

04:48:07    15   before.  And, again, that's all we're asking for here.  I'm not

16   waving any objections to evidence, by the way.  But it's

17   available.

18       THE COURT:  Okay.  Any final point?

19       MR. BURSON:  No, Your Honor, unless the Court has any

04:48:28    20   direct questions for the Government.

21       THE COURT:  I don't, not at this point.

22       I -- actually, I'll allow, if you -- do you have any

23   final point, Mr. McEntire?

24       MR. McENTIRE:  Very brief points, just in response to --

04:48:52    25       THE COURT:  Only if they're very brief.

1      MR. McENTIRE:  Your Honor, Mr. Burson said, quote, we

2  want to deter certain police conduct.

3      And my response would be -- is:  We don't just want

4  officers to follow policy.  We want to know it exists in the

04:49:13    5  first place, which is one of the problems that we had here.

6      Second point that I would bring up is that Mr. Burson

7  had -- is -- with respect to JV, is pinning the misconduct on

8  the wrong event.  He is pinning the misconduct on the wanted

9  poster, and the misconduct is actually on Special Agent Ribail's

04:49:35   10  failure to provide that instruction.  So just providing that

11  clarification.

12      Three, I think *Dennis* is being taken out of context in

13  that this is an appeals court reviewing a habeas decision under

14  AEDPA, that was a state case, going through the state Supreme

04:49:52   15  Court process.  And so their comments on that these were --

16  there should be jury instructions and other of these comments

17  were provided in the context of the very unique posture that

18  *Dennis* presented.

19      Fourth, Mr. Burson referencing *United States v. Jones*.

04:50:11   20  There was actually specifically in that *Jones* opinion a 2017

21  district court decision that was referenced in respect to Rule

22  403, there was no -- I just pulled it up again and reread it --

23  there actually was no policy violation by police.  There was no

24  actually lineup to begin with.  What happened is -- is witnesses

04:50:29   25  became aware of an individual charged, and then they went to

1    look that information up.  So, again, we're in a different

2    procedural posture.

3            Next point is that the United States called LL's lineup

4    a misidentification --

04:50:42  5            THE COURT:  Counsel, I think I'm on five points,

6    although you said three, so I think you're done.

7            Thank you.

8            MR. McENTIRE:  You're welcome, Your Honor.

9            THE COURT:  All right.  Mr. Smith?  I allowed him.

04:50:52  10           MR. SMITH:  I have nothing.  Thank you, Your Honor.

11           THE COURT:  Mr. Burson?

12           MR. BURSON:  Nothing, Your Honor.  Thank you.

13           THE COURT:  All right.  We're also set for a status

14    conference.  We have one scheduled for October 27th.  I guess we

04:51:13  15   can defer sort of a more robust discussion at that point to

16    address many -- the plethora of other issues involved in this

17    case.  So we'll hold off on that.

18            With regards to a decision on these matters, I -- I

19    promised I would look at certain things that were discussed,

04:51:38  20   certainly in closing, and I -- I definitely want to do that.

21    And so I will -- I appreciate the arguments today.  I think it

22    was well argued the last couple days.

23            And anything else that we need to address today?

24           MR. BURSON:  Nothing from the Government, Your Honor.

04:51:56  25           MR. McENTIRE:  Nothing from James Cloud, Your Honor.

1          MR. SMITH:  Nothing, Your Honor.

2          THE COURT:  All right.  Again, thank you for your

3     presentations, and that will conclude this matter.

4          THE COURTROOM DEPUTY:  All rise.

5          (Hearing concluded at 4:52 p.m.)

04:52:17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

519

1                    C E R T I F I C A T E

2

3        I, KIMBERLY J. ALLEN, do hereby certify:

4             That I am an Official Court Reporter for the United

5   States District Court for the Eastern District of Washington in

6   Richland, Washington;

7             That the foregoing proceedings were taken on the date

8   and at the time and place as shown on the first page hereto; and

9             That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12            I do further certify that I am not a relative of,

13  employee of, or counsel for any of said parties, or otherwise

14  interested in the event of said proceedings.

15            DATED this 28th day of October, 2020.

16

17

18

19        _____

20        Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
          Washington CCR No. 2758
21        Official Court Reporter
          Richland, Washington
22

23

24

25