1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,          ) Case No.
3                                  ) 1:19-cr-2032-SMJ-1, 2
                     Plaintiff,    )
4                                  ) September 30, 2020
v.                                 ) Yakima, Washington
5                                  ) Evidentiary Motion Hearing
JAMES DEAN CLOUD (01); and         ) Day 2, Volume II
6  DONOVAN QUINN CARTER CLOUD       ) EXCERPT -
   (02),                           ) Williams/Prosecution
7                                  ) Closing
                     Defendants.   ) Pages 1 to 29
8

9

                 BEFORE THE HONORABLE SALVADOR MENDOZA, JR.
10                   UNITED STATES DISTRICT COURT JUDGE

11

                            APPEARANCES:
12

   For the Plaintiff:            Richard Cassidy Burson
13                               Richard.c.burson@usdoj.gov
                                 Thomas Hanlon
14                               Thomas.j.hanlon@usdoj.gov
                                 United States Attorney's Office
15                               402 East Yakima Avenue
                                 Suite 210
16                               Yakima, WA 98901
                                 509-454-4425
17

18  For the Defendant James      John B. McEntire, III
    Cloud (01):                  Jay_McEntire@fd.org
19                               Lorinda Youngcourt
                                 Lorinda_Youngcourt@fd.org
20                               Jeremy Sporn
                                 Jeremy_Sporn@fd.org
21                               Federal Defenders
                                 Eastern Washington
22                               10 N. Post Street
                                 Spokane, WA 99201
23                               509-624-7606

24

25

2

```
 1   For Defendant Donovan Cloud    Richard A. Smith
     (02):                          Rasmith@house314.com
 2                                  Smith Law Firm
                                    314 North Second Street
 3                                  Yakima, WA  98901
                                    509-457-5108
 4

 5                                  Mark A. Larranaga
                                    Mark@jamlegal.com
 6                                  Walsh and Larranaga
                                    705 2nd Avenue
 7                                  Suite 501
                                    Seattle, WA  98104
 8                                  206-972-0151

 9

10

11   Official Court Reporter:       Kimberly J. Allen, CCR #2758
                                    United States District Courthouse
12                                  P.O. Box 685
                                    Richland, Washington 99352
13                                  (509) 943-8175

14   Proceedings reported by mechanical stenography; transcript
     produced by computer-aided transcription.
15

16

17

18

19

20

21

22

23

24

25
```

3

<u>**INDEX**</u>

<u>**Proceedings:**</u>                                                    <u>**Page**</u>

      Argument by Mr. Burson                          9
      Rebuttal Argument by Mr. McEntire              25


<u>**WITNESS INDEX**</u>

<u>**Plaintiff Witness:**</u>                                          <u>**Page**</u>


  **MICHAEL WILLIAMS**
      Continued Cross-Examination By Mr.           5
      McEntire

                 *****

<u>**Defense Witnesses:**</u>                                         <u>**Page**</u>


  None




<u>**EXHIBITS ADMITTED**</u>

**Plaintiff**
 <u>**Number**</u>      <u>**Description**</u>                          <u>**Page**</u>

         None

**Defense**
 <u>**Number**</u>      <u>**Description**</u>                          <u>**Page**</u>

         None


<u>**GENERAL INDEX**</u>

                                  <u>**Page**</u>

  Reporter's Certificate...........................29

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                          4
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*

1    (September 30, 2020; 7:58 a.m.)

2         THE COURTROOM DEPUTY:  All rise.

3         (Call to Order of the Court.)

4         THE COURT:  Good morning.  Please be seated.

07:58:59  5         THE COURTROOM DEPUTY:  Matter before the Court is *United*

6    *States of America v. James Cloud and Donovan Quinn Carter Cloud*,

7    Cause No. 1:19-cr-02032-SMJ, Defendant 1 and Defendant 2.  Time

8    set for motion hearing.

9         Counsel, please state your presence for the record,

07:59:20  10   beginning with Government counsel.

11        MR. BURSON:  Good morning, Your Honor.  Richard Burson

12   and Tom Hanlon for the United States.  Sitting at counsel table

13   as well is Special Agent Troy Ribail with the FBI.

14        THE COURT:  Good morning to all three of you.

07:59:30  15        MR. BURSON:  Good morning.

16        MR. HANLON:  Good morning.

17        MR. McENTIRE:  Good morning, Your Honor.  Jay McEntire,

18   Lorinda Youngcourt, and Jeremy Sporn on behalf of James Cloud.

19        THE COURT:  Good morning.

07:59:40  20        MR. SMITH:  Good morning, Your Honor.  Mark Larranaga

21   and Rick Smith on behalf of Donovan Cloud.

22        THE COURT:  Good morning.

23        Good morning, gentlemen.

24        DEFENDANT JAMES CLOUD:  Good morning.

07:59:50  25        DEFENDANT DONOVAN CLOUD:  Good morning.

1    THE COURT:  Now, we last left on -- last left on

2    Detective Williams and his testimony.  We were having some

3    issues with the video.  Sounds like the video is as good as it's

4    going to get.

08:00:19  5        So I think we could proceed forward, Mr. McEntire.

6        MR. McENTIRE:  Correct, Your Honor.

7        THE COURT:  Okay.  So why don't we -- why don't we get

8    the detective back on.

9        (Witness MICHAEL WILLIAMS approached.)

08:00:49  10       THE COURT:  Good morning, sir.  You are still under

11   oath.

12       THE WITNESS:  Okay.

13       THE COURT:  Please have a seat.  And make sure that mic

14   is close to you so we can capture everything you're saying.

08:01:08  15       With that, Mr. McEntire, you can proceed.

16       MR. McENTIRE:  Thank you, Your Honor.

17

18                   CONTINUED CROSS-EXAMINATION

19   BY MR. McENTIRE:

08:01:13  20   Q    Good morning, Detective Williams.

21   A    Good morning.

22   Q    Detective Williams, when we left off yesterday we were

23   discussing Yakima County Sheriff's Office Policy 603.6.

24        Refresh your recollection on where we left off?

08:01:27  25   A    Yes.

1   Q    What I'd like to do is bring you back to that policy, same

2   page that we left off before, which is Defendant's

3   Exhibit 1002-3.  And what I'd like to do, Detective, is direct

4   your attention to the third paragraph down in that policy.

5   08:01:53        Reading, quote:  The member presenting the lineup to a

6   witness should do so sequentially; i.e., show the witness one

7   person at a time and not simultaneously.

8         Detective Williams, you indicated yesterday that you did

9   have an opportunity to refresh your recollection on the

10  08:02:15  interview that you did with EZ on June 10th.

11  A    Yes.

12  Q    And during the course of that, you watched the video start

13  to finish all the way through?

14  A    Yes.

15  08:02:29  Q    During the course of your interview with EZ, would you

16  agree that EZ was able to look at more than one photo at the

17  same time when she was going through the various lineups?

18  A    Yes.

19  Q    So you would agree, based upon your review of this policy

20  08:02:43  now, that that was not, in fact, a sequential lineup; that that

21  was a simultaneous.

22  A    Correct.

23  Q    Which, again, is in violation of YCSO policy.

24  A    Yes.

25  08:02:58  Q    Detective, I'm going back to the previous page, 1002-2, on

1    the YCSO policy.

2         Drawing your attention to this section (reading):  In order

3    to avoid undue influence, witnesses should view suspects or a

4    lineup individually and outside the presence of other witnesses.

08:03:24   5    Witnesses should be instructed to avoid discussing details of

6    the incident or of the identification process with other

7    witnesses.

8         Detective, when you left off the interview -- I guess maybe

9    let me start here:  Did the video recording capture the full

08:03:42  10    interaction that you had, as well as Detective McIlrath, with

11    EZ?

12    A    I believe it did, yes.

13    Q    So there weren't any substantive conversations that were

14    occurring before the -- the recording started.

08:03:55  15    A    No.

16    Q    Or after.

17    A    No.

18    Q    Do you recall, after refreshing your recollection to the

19    video, did you leave that interview with an instruction to EZ

08:04:06  20    not to discuss the interview that you just had with other

21    witnesses?

22    A    I don't think I did, no.

23    Q    Detective Williams, that's all the questions I have.  Thank

24    you.

08:04:43  25         THE COURT:  Mr. Smith?

```
                USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2        8
          Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020
                     Williams/Continued X/McEntire
```

           1          MR. SMITH:  Pardon me?

           2          THE COURT:  Any questions?

           3          MR. SMITH:  No.  No questions, Your Honor.

           4          THE COURT:  Okay.  Any additional questions?

08:04:54   5          MR. BURSON:  Nothing from the United States, Your Honor.

           6          THE COURT:  Okay.  May this witness be excused?

           7          MR. McENTIRE:  Yes, Your Honor.

           8          THE COURT:  Mr. Burson?

           9          MR. BURSON:  Yes, Your Honor.

08:05:04  10          MR. HANLON:  Yes, Your Honor.

          11          THE COURT:  Okay.  Thank you.  You're excused.

          12

          13   (Additional proceedings were reported but not requested to be

          14   transcribed.)

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*                    9
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Argument by Mr. Burson*

1                    EXCERPT OF PROCEEDINGS

2          THE COURT:  Thank you.

3          Mr. Burson?

4          MR. BURSON:  So, Your Honor, I want to start off by

04:20:51  5   talking about the two tests that we're dealing with here.  One

6   is the due process clause test under *Perry*.  And we call it the

7   due process test, but what it really is it's an exclusionary

8   rule case.  Why do we exclude evidence when it's obtained under

9   the due process?  We exclude evidence when it's obtained in

04:21:20  10  violation of due process because we want to deter certain police

11  misconduct.  We don't do it to remedy the due process violation.

12  The due process violation already happened.

13         THE COURT:  Counsel argues that the misconduct is the

14  policy violations, and they articulate several; that that's the

04:21:42  15  reason, and specifically one of them which led, with regards to

16  LV, to -- in their argument is that led them to -- him to go out

17  and investigate the Internet and get this additional

18  information.

19         MR. BURSON:  So I'll start by talking about policy

04:22:02  20  violations.

21         THE COURT:  Okay.

22         MR. BURSON:  So the test under *Perry* is that before we

23  get into a judicial inquiry into reliability of eyewitness

24  identification, we have to ask whether that identification was

04:22:15  25  procured under unnecessarily suggestive circumstances arranged

1    by law enforcement.

2          The policy violations at issue here did not create an

3    unnecessarily suggestive lineup.

4          THE COURT:  They argue that it was arranged in the sense

5    that they failed to follow their own policies in telling the

6    witness, "Hey, don't go and look at the media," number one; and

7    that -- and their -- in their mind, that that is a -- that that

8    is a violation, and therefore it was, in fact, arranged.

9          MR. BURSON:  So I do want to focus, then, on the policy

10   itself.  The policy itself is to advise -- or to request that

11   witnesses do not contact the media.  And the reason it says

12   "request," I believe it's dropped in a footnote at least in the

13   2019 policy, is because agents cannot instruct --

14         THE COURT:  Right.

15         MR. BURSON:  -- people not to talk to the media.

16         And I think that's significant in two ways.  So the

17   phrase "contact the media," what does that mean?  And there

18   actually is no dispute over what "media" is.  That's not the

19   dispute.  I agree social media is media.  The dispute is over

20   the word "contact."

21         And we can sit here in this room as lawyers, and

22   Dr. Laney can sit there as a scientist, and we can quibble over

23   what "contact" means.  What it is -- what it means to contact

24   the media.  But the fact is, this policy wasn't written for

25   lawyers.  It wasn't written for scientists.  It's not a piece of

1   legislation that we're going to dig into the legislative history

2   on and try and figure out what "contact" means.  This was

3   straightforward policy advice presented for FBI agents;

4   nonlawyers, nonscientists.

04:24:20   5        I think it's unreasonable, given the audience for that

6   phrase, "contact the media," to define that as:  Don't view

7   media.  Don't look at Facebook.

8        THE COURT:  You -- you agree that -- I mean, I think the

9   testimony bears out that the special agent did not advise him

04:24:44   10   not to do that.

11        Correct?

12        MR. BURSON:  I agree that Special Agent Ribail did not

13   advise him to do that.  However, there's no connection between

14   him failing to advise him to do that and JV viewing Facebook.

04:24:58   15   And the reason I say that is because let's say Agent Ribail had

16   walked up to JV -- or they're already together -- after the

17   lineup had instructed JV verbatim from the FBI policy.  JV, he's

18   not even an FBI agent.  He certainly is not a lawyer, and he's

19   not a scientist.  "By the way, I'm required to request that you

04:25:16   20   do not contact the media."

21        No normal person thinks that means that I can't get on

22   my computer and look on the Internet.  And so that's what JD did

23   anyway.  So the failure to tell him "do not contact the media"

24   didn't change his behavior in any way, because JV didn't call

04:25:41   25   the media, he didn't -- he didn't contact the media, not in the

1    way that normal people speak.

2              And under the definition, as the defendant wants it, of

3    "contact the media," I think it's important to consider what

4    that would include, because if there is causation here between

04:25:59    5    the failure to advise "do not contact the media" and seeing the

6    public safety announcement, for there to be causation to exist,

7    that means their definition has to include public safety

8    announcements.  So not only don't contact the media, don't look

9    at news sites, don't look at Facebook, don't look at public

04:26:20    10   safety announcements.

11             So even in this situation, where your family has been

12   attacked, someone held a gun to your kid's head, tried to kidnap

13   him, took your car, terrorized your family for a span of

14   minutes, and they're still at large and believed to be armed and

04:26:40    15   dangerous, and you know, because your a resident of White Swan,

16   that they just killed five other people nearby, don't view any

17   public safety announcements.

18             That cannot be the advisal, and that cannot be included

19   in the definition of "contact the media."  That's an

04:27:00    20   unreasonable way to interpret that phrase.

21             But in order for, like I said, in order for the failure

22   of Agent Ribail to tell him "do not contact the media," in order

23   for there to be causation between that and him seeing that

24   wanted poster, the definition of "contact the media" would have

04:27:16    25   to include that poster.

1    THE COURT:  What about the other argument that -- that

2  while -- that announcement with the poster of James Cloud was

3  arranged, I guess it would be, by the agencies that were being

4  overlooked by the FBI or working in coordination with the FBI,

04:27:44  5  because that came out of an advisory from, yes, the tribe, but

6  the tribe got it from someone, presumably, you know, another

7  agency, maybe the tribal police or -- I mean, what about that

8  argument, that it was coordinated in that way?

9    MR. BURSON:  Are we talking about the first advisal or

04:28:04  10  the second advisal?  I just want to know for --

11    THE COURT:  The second.  Well -- yeah, the second one is

12  what I'm referring to.

13    MR. BURSON:  The second one, I believe, was someone with

14  Yakama Nation Tribal Police --

04:28:18  15    THE COURT:  Correct.

16    MR. BURSON:  -- who called Yakama Nation, the Tribal

17  Council's office, essentially, who runs that Facebook page,

18  after they found out, oh, no, these aren't the guys, or those --

19  those weren't the people that were arrested, or at least not

04:28:34  20  James Cloud at that time.

21    Even if, even if we consider that law enforcement

22  involvement, I don't think that --

23    THE COURT:  Was that tribal police?  Or was there

24  evidence that -- let me ask it this way:  Was there evidence

04:28:52  25  that that was tribal police presented in this hearing?

1    MR. BURSON:  There was not, although following

2  testimony, I reviewed the reports again, and so I can shed some

3  light on it in a little more detail, if the Court would like --

4    THE COURT:  You're not a witness, Counsel.

04:29:03    5    MR. BURSON:  -- but I don't know that it's helpful.  But

6  it was -- there was some involvement of tribal police telling

7  the council's office to, "Hey, they're not actually in custody."

8  That led to the posting.

9    THE COURT:  Okay.

04:29:19   10    MR. BURSON:  Who drafted it, who typed it is unclear,

11  and I'm afraid probably going to be lost to the sands of time.

12  My understanding is someone in the Council's office.

13    But certainly we can't include that as the misconduct.

14  That was a necessary posting.  It was necessary from a public

04:29:42   15  safety standpoint.  I don't think that that is the type of

16  conduct that we want to deter.  And that's the whole point of

17  the exclusionary rule, is to deter.

18    If this happened all over again, would we want the

19  Tribal Council to second-guess should we put this information

04:30:04   20  out there?

21    No, of course not.  No resident of White Swan would want

22  that.  No resident of Yakima would want that.

23    And the other policy violations -- this is what I

24  touched on -- they themselves don't create a suggestive

04:30:28   25  circumstances.  There's no evidence that Agent Ribail created

1    any suggestive circumstance.  Even Dr. Laney could not point to

2    any evidence that there was any suggestion going on with this

3    lineup.  And without some sort of suggestion created by law

4    enforcement improperly, we don't even get to a judicial inquiry

04:30:55  5    under the Biggers factors, or whatever factors the Court wants.

6    The Court wanted to add more factors.  I think the Court should

7    stick to the Biggers factors, and I can address that briefly, if

8    the Court would like, but I think -- understood.

9         I do also want to talk about Rule 403, because Rule

04:31:19  10    403 -- I will concede that Rule 403 is -- is theoretically

11    applicable here, and I will concede that there is language in

12    decisions that are either precedential or -- or what are called

13    persuasive -- I don't find them persuasive, I'll get to the why

14    in a second, but that are generally called persuasive, that

04:31:42  15    suggests that Rule 403 is applicable here.

16         Now, other courts have explicitly said that Rule 403

17    could be explicable with eyewitness identification, even where

18    there is no exclusionary rule culpability, as here, frankly.

19         But I want to re-emphasize the word "theoretical" when I

04:32:00  20    say that, because as a practical matter, it just doesn't happen.

21    It -- the defense relies heavily on Dennis.  I believe it's the

22    case out of the Third Circuit -- it is the case out of the Third

23    Circuit.  I believe -- I believe they mentioned it in their

24    closing argument.  In their words, it was a tour de force.

04:32:21  25         Well, first, Dennis was Brady decision.  It was an en

1    banc or en banc decision, however you pronounce it, by the Third

2    Circuit, which means up to 12 judges.  Of the 12 judges or so,

3    one wrote this part of the opinion, the concurring opinion that

4    is relied on by the defense.  One other joined it.

04:32:42   5         And I think it's important to notice -- to note what's

6    happening in that concurring opinion.  That concurring opinion

7    is detailed, and it spends most of its time talking about the

8    eyewitness identifications that were at issue in *Dennis*.  The

9    whole issue in *Dennis* was there were eyewitnesses presented at

04:33:05   10   trial, and the State didn't turn over some Brady material that

11   would have been able to impeach those eyewitnesses, or at least

12   reduce their credibility.  I believe there were two witnesses at

13   issue; three Brady violations in total.

14        The -- the en banc opinion just found that, yeah, that

04:33:25   15   is a Brady violation.  Why?  Because that evidence could have

16   been used to impeach at trial.  They never said:  Because that

17   evidence could have been used to exclude the evidence altogether

18   under Rule 403.

19        So the concurring opinion goes into detail about some of

04:33:38   20   the problems with eyewitness identification, and the Court heard

21   a lot about that today.  And some of the terms would sound

22   familiar from -- from that concurring opinion, such as other

23   witness reactions influencing other witnesses, photo arrays and

24   lineup construction, blinded techniques.  You know, the judge in

04:34:03   25   that concurring opinion says, look, blinded techniques are

1  important.  And as to why it's important, the *Dennis* jurors

2  would have been in a far better position to assess the

3  reliability of the three courtroom identifications had they been

4  informed of the importance of blinding procedures.

04:34:21  5          Keyword:  The jurors.

6          With respect to lineup construction, the district court,

7  according to the concurring opinion, should have provided the

8  jury with an explanation of how this may have affected the

9  witness' identifications.

04:34:40  10         Other witnesses influencing witnesses.  The jurors

11  should have been instructed about this possibility.

12         The opinion also talks about stress, as did Dr. Laney;

13  weapons-focus, as did Dr. Laney; memory decay over time.  And

14  all of it the recommendation is the jurors should have been

04:35:03  15  informed of these variables.  This is not an opinion saying that

16  this evidence should have been excluded under Rule 403.

17         *Jones*, which is cited by the defense as well, in that

18  case, it's an interesting fact pattern.  The witnesses at issue

19  were inadvertently informed of the defendant's identity, given

04:35:28  20  his name, by the state prosecutor's office.  It ended up being

21  an adopted case federally.  They Googled the person, found his

22  mugshots online, told investigators, "Hey, this is the guy.  We

23  found him online," before even being asked questions by the FBI,

24  and were allowed to make an in-court identification.  That

04:35:50  25  district court, again, cited by the defendants, said, okay, Rule

1   403 applies.  But in the availability of cross-exam, jury

2   instructions, expert testimony, unfair prejudice is adequately

3   mitigated.

4          Which brings me to my point about unfair prejudice.

5   This is not a prior conviction or a prior bad act that rings a

6   bell that kind of sits by itself in a vacuum.  It's hard to

7   imagine bringing an expert and explaining to the jury why that

8   prior felony is so bad.  Right?  It's hard to imagine a closing

9   argument that can fully mitigate what's been done there.  And

10  it's hard to imagine jury instructions, although we have them,

11  that can fully push back.

12         Here, with eyewitness identifications, we do have

13  experts, as we saw today, who come in and say, look, this was a

14  non blinded procedure.  That's why this is important.  Look,

15  there was suggestion going on here, possibly.  We don't know,

16  but all these procedures that went wrong, we don't know; there

17  could have been suggestion.  That's essentially what Dr. Laney

18  was testifying to today.

19         There's -- there's jury instructions that are -- that

20  are fulsome.  That was what the Third Circuit was advocating

21  for, primarily, that concurring opinion was fulsome jury

22  instructions to explain to a jury, look, eyewitness

23  identifications have problems.

24         And, finally, there's cross-exam --

25         THE COURT:  I want to turn your attention, if you could,

1   to LL.  Both Mr. McEntire and Mr. Smith talk about the courts,

2   in their request to exclude LL -- LL's identification because,

3   in the words of Mr. Smith, it's coming out of nothing.  That is,

4   that, you know, first there was a nonidentification.  Then there

04:37:47  5   was sort of a comment made, and it sounds like that might have

6   been related to -- that happened after media interviews and

7   meetings with his family about who were the Clouds.

8          And why shouldn't the Court, under that -- those

9   circumstances, exclude that identification as nonreliable?

04:38:13  10          MR. BURSON:  Because I think that -- so now is a good

11   time to talk about, I guess, probative value and prejudice.  And

12   I think the point here is -- unfair prejudice.  Keyword.  And I

13   think the point here is that the unfair prejudice factor can be

14   mitigated.  I don't dispute the fact that it is significant to a

04:38:39  15   jury when someone stands up and points at the defendant's table

16   and says, "I recognize that person" --

17          THE COURT:  Right.

18          MR. BURSON:  -- from the -- from the incident," which,

19   by the way, brings me to a side note.  No one is going to come

04:38:52  20   in here and say, "James Cloud shot me."  Okay?  We understand

21   the Court wouldn't allow that without mountains of foundation.

22   That's not what we're asking for here, at least not someone

23   without prior knowledge who we can't lie a foundation for.

24          But Mr. Smith is right.  That's not what we're talking

04:39:11  25   about today.  What we're talking about today is recognition.

1    And there are plenty of questions that can be asked on

2    cross-examination to cast doubt on the reliability of someone's

3    recognition.  And there's also explanations for --

4         THE COURT:  But I think the argument is that the Court

5    wouldn't typically just allow any Joe Schmo to come in here and

6    say, "Yep, yep, that's the one, right there.  That's the guy

7    that did this," and, in their view, that this identification by

8    LL is tantamount to that, in that there was a nonidentification,

9    and then only through these other series of events that now,

10   apparently, there is more than that.  I mean, I think that's the

11   argument.  And so it's -- it's a little different.

12        MR. BURSON:  It is different from a typical

13   identification in that there was originally a nonidentification,

14   and then subsequent to that, during an interview with the FBI,

15   there was an identification by name, associating it with an

16   individual in a red shirt.

17        But that can be asked on cross-examination.  And there

18   may very well be an answer for it.  The answer may be, "Yeah, I

19   didn't know it was James Cloud at the time, and I didn't

20   identify him in the lineup, but then I saw a picture later, and

21   I recognized him when I saw him on TV, and I also learned his

22   name was James Cloud."  It's a very reasonable explanation.

23   We're just asking that he be able to provide it to the jury

24   after, presumably, he's asked about it on cross.  That is called

25   a trial.  And that is how unfair prejudice is mitigated.  That's

1    all we're asking for.

2            Defense is asking to skip the jury instructions, skip

3    cross-examination, skip presentation of expert testimony on

4    eyewitness identification, skip any commands from the Court,

04:41:19    5    cautions from the Court, skip closing argument regarding

6    eyewitness identification, and jump right to Rule 403, which I

7    don't think it's controversial to say Rule 403 is a last resort.

8    When those other things cannot adequately mitigate unfair

9    prejudice, then we have Rule 403.  Defense kind of wants it both

04:41:41    10    ways.  They want -- they want to look at the Court and say:

11    Your Honor, look how unreliable this ID is.  He -- he first made

12    a misidentification, and then later on he said, "Oh, that's --

13    that's -- that's James Cloud."  And then with another defendant

14    he said, "Your Honor" -- or he said, "No, that's" -- too many

04:42:07    15    names at this point -- "that is somebody not here," and then

16    later on says, "That's Donovan Cloud."

17            THE COURT:  Um-hmm.

18            MR. BURSON:  They -- they put that forth, rightly so, to

19    the Court to say:  Clearly there is no probative value here.

04:42:26    20    But at the same time, they act as though a jury won't be able to

21    take that very simple evidence, very easy to comprehend -- he

22    didn't pick him out of the lineup, he attached a name later, he

23    confused a guy in blue shirts -- that very presentable,

24    easy-to-digest information, they act as though that will not

04:42:46    25    mitigate any of the prejudice, and that's just not true.  It's

1    just not reasonable.

2         THE COURT:  Can we move on to EZ?  And I think it's been

3    established, certainly by the testimony and by the admission of

4    the deputy, that, you know, he made some mistakes.  He

04:43:05  5    acknowledges those, and -- and in not following a certain set of

6    procedures.

7         Counsel argues that those specific violations

8    potentially result -- well, really, that there's no way of

9    knowing, necessarily, how that influenced the -- the not having

04:43:26  10    a real blind presentation or double-blind presentation versus

11    having him look at it and then, in their view, gesturing or

12    conveying other nonverbal cues.

13         And I guess in -- don't they have a point about that?

14         MR. BURSON:  They do have a point that there is an issue

04:43:53  15    with nonblinded lineup procedures, as the Court in -- or, I'm

16    sorry, as the concurring opinion in *Dennis* said:  Look, there's

17    a problem when you don't use nonblinded procedures.  These

18    things are important.

19         But also like that concurring judge in *Dennis*, I think

04:44:09  20    the remedy is jury instructions coupled with eyewitness

21    testimony -- I'm sorry, expert testimony regarding eyewitnesses,

22    like Dr. Laney will testify about the importance of blinded

23    procedures.  The jury will understand that.  It's not so hard to

24    digest that this Court is the only body that can make that

04:44:32  25    ruling.  And that's your mitigation.

1      Now, if there were procedures here in this lineup that

2    actually were suggestive, we might have a different

3    hypothetical.  But we don't.  And I know there's some

4    disagreement about what that pen was.  Frankly, I think because

04:44:53   5    it was made after a recognition, I think it's -- defense is

6    really overplaying what that was.  And I think similarly to the

7    suggestion to write on the lineup what the witness had just said

8    I don't think is suggestive.  I certainly don't think it's

9    unduly suggestive, which is the keyword here.

04:45:12  10      THE COURT:  So let me ask you this:  So you're conceding

11    that you're going to allow expert testimony on eyewitness

12    identification in this case?  Should the Court allow this?

13      MR. BURSON:  I think we're -- we're too early there,

14    Your Honor, to decide.  Well --

04:45:24  15      THE COURT:  You just made the argument, Counsel.  You

16    can't have it both ways.

17      MR. BURSON:  There's -- there's a lot of factors that go

18    into it.  There's scope of expert testimony, who the expert is,

19    is it always allowable.  But we'll certainly entertain it, and I

04:45:36  20    invite the Court or defense to use my words against me --

21      THE COURT:  Well, believe me, I will not be using your

22    words against you.  I have a feeling I know who will, but I will

23    not be using your words against you.

24      MR. BURSON:  I invite that.  But for today, I just want

04:45:53  25    to focus on is Rule 403 applicable.  My point here is there are

1    tools to mitigate prejudice down to the point where it's no

2    longer unfairly prejudicial.  Counsel for the defense is right;

3    a lot has been learned over the years with respect to eyewitness

4    identification.  And it's because of that we have the jury

04:46:13  5    instructions we do now, we have expert testimony on this -- on

6    these things, defense attorneys are more equipped with a little

7    more knowledge so they can do cross-examination, they know what

8    to say during closing argument.  We've come a long way.

9        As we learn more about misidentification, the dangers of

04:46:34  10   it, we've learned how to mitigate it, and we're just asking that

11   those tools be used --

12        THE COURT:  Well, and the defense is saying:  Yeah, you

13   learned a lot, but you didn't follow them.  That's what they're

14   saying.

04:46:45  15       MR. BURSON:  I disagree.  I actually --

16        THE COURT:  Okay.

17        MR. BURSON:  I actually do think courts have been

18   adapting.  And I understand that, like with everything else,

19   court precedent doesn't necessarily keep up to science.  Not --

04:47:00  20   I think it would be naive to make that suggestion.  But the fact

21   that we have opinions like *Dennis*, concurring opinions like

22   *Dennis*; the fact that we do have courts entertaining Rule 403

23   applicability, although not really applying it to eliminate

24   evidence, but at least considering Rule 403 in the context of

04:47:20  25   eyewitness identification, the fact that we have those things,

1    that shows that courts have come around on this issue.  But they

2    still let juries hear it.  Where they have changed is they allow

3    the admissibility of expert testimony.

4         I quoted some cases in my briefing where experts were

04:47:38    5    actually disallowed.  Now, I want to make clear, I didn't do

6    that because I'm making an argument now that expert testimony

7    isn't relevant.  I was showing the inapplicability of other

8    cases.  But my point in bringing it up now is to show that I

9    think if you looked at the landscape for excluding testimony

04:47:54   10    now, I think we would be in a different landscape, which is to

11    say that even though courts have learned more, the -- the result

12    of courts learning more about eyewitness identification is to

13    let in certain evidence that maybe they thought irrelevant

14    before.  And, again, that's all we're asking for here.  I'm not

04:48:12   15    waving any objections to evidence, by the way.  But it's

16    available.

17         THE COURT:  Okay.  Any final point?

18         MR. BURSON:  No, Your Honor, unless the Court has any

19    direct questions for the Government.

04:48:30   20         THE COURT:  I don't, not at this point.

21         I -- actually, I'll allow, if you -- do you have any

22    final point, Mr. McEntire?

23         MR. McENTIRE:  Very brief points, just in response to --

24         THE COURT:  Only if they're very brief.

04:48:58   25         MR. McENTIRE:  Your Honor, Mr. Burson said, quote, we

1    want to deter certain police conduct.

2        And my response would be -- is:  We don't just want

3    officers to follow policy.  We want to know it exists in the

4    first place, which is one of the problems that we had here.

5        Second point that I would bring up is that Mr. Burson

6    had -- is -- with respect to JV, is pinning the misconduct on

7    the wrong event.  He is pinning the misconduct on the wanted

8    poster, and the misconduct is actually on Special Agent Ribail's

9    failure to provide that instruction.  So just providing that

10   clarification.

11       Three, I think *Dennis* is being taken out of context in

12   that this is an appeals court reviewing a habeas decision under

13   EDPA, that was a state case, going through the state Supreme

14   Court process.  And so their comments on that these were --

15   there should be jury instructions and other of these comments

16   were provided in the context of the very unique posture that

17   *Dennis* presented.

18       Fourth, Mr. Burson referencing *United States v. Jones*.

19   There was actually specifically in that *Jones* opinion a 2017

20   district court decision that was referenced in respect to Rule

21   403, there was no -- I just pulled it up again and reread it --

22   there actually was no policy violation by police.  There was no

23   actually lineup to begin with.  What happened is -- is witnesses

24   became aware of an individual charged, and then they went to

25   look that information up.  So, again, we're in a different

1    procedural posture.

2         Next point is that the United States called LL's lineup

3    a misidentification --

4         THE COURT:  Counsel, I think I'm on five points,

04:50:44   5    although you said three, so I think you're done.

6         Thank you.

7         MR. McENTIRE:  You're welcome, Your Honor.

8         THE COURT:  All right.  Mr. Smith?  I allowed him.

9         MR. SMITH:  I have nothing.  Thank you, Your Honor.

04:50:55  10    THE COURT:  Mr. Burson?

11         MR. BURSON:  Nothing, Your Honor.  Thank you.

12         THE COURT:  All right.  We're also set for a status

13    conference.  We have one scheduled for October 27th.  I guess we

14    can defer sort of a more robust discussion at that point to

04:51:22  15    address many -- the plethora of other issues involved in this

16    case.  So we'll hold off on that.

17         With regards to a decision on these matters, I -- I

18    promised I would look at certain things that were discussed,

19    certainly in closing, and I -- I definitely want to do that.

04:51:43  20    And so I will -- I appreciate the arguments today.  I think it

21    was well argued the last couple days.

22         And anything else that we need to address today?

23         MR. BURSON:  Nothing from the Government, Your Honor.

24         MR. McENTIRE:  Nothing from James Cloud, Your Honor.

04:51:59  25    MR. SMITH:  Nothing, Your Honor.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1, 2*
*Evidentiary Motion Hearing/Day 2, Volume II/September 30, 2020*
*Rebuttal Argument by Mr. McEntire*

28

1          THE COURT:  All right.  Again, thank you for your

2     presentations, and that will conclude this matter.

3          THE COURTROOM DEPUTY:  All rise.

4       (Hearing concluded at 4:52 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3       I, KIMBERLY J. ALLEN, do hereby certify:

4            That I am an Official Court Reporter for the United

5    States District Court for the Eastern District of Washington in

6    Richland, Washington;

7            That the foregoing proceedings were taken on the date

8    and at the time and place as shown on the first page hereto; and

9            That the foregoing proceedings are a full, true and

10   accurate transcription of the requested proceedings, duly

11   transcribed by me or under my direction.

12           I do further certify that I am not a relative of,

13   employee of, or counsel for any of said parties, or otherwise

14   interested in the event of said proceedings.

15           DATED this 28th day of October, 2020.

16

17

18

19      _____

20      Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
        Washington CCR No. 2758
21      Official Court Reporter
        Richland, Washington
22

23

24

25