1

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No.
3                                ) 1:19-cr-2032-SMJ-1, 2
                    Plaintiff,   )
4                                ) October 27, 2020
v.                               )
5                                ) Yakima, Washington
JAMES DEAN CLOUD (01); and       )
6  DONOVAN QUINN CARTER CLOUD     ) Status Conference
   (02),                         )
7                                ) Pages 1 to 42
_____Defendants.  )
8

9
          BEFORE THE HONORABLE SALVADOR MENDOZA, JR.
10            UNITED STATES DISTRICT COURT JUDGE

11
                      APPEARANCES:
12

   For the Plaintiff:        Richard Cassidy Burson
13                           Richard.c.burson@usdoj.gov
                             Thomas Hanlon
14                           Thomas.j.hanlon@usdoj.gov
                             United States Attorney's Office
15                           402 East Yakima Avenue
                             Suite 210
16                           Yakima, WA 98901
                             509-454-4425
17

18 For the Defendant James   John B. McEntire, III
   Cloud (01):              Jay_McEntire@fd.org
19                           Lorinda Youngcourt
                             Lorinda_Youngcourt@fd.org
20                           Jeremy Sporn
                             Jeremy_Sporn@fd.org
21                           Federal Defenders
                             Eastern Washington
22                           10 N. Post Street
                             Spokane, WA 99201
23                           509-624-7606

24

25

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

2

For Defendant Donovan Cloud        Richard A. Smith
(02):                              Rasmith@house314.com
                                   Smith Law Firm
                                   314 North Second Street
                                   Yakima, WA  98901
                                   509-457-5108


                                   Mark A. Larranaga
                                   Mark@jamlegal.com
                                   Walsh and Larranaga
                                   705 2nd Avenue
                                   Suite 501
                                   Seattle, WA  98104
                                   206-972-0151




Official Court Reporter:           Kimberly J. Allen, CCR #2758
                                   United States District Courthouse
                                   P.O. Box 685
                                   Richland, Washington 99352
                                   (509) 943-8175

Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.

3

1                                   **INDEX**

2

3                              **WITNESS INDEX**

4    **Plaintiff Witness:**                                   **Page**

5

6       None

7                                     *****

8
     **Defense Witnesses:**                                   **Page**
9

10
        None
11

12

13                          **EXHIBITS ADMITTED**

14   **Plaintiff**
        **Number**        **Description**                     **Page**
15                        None

16

17   **Defense**
        **Number**        **Description**                     **Page**
18                        None

19

20                            **GENERAL INDEX**

21                                                            **Page**

22      Reporter's Certificate...........................42

23

24

25

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1,2*                                4
*Status Conference/October 27, 2020*

1   (October 27, 2020; 9:02 a.m.)

2          THE COURTROOM DEPUTY:  All rise.

3       (Call to Order of the Court.)

4          THE COURT:  Please be seated.

09:02:53  5          THE COURTROOM DEPUTY:  Matter before the Court is *United*

6   *States of America v. James Dean Cloud* and *Donovan Quinn Carter*

7   *Cloud*, Cause No. 1:19-cr-02032-SMJ-1 and, excuse me,

8   1:19-cr-02032-SMJ-2.  Time set for status conference.

9          Counsel, please state your presence for the record,

09:03:26  10  beginning with Government counsel.

11          MR. HANLON:  Good morning, Your Honor.  Tom Hanlon and

12  Rick Burson appearing for the United States.

13          THE COURT:  Good morning to both of you.

14          MS. YOUNGCOURT:  Good morning, Your Honor.  Lorinda

09:03:34  15  Youngcourt and Jay McEntire for James Cloud, and Jeremy Sporn.

16  I'm sorry.  I wasn't looking across.

17          THE COURT:  He's hiding over there.  Good morning all

18  three of you.

19          MR. SMITH:  Your Honor, Rick Smith and Mark Larranaga on

09:03:49  20  behalf of Donovan Cloud.

21          THE COURT:  Good morning to both of you, Counsel.

22          Just one second.

23          Counsel, time set for pretrial.  I guess what the Court

24  was thinking of doing today is going over a number of things

09:04:23  25  that have been raised; frankly, one of which is concerning, and

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1    I think we need to address those issues first.  So let's start

2    talking about issues of discovery.

3           I'm not sure, Mr. McEntire, if you want to begin by sort

4    of framing the issues for the Court.  I understand there is an

09:04:46    5    issue with regards to previously undisclosed discovery; and,

6    number two, some issue with regards to redactions.  So if we

7    could address that first.

8           MS. YOUNGCOURT:  Yes, Your Honor.  I'll be speaking --

9           THE COURT:  Oh, I'm sorry.

09:04:58    10           MS. YOUNGCOURT:  -- on behalf of Mr. Cloud today.  Thank

11    you, and acknowledging that Mr. McEntire did put together our

12    status conference memo.

13           THE COURT:  I'm sorry, Ms. Youngcourt.  Because he had,

14    that's why I addressed him.  Apologies.

09:05:11    15           MS. YOUNGCOURT:  Not a problem, Your Honor.

16           So we're concerned for a couple of reasons, and one that

17    is not even included in the status conference, which I just

18    discovered over the weekend.  We -- as the Court is well aware,

19    we litigated the issue of eyewitness identification through

09:05:28    20    photo arrays.  Two weeks after the hearing, we received

21    discovery indicating that a Witness 26 had been present at the

22    5151 Medicine Valley Road and had witnessed something; and, in

23    fact, had been shown four photo arrays.  We still don't have the

24    photo arrays.  We just got the 302 -- actually, two 302s.  This

09:05:57    25    witness was important enough that the Government, Mr. Ribail --

1   or, I'm sorry, Special Agent Ribail and Terami interviewed him

2   two times, the second time taking him photo arrays, yet we did

3   not receive that until after we were done litigating our

4   eyewitness identification.

09:06:14   5       To me, that seems to be either very poor organizational

6   skills or intentional.  I don't know which, and I don't want to

7   suggest.  But it is disruptive to our representation of

8   Mr. Cloud in any kind of orderly fashion.

9       Secondly, we still continue to receive redacted

09:06:36   10   discovery.  There are some 49 witnesses that are identified only

11   by a "W" or a witness and a number.  Through hook and crook,

12   we've been able to identify about nine of those witnesses.  The

13   other 40, we don't know who they are because they're just

14   witness --

09:06:55   15       THE COURT:  Well, you understand the issues that -- so

16   let's be clear on one thing:  Are you asking for the Court to

17   reconsider its motion, or are you making a motion with regards

18   to release of that information?  I'm not sure which it was.  It

19   was listed as sort of issues to address, but not necessarily a

09:07:14   20   motion.  So I want to be clear on what we're talking about.

21       MS. YOUNGCOURT:  Yes, Your Honor.  Thank you for

22   clarifying that for me.

23       At this time I would make an oral motion that discovery

24   be provided in an unredacted manner, and that if there needs to

09:07:27   25   be a protective order, that one be entered.  I had spoken to

1   Assistant U.S. Attorney Hanlon about that in August of 2019 when

2   we first got this case, and I thought we had an understanding at

3   that point.  We've continued to talk about it back and forth,

4   and we're still getting discovery redacted.

09:07:45   5       THE COURT:  Well, you recognize the concern that the

6   Government would have in terms of releasing very sensitive

7   contact information of witnesses, some, as you indicated, 26 --

8   or not 26 -- 49 witnesses.  There is a very real concern that

9   they have addressed.

09:08:05   10      So how do we deal with that?

11      MS. YOUNGCOURT:  Your Honor, I would be happy if they

12  just gave us the names.  I don't need to know -- I would love to

13  know their addresses and their contact information, but at least

14  my investigators could get a start on it.  Right now I don't

09:08:19   15  know their names.  So Mr. Cloud is going to be standing in a

16  position up until I don't know when of where he doesn't know

17  who -- who the people are that are going to testify against him.

18  I don't know how I prepare an effective defense for him when I

19  don't have that information.

09:08:34   20      THE COURT:  I dealt with a case a few years ago, it was

21  a homicide case, multiple homicides, the *Henrikson* case, wherein

22  the Court entered an order with an -- allowing the defense to

23  have an unredacted copy, restricted and limited that to only the

24  defense attorneys; to not disclose the contact information,

09:09:02   25  names, addresses with their clients.

1     Is that something that you're proposing or agreeing to?

2     MS. YOUNGCOURT:  Your Honor, I'm reticent to not

3  disclose names to my client.  I need his help.  I need to know

4  what he knows about these people, whether he's seen them, hasn't

5  seen them, has he met them before, has he not met them before.

6  It's impossible for me to do that if I can't even share their

7  names with him.

8     I'm fine with not sharing addresses, contact

9  information.  That's fine.  But I feel I need to be able to talk

10 to him about who the people are.  The Yakama Reservation,

11 although it's vast, many of the people know each other.  If

12 Mr. Cloud knows them and has information, I need to have that.

13     THE COURT:  Well, but you understand that there's a

14 balancing test that the Court has to engage in, and that is

15 certainly the needs of the defendant to present a defense, but

16 in addition, the need to protect these witnesses who, for a

17 number of reasons, would not like their information to be

18 released.

19     MS. YOUNGCOURT:  I understand that, Your Honor.  I would

20 note, though, that it's been some 18 months now that Mr. Cloud

21 has been fully aware of the names of the witnesses that we

22 discussed during our eyewitness identification hearing a few

23 weeks ago.  To my knowledge, there's been zero allegations,

24 anything that there's been any threats made to them.  So I would

25 point that out as -- as a good sign.  I mean, those are the

1    eyewitnesses that the Government, at least at that point, was

2    telling us that they were going to rely upon, and there's been

3    no issues.

4              THE COURT:  Okay.  Anything else on these -- these

09:10:47  5    discovery points?

6              MS. YOUNGCOURT:  One more thing, Your Honor.

7              So what I did over the weekend is go through all the

8    discovery that we've received so far to try and organize it in a

9    way.  The FBI 302 reports that we've been getting, each of them

09:11:05  10   has the case number, dash, serial and then a number behind it,

11   so serial 1, serial 2, serial 3.

12             I went through those and realized that we are missing

13   upwards of 50 reports.  I assume that they are all in

14   chronological -- or all in numbered order.  When I put them into

09:11:26  15   a spreadsheet, and I filter them by date or I filter them by

16   serial number, they clearly appear to be close in time by date.

17   I'm missing things from the first week of the investigation.

18             THE COURT:  Have you discussed that with the Government?

19             MS. YOUNGCOURT:  I just realized it this weekend, Your

09:11:48  20   Honor, when I did the -- did the spreadsheet, so I am now

21   mentioning it now.

22             THE COURT:  Okay.  Okay.  Anything else?

23          (Counsel conferring.)

24             MS. YOUNGCOURT:  One final thing, Your Honor, about the

09:12:04  25   point that the Court made concerning the names.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1,2*          10
*Status Conference/October 27, 2020*

1    We'll get them at some point.  Right?  We're going to

2    get them at some point before the trial.

3          THE COURT:  I think it's three days before the trial.

4          MS. YOUNGCOURT:  And I think, Judge, what that is going

09:12:18   5    to mean is I'm going to have to ask for a continuance.  I need

6    to be able to provide Mr. Cloud the effective representation of

7    counsel guaranteed by the Sixth Amendment.  I'm not going to be

8    able to do that with three days' notice to investigate

9    witnesses.

09:12:33   10          THE COURT:  Okay.  Mr. Smith, anything on those motions?

11          MR. SMITH:  Mr. Larranaga will be handling most of this,

12    Your Honor.

13          THE COURT:  Oh, okay.

14          MR. LARRANAGA:  Good morning, Your Honor.

09:12:43   15          THE COURT:  Good morning.

16          MR. LARRANAGA:  Is it all right if I remain seated?

17          THE COURT:  Yes, please.

18          MR. LARRANAGA:  We just actually would just address the

19    redaction.  We have no comment on the other issues that they

09:12:54   20    raise.

21          Regarding the redaction, we're -- we concur with our

22    co-defendant's counsel here.  As far as I'm concerned -- am

23    aware, there has been no allegations of threats to any

24    witnesses, potential witnesses, witnesses that have claimed to

09:13:12   25    identify our client.  So we would concur a request, an oral

1    motion to be provided the unredacted discovery.

2            THE COURT:  Okay.  Thank you.

3            And I'm not sure who -- okay.  Mr. Hanlon, looks like

4    you are --

09:13:32  5            MR. HANLON:  Yes, Your Honor.  Thank you.

6            THE COURT:  All right.

7            MR. HANLON:  In regards to the discovery issues, I just

8    wanted to point out to the Court that between June 19th of '19

9    and October 5th of 2020, the Government has disclosed over

09:13:44  10   11,000 pages of discovery.

11           Pursuant to the case management order, all discovery was

12   to be due on October 15th of 2020.  The report at issue that

13   defense counsel is complaining about was provided to defense

14   counsel within those time frames.

09:13:56  15           So this report regarding this witness reviewing lineups,

16   so that was disclosed within the time frame from the case

17   management order.

18           THE COURT:  Wait.  Stop here for a second.

19           When did you produce the bulk of the discovery in this

09:14:11  20   case?

21           MR. HANLON:  It's -- Your Honor, I can't give an exact

22   date because it's continually flowing in, and so as the

23   discovery -- I'm getting discovery on -- on e-mail, on hard

24   drives, on discs, in regular mail, and FedEx.

09:14:24  25           THE COURT:  This discovery that was just produced, when

1  was that produced to the Government?  When was that given to the

2  Government?

3          MR. HANLON:  I don't know when it was given to the

4  Government --

09:14:34  5          THE COURT:  Well, I need an answer to that.  So you have

6  your agent right there.  I need an answer to that question right

7  now.

8          (Counsel conferring.)

9          MR. HANLON:  Your Honor, he doesn't know off the top of

09:14:47  10  his head.  But I would like to point out that in regards to

11  that -- that report, there was not an identification made.  In

12  the report, this witness, they show him lineups.  These lineups

13  were previously disclosed to counsel in the beginning, and these

14  were addressed at the other hearing, so these aren't new

09:15:03  15  photographic lineups.

16          In addition, when the witness looked at the lineups, he

17  said he had recognized some --

18          THE COURT:  Wait.  The documents themselves are not new.

19  They were presumably shown to other witnesses.  But to this

09:15:14  20  witness, that information was not disclosed.

21          Is that -- is that accurate?

22          MR. HANLON:  That these lineups -- I'm sorry, Your

23  Honor?

24          THE COURT:  You said that these lineups are not new

09:15:23  25  information.  I presume that they're lineups that were pictures

1    of these individuals that were sent to -- were produced to this

2    particular witness, that information was not released to the

3    defense.

4            MR. HANLON:  That is correct, Your Honor.

09:15:40  5            THE COURT:  Okay.

6            MR. HANLON:  Yeah, so the lineups weren't new, but that

7    they were shown to this witness, that was --

8            THE COURT:  Got it.

9            MR. HANLON:  -- in this report.

09:15:45  10            THE COURT:  Got it.

11            MR. HANLON:  And then when he reviewed them, one lineup

12    he said he had seen some of these people before.  He advised,

13    looking at a picture of James Cloud, that he looked familiar to

14    him, and then he advised that he appeared to be a male that was

09:15:59  15    there with a shotgun, but it wasn't a positive identification.

16    It was:  He looks familiar, could be, he appears.

17            So this isn't someone who is going to testify and say,

18    "James Cloud, I identified him from a photo lineup and that's

19    the person" --

09:16:12  20            THE COURT:  But the question the Court has is why was

21    that information not provided?  Why wasn't --

22            MR. HANLON:  He --

23            THE COURT:  Why wasn't it provided when you produced the

24    other information about --

09:16:23  25            MR. HANLON:  We've been producing the information, Your

1  Honor, as the information is coming in.  I don't know exactly

2  when we got this report, but we've been trying to comply with

3  the Court's order of 10-15, and we were gathering discovery and

4  sending it out as --

09:16:33  5      THE COURT:  Is the defense wrong when they say that you

6  had this information for 14 months and that this is the first

7  time that they've received it?  That's what they're claiming.

8  That's what they've indicated in some pleadings.  And so I want

9  to know if -- if that's an overexaggeration or if that's

09:16:48  10  accurate.

11      MR. HANLON:  The dates on the reports are accurate as

12  the dates when those were created.  When they were received, I

13  don't know when they were received, because we're getting

14  discovery in different formats.  But we disclosed all of the

09:16:58  15  material to defense counsel.

16      And I just wanted to highlight that this person is not a

17  witness who is going to testify and identify James Cloud as the

18  person that was there that day.

19      THE COURT:  Okay.

09:17:09  20      MR. HANLON:  And then in regards to the redacted

21  discovery, the Government does have a concern regarding the

22  safety of witnesses.  This has been addressed by the Court

23  before.  The Government has attempted to reach out.  We spoke --

24  I spoke with Mr. McEntire, trying to reach a middle ground

09:17:28  25  somewhere, in regards to, perhaps, a protective order where the

1    names aren't disclosed to the clients.  My understanding is

2    there is no middle ground; either they're disclosed or they're

3    not disclosed.

4         THE COURT:  Well, the defense doesn't get to control

09:17:39  5    that.  What the Court has done in the past, and, again, I'm

6    thinking of that *Henrikson* case, that was a very -- it was a

7    similar case in the sense that there were allegations of

8    homicides in that case, witnesses were concerned with their

9    safety.  The Court at that point reached a middle ground, which

09:18:05  10   was to disclose that information and -- but prohibit the defense

11   from relaying that information to their clients.

12         What's wrong with that?

13         MR. HANLON:  I don't think there is anything wrong with

14   that, and we proposed that.

09:18:19  15         THE COURT:  Oh.  Okay.

16         Okay.  Anything else on these points?

17         MR. HANLON:  No, Your Honor.

18         MS. YOUNGCOURT:  Your Honor --

19         THE COURT:  There was a second -- or, excuse me, a third

09:18:36  20   point that was raised at the end, something about they

21   presumably -- or they -- they assume that there might be some

22   series that are missing of some reports, some 50 -- upwards of

23   50 reports, that's what they're indicating.

24         Do you know anything about that?

09:18:52  25         MR. HANLON:  That's the first time I've heard that, Your

1    Honor.  After this hearing, I will get into that.  I have spoken

2    to Agent Ribail.  He said there could possibly be an

3    administrative note, or something, and that is what is coming up

4    missing.  But we will check into that, and I will get back to

09:19:06    5    Ms. Youngcourt.

6            THE COURT:  Okay.

7            MR. LARRANAGA:  Your Honor, may I ask a question of the

8    Court?

9            THE COURT:  Yes.

09:19:14    10           MR. LARRANAGA:  If the Court is inclined to do this kind

11    of middle road protective order, where we're not allowed to show

12    our clients some of the redacted -- unredacted information, in

13    particular, it sounds like, witnesses' names, I would request

14    that we would at least have an option to bring it to the Court's

09:19:31    15    attention with good cause to have an exception to that general

16    rule, if that's where the Court is inclined to go.

17           THE COURT:  Okay.  Anything else?

18           Ms. Youngcourt?

19           MS. YOUNGCOURT:  Just one other point, Your Honor.  I

09:19:47    20    understand the Court's questions about when did the Government

21    receive discovery.  I just want to be clear that we're talking

22    about documents that were created by Agent Ribail, that he knew

23    about when he was on this witness stand.  He knew that he'd

24    interviewed that witness.  He knew that they had shown him a

09:20:06    25    photo array when we were here for our lineup hearing.

1    So this idea that when did they receive it, as long as

2    "they" includes Special Agent Ribail, they've had it all along.

3    And I would expect that the missing serial numbers were

4    also created by Special Agents Ribail and Terami.

09:20:42  5    THE COURT:  Okay.  Anything else?

6    MR. HANLON:  Your Honor, just in regards to the other

7    hearing, this lineup had nothing to do with that other hearing.

8    This is not a witness who identified somebody, and this is not

9    somebody who is going to testify in court as to an

09:20:54  10   identification, which was the point of the other hearing.  Those

11   are witnesses who made identifications looking at lineups.

12   This witness did not make an identification.  He is not

13   going to testify and identify anybody as "that's the person who

14   was there at this crime scene."

09:21:08  15   THE COURT:  What about that point?

16   MS. YOUNGCOURT:  Your Honor, in the report -- let me

17   pull it up.

18   MR. HANLON:  And I can hand up a copy of the report,

19   Your Honor.

09:21:15  20   MS. YOUNGCOURT:  Could you hand the Court a copy?  I

21   would appreciate that.

22   Because the witness talks about James Cloud was the

23   person at the scene with the -- with the shotgun.  So he may not

24   want to use this witness, but I would argue to the Court that if

09:21:29  25   he's not using it, it has the potential of being exculpatory.

*USA v. Cloud, et al./1:19-cr-2032-SMJ-1,2*                    18
*Status Conference/October 27, 2020*

1    As we set out in our status memo, other witnesses are saying

2    that that person was someone else.  So now we're talking about

3    not providing us discovery that they intend to use but not

4    providing us potentially -- potential *Brady* discovery, and

09:21:54   5    information relevant to the other witnesses who did testify or

6    who we were talking about.

7         MR. HANLON:  Your Honor, may I respond to that point?

8         THE COURT:  Just one second.

9       (Pause in proceedings.)

09:22:26   10        THE COURT:  Go ahead.

11        MR. HANLON:  Your Honor, defense counsel is saying the

12   Government does not intend to use this witness.  We do intend --

13   we believe this witness will testify, and the witness will

14   testify "I saw three males and a female, and I saw a red

09:22:37   15   Blazer," but he's not going to be able to identify who was

16   there, just the fact that he saw three males and a female.

17        THE COURT:  Well, and he says that -- the witness

18   advised that (reading):  The male in the photograph to appear to

19   be the male with the shotgun.

09:22:46   20        MR. HANLON:  He appeared to be.  He didn't know.  There

21   was no certainty.

22        THE COURT:  Well, that's relevant information, correct?

23        MR. HANLON:  I think the fact that what's relevant is

24   that there's three males and a female.  He can't identify anyone

09:22:58   25   from that --

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1      THE COURT:  Well, why wouldn't the defense want that

2   information for the hearing that we just had, Counsel?

3      MR. HANLON:  I'm sorry, Your Honor?

4      THE COURT:  Why wouldn't they want to have that

09:23:05   5   information for the hearing that we just had?  It's -- we were

6   talking about -- there was a question about who was wearing a

7   blue shirt, who was the one with the gun, who was the one with

8   this, and there was conflicting information, and that would have

9   been helpful to the Court to know that perhaps there's another

09:23:23  10   person that has different information about who was doing what,

11   when, where.

12      MR. HANLON:  And the information that he had was that

13   there was three males and a female.  There is nothing in the

14   report where he's able to make an identification or distinguish

09:23:36  15   and say this is the person, other than he recognized some of the

16   people that were in the photo lineup, but those people weren't

17   the defendants.

18      THE COURT:  Okay.  Ms. Youngcourt, anything else?

19      MS. YOUNGCOURT:  Yes, Your Honor.

09:23:45  20   The report -- the report specifically says that he

21   selected James Cloud from the lineup.  He said, "This looks like

22   somebody I know, and this looks like the man who had the

23   shotgun."  That's -- we can -- I would just point that out.  I

24   think the rest is semantics.

09:24:09  25      THE COURT:  Any final point?

1          MR. HANLON:  No, Your Honor.  Thank you.

2          THE COURT:  Okay.  And here's your report back.

3          MR. HANLON:  Thank you, Your Honor.

4          THE COURT:  At the start of this hearing, the Court

09:24:30    5   indicated that the Court had received some concerning

6   information regarding some questions about discovery not -- not

7   being provided early enough.  And I was hoping to be wrong about

8   that, frankly, but I'm not.  It is concerning.

9          It's the expectation of this Court that the Government,

09:24:57   10   and, likewise, the defense, produce discovery in this case on an

11   ongoing basis.  It's the expectation of this Court that, when it

12   has information, the Government produce the discovery that it

13   has at the time.

14          We're not playing games here.  These individuals are

09:25:19   15   facing very serious crimes, where penalties could put them in

16   jail for the rest of their lives.  And the Government is

17   withholding reports that they've had in their possession for

18   14 months, and then can't tell me when they received this

19   report?  Yet it was created at the time after the witness was

09:25:51   20   interviewed about specific facts that we had a hearing on?  I

21   think that's egregious.  And I'm disappointed, frankly.

22          So here's what we're going to do:  The defense -- the

23   defense will -- my pen just died.

24          Here we go.  Back up.

09:26:30   25          The defense is ordered to keep track of their hours with

1    regards to this additional report that they have, everything

2    from the attorney hours, the investigators' hours, the expert

3    hours, the staff hours that they spend on working on this

4    particular witness with regards to this particular report.

09:27:12  5    Should we have a hearing on the matter, keep track of your hours

6    with regards to that hearing.

7         And the Government will be ordered to pay those costs,

8    because I think it is a waste of time that we may have to have

9    another hearing about the issues involving identification, or

09:27:31  10    lack of identification, because the Government has failed to

11    produce a report that they've had in their possession, at least

12    at this point, in the Court's mind, for 14 months.  That's

13    unacceptable.

14         The Court will specify the details of its decision in an

09:28:06  15    order that will follow today's hearing with regards to the

16    expectations of the defense and their keeping of the hours and

17    the like.

18         With regards to the issue of the redactions, you know,

19    this is a difficult issue, because I think the Government

09:28:29  20    rightly points out that these witnesses have incredibly

21    reasonable concerns about their safety, given the allegations in

22    this case.  And it is a fine line between trying to -- on the

23    one hand, for the defense, to represent their client adequately

24    when they can't really decipher who these witnesses are.

09:28:53  25    Typically the Court doesn't -- in fact, the rule indicates that

1   the Court is not -- does not -- cannot order the Government to

2   provide a witness list any sooner than, I think it's three days

3   before trial.

4        But this case is different in many respects.  Number

09:29:15   5   one, here the Court is ordering the redaction of the witnesses'

6   names and their contact information, really, prohibiting the

7   defense from effectively investigating their -- their case

8   and -- and providing zealous representation.

9        Counsel for the defense point out that this is very

09:29:36  10   difficult for them to -- should the Court allow them to have

11   unredacted copies of the discovery, that it would be very

12   difficult for them not to discuss this with their clients,

13   because their clients would not be able to assist effectively.

14   And I understand that concern, but I also have to balance the

09:30:02  15   interests of the Government here and -- and, frankly, the

16   witnesses.

17        So the Court is going to reach what it sees as a middle

18   ground and grant the motion to release unredacted copies of

19   discovery to the defense with the protection order that will be

09:30:28  20   in place.  And the parties are ordered to get together and

21   present a proposed protection order and -- proposed and agreed

22   protection order.  If you can't agree, then indicate to the

23   Court which parts are not agreed to, and I will resolve those.

24        There is this other issue, whether the Court, on a

09:31:00  25   case-by-case basis, will -- would allow the disclosure of names,

1    only names, to their clients.  I guess I'm going to take that

2    under advisement.  I don't want to decide one way or another on

3    that point.  I think it's a reasonable request.  Let me put some

4    thought into it before I make a decision on that.  I'm still of

09:31:28   5    two minds on that, so let me think about that.

6         With regards to the final issue that was raised with

7    regards to some upwards of 50 reports that are not -- that may

8    not have been disclosed, I guess there's still a lot of

9    questions about whether or not those were or were not disclosed,

09:32:01   10    whether or not there's anything there.  So I would encourage the

11    parties to discuss that matter in detail, and update the Court

12    if there's anything for the Court to entertain.  But I will be

13    clear:  I expect all discovery to be produced in this case.  We

14    are not hiding the ball.  And I think people need to comply

09:32:28   15    with -- with that directive or expect that evidence will be

16    excluded and witnesses will be prohibited from testifying,

17    because that's where we're at.

18         Now, anything else on the discovery issue?

19         MR. HANLON:  Not from the Government, Your Honor.

09:33:03   20         MS. YOUNGCOURT:  Your Honor, I should have brought this

21    to the Court's attention a little earlier, but I would point the

22    Court to -- oh, thank you.  Thank you.

23         I would point the Court to the case of *United States v.*

24    *Grace*, 526 F.3d 499, which is a Ninth Circuit case from 2008, in

09:33:26   25    which the Ninth Circuit affirmed a district court's order that

1    the Government reveal the names of their witness list a year in

2    advance of trial.  The case stands for the principle that

3    between Criminal Rule 2 and 16, that the Court has the power and

4    authority to oversee the litigation in its courtroom.

09:33:53   5    THE COURT:  My wonderful clerk has already provided me

6    that case, Counsel.  I've already reviewed it.  Thank you.

7    Anything else, Counsel?

8    MR. HANLON:  No, Your Honor.

9    THE COURT:  Anything else on the discovery issue?

09:34:04   10   MS. YOUNGCOURT:  Not on discovery, Your Honor.

11   THE COURT:  Okay.

12   There was another point that was brought up, and I'm

13   going by the filing that was prepared by Mr. McEntire, in

14   addition to the issues that the Court normally addresses at the

09:34:31   15   time of pretrial, but one of the issues that was brought up was

16   the upcoming trial.

17   And so I guess I wanted to hear from -- and, again, I'm

18   not sure who is handling this.

19   Ms. Youngcourt, are you handling this?

09:34:42   20   MS. YOUNGCOURT:  Yes --

21   THE COURT:  Okay.

22   MS. YOUNGCOURT:  -- I am, Your Honor.

23   Your Honor, of concern to me is the fact that in the

24   grand jury transcript that we received a day or two before the

09:34:56   25   hearing on the eyewitness identification, there was a statement

1    by U.S. Attorney Hanlon to the grand jury that they would be

2    back in March to do a superseding indictment, March of 2020.

3             I understand the situation with COVID and the grand jury

4    has not been meeting here.  I would also indicate that the

5    discovery that we have received includes assertions and evidence

6    of more crimes, if you will, than are currently indicted.

7             I'm very concerned that we're going to be coming up on a

8    trial date very soon and I'm going to receive a superseding

9    indictment that includes a significant number of other crimes

10   that I'm going to need to defend against.

11            So I'd like to hear from the Government, if the Court's

12   inclined, as to what their -- what their plans are.

13            THE COURT:  Mr. Hanlon, anything on that?

14            MR. HANLON:  Your Honor, the Government does intend to

15   seek a superseding indictment.  As the Court knows, there has

16   been no grand jury in Yakima since March.

17            THE COURT:  Right.

18            MR. HANLON:  We have been providing all the discovery to

19   defense counsel, so there's not going to be like a new charge,

20   and then all of a sudden a new pile of discovery that is going

21   to be produced.

22            What I would anticipate, and, again, I can't say what

23   the grand jury is going to do, is that these -- the superseding

24   indictment would be in regards to Medicine Valley Road, not

25   another incident at this point in time.

1    THE COURT:  I see.

2    Counsel?

3    MS. YOUNGCOURT:  I know it's well within the

4    Government's discretion, but the grand jury has been meeting in

09:36:36    5    Spokane, and at one time there was conversation about would they

6    go to Spokane to get their superseding indictment so we could

7    all be prepared and know what was coming, and it hasn't

8    happened.

9        I understand, yes, I have discovery.  That's not the

09:36:49   10    same as knowing what the charge is going to be.  I can guess,

11    but it's also not a very good use of my time to spend a bunch of

12    time guessing and trying to defend against 12 things when maybe

13    it's only three.

14    THE COURT:  Counsel, it's pretty reasonable to -- a

09:37:09   15    pretty reasonable request to know what charges you're going to

16    be facing before you go to trial.  And I understand the concern

17    with regards to the grand jury.  I -- believe me, we've been

18    trying to have a grand jury.  In fact, in Spokane, while counsel

19    is right that in -- they have been meeting sometimes, we've had

09:37:35   20    a hard time getting a quorum, frankly.  So it's a difficult

21    issue now.  And I understand the concern of the Government in

22    trying to present evidence to a grand jury that is not meeting.

23        But what about the request that was made with regards to

24    a Spokane --

09:37:55   25    MR. HANLON:  Your Honor, that's -- we're looking into

1   that.  The problem is, as the Court knows, is they've had

2   difficulties with getting quorums, and they haven't had

3   consecutive grand juries since March.

4           THE COURT:  Right.

09:38:06  5       MR. HANLON:  And we would be -- that grand jury would be

6   unfamiliar with the case, as the Yakima grand jury was familiar

7   with the case, so we would be essentially reading transcripts to

8   the grand jury.

9           THE COURT:  Right.

09:38:15  10      MR. HANLON:  So there's just a lot of issues there.  I'm

11  not trying to be disrespectful or trying to delay things --

12          THE COURT:  No.

13          MR. HANLON:  -- there's just a lot of issues there.

14          THE COURT:  I recognize what you're saying, and I

09:38:24  15  understand that.  I'm just trying to see what we can do, given

16  the fact that we have a trial coming up in January.

17          Is that right?

18          MR. HANLON:  That is correct, Your Honor.

19          THE COURT:  Anything else on this point, Ms. Youngcourt?

09:38:41  20      (Counsel conferring.)

21          MR. LARRANAGA:  Your Honor, if I may be heard on this?

22          THE COURT:  I'm sorry.  Yes.

23          MR. LARRANAGA:  The difficulty besides the difficulties

24  of trying to do grand juries with COVID is, as the Court pointed

09:39:00  25  out, is knowing what exactly the charges are.  And what I've

1    heard today --

2            THE COURT:  Just give me one second.

3        (Video conference chime interruption.)

4            THE COURT:  Mr. Edris, can you hear us?

09:39:20    5            THE COURTROOM DEPUTY:  Mr. Edris, can you hear us?

6            THE DEFENDANT:  Yes, I can.

7            THE COURT:  Have him call back at, let's go with --

8            THE COURTROOM DEPUTY:  We're going to have you call back

9    at 10:15, if you could, please.  Yes.

09:39:46    10            THE COURT:  Apologies.  Go ahead, Counsel.

11            MR. LARRANAGA:  Thank you, Your Honor.

12            As the Court pointed out, one of the issues is what are

13    the charges.  And it's very difficult for Mr. Smith and myself,

14    on behalf of our client, because unlike the other two parties,

09:40:06    15    we actually have to make requests for certain budgeting,

16    funding.  And it's somewhat -- although we may have -- or some

17    of the discovery, discovery that far exceeds what the current

18    charges are for our client, we have to be responsible about what

19    we're requesting as far as time, experts, information that we're

09:40:28    20    presenting to -- and I understand this Court is not the Court

21    that does our -- is in charge of our budget, but we've been

22    asked, and reasonably so, to provide the support of why -- what

23    we're doing and why we're doing it.  And it's hard-pressed for

24    us to guess when right now the current charges are not homicide.

09:40:48    25    There are no homicide charges against our client.

1       And so although there's a handful of discovery that

2   suggests -- well, it doesn't suggest, it indicates that there

3   are homicides; by whom is another matter.  For us, to start

4   trying to sift through this, it's not fair for -- for Mr. Cloud;

09:41:10   5   it's not fair, really, for us to try to do that; and frankly,

6   it's not fair for the courts for us to start speculating.

7   That's a relatively minor -- I mean, it's not minor because it

8   is funding issues.  But the problem I'm seeing is that what I

9   hear is there's going to likely be a superseding indictment.

09:41:29  10   What charges we can all -- we can speculate.  Against whom we

11   can speculate.  But there's these other potential charges that

12   are dangling out here that we received some relatively new

13   discovery that could potentially be capital.  And we shouldn't

14   be trying these cases piecemeal for -- this Court doesn't want

09:41:51  15   to hear it, I'm assuming, two or three different times; the

16   parties don't want to do that.

17       It -- and I'm stating this with the understanding that

18   the Government is -- to some extent have their hands tied

19   because of the current situation.  But we -- these cases cannot

09:42:09  20   be tried in piecemeal.  And so we need some guidance that when a

21   superseding -- if these cases are not capital or -- or the death

22   penalty is not being sought, that -- that is a completely

23   different landscape, and if the Government can tell us that,

24   then we know how to proceed.

09:42:29  25       But right now, we are trying to -- to do the best we can

1        in the dark.

2               THE COURT:  Mr. Hanlon?

3               MR. HANLON:  Your Honor, counsel -- just for

4        clarification, what counsel is referring to is not the Medicine

09:42:44  5      Valley Road deaths.  These are a different murder case with

6        different people.  When defense counsel says recent discovery

7        has been provided, I don't want the Court to think we're hiding

8        discovery.  The bodies were just found.  So discovery is being

9        generated -- I just don't even have all of the discovery on that

09:42:58 10      case because the bodies were just found and things are at the

11       lab.  So that is a separate matter than the case at issue here,

12       Your Honor.

13              MR. LARRANAGA:  But --

14              THE COURT:  Related to -- I guess what I'm hearing, I

09:43:15 15      think -- I mean, they want to know whether this is a capital

16       case or is not a capital case.

17              When is the Government intending to make that

18       determination?

19              MR. HANLON:  Medicine Valley Road is not a capital case,

09:43:26 20      Your Honor.

21              THE COURT:  Okay.  Okay.  That -- does that answer your

22       question, Counsel?

23              MR. LARRANAGA:  Well, it answers to -- to that

24       situation, but -- and I want to step back.

09:43:38 25              I wasn't suggesting at all that the Government was

1    providing late discovery on these other.  I understand the

2    timeline.  But if those cases are capital, potentially capital,

3    and the Government is seeking the death penalty, presumably

4    whatever happens in the noncapital cases, they're going to try

5    and tie it to those.  So these -- and they need to be -- to some

6    extent they are -- they're inter -- they commingle with each

7    other.

8          We need to be able to prepare a potential capital case

9    that may come down in the future today, and that includes the

10    charges that are currently and may be in superseding with the

11    Medicine Valley situation.  We need to know whether the other

12    potential -- what I hear is Medicine Valley is not capital, but

13    the other two -- perhaps the other two victims perhaps could be.

14          That's -- that's not sufficient for us to be preparing

15    for a long-term situation and how to prepare for the noncapital

16    cases that -- that if it goes bad for -- for our clients will

17    inevitably be used against them in a capital case.  We need to

18    prepare for that now.

19          THE COURT:  Counsel, anything?

20          MR. HANLON:  Your Honor, I don't have a response, unless

21    the Court has a question of me.

22          THE COURT:  No, I don't, because I do see the Government

23    is in a difficult position.  I mean, first of all, there are no

24    other charges currently, aside from those involving the Medicine

25    Valley crimes, and the Government has indicated that there is

1    no -- that those are not going to be capital.  And I'm not going

2    to order the Government to -- to make a decision about whether

3    or not the uncharged crimes are going to be capital.  You know,

4    I don't know how they would know that at this point.  It's

09:45:37   5    certainly not fair to the Government to force them to do that.

6          So -- so, Counsel, I guess we have an answer as to

7    whether or not the Medicine Valley crimes are going to be

8    capital.  They've indicated that they are not.  There are

9    additional crimes that they may have.

09:45:57   10   But I think it's reasonable to put a deadline with

11   regards to those in terms of a new -- new charges, because we

12   have a trial in January, Counsel, and -- so you give me a date.

13         MR. HANLON:  A date for making a decision about an

14   unrelated murder that we --

09:46:18   15   THE COURT:  No, not that.  With regards to -- you

16   indicated that there's a superseding indictment as -- as it

17   relates to the Medicine Valley crimes.  So give me a date by

18   which you will have that so that we can prepare for trial on

19   that.

09:46:36   20   MR. HANLON:  And can my date be under the assumption

21   that the Court's going to hold a grand jury session in Spokane?

22         THE COURT:  Yes.

23         MR. HANLON:  The second grand jury session in Spokane in

24   November; I think it's the 16th or 17th?  I'm not certain, Your

09:46:50   25   Honor.

1          THE COURT:  Okay.  Okay.  So --

2          MR. HANLON:  And, Your Honor, the Court won't hold me to

3    that date if there's no grand jury session?

4          THE COURT:  Of course.  I don't think that's fair to the

09:47:08  5    Government.  But I think we need to prepare to go to trial, and

6    I don't see another way of doing this.  We've been -- this case

7    has been pending for quite some time, reasonably so, but it's

8    been pending for some time, so I think we need to move this

9    along.  So --

09:47:32  10         MR. LARRANAGA:  Your Honor?

11         THE COURT:  Just one second.

12         Let's see.  We're going to confirm what that date is

13   here in a second, for the grand jury.

14         Go ahead.  Who spoke?  Yes.

09:47:46  15         MR. LARRANAGA:  Thank you.

16         I understand that the Government can't inform us about

17   the -- these uncharged offenses, whether they're going to be

18   capital or not.  At a minimum, however, I think they could let

19   us know whether they're intending to seek indictments on those,

09:48:03  20   on the -- not the Medicine Valley, the other --

21         THE COURT:  They don't have to tell you that, Counsel.

22   Why?

23         MR. LARRANAGA:  That way we can at least prepare this

24   case.  It shouldn't be tried in piecemeal.  Whether they

09:48:19  25   indict on the -- if they're waiting for more information on the

1   other two, understandable.  But if they have it but just

2   withholding an indictment ...

3           THE COURT:  Counsel has indicated that there are reports

4   that are still at -- at the lab that they're trying to get at.

09:48:34   5           Do you have some other information that I don't know

6   about?

7           MR. LARRANAGA:  Perhaps I misunderstood what Government

8   counsel was referring to.  I thought he was referring to that

9   they were -- they were waiting for additional reports.  That's

09:48:46   10  why it was -- I -- I wrongfully classified it as de -- or late

11  disclosure when they were indicating they were waiting for

12  reports.  I misunderstood that they were currently waiting for

13  reports to determine whether they were going to seek an

14  indictment or not.

09:49:02   15          THE COURT:  Oh, I see.

16          Counsel, do you want to clarify that?

17          MR. HANLON:  There's two men's bodies that were just

18  found.  There are several items that are at the laboratory right

19  now in regards to that case that is separate from Medicine

09:49:13   20  Valley.  There's -- I cannot make a decision at this time, and

21  if it was a capital case, that's not even my decision to make.

22          THE COURT:  Right.

23          MR. HANLON:  So I am not even close to making a decision

24  on that, Your Honor.

09:49:22   25          THE COURT:  Okay.  And I think it would be unreasonable

1    for the Court to hold the Government to make a decision on,

2    again, uncharged crimes where they're still continuing to

3    investigate their case.  So that request is denied, by the

4    defense.

09:49:42    5          Let's see.  Just one second.

6          (Pause in proceedings.)

7          THE COURT:  So the Court, with regards to the Medicine

8    Valley crimes, will set the date by which the Government will

9    seek a superseding indictment on these defendants regarding that

09:50:22   10    incident, the Medicine Valley incident, that will be coinciding

11    with the grand jury, if we hold a grand jury.  And, again, given

12    the pandemic, I'm not sure if we're going to have a quorum, but

13    if we have a quorum, that will be November 17th.  And so that is

14    going to be the deadline.

09:50:48   15          Will that be sufficient, Counsel?

16          MR. HANLON:  I understand, Your Honor, yes.

17          THE COURT:  Okay.

18          Again, while the Court is denying the Government's

19    request to have -- or, excuse me, denying the defense request to

09:51:13   20    have the Government make a determination on the other potential

21    allegations involving two individuals that were found, when do

22    you anticipate making those decisions?

23          MR. HANLON:  Your Honor, I don't know.  The

24    investigation is still ongoing in regards to that matter.

09:51:37   25          THE COURT:  Okay.  Okay.  Those are all of the issues

1    that the Court had anticipated with regards to -- to the issues

2    raised by the defense.

3         Were there any other issues that were raised by the

4    defense that the Court has not addressed?  Because I have

09:52:20  5    another other list of matters.

6         MS. YOUNGCOURT:  There's nothing else in the status

7    conference.  I may have one other issue.  If I may have a moment

8    to confer with my client, Your Honor.

9         THE COURT:  Sure.

09:52:42  10        (Counsel and defendant conferring.)

11        MS. YOUNGCOURT:  No, Your Honor.  That's it.

12        THE COURT:  Well, that leads us to a number of issues

13   that we typically address at this time having to do with trial

14   preparation.

09:53:08  15        First, with regards to jurors in this case, what are the

16   parties thinking -- what is the parties' thinking on the number

17   of jurors to be summoned for this venire in January?  Start with

18   the Government.

19        MR. HANLON:  Your Honor, for a violent crime like this,

09:53:37  20   is it typical to bring in 60 to 70?

21        THE COURT:  For a typical case, there's 45 that we try

22   to bring in.  When it needs -- when there's more issues of

23   controversy, we go to 60.  But, Counsel, I've had -- in

24   *Henrikson*, I think we had about 100 and -- I'm going off memory

09:54:04  25   now, but it was somewhere upwards of 120 or so.  So -- so that's

1    what we've done in the past.  But I didn't know if you put any

2    thought into or have any recommendations as to how many jurors

3    you want, given the fact that we're in the pandemic.

4         MR. HANLON:  I certainly think the more, the better,

09:54:27  5    just because of the pandemic, Your Honor, but I don't have a

6    certain number to recommend to the Court.

7         THE COURT:  Okay.  The Government -- or, sorry, the

8    defense?

9         MS. YOUNGCOURT:  Your Honor, I would suggest a minimum

09:54:39  10   of 120.  I think that we might even want to summons more, in

11   light of the fact that we are likely to receive back a number of

12   requests for excusal because of the pandemic.

13        MR. LARRANAGA:  Your Honor, I don't really have a

14   comment on the number of jurors.  I'm a little baffled how we

09:55:07  15   can make this determination when we don't know what the charges

16   are.  Right now, as I indicated, our client is not charged with

17   homicide, and we may have completely different pretrial motions,

18   depending on what the charges are.  And so I'm not trying to be

19   flippant or --

09:55:25  20        THE COURT:  No, I don't think you are.

21        MR. LARRANAGA:  I just don't know how --

22        THE COURT:  That's a good point.

23        MR. LARRANAGA:  -- how we can frame what the trial looks

24   like at this stage when -- when we don't know if there's going

09:55:38  25   to be any changes come November 17th.

1    THE COURT:  Okay.  Let's see.  What is our next pretrial

2  in this?  Do we have one?

3    MR. HANLON:  December 15th, Your Honor.

4    THE COURT:  Okay.  Okay.  Why don't we do this:  Let's

09:56:07  5  hold off on making a determination on all of these points,

6  because I think we're going to know more after the 17th, it

7  sounds like, or if that date -- if we don't have a grand jury,

8  we might not know until the beginning of December.  So let's

9  push off addressing a lot of these issues with regards to the

09:56:31 10  trial itself, the running of it, et cetera, until December 15th

11  at the next pretrial.  I think that was a good point.

12    Anything else that we need to address today?

13    MS. YOUNGCOURT:  A question, Your Honor:  When would the

14  summonses need to go out?

09:56:47 15    THE COURT:  To the --

16    MS. YOUNGCOURT:  To the potential jurors.

17    THE COURT:  We typically do that, I want to say, almost

18  a month before.

19    MS. YOUNGCOURT:  So if we're talking December 15th,

09:57:00 20  we're talking within days of when the summonses would go out.

21    I'm wondering if the Court would entertain a motion to

22  move the pretrial conference to sometime between November 17th

23  and December 15th.

24    THE COURT:  Well, let's see what dates we have

09:57:21 25  available, go from there.

1    MS. YOUNGCOURT:  Yeah, Your Honor, I think what we would

2  like to do is keep the 15th for pretrial motions, but then have

3  maybe a status conference in -- shortly after, in the days

4  following November 17th.

09:57:49  5    THE COURT:  The deadline for pretrial motions is

6  November the 24th, after the 17th, so we'll know more certainly

7  by then.

8    Just one second.  Let me double-check.  I don't know if

9  we have a date in early December.

09:59:05  10   Hmm.  Let me see.

11   Counsel, we have November the 24th, which is a Tuesday.

12  Let me see.  We could do that, I'm thinking, in the afternoon.

13   1:30 on the 24th, does that work for your respective

14  schedules?

09:59:44  15   MS. YOUNGCOURT:  It does.

16   MR. HANLON:  Yes, Your Honor.

17   MS. YOUNGCOURT:  It does for James Cloud.

18   MR. LARRANAGA:  Yes, Your Honor.

19   THE COURT:  Okay.

09:59:51  20   MR. LARRANAGA:  I'm sorry, that was at 1:30?  Is that

21  what I heard?

22   THE COURT:  1:30.

23   (The Court and courtroom deputy conferring.)

24   THE COURT:  Why don't we do it -- again, we're setting a

10:00:07  25  pretrial hearing for November the 24th at 1:30.  Again, if I

1  remember, I think that was, in fact, the date for the pretrial

2  date -- excuse me, for pretrial motions.

3          Is that right?

4          Yep.  So why don't we set it for that date.  I think

10:00:28  5  that makes sense.

6          All right.  Anything else to address today?

7          MR. HANLON:  No, Your Honor.

8          MS. YOUNGCOURT:  Not from James Cloud, Your Honor.

9          THE COURT:  Mr. Smith?

10:00:47  10         MR. SMITH:  Well, Your Honor, the thing that -- and I'm

11  not even quite sure how to address it, but I'm going to at least

12  air it.

13         THE COURT:  Okay.

14         MR. SMITH:  We have -- right now our pretrial motion

10:01:00  15  deadline is the 24th.  We know that the Government intends to

16  bring a superseding indictment the 17th, and we'll be preparing

17  for whatever motions to file on the 24th, which may all change

18  on the 17th.

19         THE COURT:  Correct.

10:01:13  20         MR. SMITH:  I don't really know how to address that

21  other than to ask the Court to suspend that deadline for a

22  period of time until we know exactly what we're -- what we're up

23  against, what we're really fighting.

24          I -- my conversations with Mr. -- with Mr. Hanlon have

10:01:29  25  been pretty direct in that regard.  I mean, they're -- they're

1    bringing a superseding indictment, I think he's been pretty

2    clear about that, and -- just the difficulty in doing so, but

3    they're bringing it, so I expect that is going to happen.  And I

4    don't really have an answer to the difficulty, but I would ask

10:01:47   5    for the Court to suspend that date so we're not up against it

6    kind of in the dark, frankly.

7          THE COURT:  I can't make decisions about something we

8    don't know about yet, so I -- I don't think it's appropriate for

9    me to suspend deadlines.  The deadlines are set.  We're going to

10:02:09   10   keep those deadlines, and we'll see what happens on the 17th.

11   If we need to move those, then you can file an appropriate

12   motion at that point.

13         All right.  Anything else?

14         MR. SMITH:  No, Your Honor.

10:02:27   15   MR. HANLON:  No, Your Honor.

16         THE COURT:  Very well.  Thank you for your appearance.

17   That will conclude this matter.  Thank you.

18         THE COURTROOM DEPUTY:  All rise.

19         Court is now in recess.

10:02:47   20      (Hearing concluded at 10:02 a.m.)

21

22

23

24

25

42

C E R T I F I C A T E

     I, KIMBERLY J. ALLEN, do hereby certify:

          That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Richland, Washington;

          That the foregoing proceedings were taken on the date and at the time and place as shown on the first page hereto; and

          That the foregoing proceedings are a full, true and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

          I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings.

          DATED this 5th day of November, 2020.




_____
Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
Washington CCR No. 2758
Official Court Reporter
Richland, Washington